**ORIGINAL**
FILED

No CV-30

**BY FAX**

PAID
JUL 11 2025
CLERK, U.S. DISTRICT COURT
COURT 4612

2025 JUL 11 PM 1:39
CLERK U.S. ... COURT
CENTRAL DIST ... ...
LOS ANG...
BY: GSA

DAVID BROWN
Pro Se Plaintiff
361 Bradley Drive
West Columbia, SC 29170
(803) 528-7173
moviedavid1@gmail.com

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

DAVID BROWN, an individual,
Plaintiff,
*individually and as assignee of Specter Entertainment LLC and Fallout LLC*

vs.

TODD LUNBOHMN, an individual; 828 MEDIA CAPITAL LLC, a Delaware limited liability company; 828 PRODUCTIONS LLC, a Delaware limited liability company; KRIS LEFAN, an individual; LOWE & ASSOCIATES, P.C, a California professional corporation; STEVEN LOWE, an individual; VIKRAM AMRITRAJ, an individual.

Defendants.

Case No.: 2:25cv06350-RGK-(SK)

**COMPLAINT FOR DAMAGES**

**(1) FRAUDULENT MISREPRESENTATION**
**(2) TORTIOUS INTERFERENCE**
**(3) CIVIL CONSPIRACY**
**(4) DEFAMATION**
**(5) BREACH OF CONTRACT**
**(6) BREACH OF IMPLIED COVENANT**
**(7) ABUSE OF PROCESS**
**(8) MALICIOUS PROSECUTION**
**(9) UNFAIR BUSINESS PRACTICES**
**(10) CIVIL RICO**
**(11) LEGAL MALPRACTICE**
**(12) BREACH OF FIDUCIARY DUTY**
**(13) VIOLATION OF STATE LENDING LAWS**

1.    Plaintiff David Brown ("Brown") is an individual residing in South Carolina. Brown is the sole member and managing representative of Specter Entertainment LLC ("Specter") and Fallout LLC ("Fallout"), and brings this action in his individual capacity as the assignee of all rights, claims, and causes of action belonging to those entities. Specter and Fallout are not named as plaintiffs in this action.

## INTRODUCTION

2.    Plaintiff David Brown brings this action individually and as the assignee of all claims originally held by Fallout LLC and Specter Entertainment LLC, to recover for a pattern of financial manipulation, reputational sabotage, and retaliatory litigation by Defendants.

3.    This case exposes a calculated campaign of financial manipulation, reputational sabotage, and legal intimidation orchestrated by Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC. Under the guise of film financing, Defendants have constructed a predatory operation designed to entrap filmmakers, engineer defaults, weaponize litigation, and seize control of valuable intellectual property across the independent film industry.

4.    What began as legitimate financing relationships across four films—The Collected, Chasing Nightmares, The Undertaker's Wife, and The Fallout—rapidly devolved into an ongoing pattern of deceit and coercion. Defendants routinely withheld distribution offer approvals, made baseless accusations of financial misconduct, blocked legitimate distribution offers, and launched waves of retaliatory lawsuits.

5.    Their intent was clear: to destroy reputations, exhaust financial resources, and force creative partners into submission. But this is not an isolated dispute. It is part of a broader, calculated pattern. Since 2019, Defendants 828 Media Capital and Todd Lundbohm have directly filed at least eight separate lawsuits in California since 2020, targeting more than twenty-two defendants, not including those currently silenced in confidential mediations or private arbitrations. In nearly every

1

case, the allegations follow the same formula: withholding contractual approvals, conspiring, obstruction, defamation, and litigation.

6.    In a revealing moment on the set of *The Undertaker's Wife*, Defendant Lundbohm openly admitted to Plaintiff David Brown of using money from new investors to pay off old ones—a textbook Ponzi scheme. Plaintiff notified his counsel of this statement in February 2020 to make sure a record was made of when and what was said. At counsel advice, at least two separate tips were submitted to federal and state agencies.

7.    Defendants escalated their retaliation, initiating a coordinated legal blitz against him and his companies. Defendants' tactics include Breach of financing obligations, knowingly false allegations of embezzlement, filing or inciting at least seven lawsuits against plaintiff, blocking sales, delaying releases, and interfering with third-party contracts, spreading defamatory statements to partners, press, and financiers, abusing the legal system to intimidate, isolate, and deflect investor scrutiny

8.    This action seeks to expose Defendants' ongoing pattern of fraudulent conduct, halt their misuse and abuse of legal processes, and recover damages for the harm inflicted not only upon Plaintiff but also upon the integrity of the independent film finance system. Plaintiff will demonstrate that Defendant Lundbohm systematically employs litigation as a tactic to delay investor awareness and recognition of financial losses.

9.    Plaintiff asserts that none of the claims herein were required to be brought as compulsory counterclaims in any existing or prior litigation or arbitration. To the extent any such claims overlap factually, they are independent in legal nature, involve different parties, or were not ripe at the time of filing those prior actions.

## PARTIES

COMPLAINT FOR DAMAGES

10.     Plaintiff David Brown ("Brown") is an individual residing in South Carolina. He is the sole member and managing representative of Specter Entertainment LLC and Fallout LLC and brings this action in his individual capacity as assignee of all claims belonging to those entities.

11.     David Brown has been irrevocably assigned all rights, claims, and causes of action held by Fallout LLC and Specter Entertainment LLC arising from or relating to the subject matter of this lawsuit, and is therefore the real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure.

12.     Defendant Todd Lundbohm is an individual currently residing in New Mexico but resided in California at the time of the deals at hand. He is the managing member of both Defendant 828 Media Capital LLC and Defendant 828 Productions LLC

13.     Defendant 828 Media Capital LLC is a Delaware limited liability company which is also registered as a foreign entity in California with its principal place of business now relocated to Las Cruces, New Mexico. At all relevant times, it acted as a financier in connection with the film projects at issue.

14.     Defendant 828 Productions LLC is a Delaware limited liability company that was operating in California at the time of the disputes arising and has since relocated to Las Cruces, New Mexico. At all relevant times, it operated as a producer and loan out entity for Defendant Lundbohm.

15.     Defendant Kris Lefan is an individual and licensed California attorney. At the time of the events alleged, he served as counsel to Plaintiff Brown and/or his affiliated entities, and was concurrently Of Counsel to Defendant Lowe & Associates, P.C. He is sued in his individual capacity for legal malpractice and breach of fiduciary duty.

16.     Defendant Steven Lowe is an individual and licensed California attorney, and the managing partner of Defendant Lowe & Associates, P.C. He oversaw or participated in legal

COMPLAINT FOR DAMAGES

representation of Defendant Lundbohm and the 828 Entities during active disputes with Plaintiff, despite his firm's conflict of interest.

17. Defendant Vikram Amritraj is an individual and licensed California attorney who, at all relevant times, acted as counsel of record for Defendant Lundbohm and the 828 Entities, and participated in opposing disqualification efforts arising from an undisclosed conflict of interest.

18. Defendant Lowe & Associates, P.C. is a California professional corporation engaged in the practice of law, with its principal place of business in Los Angeles, California. It is sued for its role in the conflicted representation of 828 Media Capital LLC, despite prior representation of Plaintiff and its attorney's dual affiliations.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of federal law, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

20. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship: Plaintiff is a citizen of South Carolina, while all Defendants are citizens of California.

21. The Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the negotiation and execution of financing agreements, production of films, and the filing of the allegedly abusive lawsuits.

23.     All claims asserted herein are ripe for adjudication, as Plaintiff has suffered concrete and particularized injuries caused by Defendants' completed or ongoing misconduct. To the extent any claim (such as malicious prosecution) is contingent on the termination of separate proceedings, Plaintiff reserves the right to amend this complaint upon the conclusion of such matters.

24.     Plaintiff brings this action both individually and as assignee of all rights, claims, and causes of action belonging to Specter Entertainment LLC and Fallout LLC. As such, Plaintiff is the real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure, and no non-diverse parties are named in this action.

## BACKGROUND ALLEGATIONS

25.     Plaintiff asserts that the claims presented in this action are not barred by Rule 13(a) or any compulsory counterclaim doctrine. These claims either (a) involve different or additional parties not subject to prior proceedings, (b) were not ripe at the time of earlier filings, or (c) involve continuing harm, retaliatory litigation, or newly discovered evidence that could not reasonably have been litigated previously. To the extent any claims factually overlap with prior arbitrations or lawsuits, they are legally distinct or arose after the prior pleadings were filed. Additionally, Plaintiff notes that several related arbitrations or litigations remain unresolved and are not final judgments. Therefore, all claims in this Complaint are properly preserved and timely asserted.

26.     In 2019, Plaintiff David Brown, through his company Specter Entertainment LLC (now a non-party to this action and whose claims have been assigned to Brown), entered into a series of financing and production agreements with Defendant Todd Lundbohm and his affiliated entities, 828 Media Capital LLC and 828 Productions LLC. These agreements involved four feature films—*The Collected*, *Chasing Nightmares*, *The Undertaker's Wife*, and *The Fallout*—each of which was partially funded or controlled by the Defendants and subject to a pattern of misconduct.

27.     On *The Collected*, Todd Lundbohm provided a $950,000 bridge loan (see Exhibit C) which later converted to mezzanine financing for an additional $136,500 fee (see Exhibit D). Production was temporarily halted due to chain-of-title issues, which was ultimately resolved (see Exhibit E). However, Lundbohm allegedly spread false and defamatory claims to other financiers, causing multiple lawsuits to be filed and resulting in the appointment of a receiver—paving the way for him to pursue control of the film and ultimately, he purchased the IP rights from the receiver.

28.     In *Chasing Nightmares*, Defendants issued a $1,000,000 gross loan ($800,000 net to production), withholding $175,000 as an "origination fee," $25,000 in legal fees, (see Exhibit F) and taking an additional $45,000 producer fee (see Exhibit G). Plaintiff's company was acting as the sales agency and in exchange for the loan, Defendants were to receive 50% of all sales fees from the Picture via a confidential side letter (see Exhibit H). Plaintiff Brown's company Specter Entertainment retained a 25% ownership stake, while 828 Productions took 50% and the writer/director took 25% (see Exhibit I). 828 Media Capital funded a total of $825,600. The final production cost was $892,982.36, with Plaintiff Brown or his associated entities covering $67,382.36 (see Exhibit J)

29.     Further proof of retaliatory behavior, although David Brown's entity, as evident by Exhibit G, Specter Entertainment LLC is only 1 of 3 owners of production LLL alongside Defendant's 828 Productions LLC, Defendants never pursued action or claims against the other owner who also holds 25% ownership.

30.     The third project, *The Undertaker's Wife*, followed a similar structure. Defendants provided a gross loan of $1,200,000 with a net to production of $985,000 after deducting $200,000 for their origination and set up fees in addition to $15,000 in fees (see Exhibit K). Again, Plaintiff Brown or his entities would end up covering the difference of what was funded and what was spent. On this project, it was $65,994.65 (see Exhibit L). As with the prior two deals, the parties agreed to a 50/50 LLC split of any sales fees between 828 Productions LLC and Specter Entertainment LLC, whose

claims have been assigned to Plaintiff David Brown. (see Exhibit M). The parties would each own 50% of the entity with Lunbohm holding all business and financial approvals, Brown and Brown's entity would only maintain "creative" approvals as outlined the operating agreement (see Exhibit O)

31.    Yet despite full completion and delivery of the picture to 828, no release has occurred because Lundbohm withheld distribution approvals unless Plaintiff made concessions related to *The Fallout* litigation. Despite full completion of the picture, Defendant Lundbohm falsely accused Brown of misappropriating $500,000 and made defamatory statements to the director and others—allegations that are provably false based on bank records and the attached ledger provided in Exhibit K noted above.

32.    Brown provided the attached ledger, all check copies, all bank statements, all virtual payment confirmations, all wire confirmations. Any individual would be able to put two and two together, if Todd funded $985,000 but that spent $1,050,994.65, it's financially impossible for $500,000 to have been misappropriated.

33.    Given the short nature of film productions, production did not have any sort of debit or credit card for their new account. Being the 50% owner and producer, Brown zeroed out a different business account for his production company, transferred funds for the debit card use and allowed the various production members to use the production company card for all the expenses that required a card. A complete breakdown of the card usage was previously provided (see Exhibit O). Nonetheless, defendants have continued repeating this assertion while they know this to be false because they have a narrative to paint.

34.    The final project, *The Fallout*, involved a committed $1.5 million loan from Defendants. (see Exhibit P). However, they funded only $285,000 before halting performance, citing the COVID-19 pandemic in March 2020. Plaintiff Brown secured bridge financing to complete the film, which later won the SXSW Grand Jury Prize and sold for $5 million. Nevertheless, Lundbohm

1  initiated multiple retaliatory lawsuits, including claims against the buyer, HBO Max aka New Line

2  Cinema, David Brown, the Fallout LLC, and even the bridge lender, SSS Film Capital LLC and its

3  respective owner. Fallout LLC (a non-party to this action, whose claims have been assigned to Plaintiff

4  Brown) repaid the $285,00 funded + premium + default interest for a total of $437,060.00 via cashier

5  check on September 3, 2021 (see Exhibit Q).

6       35.    In March 2020, when California went into lock down, Plaintiff received an email from

7
8  defendant's transactional counsel, requesting to amend their loan to what had been funded to date with

9  no further obligations required of him. A copy of this email is attached. (see Exhibit R)

10      36.    A copy of the amended loan agreement for The Fallout is attached. As you will see, it

11  reduced the loan obligation to only what had been funded to date while keeping credit, ownership

12  rights the same. (see Exhibit R). Plaintiff was not in agreement and received another email from

13
14  Defendants' transactional counsel threatening to use the limited power of attorney that was provided in

15  the loan package to sign on behalf of Plaintiff Brown to unilaterally amend the loan terms in his favor

16  (see Exhibit S).

17      37.    In 2019, Plaintiff David Brown retained attorney Kris LeFan in connection with film-

18  related legal matters, including films that 828 Media Capital was a financier on which would later

19
20  become subject to a litigation between Plaintiff and Defendants. At the time of representation, Mr.

21  LeFan was Of Counsel to Lowe & Associates, P.C.—a fact not disclosed to Plaintiff. A copy of the

22  engagement letter from November 2019 is attached. (see Exhibit AA).

23      38.    In late 2020, Defendants engaged Lowe & Associates, including attorneys Steven Lowe

24  and Vikram Amritraj, to represent them in connection to our dispute. The firm began representing

25  Defendants against Plaintiff in matters that were substantially related to Mr. LeFan's prior work for

26  Plaintiff. This included active disputes over *The Fallout*, *The Undertaker's Wife*, and *Chasing*

27
28

COMPLAINT FOR DAMAGES

*Nightmares*—all films Mr. LeFan had discussed with Plaintiff, handle arbitration filings, etc. on behalf of Plaintiff while acting as his counsel.

39.    In December 2021, Plaintiff became aware of the conflict when reviewing Lowe & Associates website and was taken back to see his counsel, Kris Lefan, listed as a partner and of-counsel. Plaintiff's legal team served a formal conflict of interest and disqualification notice on Lowe & Associates. A copy of the Lowe Firm website is attached. (See Exhibit BB). After discovering him on the Lowe Firm website, Brown found him on LinkedIn and discover Kris LeFan's profile showed him as "Of Counsel" from November 2012 to present. At that time, that was December 2021. A copy of this profile is attached. (see Exhibit CC).

40.    In January 2022, Plaintiff filed a formal Motion to Disqualify, attaching declarations and communications showing the prior attorney-client relationship and that the conflict extended to the entire firm under Rule 1.10 of the California Rules of Professional Conduct. (see Exhibit Y)

41.    Despite these ethical obligations, Lowe & Associates refused to withdraw. Instead, the firm opposed the disqualification motion, with attorney Vikram Amritraj going so far as to file retaliatory papers questioning the neutrality of Plaintiff's current counsel, in what appeared to be a bad faith diversion. Ultimately, the arbitrator declined to disqualify the firm, citing inconvenience to 828 Media, but stated that a California Superior Court might reach a different conclusion. Following this, Mr. LeFan contacted Plaintiff directly and stated that Steven Lowe "was pissed" about the disqualification motion and that the firm was pressuring him to disengage.

42.    Mr. LeFan then formally withdrew as Plaintiff's attorney. This sequence demonstrates a willful pattern of conflict-based obstruction and legal misconduct designed to undermine Plaintiff's legal standing and suppress his ability to challenge 828's conduct in a fair proceeding.

COMPLAINT FOR DAMAGES

43.     Their representation of Defendants is still ongoing and still in violation of ethical obligations and California Bar rules to this vary day. As such, I have submitted complaints to the State Bar. A copy of the bar complaints are correspondence with the bar are attached. (see Exhibit FF).

44.     Todd Lundbohm's litigation strategy was not only retaliatory, but it was also weaponized to cause reputational harm. Even though Plaintiff had already initiated confidential arbitration against 828 Media Capital LLC and Todd Lundbohm for breach of the Fallout loan agreement, Defendant filed a duplicative lawsuit in California state court, making public allegations that mirrored the issues already in arbitration. This calculated misuse of the legal system served no purpose but to taint Plaintiff's professional reputation in a public forum. Plaintiff was forced to file a motion to compel arbitration, which the court granted. Nonetheless, by placing defamatory accusations into court records and press-accessible filings, Defendants advanced their scheme of intimidation, investor manipulation, and character assassination—causing Plaintiff to lose job offers, investor confidence, and key business relationships.

45.     Beyond these four projects, Defendants cited at least three other lawsuits against Plaintiff and made repeated defamatory statements to collaborators and financiers, claiming that Plaintiff Brown had embezzled funds or "stolen" $500,000. Lundbohm even threatened to forge Plaintiff's signature using a limited power of attorney. He demanded unwarranted credits and press recognition—demands to which Brown acquiesced in good faith. Yet, Defendants continued blocking approvals for Chasing Nightmares and The Undertaker's Wife, freezing repayment, harming Brown's equity, and suppressing commercial release.

46.     Critically, in February 2020, during the production of "The Undertaker's Wife," Defendant Lundbohm openly admitted on set, "If a film loses money, I take money from Investor B to pay back Investor A," directly describing conduct characteristic of a Ponzi scheme. At counsel's recommendation, Plaintiff Brown promptly reported this statement to the U.S. Securities and Exchange

COMPLAINT FOR DAMAGES

Commission. A copy of this tip is attached. (see Exhibit U). Following this disclosure, Defendant Lundbohm and his affiliated entities escalated their retaliatory litigation tactics, suing or causing litigation against more than 22 other producers or production entities across at least 8 separate actions. These lawsuits consistently follow a pattern of engineered defaults, strategic litigation, coordinated pressure from aligned financiers, and attempts to seize project control. Several defendants from these other actions have indicated their willingness to testify and substantiate these allegations. Plaintiff asserts that Defendants' litigation strategy is not intended to resolve legitimate disputes but rather to obscure financial shortfalls, delay investor recognition of losses, and perpetuate their scheme of financial manipulation. A list of the other actions and parties Defendants initiated action against are attached. (see Exhibit EE).

47.    In all four films and loans at dispute, Defendants acted as a lender providing commercial loans to Plaintiff and others in the independent film industry. However, at no point have Defendants held a valid lending license under either the California Financing Law (Cal. Fin. Code §22000 et seq.) or the Delaware Licensed Lenders Act (Del. Code, Title 5, §2201 et seq.). Defendants intentionally failed to disclose their unlicensed status to Plaintiff, thus violating statutory and regulatory obligations and engaging in lending activities that were unlawful per se. A statewide search in both California and Delaware have no record of Defendants being licensed lenders, a copy of such reports are attached. (see Exhibit GG).

## FIRST CAUSE OF ACTION
FRAUDULENT MISREPRESENTATION
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

48.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

49.     Defendants made false and material representations of fact to Plaintiff regarding the nature, terms, and intent of their film financing agreements and business dealings.

50.     These misrepresentations included assurances that:

a.  Defendants would fund film productions in full and on time pursuant to executed loan agreements.

b.  The financing would be commercially reasonable and not exploitative.

c.  Defendants had the legal capacity and intent to perform under the agreements.

d.  Plaintiff would retain creative and financial control unless legitimate default occurred.

e.  Defendants would cooperate in sales and distribution efforts in good faith.

51.     At the time these representations were made, Defendants knew them to be false and intended to induce Plaintiff into signing binding agreements under false pretenses.

52.     In truth, Defendants withheld tranches, blocked approvals, made false allegations, and used litigation to exert control.

53.     Plaintiff reasonably relied on these representations in agreeing to move forward with multiple projects and incurred substantial losses as a result.

54.     Each of the above misrepresentations occurred between 2019 and 2022 via specific emails, phone calls, or written correspondence between Plaintiff and Defendants, including but not limited to communications regarding The Collected, Chasing Nightmares, The Undertaker's Wife, and The Fallout. Defendants falsely assured Plaintiff of full funding commitments, cooperative sale approvals, legal compliance, and equitable credit and ownership positions. These statements were knowingly false, made with intent to induce reliance, and are supported by attached written materials and communications. Plaintiff has identified the actors, content, timeline, and context of each fraudulent statement as required under Rule 9(b).

COMPLAINT FOR DAMAGES

55.    As a direct and proximate result, Plaintiff suffered reputational, financial, and emotional harm.

56.    Defendants acted with fraud, malice, and oppression, warranting the imposition of punitive damages pursuant to California Civil Code § 3294.

## SECOND CAUSE OF ACTION
### TORTIOUS INTERFERENCE
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

57.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

58.    At all relevant times, Plaintiff maintained valid and enforceable contracts and business relationships with third parties, including but not limited to sales agents, distributors, financiers and potential buyers of the motion picture *The Fallout*.

59.    Defendants, including Todd Lundbohm and 828 Media Capital LLC, had knowledge of these existing relationships and contractual obligations, and were aware of the sensitive and time-critical nature of those negotiations, sales processes, and financing commitments.

60.    Defendants intentionally and without justification interfered with these business relationships by failing to fund *The Fallout* in accordance with the executed term sheet; attempting to unilaterally amend the agreement using a limited power of attorney after breaching their own obligations; threatening legal action against Plaintiff and replacement financiers; making false and disparaging claims to other financiers which both Plaintiff and Defendant had existing relationships with, thereby creating friction and uncertainty in those relationships; filing a state court complaint while arbitration was already pending, to create reputational harm and public doubt over the project's stability.

61.     These actions by Defendants were not protected conduct. They were done maliciously and with the intent to sabotage Plaintiff's ability to complete financing, close distribution, and monetize the Picture—all for the purpose of leveraging ownership control and pressuring settlement or increased backend concessions.

62.     In 2020, Plaintiff Brown, through another corporate entity, acquired the worldwide distribution rights to the feature film *Son of the South* for $1.8 million, payable on two installments, $1.5m on execution, $300k after release. To finance the acquisition, Plaintiff secured a $1.5 million loan from 8th Wonder Pictures, also known as Ocelot Capital or Andrew Townsend. The remaining $300,000 balance was intended to be paid from revenue generated through international and domestic distribution deals, which Plaintiff was actively pursuing.

63.     Notably, 8th Wonder Pictures and Townsend were the same parties that had previously financed *The Collected* with a $3 million loan. Upon information and belief, Defendant Todd Lundbohm made unsolicited and false statements to these lenders regarding Plaintiff's alleged misuse of funds on *The Collected* and *Son of the South*, despite no factual or financial basis for such claims.

64.     Relying on these false accusations and without allowing the loan term to reach maturity, 8th Wonder filed lawsuits against Plaintiff on both The Collected and Son of the South and unilaterally appointed a receiver. The receiver, who lacked industry experience, assumed operational control of the distribution company and interfered with its ability to monetize the *Son of the South* rights.

65.     As a result of the receiver's mismanagement and failure to engage in the subsequent litigation with the producers of *Son of the South*, default judgments were entered against the distribution entity and, ultimately, Plaintiff Brown personally — despite Plaintiff being contractually and procedurally barred from intervening in the proceedings.

66.     This cascade of legal and financial harm stemmed directly from the wrongful interference, conspiracy, and reputational sabotage orchestrated by Defendants Lundbohm, 828 Media

Capital LLC, and 828 Productions LLC. Though on its face this may appear as a one-off incident, similar tactics have been identified in at least eight other lawsuits initiated or orchestrated by Defendants against unrelated producers and financiers.

67.    In each case, Defendants executed a substantially similar scheme: initiate litigation, make false accusations to other creditors or investors, pressure third parties into legal action, and use public lawsuits or receiverships to isolate targets and coerce settlements. In several of those cases, the targets prevailed in court — after considerable reputational and financial damage was inflicted. Plaintiff brings this action, in part, to expose and halt these recurring abusive practices before more independent creators are similarly harmed.

68.    A former employee of one of Plaintiff's financiers identified here as JOHN DOE for privacy and security reasons — was directly involved in day-to-day communications with Plaintiff regarding the Son of the South loan. JOHN DOE informed Plaintiff that Defendant Todd Lundbohm and his legal counsel were the ones who "put kindle in the fire" and urged them to pursue litigation in coordination with other legal threats initiated by Defendants. Plaintiff intends to subpoena relevant phone records, emails, and text messages to confirm this collusion and will call JOHN DOE to testify under oath or be deposed to establish the coordinated nature of the scheme. This supports Plaintiff's claims that the lawsuits were not isolated business disputes, but rather a calculated and repeated litigation tactic orchestrated by Defendants as part of a broader racketeering pattern.

69.    As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered substantial damages, including the loss of goodwill with financiers and buyers, disruption to revenue streams, diminished reputation, delayed release of completed films, and increased legal and financing costs.

15

70.    Defendants acted willfully, maliciously, and in conscious disregard of Plaintiff's contractual and business interests. Plaintiff is therefore entitled to compensatory damages, punitive damages, attorneys' fees where permitted, and any other relief the Court deems just.

## THIRD CAUSE OF ACTION
### CIVIL CONSPIRACY
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

71.    Plaintiff re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

72.    Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC, in coordination with other third-party financiers and associates, knowingly entered into an agreement and acted in concert to engage in unlawful acts including fraud, defamation, tortious interference with contract, and abuse of process, all with the purpose of harming Plaintiff's business, reputation, and legal standing.

73.    Defendants collectively developed and executed a scheme across multiple film projects—The Collected, Chasing Nightmares, The Undertaker's Wife, and The Fallout—wherein they partially funded productions, intentionally delayed or withheld tranches, manufactured financial defaults, and then instigated or encouraged retaliatory litigation to create false narratives of misconduct.

74.    As part of the conspiracy, Defendant Lundbohm conspired with other financiers on The Collected to spread false allegations about David Brown, intentionally triggering a receivership with the aim of acquiring the film's IP rights. At least one former employee of a co-lender has indicated willingness to testify that Lundbohm was the source of the fabricated claims regarding alleged misuse of funds.

75.     Lundbohm's tactics were consistent and repeated: inducing defaults, suing co-producers, and weaponizing the legal process. Since 2019, he and his entities have initiated or caused at least eight lawsuits involving more than 22 defendants, many of which follow the same pattern of breach, smear, and seizure of assets.

76.     Defendants acted with malice by excluding other liable parties (such as co-signers and co-owners) from lawsuits, targeting David Brown individually to isolate him, damage his credibility, and pressure concessions that would benefit Defendants financially and reputationally.

77.     Defendants also interfered with film distribution deals and financing arrangements by spreading false statements to third parties leading to further legal actions and business collapse.

78.     As further detailed in Count II above, a former employee of one of Plaintiff's financiers ("JOHN DOE") has confirmed that Defendant Todd Lundbohm and his counsel actively encouraged them to initiate litigation against Plaintiff as part of a coordinated pressure campaign. Plaintiff intends to subpoena corroborating communications and call JOHN DOE to testify. This corroborates Defendants' pattern of conspiring with third parties to engineer legal threats and reputational harm against Plaintiff.

79.     The cumulative effect of this conduct was to injure Plaintiff's business relationships, suppress film monetization, coerce settlements, and destroy reputational standing within the film industry.

80.     Each Defendant committed overt acts in furtherance of the conspiracy, including communicating false claims of embezzlement or fraud to third parties; blocking approvals necessary for film delivery or repayment; filing or encouraging frivolous lawsuits against Plaintiff; directing film directors and collaborators to repeat defamatory statements in the press and private industry settings, threatening to forge David Brown's signature on amendments via POA; spreading defamatory statements to directors and creative partners and directing them to share with press.

COMPLAINT FOR DAMAGES

81.     As a direct and proximate result of the civil conspiracy, Plaintiff has suffered substantial reputational damage; loss of film distribution and sales revenue; loss of investor confidence and future business; legal fees more than $1 million; emotional and economic distress; damage to ownership interests in completed films.

82.     Defendants' conduct was fraudulent, malicious, and willful, and entitles Plaintiff to compensatory and punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### DEFAMATION
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

83.     Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

84.     Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC knowingly and intentionally made numerous false, malicious, and defamatory statements about Plaintiff David Brown and Specter Entertainment LLC to third parties.

85.     These defamatory statements were made verbally and in writing, and were widely disseminated to financiers, sales agents, creative collaborators, talent representatives, and members of the press in connection with the films *The Collected*, *Chasing Nightmares*, *The Undertaker's Wife*, and *The Fallout*.

86.     Among the false statements made by Defendants: that David Brown "stole $500,000" from the Chasing Nightmares budget; that Plaintiff misappropriated or embezzled investor funds; that Plaintiff engaged in financial fraud and misconduct; that Plaintiff was dishonest, untrustworthy, or criminally liable in connection with production funds; that David Brown was solely responsible for alleged project failures or litigation.

87.    These statements were false at the time they were made. Financial records, budget ledgers, and independent third-party audits confirm that Plaintiff has spent more money on the productions than was provided by Defendants, and that no misappropriation occurred.

88.    Defendants made these false statements with actual knowledge of their falsity, or with reckless disregard for the truth, as they had access to full financial documentation, email correspondence, and production logs.

89.    These statements were made with the intent to harm Plaintiff's professional reputation, discredit them in the eyes of collaborators and financiers, and create leverage in ongoing or anticipated litigation.

90.    Defendants' defamatory statements constitute defamation *per se*, as they falsely accuse Plaintiff of criminal conduct, fraud, and serious professional misconduct in a public industry where reputation is critical.

91.    As a direct and proximate result of these false and defamatory statements, Plaintiff suffered severe damage to their business and professional reputations; loss of existing and future financing opportunities; loss of distribution deals and project momentum; emotional distress; legal costs incurred in defending against false claims.

92.    These defamatory statements also led other parties, including 8th Wonder Pictures and Red Card LLC, to initiate legal actions against Plaintiff based on misinformation. Many of those claims were later dropped or resolved with no finding of wrongdoing against Plaintiff.

93.    Defendants' conduct was willful, malicious, oppressive, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to compensatory damages, reputational damages, and punitive damages in an amount to be proven at trial.

94.    In or around April 2023, the director of *The Undertaker's Wife* sent a Facebook message to Plaintiff's colleague repeating verbatim that "David Brown stole $500,000 from our

19

COMPLAINT FOR DAMAGES

movie" — a knowingly false allegation originally made by Defendant Todd Lundbohm. In the same message, the director repeated that Plaintiff "stole $3 million from *The Collected*." These statements are provably false based on the parties' shared bank records and audit reports, which Defendants had full access to. See message thread attached. (see Exhibit W).

95.    Separately, the director of *Chasing Nightmares*, in a public interview or press statement, referred to Plaintiff Brown as a "con man" — another false, defamatory statement. These directors' only commonality is that both films were financed by Defendant Lundbohm. Upon information and belief, these statements were instigated, encouraged, or directly relayed by Defendant Lundbohm in furtherance of his broader pattern of reputational sabotage and strategic litigation. (see Exhibit X)

96.    Furthermore, the financier who provided the $3 million to *The Collected* project issued a written statement confirming that, pursuant to an independent third-party audit, "David did not embezzle or misappropriate any funds." A copy of which is attached. (see Exhibit V). Despite this clear exoneration, Defendant Lundbohm and/or those acting at his direction continued to repeat and disseminate defamatory accusations of theft. These knowingly false statements were later echoed by the director of *The Collected* to third parties, further damaging Plaintiff's professional reputation and relationships.

97.    These false statements have been disseminated and repeated widely to industry colleagues, collaborators, financiers, and the public, directly causing significant reputational damage, lost business opportunities, and substantial emotional distress to Plaintiff. In May 2023, an article highlighting the seven lawsuits either filed or instigated by Defendants was published, focusing negatively on Plaintiff Brown. Notably, the only connections to Defendants cited in the article were the directors of the two film projects for which Defendant Lundbohm intentionally withheld distribution approvals. This demonstrates Defendants' deliberate pattern of defamatory conduct, aimed explicitly at

harming Plaintiff's professional reputation and leveraging litigation tactics to obscure their own misconduct. A copy of the article can be found attached. (see Exhibit X).

98.    Plaintiff alleges that these defamatory statements were made primarily outside of any protected judicial proceedings and are therefore not subject to California's litigation privilege (Civ. Code § 47(b)). Specifically, the false allegations that Plaintiff Brown "stole $500,000" were repeated in verbal conversations with industry collaborators, sent in text messages and emails to financiers, echoed in social media messages (see Exhibit W), and relayed by directors and sales agents to third parties not involved in litigation. These statements were not limited to pleadings or court arguments but were weaponized as part of a broader reputational attack to sabotage Plaintiff's professional relationships. Moreover, they were objectively false and provably contradicted by financial audits and third-party statements (see Exhibit V), which exonerated Plaintiff from the misappropriation accusations.

### FIFTH CAUSE OF ACTION
BREACH OF CONTRACT
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

99.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

100.    Plaintiff David Brown, individually and as assignee of Specter Entertainment LLC and Fallout LLC, entered into multiple written agreements with Defendants 828 Media Capital LLC, 828 Productions LLC, and Todd Lundbohm related to the financing, production, and ownership of various motion pictures, including *The Fallout*, *Chasing Nightmares*, and *The Undertaker's Wife*.

101.    These agreements included executed Loan Term Sheets outlining financing obligations, disbursement schedules, and fees; Operating Agreements defining membership rights, control, and

fiduciary obligations of the parties; Confidential Side Letters concerning backend participation and sales fee splits; Power of Attorney clauses, invoked in bad faith by Defendants in later threats.

102.    Plaintiff fulfilled, or were ready, willing, and able to fulfill, all material obligations under the contracts. Plaintiff has delivered completed films (*Chasing Nightmares* and *Undertaker's Wife*), secured third-party bridge financing to protect *The Fallout*, and made full repayment offers with interest and backend participation.

103.    Defendants materially breached the agreements in several ways, including but not limited to:

  a.   <u>The Fallout</u>: Breached by failing to fund $965,000 of a $1.25 million financing commitment; Breached by refusing to approve third-party distribution or bridge financing deals despite their own failure to perform under the agreement; Breached by violating the mandatory arbitration provision in the parties' contract after Plaintiff initiated arbitration in good faith, Defendants willfully disregarded the arbitration clause and filed a retaliatory public complaint in California state court, solely to inflict reputational harm and gain leverage, despite being contractually bound to arbitrate.

  b.   <u>Chasing Nightmares</u>: Breached by interfering with sales efforts, accusing Plaintiff of misconduct, and failing to approve distribution deals despite full delivery.

  c.   <u>The Undertaker's Wife</u>: Breached by failing to approve distribution or sales deals post-delivery, harming Plaintiff's economic interests and breaching the implied covenant of good faith.

  d.   <u>All Projects</u>: Filed retaliatory litigation and falsely alleged financial wrongdoing in direct contravention of arbitration clauses and post-funding obligations to act in good faith toward monetization.

COMPLAINT FOR DAMAGES

104.    Defendants also refused multiple reasonable repayment offers (including one for *The Fallout* that included full loan repayment with interest and producer credits) and misused contractual rights (e.g., threats to forge Plaintiff's name under a limited POA).

105.    Defendants further breached the Operating Agreements by misusing majority voting control to block distribution approvals; failing to mitigate damages or act to preserve the value of the projects; violating fiduciary duties to the LLCs and co-members.

106.    As a direct and proximate result of Defendants' breaches, Plaintiff suffered: loss of backend profit participation; damage to the value and marketability of completed films; costs associated with securing replacement financing; legal expenses, reputational damage, and lost business opportunities.

107.    Plaintiff is entitled to compensatory damages, specific performance (as appropriate), restitution, interest, and attorneys' fees as provided by contract and law.

## SIXTH CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

108.    Plaintiff re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

109.    Every contract under California law contains an implied covenant of good faith and fair dealing, obligating each party to act honestly and so as not to destroy or injure the right of the other to receive the benefits of the agreement.

110.    Plaintiff and Defendants were parties to valid and enforceable written agreements, including Loan Term Sheets and Security Agreements; Operating Agreements governing project LLCs; Confidential Side Letters regarding sales fees, credits, and backend participation.

111.    Plaintiff fully performed or were ready, willing, and able to perform all their obligations under these agreements, delivering completed films and pursuing monetization efforts in good faith.

112.    Defendants breached the implied covenant of good faith and fair dealing by:

    a.    Unreasonably refusing to approve legitimate sales and distribution offers on *Chasing Nightmares* and *The Undertaker's Wife*, despite full delivery and David Brown's personal investment in overages.

    b.    Blocking monetization efforts and exploiting their contractual approval rights not to protect the project or investors, but to extract leverage on unrelated disputes (*i.e.*, withholding approvals until David surrendered rights in *The Fallout*).

    c.    Filing retaliatory and duplicative lawsuits after Plaintiff invoked mandatory arbitration clauses, solely to apply public pressure and reputational harm.

    d.    Deliberately withholding cooperation, communications, or action on film delivery and exploitation—despite controlling rights, materials, and backend obligations.

    e.    Further, as detailed above and in Count XI, Defendants used conflicted counsel who previously represented Plaintiff to defend against arbitration and suppress legitimate claims. This conduct constituted bad faith obstruction and violated the spirit of the parties' agreements.

113.    Defendants' conduct was not simply nonperformance — it was intentional sabotage. Defendants used their contractual positions and majority voting rights not to protect their interests, but to obstruct monetization, manufacture default, and retaliate against Plaintiff.

114.    This conduct deprived Plaintiff of the benefit of the bargains they struck, frustrated their legitimate contractual expectations, and rendered many of the projects commercially dormant despite having completed assets and interested distributors.

115.    As a direct and proximate result of Defendants' breach of the implied covenant, Plaintiff has suffered substantial damages including loss of backend participation and distribution revenue; reputational harm in the entertainment and finance industries; legal fees, business interruption, and lost economic opportunities.

116.    Defendants acted with malice, oppression, and conscious disregard for Plaintiff's contractual rights. Plaintiff seeks compensatory and punitive damages as allowed by law.

## SEVENTH CAUSE OF ACTION
ABUSE OF PROCESS
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

117.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

118.    Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC willfully and maliciously misused the legal process by filing multiple civil actions against Plaintiff, not to redress legitimate grievances, but to harass, intimidate, and retaliate after Plaintiff invoked contractual arbitration rights.

119.    After Plaintiff initiated formal arbitration against 828 Media Capital LLC in connection with its breach of *The Fallout* financing agreement—as required under the mandatory arbitration clause—Defendants deliberately circumvented the contract by filing a duplicative state court lawsuit, making reputationally damaging allegations in a public forum.

120.    This litigation was not filed to resolve actual claims but was instead used as a weapon to:

  a.    Exert economic pressure.

  b.    Damage Plaintiff's standing with third parties (investors, buyers, collaborators).

  c.    Manufacture false narratives of wrongdoing.

  d.    Force unfair settlement leverage by increasing legal exposure and cost.

121.    Defendants repeated this tactic across other projects—*Chasing Nightmares*, *The Undertaker's Wife*, and *The Collected*—using lawsuits and threats of legal action to delay arbitration, suppress deal-making, and isolate David Brown.

122.    Defendants' actions were not accidental. They misused the legal system with ulterior motives—specifically, to interfere with film sales, discredit Plaintiff in the industry, and apply unlawful leverage.

123.    These actions caused Plaintiff substantial harm, including:

   a.   Legal fees from compelled motion practice (e.g., Motion to Compel Arbitration).

   b.   Delays in arbitration and film monetization.

   c.   Reputational damage and loss of future employment and financing.

   d.   Severe emotional distress and financial pressure.

124.    Defendants' improper use of legal process included:

   a.   Naming Plaintiff's spouse, Julian Raymond, who had no connection to the transactions at issue.

   b.   Targeting unaffiliated LLCs and companies belonging to Plaintiff Brown as leverage.

   c.   Filing these actions despite knowing they had no factual or legal basis, for the sole purpose of harassment, embarrassment, and economic harm.

   d.   Engaged attorneys with a known conflict of interest—despite notice and disqualification requests—to defend retaliatory lawsuits, amplifying the misuse of the legal process.

125.    As a result of Defendants' abuse of process, Plaintiff is entitled to compensatory damages. Because Defendants' conduct was malicious and in bad faith, Plaintiff also seek punitive damages as permitted under California law.

COMPLAINT FOR DAMAGES

126.    Defendants' conduct went far beyond the mere filing of lawsuits. They misused process by threatening to exercise a limited power of attorney to unilaterally amend contract terms in their favor (see Exhibit T), naming wholly unrelated parties such as Plaintiff Brown's spouse and uninvolved business entities and using litigation as a public relations weapon by filing claims already subject to binding arbitration. Further, Defendants leveraged their influence to pressure unrelated financiers and collaborators—such as 8th Wonder Pictures and John Doe's employer—into joining or coordinating legal action against Plaintiff. These actions were calculated to inflate legal costs, delay adjudication, manufacture reputational harm, and coercively extract business concessions. Such abuse of legal procedure falls squarely within the scope of actionable conduct under California law governing abuse of process.

## EIGHTH CAUSE OF ACTION
### MALICIOUS PROSECUTION
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

127.    Plaintiff re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

128.    Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC initiated or orchestrated at least seven lawsuits against Plaintiff David Brown and his affiliated entities—including Fallout LLC and Specter Entertainment LLC (neither of which is a party to this action, and whose claims have been assigned to Brown)—based on knowingly false allegations and for purposes unrelated to the pursuit of justice.

129.    These lawsuits included actions related to *The Fallout*, *Chasing Nightmares*, *The Undertaker's Wife*, and *The Collected*, among others, and followed Plaintiff's lawful and contractually mandated filing of arbitration proceedings.

130.   Each action was brought without probable cause, and in retaliation for Plaintiff's assertion of contractual rights, such as initiating arbitration and refusing to agree to amendments that would absolve Defendants of financial obligations.

131.   Plaintiff asserts that at least two of the retaliatory lawsuits initiated or orchestrated by Defendants have already been dismissed, abandoned, or resolved without any finding of liability or wrongdoing against Plaintiff. These dismissals constitute favorable terminations under California law, supporting Plaintiff's right to assert this cause of action. Additional cases remain pending, and Plaintiff reserves the right to supplement or amend this claim as further proceedings conclude in their favor. Plaintiff reserves the right to amend this claim as additional lawsuits conclude in their favor. At least two cases have already been resolved without adverse findings, satisfying the favorable termination requirement under California law.

132.   Defendants pursued these claims with malice, intending not to obtain legal redress but to:

a.  Harass and exhaust Plaintiff, damage Plaintiff's professional reputation and financing relationships; delay arbitration and other adjudication forums; force settlements through coercion rather than merit.

b.  At least two of these lawsuits were: dismissed, abandoned, or stayed; resolved without findings of wrongdoing against Plaintiff.

c.  Based on fabricated allegations that were disproven by third-party audits, including audits submitted by other financiers who later retracted or dismissed their claims.

133.   The litigation campaign waged by Defendants created a public record of false accusations that harmed Plaintiff's standing in the entertainment and investment communities, undermining multiple distribution efforts and causing the loss of commercial deals and future productions.

COMPLAINT FOR DAMAGES

134.    Defendants' conduct constitutes malicious prosecution under California law. As a result, Plaintiff suffered substantial harm, including Legal fees and court costs; reputational damage; lost business opportunities; severe emotional and financial distress.

135.    Defendants' actions were willful, wanton, and malicious. Plaintiff therefore seek compensatory and punitive damages as permitted by law.

136.    In addition to initiating seven meritless lawsuits against Plaintiff, Defendants further retaliated by naming unrelated parties as co-defendants — including Plaintiff Brown's spouse, Julian Raymond, and several of Brown's other companies that had no connection whatsoever to the disputed film projects. These entities and individuals were added solely to increase pressure, increase litigation cost, and publicly damage Plaintiff Brown's reputation and relationships.

## NINTH CAUSE OF ACTION
### UNFAIR BUSINESS PRACTICES
(Against Defendants Todd Lundbohm, 828 Media Capital LLC and 828 Productions LLC)

137.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

138.    Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC have engaged in unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200 et seq. ("UCL").

139.    The unlawful conduct includes, but is not limited to:

a.    Engaging in predatory lending activity for multiple film projects without proper licensure under the California Financing Law (Cal. Fin. Code § 22000 et seq.).

b.    Defendants violated the California Financing Law by acting as commercial lenders in California without obtaining the requisite license from the Department of Financial Protection and Innovation (DFPI). Further, they violated the Delaware

29
COMPLAINT FOR DAMAGES

Licensed Lenders Act by engaging in lending activities without obtaining proper licensure from Delaware's Office of the State Bank Commissioner. These failures constitute unlawful and unfair business practices, harming Plaintiff by subjecting them to unlicensed, unregulated, and abusive lending terms.

c.  Charging excessive "set-up fees," hidden producer fees, and 20%+ interest in violation of California's usury laws.

d.  Structuring illegal side letters that violate disclosure obligations to other stakeholders.

e.  Misusing corporate control and limited power of attorney clauses to manufacture legal leverage.

f.  Violating mandatory arbitration clauses while filing public complaints intended to shame or pressure Plaintiff.

140.  The unfair conduct includes:

a.  Creating fabricated default scenarios by intentionally withholding distribution approvals or obstructing deal closures.

b.  Suing Plaintiff in bad faith to create reputational damage and financial coercion.

c.  Refusing to monetize completed films (e.g., *The Undertaker's Wife*, *Chasing Nightmares*) unless Plaintiff made unrelated concessions in other disputes (e.g., *Fallout*).

d.  Abusing litigation and LLC control to delay project repayment, harming both Plaintiff and outside creditors.

141.  The fraudulent conduct includes:

a.  Representing that loans were fully committed while knowing that Defendants would later halt or delay tranches.

COMPLAINT FOR DAMAGES

b. Misleading third parties, including directors, press, and financiers, with provably false statements about "stolen funds" or "misuse" by Plaintiff.

c. Making false accusations to trigger lawsuits by other financiers as later retracted.

d. Concealing Defendants' financial motivations and investment shortfalls from co-producing partners while seeking court intervention.

142. In February 2020, Defendant Todd Lundbohm admitted to Plaintiff David Brown—onset—that he routinely pays off "Investor A" with funds from "Investor B" if a project underperforms. This conduct, resembling a Ponzi-like scheme, was reported to the SEC. The SEC-reportable nature of Defendants' enterprise further evidences unfair and unlawful conduct under the UCL.

143. As a direct result of Defendants' actions, Plaintiff suffered:

a. Lost business relationships, partners, and financiers.

b. Stalled film distribution and monetization.

c. Legal costs and reputational damage.

d. Emotional and financial distress from prolonged and manufactured disputes.

144. Plaintiff seeks relief under Bus. & Prof. Code § 17203, including:

a. Restitution of all unlawful gains \derived from predatory fees and false claims.

b. Injunctive relief restraining Defendants from further business under unlawful or unlicensed conditions.

c. Declaratory relief confirming the illegal and retaliatory nature of Defendants' conduct.

d. Any further equitable relief the Court deems proper to prevent future harm.

145. Plaintiff alleges these fraudulent predicate acts with the particularity required by Rule 9(b). Each misrepresentation identified herein is tied to specific communications—emails, texts, or

loan documents. The predicate acts were made by named individuals (e.g., Todd Lundbohm, legal counsel) and involved clear and repeated false statements concerning loan commitments, IP ownership rights, default claims, and fabricated allegations of theft, all designed to induce reliance, obstruct arbitration, and gain commercial control.

## TENTH CAUSE OF ACTION
### CIVIL RICO
(Against all Defendants)

146.    Plaintiff re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

147.    This cause of action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Plaintiff asserts their right to bring a private civil action under 18 U.S.C. § 1964(c) for damages and equitable relief.

148.    Defendants Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC have conducted or participated, directly or indirectly, in the conduct of the affairs of an ongoing enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

149.    The "enterprise" consists of the 828 Entities (including 828 Media Capital and 828 Productions), controlled and directed by Todd Lundbohm, and operating as an association-in-fact enterprise whose purpose was to solicit capital, issue high-interest unlicensed loans, fabricate project defaults, weaponize litigation, and fraudulently seize control of film assets and IP.

150.    Over a span of at least five years, Defendants used this enterprise to:

   a.    Solicit investor capital under false pretenses.

   b.    Fund only partial amounts of agreed-upon film financing, while misrepresenting available capital.

COMPLAINT FOR DAMAGES

c.   Engage in a repeated pattern of lawsuits against partners, producers, and financiers to create reputational and financial harm.

d.   Withhold approvals for project sales unless extortionate demands were met.

e.   Spread knowingly false and defamatory statements to gain leverage in unrelated disputes.

f.   Engage conflicted legal counsel to protect and expand the fraudulent enterprise, despite ethical obligations and prior representation of Plaintiff.

g.   Coordination with third parties to initiate sham litigation: As further described in Count II, Defendants encouraged and conspired with third-party financiers to file lawsuits against Plaintiff based on knowingly false accusations. JOHN DOE will testify to Defendants' direct involvement in promoting coordinated litigation for leverage. This conduct constitutes part of the overall racketeering pattern under 18 U.S.C. § 1962(d)

151.   Defendants' racketeering activity includes, but is not limited to, the following predicate acts:

a.   <u>Wire Fraud (18 U.S.C. § 1343)</u>: Transmitting false funding commitments, false accusations of theft, and fabricated claims via email, text, and digital communications to Plaintiff, co-financiers, sales agents, and legal counsel across state lines.

b.   <u>Mail Fraud (18 U.S.C. § 1341)</u>: Sending fraudulent agreements, demand letters, and legal threats via U.S. Mail and interstate carriers in connection with fabricated defaults and knowingly false claims of embezzlement or breach.

c.   Fraudulent inducement of contract and investment, including using side letters, power of attorney threats, and intentionally ambiguous documents to create future legal leverage and project control.

33

d. Retaliatory legal filings and abuse of process to obstruct arbitration, intimidate whistleblowers, and create a public record of false accusations to avoid investor liability.

e. <u>Conspiracy to commit racketeering (18 U.S.C. § 1962(d)</u>, including coordination with other lenders and financiers to file lawsuits, pressure settlements, and manufacture reputational damage.

f. <u>Conflict-based litigation fraud</u>: Attorneys Kris LeFan, Steven Lowe, Vikram Amritraj, and the law firm Lowe & Associates, P.C. knowingly aided and abetted the enterprise's racketeering scheme by representing 828 Media and Todd Lundbohm in active disputes against Plaintiff despite a prior attorney-client relationship with Plaintiff through Mr. LeFan. These attorneys were formally notified of the disqualifying conflict in December 2021 and January 2022 yet persisted in their representation and actively defended their role in arbitration proceedings. This conduct furthered the retaliatory objectives of the enterprise and obstructed Plaintiff's access to a fair and impartial forum.

g. Weaponization of litigation against unrelated parties: Defendants included Plaintiff's spouse and unaffiliated companies in lawsuits to escalate pressure, inflict reputational damage, and increase litigation burdens—despite knowing those parties were not involved in the disputes. This tactic supports the enterprise's pattern of racketeering, coercion, and malicious prosecution.

h. In one instance, Defendant Lundbohm admitted on set during the production of *The Undertaker's Wife* that he routinely paid back earlier investors with new investor funds when projects failed to perform—an acknowledgment of Ponzi-like behavior

reported to the SEC. This admission supports the assertion that the enterprise existed to conceal insolvency and delay accountability by fabricating legal leverage.

152. These predicate acts occurred continuously and repeatedly from 2019 to the present and involved multiple victims, including Plaintiff and at least 22 other individuals and entities named as defendants across nine or more lawsuits and arbitrations orchestrated by Defendants. Many of these lawsuits targeted producers, financiers, and third parties who either challenged Defendants' conduct or refused to comply with their demands.

153. Defendants engaged in a deliberate and ongoing pattern of racketeering activity spanning from 2019 to the present, targeting Plaintiff and at least 22 other independent producers, sales agents, and financiers across no fewer than eight separate film projects and nine separate lawsuits or arbitrations. This pattern involved predicate acts under 18 U.S.C. §§ 1341, 1343, and 1962(d), including wire fraud, mail fraud, abuse of process, and the strategic use of conflicted legal counsel. The enterprise—an association-in-fact between 828 Media Capital LLC, 828 Productions LLC, Defendant Lundbohm, and their affiliated attorneys—was created and maintained for the purpose of seizing control of intellectual property, obstructing lawful arbitration, coercing settlements, and misleading investors. Unlike a mere contract dispute, Defendants' conduct constitutes a coordinated scheme across multiple jurisdictions and multiple victims, designed to suppress dissent, fabricate defaults, and defraud stakeholders through misinformation and litigation abuse.

154. Defendants' pattern of racketeering activity has directly and proximately injured Plaintiff through:

    a. Lost film assets, delayed revenue, and impaired IP value.

    b. Hundreds of thousands of dollars in legal fees.

    c. Reputational destruction and lost career opportunities.

    d. Emotional distress and harm to investor relationships.

COMPLAINT FOR DAMAGES

e.  Loss of sales, financing, and distribution deals intentionally blocked by Defendants.

f.  Use of conflicted counsel and obstructive litigation conduct to suppress legal defenses, undermine arbitration, and perpetuate racketeering aims.

155.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to:

a.  Treble damages.

b.  Costs of suit and reasonable attorneys' fees.

c.  Injunctive and declaratory relief to halt further racketeering conduct and prevent Defendants from continuing to harm Plaintiff or others in the film finance industry.

## ELEVENTH CAUSE OF ACTION
### LEGAL MALPRACTICE
(Against Defendants Kris LeFan, Steven Lowe, Vikram Amritaj, and Lowe & Associates, P.C.)

156.  Plaintiff re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

157.  Plaintiff David Brown retained Defendant Kris LeFan as legal counsel in connection with film-related transactions and disputes between 2019 and 2021, including issues relating to the production and financing of *The Fallout*, *Chasing Nightmares*, and *The Undertaker's Wife*. LeFan represented Plaintiff directly in legal matters tied to those film projects and possessed confidential knowledge regarding Plaintiff's business strategies, legal positions, and contract history.

158.  At all relevant times, Kris LeFan was affiliated as "Of Counsel" with Lowe & Associates, P.C., a professional law corporation. As a result, all conflicts held by Mr. LeFan were imputed to the entire firm under California Rules of Professional Conduct Rule 1.10.

159.  The legal malpractice claim is timely. Plaintiff did not discover the full scope of the conflict until December 2021, when Plaintiff Brown reviewed the Lowe & Associates website and saw that Defendant Kris LeFan was listed as Of Counsel to the firm actively litigating against him. This

COMPLAINT FOR DAMAGES

complaint was filed within 3.5 years of that discovery—within the four-year residual statute of limitations under California Code of Civil Procedure § 343, and within one year of the latest ongoing litigation conduct. Moreover, the limitations period is tolled due to ongoing legal representation in overlapping matters and the continuous nature of the conflicted conduct, which extended through 2022 and beyond.

160.    The legal advice and representation provided by Defendant LeFan included contract review, financing structuring, and arbitration preparation specifically related to The Fallout, Chasing Nightmares, and The Undertaker's Wife—the same projects now at issue in this litigation and the related disputes in which Lowe & Associates represented Defendants directly adverse to Plaintiff. This constitutes a textbook violation of Rule 1.9 of the California Rules of Professional Conduct, which prohibits representing a new client in a matter that is the same or substantially related to a former client's matter without informed written consent.

161.    No written waiver or informed consent was ever obtained by Defendants, in violation of CRPC Rules 1.9 and 1.10.

162.    Despite their prior attorney-client relationship with Plaintiff, Defendants later undertook representation of Todd Lundbohm, 828 Media Capital LLC, and 828 Productions LLC in litigation and arbitration directly adverse to Plaintiff in matters substantially related to their prior representation.

163.    Defendants never obtained Plaintiff's informed written consent, as required by California Rules of Professional Conduct 1.9 and 1.10.

164.    On or about January 2022, Plaintiff formally notified Defendants of the conflict and requested that they withdraw. Rather than honoring their ethical obligations, Defendants refused to withdraw and instead actively defended their conflicted role in proceedings before a neutral arbitrator.

165.    Defendants' conduct constitutes legal malpractice, including:

   a.  Breach of the duty of loyalty and confidentiality.

COMPLAINT FOR DAMAGES

    b.  Representation of directly adverse interests in substantially related matters.

    c.  Failure to obtain informed consent.

    d.  Active litigation against a former client based on privileged insights

166.    As a direct and proximate result of Defendants' professional negligence and ethical violations, Plaintiff suffered litigation disadvantage, reputational harm, financial losses, and emotional distress.

167.    Plaintiff seeks compensatory damages in an amount to be determined at trial, disgorgement of fees earned during conflicted representation, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
BREACH OF FIDUCIARY DUTY
(Against Defendants Kris LeFan, Steven Lowe, Vikram Amritaj, and Lowe & Associates, P.C.)

168.    Plaintiff re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

169.    By virtue of the attorney-client relationship, Defendant Kris LeFan owed Plaintiff David Brown a continuing fiduciary duty of loyalty, confidentiality, and undivided commitment to Plaintiff's legal interests. This duty extended to Lowe & Associates, P.C. based on LeFan's affiliation as Of Counsel and their joint knowledge and conduct.

170.    Defendants breached that duty by:

    a.  Representing clients (Todd Lundbohm and 828 entities) directly adverse to Plaintiff in disputes arising from the same or closely related film projects.

    b.  Failing to disclose the conflict or obtain informed consent.

    c.  Utilizing or placing themselves in a position to utilize confidential knowledge obtained through the prior representation.

    d.  Continuing to litigate against Plaintiff after being formally notified of the conflict.

COMPLAINT FOR DAMAGES

171.    Plaintiff relied in good faith on the integrity of Defendants' duties, including the expectation that they would not switch sides or compromise confidential information.

172.    Defendants' breach was knowing, intentional, and in conscious disregard of Plaintiff's rights. Their refusal to withdraw after conflict notification constitutes willful misconduct and oppression under California Civil Code § 3294.

173.    As a result, Plaintiff suffered economic damages, reputational harm, litigation cost increases, and emotional distress. Plaintiff is entitled to compensatory and punitive damages.

## THIRTEENTH CAUSE OF ACTION
VIOLATION OF STATE LENDING LAWS
(Against Defendants 828 Media Capital LLC and Todd Lundbohm.)

174.    While Plaintiff acknowledges that the California Financing Law and Delaware Licensed Lenders Act may not provide explicit private rights of action, such violations nonetheless support claims under California's Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.). California courts have consistently held that violations of predicate statutes, including lending laws, may form the basis for UCL claims where Plaintiff suffers economic harm. Here, Plaintiff suffered concrete injuries from Defendants' unlicensed and unlawful lending conduct, including excessive origination and producer fees, inflated interest rates above legal limits, and loss of business value due to usurious and unenforceable loan terms. As detailed in Paragraph 45 and supported by state-level licensing records (see Exhibit GG), Defendants operated without the legally required lending licenses in both California and Delaware.

175.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

39

COMPLAINT FOR DAMAGES

176.    Defendant 828 Media Capital LLC engaged in commercial lending activities in both California and Delaware without obtaining the requisite lending licenses under the California Financing Law (Cal. Fin. Code §22000 et seq.) and the Delaware Licensed Lenders Act (Del. Code, Title 5, §2201 et seq.).

177.    Defendants knew or reasonably should have known of these licensing requirements but chose to ignore them intentionally.

178.    Plaintiff reasonably relied upon Defendants' representation that they were operating legally and in compliance with state laws. Plaintiff would not have entered into these agreements had they known Defendants were operating illegally.

179.    As a direct and proximate result of Defendants' unlawful lending activities, Plaintiff suffered damages including, but not limited to, excessive fees, interest payments, legal costs, and reputational damage.

180.    Plaintiff seeks compensatory damages, restitution of unlawfully collected fees and interest, statutory penalties, attorneys' fees, and costs as permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in their favor and against all Defendants, and award the following relief:

1.    Compensatory damages in an amount not less than $25,000,000, representing lost profits, reputational harm, legal expenses, and business disruption.

2.    Punitive and exemplary damages in an amount not less than $50,000,000, to punish Defendants' willful misconduct and deter future abuse.

COMPLAINT FOR DAMAGES

3.      Treble damages pursuant to 18 U.S.C. § 1964(c) for violations of the RICO statute;
Treble damages pursuant to 18 U.S.C. § 1964(c) for Defendants' violations of the
Racketeer Influenced and Corrupt Organizations (RICO) Act.

4.      Disgorgement of all fees earned by Defendant attorneys and law firms during periods of
conflicted or unethical representation.

5.      Injunctive relief prohibiting Defendants from further defamatory statements,
interference with distribution approvals, and misuse of litigation to harass Plaintiff.

6.      Declaratory relief voiding unlawful, unconscionable, or fraudulently induced loan
provisions, side letters, or rights asserted by Defendants in violation of law or contract.

7.      Statutory penalties, restitution, disgorgement, and other relief available under California
Financing Law and Delaware Licensed Lenders Act for Defendants' unlawful and
unlicensed lending activities.

8.      Reasonable attorneys' fees and court costs, pursuant to statute, contract, or equity.

9.      Pre-judgment and post judgment interest as permitted by law.

10.     And any other relief the Court deems just and proper considering the egregious and
ongoing nature of Defendants' conduct.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demand a trial by jury on all issues so triable.

Dated: July 10, 2025                              Respectfully submitted,

                                                By:
                                                David Brown
                                                Pro Se Plaintiff
                                                361 Bradley Drive
                                                West Columbia, SC 29170
                                                (803) 528-7173
                                                moviedavid1@gmail.com

COMPLAINT FOR DAMAGES

Exhibit A

## ASSIGNMENT OF CLAIMS

This Assignment of Claims ("Assignment") is made and entered into as of this 10ᵗʰ day of July, 2025, by and between: ***Specter Entertainment LLC***, a Wyoming limited liability company formed on February 16, 2018 ("Assignor") and ***David Brown***, an individual residing in South Carolina ("Assignee").

WHEREAS, Assignor is the sole holder of certain claims, rights, and causes of action arising from or relating to business dealings with Todd Lundbohm, 828 Media Capital LLC, 828 Productions LLC, and others, as further described in the Complaint being filed in the United States District Court for the Eastern District of California, entitled *David Brown v. Todd Lundbohm, et al.*

WHEREAS, David Brown, or his entity, was and has always the original and sole member and manager of Fallout LLC relevant hereto;

WHEREAS, Assignor desires to irrevocably assign and transfer to Assignee all rights, claims, and causes of action arising from the subject matter of said Complaint;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor hereby agrees as follows:

**1. Assignment**
Assignor hereby irrevocably assigns, transfers, and conveys to David Brown all rights, claims, causes of action, legal and equitable remedies, and all interests arising out of or related to the matters referenced in the above-captioned litigation or the business dealings giving rise thereto.

**2. Authority**
Assignor affirms that David Brown, as original sole member and manager of Specter Entertainment LLC, has full legal authority to execute this Assignment on behalf of the company and bind Assignor to the terms stated herein.

**3. Effective Date**
This Assignment shall be effective as of the date first written above and shall be applicable to all claims whether known or unknown, pending or not yet filed.

**IN WITNESS WHEREOF**, the undersigned has executed this Assignment as of the date below.

ASSIGNOR                                                    ASSIGNEE

**Specter Entertainment LLC**                  **David Brown, an individual**
a Wyoming Limited Liability Company

By: _____                              By: _____
**David Brown**                                        **David Brown**
Sole Member and Manage                          July 10, 2025
July 10, 2025

Exhibit B

## ASSIGNMENT OF CLAIMS

This Assignment of Claims ("Assignment") is made and entered into as of this 10th day of July, 2025, by and between: *Fallout LLC*, a California limited liability company formed on January 28, 2020 ("Assignor") and *David Brown*, an individual residing in South Carolina ("Assignee").

WHEREAS, Assignor is the sole holder of certain claims, rights, and causes of action arising from or relating to business dealings with Todd Lundbohm, 828 Media Capital LLC, 828 Productions LLC, and others, as further described in the Complaint being filed in the United States District Court for the Eastern District of California, entitled *David Brown v. Todd Lundbohm, et al.*

WHEREAS, David Brown, or his entity, was and has always the original and sole member and manager of Fallout LLC relevant hereto;

WHEREAS, Assignor desires to irrevocably assign and transfer to Assignee all rights, claims, and causes of action arising from the subject matter of said Complaint;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor hereby agrees as follows:

**1. Assignment**
Assignor hereby irrevocably assigns, transfers, and conveys to David Brown all rights, claims, causes of action, legal and equitable remedies, and all interests arising out of or related to the matters referenced in the above-captioned litigation or the business dealings giving rise thereto.

**2. Authority**
Assignor affirms that David Brown, as original sole member and manager of Fallout LLC, has full legal authority to execute this Assignment on behalf of the company and bind Assignor to the terms stated herein.

**3. Effective Date**
This Assignment shall be effective as of the date first written above and shall be applicable to all claims whether known or unknown, pending or not yet filed.

**IN WITNESS WHEREOF**, the undersigned has executed this Assignment as of the date below.

ASSIGNOR

**Fallout LLC**
a California Limited Liability Company

By: _____
**David Brown**
Sole Member and Manage
July 10, 2025

ASSIGNEE

**David Brown, an individual**

By: _____
**David Brown**
July 10, 2025

Exhibit C

828 Media Capital, LLC
Attn: Todd Lundbohm
Email: todd@828mediacapital.com

Lock the Door, LLC
Attn: David Brown
Email: upmbrown@gmail.com

August 20, 2019 (the "Effective Date")

**Re:**   **Bridge Loan Term Sheet: terms and conditions ("Term Sheet") for the loan for the motion picture currently entitled, "Collected" (the "Picture").**

| | | |
|---|---|---|
| 1. | Borrower: | Lock the Door, a California limited liability company ("LD"). |
| 2. | Lender: | 828 Media Capital LLC, or its assignees. |
| 3. | Nature of Loan: | A customary secured production bridge facility loan to be paid upon the closing of the primary financing for the Picture.<br><br>Lender has a perfected first priority lien against all executed pre-sales, future sales, and all other assets of Borrower. Further, Lender shall have a secured first position against all assets of the Picture, tangible, intangible, including all rights, proceeds, tax credits, and receivable related to the Picture. |
| 4. | Commitment Amount: | Equals up to US$410,000 (the "Commitment Amount") of which US$400,000 ("Loan") (i.e. the Commitment Amount less the Set Up Fee) will be deposited upon (i) execution of this Term Sheet; (ii) execution of the Security Agreement; and (iii) satisfaction of the Conditions Precedent.<br><br>Upon close of financing, and subject to the terms and conditions set forth herein, the Loan shall be released to Borrower, in amounts and (approximate) dates as set forth in the Lender Funding Schedule below:<br><br><table><tr><td colspan="3" align="center"><strong>Lender Funding Schedule</strong></td></tr><tr><td>Trance</td><td>US $ Amount</td><td>Target Date (subject to confirmation)</td></tr><tr><td>1</td><td>$100,000</td><td>August 21, 2019</td></tr><tr><td>2</td><td>$300,000</td><td>August 23, 2019</td></tr></table><br>Lender may provide an additional $500,000 in bridge financing upon the agreement of the parties on a mutually approved cash flow schedule. |
| 5. | Legal Fee: | US$20,000 (the "Legal Fee"), to paid by Borrower to Ramo Law PC by August 29, 2019. |
| 6. | Set Up Fee: | US$10,000 (the "Set Up Fee") to be withheld from the Commitment Amount upon the closing of the bridge loan herein. |
| 7. | Repayment: | Borrower shall repay the Commitment Amount plus a fifteen percent (15%) premium (the "Indebtedness") to the Lender upon the earlier of the following: (i) September 30, 2019; (ii) closing of any debt |

| | financing for the Picture; or (iii) the start of principal photography for the Picture (the "Maturity Date"). |
|---|---|
| 8.   Default Interest Rate: | Three and a half percent (3.5%) per month on the unpaid balance of the Commitment Amount, which shall accrue after (i) the Maturity Date, or (ii) an "Event of Default" (as further defined below). If the provisions of this Term Sheet or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount. |
| 9.   Contingent Compensation: | In the event that the Indebtedness is repaid prior to the Maturity date, then Lender shall receive two and a half percent (2.5%) of one hundred percent (100%) of the net profits with respect to the Picture. In the event that the Indebtedness is repaid after the Maturity Date, then Lender shall be entitled to five percent (5%) of one hundred percent (100%) of the net profits for the Picture.  In the event that Lender funds Nine Hundred Thousand Dollars under the terms of this agreement, and elects to convert that bridge financing to equity financing, then Lender shall be entitled to a pro rata share of the investor's share of net profits based on this equity conversion, plus an additional ten percent (10%) of net profits with respect to the Picture.<br><br>Lender's share of net profits shall be defined, accounted and paid on a most favored nations basis with all other participants in Net Profits.<br><br>Lender shall be made a party to the Collection Account Management Agreement, when established. |
| 10.  Use of Proceeds: | Borrower shall use the Loan to fund production until all other funding is released for the Picture. |
| 11.  First Opportunity and Matching: | In the event that Borrower seeks additional debt financing with respect to the Picture, Borrower shall provide Lender with written notice that it intends to raise additional financing, and Lender shall have the first opportunity to secure additional debt financing for the Picture, for thirty days thereafter. In the event Lender secures and/or provides such financing, then Lender shall receive five percent (5%) of any such amount as an executive producer fee in the budget for the Picture.<br><br>In the event that Lender does not secure such additional debt financing for the Picture, then Borrower, upon receipt of an offer to finance the Picture, shall provide the key terms of such offer to Lender in writing, in each instance. Lender shall thereafter have fourteen (14) days to determine if it will match such terms and provide the additional debt financing (or secure such additional debt financing from another third party).<br><br>Lender shall also be entitled, in its sole discretion, to convert the Commitment Amount, provided hereunder, into equity financing towards the budget of the Picture. |
| 12.  Lender's Approval Rights: | Lender shall be entitled to approve all additional financing, bridge or otherwise, as well as any other key agreements related to the Picture, until such time as the Indebtedness is repaid. |
| 13.  Reports: | Until repayment of the Commitment Amount (and Default Interest, if any), Borrower shall provide regular status reports containing |

| | |
|---|---|
| | meaningful and reasonable detail on material production activities, including timeline to and budget for completion of pre-production, production, and post-production, as well as sales and distribution activities. This includes call-sheets, production reports, bank statements, discussion with third party vendors and financiers. Lender shall be entitled to participate in all closing calls in connection with the financing of the Picture. |
| | For the avoidance of doubt, if Borrower fails to meet the obligations set forth herein, Lender shall have the right to terminate this Term Sheet and, following Borrower's receipt of written notice of such termination, the Commitment Amount (and Default Interest, if any) shall immediately become due and payable. |
| 14.  Security: | Pursuant to that certain Security Agreement, Lender has a first priority security interest in all of Borrower's assets, tangible and intangible, including, but not limited to accounts receivable, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future. |
| | Lender has perfected its security interest in the Collateral (as defined in the Security Agreement) by filing a UCC-1 statement and any other relevant filings, with each applicable state and government authority, as determined by Lender, in Lender's sole discretion. |
| 15.  Audit Rights: | Lender shall have the right to audit the books and records of Borrower, on a semi-annual basis, subject to at least thirty (30) days prior written notice to Company, at Lender's expense, until payment of the Commitment Amount (and Default Interest, if any) is irrevocably received by Lender. In the event the audit uncovers a discrepancy unfavorable to Lender, Borrower shall pay the third party costs of any such audit. |
| 16.  Financing Documents: | The following documents and all other documentation required under this Term Sheet shall constitute the "Financing Documents": |
| | i.)       Promissory Note; <br> ii.)      Corporate documents and certificates of Borrower; and <br> iii.)     Any other documents required, in Lender's sole discretion. |
| | All Financing Documents shall be in form and substance satisfactory to Lender and, unless otherwise agreed by Lender in writing, prepared by Lender's counsel. |
| 17.  Credit, One-Sheet; Premiere Tickets; Press: | Lender shall be entitled to the following credits in connection with the Picture: |
| | An animated company logo prior to main title sequence of the Picture for the Lender as well as in paid ads. |
| | A bug logo in the end credits of the Picture, as well as in paid ads |
| | A company credits, on screen, in the main titles of the Picture, and in paid ads, in the following form: "In Association with 828 Media Capital" |
| | Two (2) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, in the main titles of the Pictures, and in paid ads. |

| | |
|---|---|
| | All credits are on a more favored nations basis with other companies and executive producers, as applicable. |
| | Borrower shall provide Lender's representatives with a paid set visit for at least one week of production of the Picture. |
| | Borrower will provide Lender with one (1) high quality "one-sheet" (or an electronic file thereof) for the Picture, which Lender may use to promote, market and advertise its business. |
| | Borrower will use commercially reasonable good faith efforts to cause the domestic distributor of the Picture to provide Lender with at least four (4) invitations to the Picture's domestic premiere and festival screening, if any, including travel/accommodations on a most favored nations basis with all other executive producers. |
| | Borrower shall reference "828 Media Capital" as a financier in any press releases regarding the Picture. |
| 18. Assignment: | Neither this Term Sheet nor the Commitment Amount are assignable by Borrower. |
| 19. Bond: | Borrower shall ensure that Lender is names as an additional beneficiary under the Bond, if any, for the Picture. |
| 20. Events of Default: | <u>If at any time after Closing</u>, any of the following "Events of Default" have occurred (as determined by Lender in its sole discretion), the Commitment Amount (and Default Interest, if any) shall immediately become due and payable:<br><br>i.) Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due;<br><br>ii.) Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements and/or obligations of Borrower contained in the Term Sheet or in any agreement relating to the Loan and/or the Picture which would materially adversely affect the value of the Loan;<br><br>iii.) Borrower's failure to perform or observe, in a due and timely manner, any of the material terms, provisions, covenants, conditions, agreements or obligations contained in the Financing Documents or in any other agreement, contract, indenture, document, or instrument executed, or to be executed, by Borrower in connection with the Financing Documents which would have a materially adverse effect on the ability of Borrower to perform its obligations pursuant to the Financing Documents;<br><br>iv.) Borrower receiving any bridge financing or any other form of financing without Lender's express written approval;<br><br>v.) Suspension by Borrower of its business operations;<br><br>vi.) The failure of Borrower to effect delivery of the Picture to sales agents and distributors in accordance with the terms and conditions of the relevant sales and distribution agreements by their respective delivery dates; |

| | |
|---|---|
| | vii.)    Any material change in the budget, cash flow schedule, financing structure, timing of pre-production, production, and/or post-production, Borrower's production team or other change which would be an Event of Default in the Financing Documents. |
| 21.  Conditions Precedent to Closing: | The funding of the Loan is subject to Borrower's compliance with each of the following conditions:<br><br>i.)    Execution and/or approval of the Financing Documents;<br><br>ii.)    Borrower providing key terms of the of Saban distribution agreement, the sales agent agreement with Clear Horizon, and confirmation of finance plan and equity financing<br><br>iii)    There being, prior to the time of Closing, no material adverse change in Borrower's condition, financial or otherwise, or financial business prospects from that represented in any financial statement or other information submitted to Lender or upon which Lender has relied;<br><br>iv.)    Lender shall have received, in form and substance reasonably satisfactory to Lender, copies of all agreements or documents, and all amendments thereto, relating to the formation, existence, power, authority and governance of Borrower, together with copies of all certificates which are required to be, or may be, filed in connection with the creation of Borrower; and<br><br>v.)    Receipt and approval by Lender of chain of title documentation with respect to the Picture. |
| 22.  Representations and Warranties: | The Borrower hereby represents and warrants to Lender that:<br>    (i) It is duly organized, validly existing and in good standing. It has the power and all necessary rights and title to enter into and perform this Agreement and the transactions contemplated hereby or referred to herein. It has taken all necessary action to author-ize the entry into and performance of this Agreement and such transactions.<br>    (ii) This Term Sheet constitutes a legal, valid and binding obligation of the Borrower and is in proper form for enforcement against it.<br>    (iii) The entry into and performance of this Term Sheet and the transactions contemplated hereby do not and will not conflict with: (a) any existing law or regulation or any official or judicial order, or (b) its articles of creation, or (c) any agreement or document to which it is a party or which is binding upon it or any of its assets. Without limiting the generality of the foregoing, the Borrower represents and warrants that there are not now any liens, claims, encumbrances, legal proceedings, restrictions, agreements or understandings which might conflict or interfere with, limit, derogate from, or be inconsistent with or otherwise affect any of the provisions of this Agreement or any of the representations or warranties of the Borrower contained herein, including without limitation, any U.C.C. filings, copyright assignments or other liens, inconsistent herewith or offsets or other costs charged against the Picture by any distributor pursuant to cross-collateralization agreements or otherwise except for the following: the lien created by that certain agreement between LD Development, LLC by Clear Horizon Entertainment LLC, pursuant to that certain agreement between those parties dated as of July 17, 2019, which is explicitly subordinate to any financier, distributor, completion guarantor or guild liens. |

| | |
|---|---|
| | (iv) All authorizations, approvals, consents, licenses, exemptions, filings, registrations, notarizations and other matters, official or otherwise, required by the Borrower or advisable in connection with the entry into, performance, validity and enforceability of this Agreement and the transactions contemplated hereby the Borrower have been obtained or effected and are in full force and effect (other than the registration of security interests to be created pursuant hereto). |
| | (v) No litigation, arbitration or administrative proceedings are threatened or, to its knowledge, pending which call into question the validity or performance of its obligations hereunder. |
| | (vi) All information which might be material to a person assuming the obligations and acquiring the rights assumed and acquired by the Lender pursuant to this Agreement has been disclosed in writing to the Lender and there are no facts or circumstances which might make such information misleading or inaccurate. |
| | (vii) The Borrower's warranties, representations and agreements are of the essence of this Agreement and shall survive the early termination hereof. None of the Borrower's warranties, representations or agreements shall in any way be limited by reason of any investigation made by the Lender or on behalf of the Lender regarding said warranties, representations or agreements. |
| | The Lender represents and warrants that they have the power and all necessary rights and title to enter into and perform this Term Sheet and the transactions contemplated hereby or referred to herein. They have taken all necessary action to authorize the entry into and performance of this Term Sheet and such transactions. And they are properly organized and in good standing. |
| 23. Indemnification: | Each Party shall, at its own expense, indemnify, save and hold harmless the other party and its successors, licensees, assigns, agents, representatives and affiliates from and against any and all claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable outside attorneys' fees), incurred or sustained by reason of or arising out of any breach or alleged breach of any of the warranties, representations or agreements herein made by the other Party, or from any reliance upon any such warranties, representations or agreements. If any person or entity shall make any claim or institute any suit or proceeding alleging any facts, which, if true, would constitute a breach by the other Party, of any warranty, representation or agreement herein made, the Party shall give prompt written notice of same to the other Party and shall undertake at its own cost and expense the defense thereof and shall supply competent and experienced counsel to defend any such suit or proceeding for the non-breaching Party. |
| 24. Confidentiality: | The terms of this Term Sheet are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender except that Borrower may disclose such terms to its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors, also governmental entities and other parties with a right to access such information, including guilds or parties required by law. |
| 25. Conflict Waiver | The Parties acknowledge that Ramo Law PC ("Ramo") solely represents Lender with respect to this matter. It is also agreed and acknowledged that Ramo represents Borrower on other matters, including with respect to the Picture, and may continue to do so, and has advised Borrower to seek outside counsel with respect to the |

| | |
|---|---|
| | subject matter herein between Lender and Borrower. Ramo shall not provide financing advice in connection with this matter to Borrower. Notwithstanding such representation and any actual or potential conflict of interest, the Parties consent to Ramo's representation of Lender, provided that the parties acknowledges and agrees that at no time will Ramo's representation be construed, claimed or deemed to be a breach of a fiduciary relationship, a conflict of interest or a violation of any other obligation to Lender and/or Borrower.<br><br>_____ Initialed by Borrower<br><br>_____ Initialed by Lender |
| 26.  Notice: | **Lender**<br>As set forth above<br><br>With a copy to:<br>Ramo Law PC<br>315 S. Beverly Dr., Ste. 210<br>Beverly Hills, CA 90212<br>Attn: Elsa Ramo, Esq.<br>Email: eramo@ramolaw.com<br><br>**Borrower**<br>As set forth above |
| 27.  Exclusivity: | Borrower shall not solicit or entertain competing financial proposals or conduct any negotiation, or enter into any agreement, arrangement or understanding for a competing financial transaction, for a period of fourteen (14) days from the execution of this Term Sheet unless otherwise agreed to by Borrower and Lender in writing. |
| 28.  Miscellaneous: | The terms and conditions of this Term Sheet shall be interpreted and governed by California law applicable to contracts entered into and to be wholly performed in California without reference to choice of law rules.  The parties consent to the jurisdiction and venue of the State of California in the City and County of Los Angeles.  Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS comprehensive arbitration rules and procedures.  The prevailing party in such arbitration shall be entitled to recover its reasonable, outside attorneys' fees and costs incurred in connection with such arbitration. This Term Sheet shall be deemed to have been drafted jointly by the parties, notwithstanding that one party or the other may have performed the actual drafting hereof.  No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of the Term Sheet shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other covenant or condition.  The provisions of this Term Sheet are severable.  If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.  This Term Sheet may be executed by facsimile or PDF signatures and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Unless and until modified, amended or superseded by the Financing Documents in writing, this Term Sheet sets forth the legally binding Term Sheet of the parties with respect to the subject matter hereof. |

| | |
|---|---|
| 29. Expiration Date: | If Borrower has not satisfied all of the Conditions Precedent on or before August 30, 2019 (the "Expiration Date"), Lender's commitment to make the Loan shall automatically expire, the Loan shall be returned to Lender at Lender's written instruction, and Lender shall have no further obligations to Borrower under this Term Sheet.<br><br>The Expiration Date may be extended by Lender in Lender's sole discretion, it being understood that Lender shall have no obligation to extend the Expiration Date. |

The parties shall enter into the Financing Documents to be negotiated in good faith reflecting the terms and conditions of this Term Sheet prior to the making of this Loan.

Sincerely,

*Todd Lundbohm*

By: Todd Lundbohm
Its: Authorized Signatory

AGREED AND ACCEPTED:

LOCK THE DOOR, LLC

By: David Brown
Its: Authorized Signatory

Exhibit D

**CONFIDENTIAL**

828 Media Capital, LLC
Attn: Todd Lundbohm
Email: todd@828mediacapital.com

Lock the Door, LLC
Attn: David Brown
Email: upmbrown@gmail.com

August 20, 2019 (the "Effective Date")

**Re:** **Bridge to Mezzanine Loan Term Sheet: terms and conditions ("Term Sheet") for the loan for the motion picture currently entitled, "Collected" (the "Picture").**

| | |
|---|---|
| 1. Borrower: | Lock the Door, a California limited liability company ("LD"). |
| 2. Lender: | 828 Media Capital LLC, or its assignees. |
| 3. Nature of Loan: | A customary first priority secured production bridge facility loan ("Bridge Loan") to be converted to a subordinated secured loan upon the closing of the senior secured financing for the Picture in addition to other conditions described further below.<br><br>Lender has a perfected first priority lien against all gross revenue of the Picture, executed pre-sales, future sales, and all other assets of Borrower as more fully set forth in that certain Security Agreement between the parties dated as of August 23, 2019. Further, Lender shall have a secured first position against all assets of the Picture, tangible, intangible, including all rights, proceeds, tax credits, and receivable related to the Picture until such time that the "Mezzanine Condition Precedents" are met. Upon Borrower satisfying the Mezzanine Condition Precedents, the amount of the Loan actually received by Borrower shall convert to a subordinated secured loan ("Secured Mezzanine Loan") which shall be repaid in second position to the senior debt which shall be collateralized by a first priority security against all rights and assets in the Picture, any revenues, tax credits or other forms of incentives or other benefits relating to the Picture, as further defined below ("Senior Secured Debt").<br><br>"Bridge Loan Period" means the period after execution of this Term Sheet and prior to Borrower's fulfillment of the Mezzanine Conditions Precedent.<br><br>"Mezzanine Loan Period" means the period after the Mezzanine Conditions Precedent" are met and prior to full repayment of the Obligations. |
| 4. Commitment Amount: | Equals up to US$910,000 (the "Commitment Amount") of which up to US$900,000 ("Loan") (i.e. the Commitment Amount less the Set Up Fee, $450,000 of which is acknowledged by Borrower as received) will be deposited upon (i) execution of this Term Sheet; (ii) execution of the Security Agreement; and (iii) satisfaction of the Conditions Precedent.<br><br>Subject to the terms and conditions set forth herein, the Loan shall be released to Borrower, in amounts and (approximate) dates as set forth in the Lender Funding Schedule below: |

|   | Lender Funding Schedule | |
|---|---|---|
| Trance | US $ Amount | Target Date (subject to confirmation) |
| 1 | $100,000 | August 21, 2019 |
| 2 | $300,000 | August 23, 2019 |
| 3 | $50,000 | September 10, 2019 |
| 4 | $450,000 | September 18, 2019 |
|   |   |   |
|   |   |   |

Lender's failure to fund any portion of the Commitment Amount within 2 business days of the dates prescribed by this section will be a material breach of this Term Sheet (Borrower hereby confirms receipt of all amounts set forth above on the dates set forth above).

| 5. | Legal Fee: | US$20,000 (the "Legal Fee"), to paid by Borrower to Ramo Law PC by August 29, 2019 (Acknowledged by Lender as paid). |
|---|---|---|

Up to an additional US$10,000 (the "Mezzanine Legal Fee") to be paid by Borrower to Ramo Law PC. At earlier of (i) the closing of the Bond and the conversion to the Secured Mezzanine Loan, or (ii) October 21, 2019, those fees incurred shall be invoiced to Borrower, and paid within five (5) business days.

| 6. | Set Up Fee: | US$10,000 (the "Set Up Fee") to be withheld from the Commitment Amount upon the closing of the bridge loan herein (Acknowledged as withheld by the Parties). |
|---|---|---|

| 7. | Conversion to Mezzanine/Repayment: | Provided that Lender has funded the full Commitment Amount and there are no then-existing uncured Events of Default, upon Borrower's satisfaction of the Mezzanine Conditions Precedent, the parties hereto shall effect a long-form mezzanine loan agreement converting the Bridge Loan into the Secured Mezzanine Loan. |
|---|---|---|

Upon successful conversion to the Secured Mezzanine Loan, Borrower shall pay Lender a fifteen percent (15%) premium calculated on the Commitment Amount in the amount of One Hundred Thirty Six Thousand and Five Hundred Dollars ($136,500) payable as an executive producer fee ("EP Fee") within 5 business days of the fulfillment of the Mezzanine Conditions Precedent. Borrower may withhold up to 6% in GA state withholding taxes from the EP Fee, provided that Borrower provides evidence of the payment of such withholding to the state of GA on behalf of Lender.

Upon conversion of the Bridge Loan into the Secured Mezzanine Loan, Borrower shall be entitled to an interest fee in the amount of twenty percent (20%) of the Commitment amount, i.e. One Hundred and Eighty-Two Thousand United States Dollars (US$182,000) (the "Mezzanine Interest Fee"), which shall be due and payable on the Maturity Date. Pre-payment of the full Obligations prior to the Maturity Date will reduce the amount of the Mezzanine Interest Fee by 0.25% per week of early payment (up to a maximum discount of 5%).

"Obligations" means the Commitment Amount, the Mezzanine Interest Fee, the EP Fee, and any other amounts due and owing to Lender pursuant to this Term Sheet.

| | |
|---|---|
| | Any unpaid amounts of the Obligations shall be due and payable to Lender on the earlier of (i) June 1, 2020, or (ii) the bonded delivery date agreed to in the anticipated completion guarantor agreement with Film Finances Inc, Media Guarantors or other completion guarantor ("Bond") approved in writing by Lender (the "Maturity Date"). |
| 8. Default Interest Rate: | During the Bridge Loan Period: Three and a half percent (3.5%) per month on the unpaid balance of the Commitment Amount, which shall accrue after an "Event of Default" (as further defined below) and/or October 21, 2019. |
| | During the Mezzanine Loan Period: Two percent (2%) per month on the unpaid balance of the Commitment Amount, which shall accrue after (i) the Maturity Date, or (ii) an "Event of Default" (as further defined below). |
| | If the provisions of this Term Sheet or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount. |
| 9. Contingent Compensation: | Lender is entitled to two and one half percent (2.5%) of one hundred percent of the net profits of the Picture, provided that in the event that the Lender is not repaid $471,500 by September 30, 2019, then Lender shall receive five percent (5%) of one hundred percent (100%) of the net profits of the Picture, and in the event that Lender is not repaid an additional $575,000 on or before October 21, 2019, then Lender shall receive five percent (5%) of one hundred percent (100%) of the net profits of the Picture. However, in the event that the Bridge Loan is converted to a Secured Mezzanine Loan, then Lender shall be entitled to twelve percent (12%) of one hundred percent of the net profits for the Picture. |
| | Lender's share of net profits shall be defined, accounted and paid on a most favored nations basis with all other participants in Net Profits. |
| | Lender shall be made a party to the Collection Account Management Agreement, when established. |
| 10. Use of Proceeds: | Borrower shall use the Loan to fund production until all other funding is released for the Picture. |
| 11. First Opportunity: | INTENTIONALLY OMITTED |
| 12. Lender's Approval Rights: | Lender shall be entitled to approve all additional bridge or senior financing prior to such time that the Mezzanine Condition Precedents are met. For clarity, all agreements related to equity contributions to the Borrower the terms of the Intercut Media Capital senior secured financing (as of 9/12/19) are approved. |
| 13. Reports: | Until repayment of the Commitment Amount (and Default Interest, if any), Borrower shall provide regular status reports containing meaningful and reasonable detail on material production activities, including timeline to and budget for completion of pre-production, production, and post-production, as well as sales and distribution activities. This includes call-sheets, production reports, bank statements, discussion with third party vendors and financiers. Lender |

| | |
|---|---|
| | shall be entitled to participate in all closing calls in connection with the financing of the Picture.<br><br>For the avoidance of doubt, if Borrower fails to meet the obligations set forth in this section, after providing Borrower with notice and 5 business days to cure such breach, Lender shall have the right to terminate this Term Sheet and, following Borrower's receipt of written notice of such termination, the Commitment Amount (and Default Interest, if any) shall become due and payable within 5 business days of such notice. |
| 14. Security: | Pursuant to that certain Security Agreement, Lender has a first priority security interest in all of Borrower's assets, tangible and intangible, including, but not limited to accounts receivable, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender has perfected its security interest in the Collateral (as defined in the Security Agreement) by filing a UCC-1 statement and any other relevant filings, with each applicable state and government authority, as determined by Lender, in Lender's sole discretion.<br><br>Lender agrees, that upon Borrower's satisfaction of all Mezzanine Conditions Precedent, Lender shall enter into an interparty agreement, and do all things necessary to effect the conversion of the Bridge Loan to the Secured Mezzanine Loan to subordinate its secured interest to the Senior Lender and customary guild liens only. |
| 15. Audit Rights: | Lender shall have the right to audit the books and records of Borrower, on a semi-annual basis, subject to at least thirty (30) days prior written notice to Company, at Lender's expense, until payment of the Commitment Amount (and Default Interest, if any) is irrevocably received by Lender. In the event the audit uncovers a discrepancy unfavorable to Lender in an amount in excess of 10% of the amount reported by Borrower, Borrower shall pay the reasonable third party costs of any such audit. |
| 16. Financing Documents: | The following documents and all other documentation required under this Term Sheet shall constitute the "Financing Documents":<br><br>i.)      Promissory Note;<br>ii.)     Corporate documents and certificates of Borrower; and<br>iii.)    Any other documents reasonably required and customarily included in similar transactions, in Lender's sole discretion.<br><br>All Financing Documents shall be in form and substance satisfactory to Lender and, unless otherwise agreed by Lender in writing, prepared by Lender's counsel. |
| 17. Credit, One-Sheet; Premiere Tickets; Press: | Lender shall be entitled to the following credits in connection with the Picture:<br><br>An animated company logo prior to main title sequence of the Picture for the Lender as well as in paid ads.<br><br>A bug logo in the end credits of the Picture, as well as in paid ads<br><br>A company credits, on screen, in the main titles of the Picture, and in paid ads, in the following form: "In Association with 828 Media |

4

|  | Capital" in no less than third position among company "in association with" credits. |
|---|---|
|  | Two (2) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, shared only with themselves, in no less than fifth position among executive producers, in the main titles of the Pictures, and in paid ads. |
|  | All credits are on a more favored nations basis with other companies and executive producers, as applicable. |
|  | Borrower shall provide Lender's representatives with a paid set visit for at least one week of production of the Picture. |
|  | Borrower will provide Lender with one (1) high quality "one-sheet" (or an electronic file thereof) for the Picture, which Lender may use to promote, market and advertise its business. |
|  | Borrower will use commercially reasonable good faith efforts to cause the domestic distributor of the Picture to provide Lender with at least four (4) invitations to the Picture's domestic premiere and festival screening, if any, including travel/accommodations on a most favored nations basis with all other executive producers. |
|  | Borrower shall reference "828 Media Capital" as a financier in any press releases regarding the Picture. |
| 18. Assignment: | Neither this Term Sheet nor the Commitment Amount are assignable by Borrower. |
| 19. Bond: | Borrower shall ensure that Lender is named as an additional beneficiary under the Bond, for the Picture. |
| 20. Events of Default: | If at any time after Closing, any of the following "Events of Default" have occurred (as determined by Lender in its sole discretion), the Commitment Amount (and Default Interest, if any) shall immediately become due and payable:<br><br>i.)    Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due;<br><br>ii.)    Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements and/or obligations of Borrower contained in the Term Sheet or in any agreement relating to the Loan and/or the Picture which would materially adversely affect the value of the Loan;<br><br>iii.)    Borrower's failure to perform or observe, in a due and timely manner, any of the material terms, provisions, covenants, conditions, agreements or obligations contained in the Financing Documents or in any other agreement, contract, indenture, document, or instrument executed, or to be executed, by Borrower in connection with the Financing Documents which would have a materially adverse effect on the ability of Borrower to perform its obligations pursuant to the Financing Documents;<br><br>iv.)    Borrower receiving any bridge financing or any other form of financing without Lender's express written approval;<br><br>v.)    Suspension by Borrower of its business operations; |

| | |
|---|---|
| | vi.)    The failure of Borrower to effect delivery of the Picture to sales agents and distributors in accordance with the terms and conditions of the relevant sales and distribution agreements by their respective delivery dates, or the bonded delivery date agreed to with the Bond, with the bonded delivery date to take precedence over the delivery dates in all other agreements;<br><br>vii.)    Any material change in the budget, cash flow schedule, financing structure, timing of pre-production, production, and/or post-production, Borrower's production team or other change which would be an Event of Default in the Financing Documents (budget, cashflow and schedule documents are pre-approved as of the 9/13/19).<br><br>viii.)    Borrower's failure to meet the Mezzanine Conditions Precedent by October 21, 2019 |
| 21.  Conditions Precedent to Closing: | The funding of the Loan is subject to Borrower's compliance with each of the following conditions:<br><br>i.)    Execution and/or approval of the Financing Documents;<br><br>ii.)    Borrower providing key terms of the of Saban distribution agreement, the sales agent agreement with Clear Horizon, and confirmation of finance plan and equity financing<br><br>iii)    There being, prior to the time of Closing, no material adverse change in Borrower's condition, financial or otherwise, or financial business prospects from that represented in any financial statement or other information submitted to Lender or upon which Lender has relied;<br><br>iv.)    Lender shall have received, in form and substance reasonably satisfactory to Lender, copies of all agreements or documents, and all amendments thereto, relating to the formation, existence, power, authority and governance of Borrower, together with copies of all certificates which are required to be, or may be, filed in connection with the creation of Borrower; and<br><br>v.)    Receipt and approval by Lender of chain of title documentation with respect to the Picture.<br><br>Mezzanine Conditions Precedent:<br><br>i) All conditions precedent described above in this section;<br><br>ii) Proof of all required funds to complete and deliver the Picture;<br><br>iii) Full execution of the all required agreements for the Senior Secured Financing;<br><br>iv) Full execution of the completion guaranty agreement for the Picture and "on-risk" status by the Bond;<br><br>v) Full execution of the Collection Account Management Agreement with Freeway or Fintage and Lender;<br><br>vi) Full execution of an interparty agreement by and between the parties hereto, the party providing the Senior Secured Debt and the Bond, to acknowledge terms consistent herewith. |

| | |
|---|---|
| | vii) Full execution of the sales agent interparty agreement (if any), and completion guaranty,<br><br>viii) Lender's receipt of additional insured certificate naming Lender and any affiliates or related parties. |
| 22.  Representations and Warranties: | The Borrower hereby represents and warrants to Lender that:<br>(i) It is duly organized, validly existing and in good standing. It has the power and all necessary rights and title to enter into and perform this Agreement and the transactions contemplated hereby or referred to herein. It has taken all necessary action to authorize the entry into and performance of this Agreement and such transactions.<br>(ii) This Term Sheet constitutes a legal, valid and binding obligation of the Borrower and is in proper form for enforcement against it.<br>(iii) The entry into and performance of this Term Sheet and the transactions contemplated hereby do not and will not conflict with: (a) any existing law or regulation or any official or judicial order, or (b) its articles of creation, or (c) any agreement or document to which it is a party or which is binding upon it or any of its assets. Without limiting the generality of the foregoing, the Borrower represents and warrants that there are not now any liens, claims, encumbrances, legal proceedings, restrictions, agreements or understandings which might conflict or interfere with, limit, derogate from, or be inconsistent with or otherwise affect any of the provisions of this Agreement or any of the representations or warranties of the Borrower contained herein, including without limitation, any U.C.C. filings, copyright assignments or other liens, inconsistent herewith or offsets or other costs charged against the Picture by any distributor pursuant to cross-collateralization agreements or otherwise except for the following: the lien created by that certain agreement between LD Development, LLC by Clear Horizon Entertainment LLC, pursuant to that certain agreement between those parties dated as of July 17, 2019, which is explicitly subordinate to any financier, distributor, completion guarantor or guild liens.<br>(iv) All authorizations, approvals, consents, licenses, exemptions, filings, registrations, notarizations and other matters, official or otherwise, required by the Borrower or advisable in connection with the entry into, performance, validity and enforceability of this Agreement and the transactions contemplated hereby the Borrower have been obtained or effected and are in full force and effect (other than the registration of security interests to be created pursuant hereto).<br>(v) No litigation, arbitration or administrative proceedings are threatened or, to its knowledge, pending which call into question the validity or performance of its obligations hereunder.<br>(vi) All information which might be material to a person assuming the obligations and acquiring the rights assumed and acquired by the Lender pursuant to this Agreement has been disclosed in writing to the Lender and there are no facts or circumstances which might make such information misleading or inaccurate.<br>(vii) The Borrower's warranties, representations and agreements are of the essence of this Agreement and shall survive the early termination hereof. None of the Borrower's warranties, representations or agreements shall in any way be limited by reason of any investigation made by the Lender or on behalf of the Lender regarding said warranties, representations or agreements. |

| | |
|---|---|
| | The Lender represents and warrants that they have the power and all necessary rights and title to enter into and perform this Term Sheet and the transactions contemplated hereby or referred to herein. They have taken all necessary action to authorize the entry into and performance of this Term Sheet and such transactions. And they are properly organized and in good standing. |
| 23. Indemnification: | Each Party shall, at its own expense, indemnify, save and hold harmless the other party and its successors, licensees, assigns, agents, representatives and affiliates from and against any and all claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable outside attorneys' fees), incurred or sustained by reason of or arising out of any breach or alleged breach of any of the warranties, representations or agreements herein made by the other Party, or from any reliance upon any such warranties, representations or agreements. If any person or entity shall make any claim or institute any suit or proceeding alleging any facts, which, if true, would constitute a breach by the other Party, of any warranty, representation or agreement herein made, the Party shall give prompt written notice of same to the other Party and shall undertake at its own cost and expense the defense thereof and shall supply competent and experienced counsel to defend any such suit or proceeding for the non-breaching Party. |
| 24. Confidentiality: | The terms of this Term Sheet are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender except that Borrower may disclose such terms to its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors, also governmental entities and other parties with a right to access such information, including guilds or parties required by law. |
| 25. Conflict Waiver | The Parties acknowledge that Ramo Law PC ("Ramo") solely represents Lender with respect to this matter. It is also agreed and acknowledged that Ramo represents Borrower on other matters, including with respect to the Picture, and may continue to do so, and has advised Borrower to seek outside counsel with respect to the subject matter herein between Lender and Borrower. Ramo shall not provide financing advice in connection with this matter to Borrower. Notwithstanding such representation and any actual or potential conflict of interest, the Parties consent to Ramo's representation of Lender, provided that the parties acknowledges and agrees that at no time will Ramo's representation be construed, claimed or deemed to be a breach of a fiduciary relationship, a conflict of interest or a violation of any other obligation to Lender and/or Borrower.<br><br>_____ Initialed by Borrower<br><br>_____ Initialed by Lender |
| 26. Notice: | <u>Lender</u><br>As set forth above<br><br>With a copy to:<br>Ramo Law PC<br>315 S. Beverly Dr., Ste. 210<br>Beverly Hills, CA 90212<br>Attn: Elsa Ramo, Esq. & Zev Raben, Esq. |

| | Email: eramo@ramolaw.com; zev@ramolaw.com<br><br>**Borrower**<br>As set forth above<br><br>With a copy to:<br><br>Creativ Law P.C.<br>8730 Wilshire Blvd. # 350<br>Beverly Hills, CA 90211<br>Attn: Harry Finkel, Esq.<br>Email:harry@creativlaw.com |
|---|---|
| 27.  Exclusivity: | INTENTIONALLY OMMITTED. |
| 28.  Miscellaneous: | The terms and conditions of this Term Sheet shall be interpreted and governed by California law applicable to contracts entered into and to be wholly performed in California without reference to choice of law rules.  The parties consent to the jurisdiction and venue of the State of California in the City and County of Los Angeles.  Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS comprehensive arbitration rules and procedures.  The prevailing party in such arbitration shall be entitled to recover its reasonable, outside attorneys' fees and costs incurred in connection with such arbitration.  This Term Sheet shall be deemed to have been drafted jointly by the parties, notwithstanding that one party or the other may have performed the actual drafting hereof.  No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of the Term Sheet shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other covenant or condition.  The provisions of this Term Sheet are severable.  If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.  This Term Sheet may be executed by facsimile or PDF signatures and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.  Unless and until modified, amended or superseded by the Financing Documents in writing, this Term Sheet sets forth the legally binding Term Sheet of the parties with respect to the subject matter hereof. |
| 29.  Expiration Date: | INTENTIONALLY OMMITTED |

The parties shall enter into the Financing Documents to be negotiated in good faith reflecting the terms and conditions of this Term Sheet prior to the making of this Loan.

Sincerely,

*Todd Lundbohm*

By: Todd Lundbohm
Its: Authorized Signatory

AGREED AND ACCEPTED:
LOCK THE DOOR LLC

By: David Brown
Its: Authorized Signatory

9

Exhibit E

**Chain of Title Index**
**Picture: THE COLLECTED**
**Owner: LOCK THE DOOR, LLC**
**Rev 9/17/19**

Owner has rights in and to all underlying material sufficient to produce the Picture ("**Underlying Rights**"), pursuant to the following:

**1. Documents:**

1) **Acquisition of Rights Agreement** dated September 8, 2006 between Fortress Entertainment, Inc. ("Fortress") and Dimension Films, a division of The Weinstein Co, LLC ("Dimension") whereby Fortress granted Dimension the rights to the screenplay entitled "Midnight Man" written by Dunstan and Melton.

2) **Quitclaim Agreement** dated April 8, 2009 between Dimension and LD Entertainment, LLC ("LD Entertainment") whereby Dimension quitclaims the rights to the underlying work in the Picture to LD Entertainment. Proof of payment attached.

3) **Assignment Agreement** effective March 31, 2015 between LD Entertainment and LD Development LLC ("LD Development") whereby LD Entertainment assigns all rights held by LD Entertainment to LD Development.

4) **Quitclaim Agreement** dated April 1, 2015 between LD Development and Fortress whereby LD Development quitclaims to Fortress the rights to the screenplay, entitled "The Collected" ("Screenplay") written by Marcus Dunstan ("Dunstan") and Patrick Melton ("Melton").

5) **Co-Production and Financing Agreement** dated May 20, 2019 between Brett Forbes d/b/a Rad All Day Productions ("Forbes") and Clear Horizon Entertainment, LLC ("Clear Horizon") whereby Forbes and Clear Horizon enter into a co-production agreement to produce the Picture and Forbes agrees to quitclaim rights acquired from Fortress (for the rights to the underlying work in the Picture) to Lock the Door LLC ("Lock the Door"), the Picture's SPV.

6) **Quitclaim Agreement** dated July 17, 2019 between LD Development and Clear Horizon whereby LD Development granted to Clear Horizon the right to produce the Picture based on the underlying pictures (The Collector and The Collection).

7) **Assignment Agreement** dated July 17, 2019 between Clear Horizon and Lock the Door whereby Clear Horizon assigns to Lock the Door the right to produce the Picture based on the July 17, 2019 Quitclaim Agreement.

8) **Screenplay Writer Purchase Agreement** dated July 30, 2019, between Wide Pants, Inc. ("Wide Pants") and Lucky Tai, Inc ("Lucky Tai"), and Specter Entertainment, LLC ("Specter") whereby Wide Pants and Lucky Tai granted Specter the rights to the Screenplay.

9) **Assignment and Assumption Agreement** dated September 10, 2019, between Specter and Lock the Door whereby Specter assigned to Lock the Door the rights to the Screenplay.

10) **Quitclaim Agreement** dated September 13, 2019 between Wide Pants and Lock the Door whereby Dunstan quitclaims to Lock the Door all rights to the Optional Picture and the Second Optional Picture as defined under the Dunstan director agreement and all amendments thereto.

11) **Assignment Agreement** dated September 16, 2019 between Fortress and Lock the Door whereby Fortress assigns to Lock the Door all rights to the Screenplay and acknowledges the Dimension payments due under the September 8, 2006 Acquisition of Rights Agreement.

Exhibit F

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

828 Media Capital, LLC
Attn: Todd Lundbohm
Email: todd@828mediacapital.com

Nightmares PSC LLC
Attn: David Brown and Christopher McGowan
Email: moviedavid1@gmail.com & chris@chasingnightmaresmovie.com

November 20, 2019 (the "Effective Date")

**Re:**    **Senior Lender Loan Term Sheet: terms and conditions ("Term Sheet") for the loan for the motion picture currently entitled, "Chasing Nightmares" (the "Picture").**

| | | |
|---|---|---|
| 1. | Borrower: | Nightmares PSC LLC, a California limited liability company ("Nightmares" or "Borrower"). |
| 2. | Lender: | 828 Media Capital LLC, or its assignees ("Lender"). |
| 3. | Nature of Loan: | A secured corporate loan facility against all of Borrower's assets, tangible and intangible, including but not limited to all exploitation proceeds and rights, including Clear Distribution executed pre-sales and worldwide sales to be made on a go forward basis for the Picture, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender shall have a first priority repayment position, and in accordance with the attached waterfall, attached hereto as Exhibit A. |
| 4. | Commitment Amount: | Equals up to US$1,000,000 (the "Commitment Amount") of which US$800,000 ("Loan") (i.e. the Commitment Amount less the Set Up Fee and Legal Fee) will be deposited upon (i) execution of this Term Sheet; (ii) execution of the Security Agreement; and (iii) satisfaction of the Conditions Precedent.<br><br>Upon close of financing, and subject to the terms and conditions set forth herein, the Loan shall be released to Borrower, in amounts and (approximate) dates as set forth in the Lender Funding Schedule below: |
| 5. | Legal Fee: | US$25,000 (the "Legal Fee"), to be withheld from the Commitment Amount upon the closing of the loan herein. |
| 6. | Set Up Fee: | US$175,000 (the "Set Up Fee") to be withheld from the Commitment Amount upon the closing of the loan herein. |

Lender Funding Schedule (within item 4):

| Lender Funding Schedule | | |
|---|---|---|
| Trance | US $ Amount | Target Date (subject to confirmation) |
| 1 | $40,000 | November 20, 2019 |
| 2 | $200,000 | November 25, 2019 |
| 3 | $100,000 | November 29, 2019 |
| 4 | $100,000 | December 2, 2019 |
| 5 | $200,000 | December 9, 2019 |
| 6 | $160,000 | December 16, 2019 |

1

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| 7. Repayment: | Borrower shall repay the Commitment Amount plus a twenty percent (20%) premium (the "Indebtedness") to the Lender by November 25, 2020 (the "Maturity Date"). |
|---|---|
| 8. Default Interest Rate: | Two percent (2%) per month on the unpaid balance of the Commitment Amount, which shall accrue after (i) the Maturity Date, or (ii) an "Event of Default" (as further defined below). If the provisions of this Term Sheet or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount. |
| 9. Contingent Compensation: | 828 Productions, LLC ("828 Productions") shall receive fifty percent (50%) of one hundred percent (100%) of the net profits with respect to the Picture.<br><br>828 Productions' share of net profits shall be defined, accounted and paid on a most favored nations basis with all other participants in Net Profits.<br><br>Lender and 828 Productions shall be made a party to the Collection Account Management Agreement, when established. |
| 10. Use of Proceeds: | Borrower shall use the Loan to finance pre-production, production, post-production and delivery of the Picture. |
| 11. First Opportunity and Matching: | In the event that Borrower seeks additional debt financing with respect to the Picture, Borrower shall provide Lender with written notice that it intends to raise additional financing, and Lender shall have the first opportunity to secure additional debt financing for the Picture, for thirty (30) days thereafter. In the event Lender secures and/or provides such financing, then Lender shall receive five percent (5%) of any such amount as an executive producer fee in the budget for the Picture.<br><br>In the event that Lender does not secure such additional debt financing for the Picture, then Borrower, upon receipt of an offer to finance the Picture, shall provide the key terms of such offer to Lender in writing, in each instance. Lender shall thereafter have fourteen (14) days to determine if it will match such terms and provide the additional debt financing (or secure such additional debt financing from another third party). |
| 12. Lender's Approval Rights: | Lender shall be entitled to approve all additional financing as well as any other key agreements related to the Picture, until such time as the Indebtedness is repaid. |
| 13. Reports: | Until repayment of the Commitment Amount (and Default Interest, if any), Borrower shall provide regular status reports containing meaningful and reasonable detail on material production activities, including timeline to and budget for completion of pre-production, production, and post-production, as well as sales and distribution activities. This includes call-sheets, production reports, bank statements, discussion with third party vendors and financiers.<br><br>For the avoidance of doubt, if Borrower fails to meet the obligations set forth herein, Lender shall have the right to terminate this Term Sheet and, following Borrower's receipt of written notice of such |

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| | |
|---|---|
| | termination, the Commitment Amount (and Default Interest, if any) shall immediately become due and payable. |
| 14. Security: | Pursuant to that certain Security Agreement entered into between Borrower and Lender, Lender has a first priority security interest in all of Borrower's assets, tangible and intangible, including, but not limited to accounts receivable, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender is entitled to perfect its security interest in the Collateral (as defined in the Security Agreement) by filing a UCC-1 statement and any other relevant filings, with each applicable state and government authority, as determined by Lender, in Lender's sole discretion. |
| 15. Audit Rights: | Lender shall have the right to audit the books and records of Borrower, on a semi-annual basis, subject to at least thirty (30) days prior written notice to Company, at Lender's expense, until payment of the Commitment Amount (and Default Interest, if any) is irrevocably received by Lender. In the event the audit uncovers a discrepancy unfavorable to Lender, Borrower shall pay the third party costs of any such audit. |
| 16. Financing Documents: | The following documents and all other documentation required under this Term Sheet shall constitute the "Financing Documents":<br><br>i.)    Promissory Note;<br>ii.)    Power of Attorney;<br>iii.)    Interparty Agreement between Borrower, Lender and sales agent, Clear Distribution, LLC;<br>iv.)    Corporate documents and certificates of Borrower (and its managers and/or members, including, but not limited to, Specter Entertainment, LLC and Perth Road Productions );<br>v.)    Irrevocable Direction-to-Pay / Notice of Assignment(s) / Assignment of Proceeds Agreement(s) with Clear Distribution / rest of world distributors; and<br>vi.)    Copyright Mortgage and Assignment; and<br>vii.)    Any other documents required, in Lender's sole discretion.<br><br>All Financing Documents shall be in form and substance satisfactory to Lender and, unless otherwise agreed by Lender in writing, prepared by Lender's counsel. |
| 17. Credit, Set Visits, One-Sheet; Premiere Tickets; Press: | Lender shall be entitled to the following credits in connection with the Picture:<br><br>An animated company logo in first position, other than the distributors for the Picture, prior to main title sequence of the Picture for the Lender as well as in paid ads, and tied to all others getting animated logos in all respects.<br><br>A bug logo in the end credits of the Picture, as well as in paid ads, tied to all others receiving a bug logo in all respects.<br><br>A company credit, on screen, in the main titles of the Picture, and in paid ads, in first position among company credits, in the following form: "In Association with 828 Media Capital" and tied to all others receiving company credit in all respects. |

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| | |
|---|---|
| | A "Produced By" credit, on screen, in the first position of the main titles and tied to all other receiving producer credit in all respects. |
| | Four (4) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, in the main titles of the Pictures, on two cards (shared only with each other) and in paid ads in first through fourth position among all executive producers, and tied in all respects to any other party receiving an executive producer credit. |
| | All credits are on a most favored nations basis with other companies and producers, as applicable. |
| | Lender, and its designees, shall be entitled to unlimited set visits during production of the Picture. |
| | Borrower will provide Lender with one (1) high quality "one-sheet" (or an electronic file thereof) for the Picture, which Lender may use to promote, market and advertise its business. |
| | Borrower will use commercially reasonable good faith efforts to cause the domestic distributor of the Picture to provide Lender with at least six (6) invitations to the Picture's domestic premiere and festival screening, if any, including travel/accommodations on a most favored nations basis with all other producers. |
| | Borrower shall reference "828 Media Capital" as the financier in any press releases regarding the Picture. |
| 18.  Assignment: | Neither this Term Sheet nor the Commitment Amount are assignable by Borrower. |
| 19.  Insurance: | Borrower shall ensure that Lender is names as an additional insured under all insurance policies for the Picture. |
| 20.  Events of Default: | If at any time after Closing, any of the following "Events of Default" have occurred (as determined by Lender in its sole discretion), the Commitment Amount (and Default Interest, if any) shall immediately become due and payable:<br><br>i.)       Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due;<br><br>ii.)      Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements and/or obligations of Borrower contained in the Term Sheet or in any agreement relating to the Loan and/or the Picture which would materially adversely affect the value of the Loan;<br><br>iii.)     Borrower's failure to perform or observe, in a due and timely manner, any of the material terms, provisions, covenants, conditions, agreements or obligations contained in the Financing Documents or in any other agreement, contract, indenture, document, or instrument executed, or to be executed, by Borrower in connection with the Financing Documents which would have a materially adverse effect on the ability of Borrower to perform its obligations pursuant to the Financing Documents;<br><br>iv.)     Borrower receiving any other form of financing without Lender's express written approval; |

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| | |
|---|---|
| | v.)   Suspension by Borrower of its business operations; |
| | vi.)   The failure of Borrower to effect delivery of the Picture to sales agents and distributors in accordance with the terms and conditions of the relevant sales and distribution agreements by their respective delivery dates; |
| | vii.)   Any material change in the budget, cash flow schedule, financing structure, timing of pre-production, production, and/or post-production, Borrower's production team or other change which would be an Event of Default in the Financing Documents. |
| 21.  Conditions Precedent to Closing: | The funding of the Loan is subject to Borrower's compliance with each of the following conditions: |
| | i.)   Cash flow schedule, budget, and production schedule for the Picture; |
| | ii.)   Execution and/or approval of the Financing Documents; |
| | iii.)   Borrower providing an executed copy of the sales agent agreement with Clear Distribution; |
| | iv.)   There being, prior to the time of Closing, no material adverse change in Borrower's condition, financial or otherwise, or financial business prospects from that represented in any financial statement or other information submitted to Lender or upon which Lender has relied; |
| | v.)   Lender shall have received, in form and substance reasonably satisfactory to Lender, copies of all agreements or documents, and all amendments thereto, relating to the formation, existence, power, authority and governance of Borrower, together with copies of all certificates which are required to be, or may be, filed in connection with the creation of Borrower; |
| | vi.)   Receipt and approval by Lender of chain of title documentation with respect to the Picture, including, but not limited to, the current copy of the screenplay; |
| | vii.)   Update records of Borrower to reflect more than one manager, and full execution of amended and restated operating agreement for Borrower; and |
| | viii.)   Fully executed agreements for the key talent participating in the Picture, and the director for the Picture. |
| | Condition subsequent: |
| | Borrower must obtain a fully executed collection account management agreement within sixty (60) days from the end of principal photography. |
| 22.  Representations and Warranties: | The Borrower hereby represents and warrants to Lender that: (i) It is duly organized, validly existing and in good standing. It has the power and all necessary rights and title to enter into and perform this Agreement and the transactions contemplated hereby or referred to herein. It has taken all necessary action to authorize the entry into and performance of this Agreement and such transactions. |

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| | |
|---|---|
| | (ii) This Term Sheet constitutes a legal, valid and binding obligation of the Borrower and is in proper form for enforcement against it. |
| | (iii) The entry into and performance of this Term Sheet and the transactions contemplated hereby do not and will not conflict with: (a) any existing law or regulation or any official or judicial order, or (b) its articles of creation, or (c) any agreement or document to which it is a party or which is binding upon it or any of its assets. Without limiting the generality of the foregoing, the Borrower represents and warrants that there are not now any liens, claims, encumbrances, legal proceedings, restrictions, agreements or understandings which might conflict or interfere with, limit, derogate from, or be inconsistent with or otherwise affect any of the provisions of this Agreement or any of the representations or warranties of the Borrower contained herein, including without limitation, any U.C.C. filings, copyright assignments or other liens, inconsistent herewith or offsets or other costs charged against the Picture by any distributor pursuant to cross-collateralization agreements or otherwise. |
| | (iv) All authorizations, approvals, consents, licenses, exemptions, filings, registrations, notarizations and other matters, official or otherwise, required by the Borrower or advisable in connection with the entry into, performance, validity and enforceability of this Agreement and the transactions contemplated hereby the Borrower have been obtained or effected and are in full force and effect (other than the registration of security interests to be created pursuant hereto). |
| | (v) No litigation, arbitration or administrative proceedings are threatened or, to its knowledge, pending which call into question the validity or performance of its obligations hereunder. |
| | (vi) All information which might be material to a person assuming the obligations and acquiring the rights assumed and acquired by the Lender pursuant to this Agreement has been disclosed in writing to the Lender and there are no facts or circumstances which might make such information misleading or inaccurate. |
| | (vii) The Borrower's warranties, representations and agreements are of the essence of this Agreement and shall survive the early termination hereof. None of the Borrower's warranties, representations or agreements shall in any way be limited by reason of any investigation made by the Lender or on behalf of the Lender regarding said warranties, representations or agreements. |
| | The Lender represents and warrants that they have the power and all necessary rights and title to enter into and perform this Term Sheet and the transactions contemplated hereby or referred to herein. They have taken all necessary action to authorize the entry into and performance of this Term Sheet and such transactions. And they are properly organized and in good standing. |
| 23. Indemnification: | Each Party shall, at its own expense, indemnify, save and hold harmless the other party and its successors, licensees, assigns, agents, representatives and affiliates from and against any and all claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable outside attorneys' fees), incurred or sustained by reason of or arising out of any breach or alleged breach of any of the warranties, representations or agreements herein made by the other Party, or from any reliance upon any such warranties, representations or agreements. If any person or entity shall make any claim or institute any suit or proceeding alleging any facts, which, if true, would constitute a breach by the other Party, of any warranty, representation or agreement herein made, the Party shall give prompt |

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| | |
|---|---|
| | written notice of same to the other Party and shall undertake at its own cost and expense the defense thereof and shall supply competent and experienced counsel to defend any such suit or proceeding for the non-breaching Party. |
| 24. Confidentiality: | The terms of this Term Sheet are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender except that Borrower may disclose such terms to its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors, also governmental entities and other parties with a right to access such information, including guilds or parties required by law. |
| 25. Conflict Waiver | The Parties acknowledge that Ramo Law PC ("Ramo") solely represents Lender in connection with the financing of the Picture. It is also agreed and acknowledged that Ramo represents Borrower on other matters, including with respect to the production legal for the Picture, and may continue to do so, and has advised Borrower to seek outside counsel with respect to the subject matter herein between Lender and Borrower. Ramo shall not provide financing advice in connection with this matter to Borrower. Notwithstanding such representation and any actual or potential conflict of interest, the Parties consent to Ramo's representation of Lender, provided that the parties acknowledges and agrees that at no time will Ramo's representation be construed, claimed or deemed to be a breach of a fiduciary relationship, a conflict of interest or a violation of any other obligation to Lender and/or Borrower. <br><br> _____ Initialed by Borrower <br><br> _____ Initialed by Borrower <br><br> _____ Initialed by Lender |
| 26. Notice: | Lender <br> As set forth above <br><br> With a copy to: <br> Ramo Law PC <br> 315 S. Beverly Dr., Ste. 210 <br> Beverly Hills, CA 90212 <br> Attn: Zev Raben, Esq. & Elsa Ramo, Esq. <br> Email: zev@ramolaw.com; eramo@ramolaw.com <br><br> Borrower <br> Nightmares PSC, LLC <br> 3940 Laurel Canyon Blvd. #1413 <br> Studio City, CA 91604 <br> Attn: David Brown and Christopher McGowan <br> Email: moviedavid1@gmail.com; <br> chris@chasingnightmaresmovie.com |
| 27. Exclusivity: | Borrower shall not solicit or entertain competing financial proposals or conduct any negotiation, or enter into any agreement, arrangement or understanding for a competing financial transaction, for a period of fourteen (14) days from the execution of this Term Sheet unless otherwise agreed to by Borrower and Lender in writing. |

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

| | |
|---|---|
| 28. Miscellaneous: | The terms and conditions of this Term Sheet shall be interpreted and governed by California law applicable to contracts entered into and to be wholly performed in California without reference to choice of law rules. The parties consent to the jurisdiction and venue of the State of California in the City and County of Los Angeles. Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS comprehensive arbitration rules and procedures. The prevailing party in such arbitration shall be entitled to recover its reasonable, outside attorneys' fees and costs incurred in connection with such arbitration. This Term Sheet shall be deemed to have been drafted jointly by the parties, notwithstanding that one party or the other may have performed the actual drafting hereof. No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of the Term Sheet shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other covenant or condition. The provisions of this Term Sheet are severable. If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision. This Term Sheet may be executed by facsimile or PDF signatures and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Unless and until modified, amended or superseded by the Financing Documents in writing, this Term Sheet sets forth the legally binding Term Sheet of the parties with respect to the subject matter hereof. |

The parties shall enter into the Financing Documents to be negotiated in good faith reflecting the terms and conditions of this Term Sheet prior to the making of this Loan.

Sincerely,

*Todd Lundbohm*
By: Todd Lundbohm
Its: Authorized Signatory

AGREED AND ACCEPTED:

NIGHTMARES PSC, LLC

*David Brown*
By: David Brown
Its: Authorized Signatory

*Christopher McGowan*
By: Christopher McGowan
Its: Authorized Signatory

Exhibit G

DocuSign Envelope ID: FB66C64D-0C68-4D36-8675-93724D6CA134

**"CHASING NIGHTMARES"**
**PRODUCER AGREEMENT**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this agreement ("Agreement") is entered into as of November 20, 2019 (the "Effective Date"), by and between Nightmares PSC LLC ("Company"), on the one hand, and 828 Productions LLC ("Lender"), furnishing the services of Todd Lundbohm ("Producer") in connection with the feature length motion picture currently entitled "Chasing Nightmares" (the "Picture") under the following terms and conditions:

1.  <u>Conditions Precedent</u>:  Company shall have no obligations hereunder unless and until (a) Company has received the following, in form and substance satisfactory to Company: (i) a copy of this Agreement executed by Producer; and (ii) all forms and documents legally necessary to enable Company to effect payment to Producer, including without limitation, a properly completed IRS Form W-4 and any other tax and identification forms required by Company; and (b) Company's securing of a completion bond for the Picture, as confirmed in writing by Company (collectively "Conditions Precedent").

2.  <u>Loan Out Company</u>:  Producer's services hereunder are rendered through Lender; therefore the following provisions shall apply:
    a.  All references to "Producer" in this Agreement shall be deemed to be references to Lender and Producer jointly, as applicable.

    b.  Lender and Producer represent and warrant that Lender has the full right, power and authority to enter into this Agreement and grant the rights granted to Company herein without the consent of any third party, and that neither Lender nor Producer is subject to any conflicting obligation or any disability which will or might prevent Lender or Producer from the performance of this Agreement.

    c.  Payments of compensation hereunder will be made to Lender and not to Producer.  In the event Company is subjected to any expenses or other liability by reason of a failure to withhold, report or pay taxes in connection with the compensation payable hereunder, Lender and Producer shall indemnify and hold Company harmless therefrom.

    d.  Producer confirms that (i) Producer has read and understands the Agreement, and (ii) Lender has the authority to grant the rights and furnish Producer's services in accordance with the provisions hereof.  Further, as a material inducement to Company, Producer agrees to abide by and be personally bound by the terms and provisions of this Agreement as if Producer were a direct party hereto, and to look solely to Lender for payment of all compensation due Producer in connection with Producer's services and grant of rights hereunder.

3.  <u>Services</u>: Company hereby engages the services of Producer to perform producing services in connection with the Picture, as requested by Company, for a term commencing on or about the Effective Date, and continuing through principal photography (the "Term").  Producer agrees to render the services hereunder as required by Company in all matters, including, but not limited to, those involving artistic taste and judgment, whenever and wherever Company may reasonably require, but there shall be no obligation on Company to actually utilize Producer's services, or the results and proceeds thereof, nor to develop, produce, release, distribute, or otherwise exploit the Picture, or any element thereof.

4.  <u>Credit</u>: Producer shall be accorded the following credits:

    4.1    A "Produced By" credit as follows:

        4.1.1    On screen, on all positive prints of the Picture, on a single card, in the main titles, if any, above or below the title of the Picture in the first (1st) position among producers, in a size of type, style of font and duration on screen no less favorable than any other producer credit therein and tied in all respects to any other party receiving an producer credit.

        4.1.2    In the billing block of paid advertisements issued by or under the direct control of Company, subject to the customary exclusions and exceptions of the distributor(s) of the Picture, in the same position as on screen, in a size of type and style of font no less favorable than any other producer credit therein. If any other producer receives credit in any so-called "excluded ads" then Producer shall also receive credit therein, except for any congratulatory or award ads naming only the honoree, in a size of type and style of font no less favorable than any other producer credit therein.

    4.2  A form of production company credit for 828 Media Capital LLC as follows:

        4.2.1    On screen, on all positive prints of the Picture, on a single card, in the main titles, if any, in the first (1st) position among production companies in a size of type, style of font and duration on screen no less favorable than any other production company credit therein, in substantially the form of "In Association with 828 Media Capital" and tied to all others receiving company credit in all respects. In the billing block of paid advertisements issued by or under the direct control of

1

DocuSign Envelope ID: FB66C64D-0C68-4D36-8675-93724D6CA134

Company, subject to the customary exclusions and exceptions of the distributor(s) of the Picture, in the first (1st) position among production companies in a size of type and style of font no less favorable than any other production company credit therein and tied to all other receiving company credit in all respects.

4.2.2    An animated logo credit, on all positive prints of the Picture, on a single card, in first (1st) position, except for the distributor, before the main titles, if any, in a size of type, style of font and duration on screen no less favorable than any other logo credit therein and tied to all others getting animated logos in all respects.

4.2.3    A still logo credit in the end credits (bug logo) and billing block of paid advertisements issued by or under the direct control of Company, subject to the customary exclusions and exceptions of the distributor(s) of the Picture, in first (1st) position among production or financing entities, and a size of type and style of font no less favorable than any other logo credit therein tied to all others receiving a bug logo in all respects.

4.4    General:  All credits granted herein shall be on a most favored nations basis with all other parties receiving credit on or in relation to the Picture. All other aspects of the credit to be accorded to Producer not specifically set forth herein shall be determined by Company in Company's sole discretion.  Any reference to the "main titles" are to the credits, whether before or after the body of the Picture, where all other producer credits appear.  For paid advertisements, the obligation shall apply only to the billing portion (excluding artwork and advertising copy) of advertisements issued by Company or under its direct control relating primarily to the Picture. No casual or inadvertent failure to comply with billing requirements, nor the failure of any third party so to comply, shall be a breach of this Agreement. If Company fails to accord the required credits hereunder, upon written notice to Company specifying such failure in reasonable detail, Company shall use reasonable efforts to prospectively cure such failure as to prints and advertisements not yet printed or committed to as of the date of Company's receipt of such notice.  All third party licensees with whom Company is in contractual privity shall be advised in writing of the foregoing credit provisions, and Company shall use good faith efforts to cause such licensees to be contractually obligated to comply with the foregoing credit provisions.

5.    Fixed Compensation:  In full consideration for all services rendered by Executive Producer hereunder and all rights granted herein, Executive Producer shall be entitled to an amount equal to Forty Five Thousand United States Dollars (US$45,000.00), subject to execution of this Agreement by Executive Producer, payable as follows:  (a) Twenty Percent (20%) payable in equal weekly installments over the course of pre-production of the Picture; (b) Sixty Percent (60%) in equal weekly installments over the in-going period of principal photography of the Picture; (c) Ten Percent (10%) upon completion of post-production of the Picture; and (d) Ten Percent (10%) upon complete delivery of the Picture to the domestic distributor, but in any event no later than by the date of the initial release of the Picture by Company.

6.    Contingent Compensation:  Provided that Producer is not in uncured material breach hereof and renders all required services during the Term, Lender shall be entitled to fifty percent (50%) of one hundred percent (100%) of the "Net Profits" of the Picture, which shall be defined, accounted for and paid on a most favored nations basis with all other participants in "Net Profits."

a.    Company may (but shall have no obligation to) set up a collection account in connection with any and all revenues of the Picture.  In such event, it is agreed and understood that Lender shall be added as a party to such collection account agreement.

b.    Company shall render to Lender and Producer periodic statements showing a summary of Net Proceeds and permitted deductions (the "Statements"), which shall be provided in a frequency in accordance with statements received by Company from the distributor on a most favored nations basis with all other participants in Net Proceeds.  If no Net Proceeds are received by Company, then no Statement shall be due after the first year (subject to receipt of statements by distributor).

c.    Lender shall have the right to examine the books and records of Company to the extent they pertain to the Picture. Such examination shall be made during reasonable business hours, upon reasonable advance written notice, at the regular place of business of Company where such books and records are maintained, and shall be conducted on Lender's behalf and at Lender's expense by Lender's designee.  Such examination shall not be made more frequently than once per year.  Lender's examination shall be limited to those records relating to the Picture and any allied or ancillary rights connected therewith and under no circumstances shall Lender have the right to examine records pertaining to Company's business generally or relating to other motion pictures for purposes of comparison or otherwise.  Lender shall provide Company with a copy of any report prepared as a result of such examination.  No action, suit, or proceeding concerning the accounting rendered by Company, or to the period of time to which such accounting relates, may be maintained against Company unless commenced within twelve (12) months after the date such Statements are received by Lender and Producer. In the event that such audit of Company's books and records reveals a discrepancy of ten percent (10%) or greater in Producer's favor, Company shall pay the cost of such audit.

2

DocuSign Envelope ID: FB66C64D-0C68-4D36-8675-93724D6CA134

7.  Set Visits: Company shall provide Producer and its designees with a unlimited set visit for the duration of production of the Picture.

8.  Assignment: This Agreement shall be binding upon and shall inure to the benefit of Company and shall be binding upon and shall be to the benefit of, and may be assigned to, any parent, subsidiary or affiliate company of Company, any company or entity acquiring all or substantially all of Company's assets, and any person, firm or corporation who may hereafter acquire the right to produce, distribute, exhibit, advertise and/or otherwise exploit the Picture hereunder, provided that Company shall remain secondarily liable unless the assignment is to a major or mini-major studio distributor, or similarly financially responsible party, which assumes all of the obligations hereunder, and the assignment is in writing.  Producer may not assign this Agreement or Producer's rights hereunder, or delegate Producer's duties, if any, under this Agreement in whole or in part.

9.  Work Made for Hire/Results and Proceeds/Independent Contractor: Producer hereby acknowledges that Company is the sole and exclusive owner, throughout the universe, in perpetuity and in all languages, of all right, title and interest in and to the results and proceeds of Producer's services hereunder, including, without limitation, all performances, material composed, submitted, added, created, or interpolated by Producer hereunder (hereafter the "Work"). The Work is a "work made for hire" for Company under the U.S. Copyright Law, prepared within the scope of Producer's engagement and/or as a work specially ordered or commissioned for use as a part of a motion picture or other visual work.  Accordingly, Company is considered the author and, at all stages of completion, and without any further act or instrument by any person, the sole and exclusive owner of the Work and all right, title and interest therein.  If under any applicable law the fact that the Work is a work-made-for-hire is not effective to place sole authorship and sole ownership of the Work and all rights therein and thereto in Company, then to the fullest extent available and for the full term of protection otherwise accorded to Producer under such applicable law, Producer hereby irrevocably and perpetually assigns and pre-assigns and transfers to Company all right, title and interest in and to the Work now or hereafter created. To the fullest extent allowable under any applicable law, Producer hereby irrevocably waives or assigns to Company Producer's so-called "moral rights of authors" or "droit morale" rights which Producer may have in connection with the Work, including the Picture.  It is agreed and understood that Producer's relationship to Company is that of an independent contractor.  Accordingly, Producer shall be responsible for payment of all taxes and insurance applicable under existing laws, including, but not limited to, social security taxes, and federal, state and city income taxes.  Producer warrants that Producer will make all necessary payments due appropriate governmental agencies to comply with the foregoing and indemnify Company against all claims, liabilities, costs, or expenses that may arise out of breach of the foregoing.  The parties hereto stipulate that Producer is self-employed or the employee of a third party.

10. Further Documents: Producer shall duly execute, acknowledge and deliver to Company or cause to be executed, acknowledged and delivered to Company, any and all assignments or instruments consistent herewith which Company reasonably deems necessary to carry out and effectuate the purposes and intent of this Agreement, including, without limitation, separate assignments of any rights granted by Producer.  In the event Producer fails to execute any such instrument after an opportunity to review and negotiate on the same (not to exceed a period of five [5] business days of receipt of Company's written request therefor), Producer hereby irrevocably nominates, constitutes and appoints Company as Producer's true and lawful attorney-in-fact for the limited purposes set forth herein, which constitutes a power coupled with an interest, with the right to execute and file all such documents and to do any and all acts and things necessary with respect to such documentation. Company shall provide Producer with copies of any such agreement executed by Company on Producer's behalf, provided that Company's inadvertent failure to do so is not a breach of this Agreement and shall not affect the validity of such document.

11. Name, Likeness and Biography: Company shall have the right, in perpetuity and throughout the universe, to use Producer's name, approved likeness and/or approved biography in connection with the development, production, exhibition, advertising, promotion and/or other exploitation of the Picture and/or all subsidiary and ancillary rights of any nature relating to the Picture, or Producer's services, if any, in connection with the Picture, in any and all media now known or hereafter devised. Company's use of Producer's name in a billing block or as part of the key art on any item of merchandise or other material or in connection with any commercial tie-in shall constitute an acceptable use of Producer's name, which shall not in any event require Producer's consent. Producer hereby irrevocably grants Company, its successors and assigns, the right to photograph and make motion pictures and sound recordings of Producer's physical likeness and voice in connection with the Picture, including but not limited to "behind-the-scenes" footage, DVD value added footage and other footage, DVD extras, interviews, excerpts from the Picture, electronic press kits, featurettes, trailers, videos and promotional films and to reproduce the same in any manner and any medium whatsoever, in perpetuity without further compensation. Producer shall submit to Company a written biography and photograph within five (5) business days (which five [5] business day period may be reduced to two [2] business days if Company requires Producer's response in such shorter time period in writing due to a production exigency) of Company's written request therefor. Provided that Producer timely submits such biography and/or photograph, Company shall primarily draw from the biographical information contained in such written biography or use such photograph so furnished.  If Producer fails to submit a written biography and/or photograph within five (5) business days (which five [5] business day period may be reduced to two [2] business days if Company requires Producer's response in such shorter time period in writing due to a production exigency) of Company's written request therefor,

3

DocuSign Envelope ID: FB66C64D-0C68-4D36-8675-93724D6CA134

then Producer waives his biographical and/or photographic submission right; provided any of Producer's biographical information issued by Company thereafter will be of a non-derogatory nature.

12. <u>Representations, Warranties and Indemnification</u>: Producer represents, warrants and agrees that Producer is free to enter into this Agreement, and that Producer has not made and will make no agreements, grants, assignments, or commitments which will conflict with or impair the rights and privileges granted to Company hereunder. Producer further represents and warrants that other than material provided by Company to Producer, all literary, dramatic and musical material, designs and inventions of Producer hereunder will be original with Producer or in the public domain throughout the world or furnished by Company, and will not infringe upon or violate any copyright of, or, to the best of Producer's knowledge (using reasonable prudence in such matters), the right of privacy or any other right of, any person or company. Each party hereby agrees to indemnify and hold harmless the other, its parents, subsidiaries and affiliates, and the officers, employees, agents, licensees and assigns, from and against any and all liabilities, losses, claims, damages, demands, costs (including without limitation reasonable outside attorneys' fees) and expenses arising from or out of any third party claim arising out of a breach by the indemnifying party of any agreement, representation or warranty made by the indemnifying party under this Agreement. Except with respect to: (a) matters constituting a breach by Producer of any of the representations, warranties and/or agreements contained herein; or (b) gross negligence, or intentionally tortious misconduct by Producer, Company further agrees to defend and indemnify Producer and hold Producer, its parents, subsidiaries and affiliates harmless from and against any and all liabilities, losses, claims, damages, demands, costs (including without limitation reasonable outside attorneys' fees) and expenses arising from the development, production, distribution and/or exploitation of the Picture or any element thereof.

13. <u>Remedies</u>: The rights and remedies of Producer in the event of any breach by Company of this Agreement or any of Company's obligations hereunder shall be limited to Producer's right to recover actual monetary damages, if any, in an action at law, and Producer hereby waives any right or remedy in equity, including without limitation any right to terminate or rescind this Agreement or Company's ownership of the Picture or the results and proceeds of any of Producer's services or any other right granted to Company hereunder and/or to seek injunctive or other equitable relief with respect to any breach of Company's obligations hereunder and/or to enjoin or restrain or otherwise impair in any manner the production, distribution, exhibition or other exploitation of the Picture, or any parts or elements thereof, or the use, publication or dissemination of any advertising in connection therewith.

14. <u>Insurance</u>: Company shall add Lender and Producer as additional insureds on Company's general liability and errors and omissions insurance policies in connection with the Picture, if any, during customary periods of production and distribution of the Picture, subject to the limitations, restrictions, and terms of said policy.

15. <u>Travel</u>: If Company requires Producer to render services hereunder at an overnight location more fifty (50) miles from wherever Producer maintains a residence (Producer represents and warrants such residence to be San Diego, California), the following shall apply: to the extent any other producer on the Picture receives air transportation, accommodations, ground transportation, or per diem, Producer shall also receive the same on a most favored nations basis with all producers.

16. <u>Premiers/Festivals/One-Sheet</u>: Provided that Producer is not in material uncured breach of this Agreement, Company shall provide Producer with six (6) invitations to all premieres of the Picture, if any, the domestic premier and festival screening of the Picture, if any, including travel accommodations on a most favored nations basis with all other producers.

17. <u>DVD/One Sheet</u>: Producer shall each be provided with one (1) gratis DVD copy of the Picture or one (1) Blu-ray copy of the Picture, and one (1) copy of the one-sheet which Producer may use to promote, market, and advertise his business, if and when they are commercially available to the general public.

18. <u>Notices</u>: Any and all notices to Company, Lender and Producer (and payments to Lender) shall be sent to the addresses provided below. Such notices and/or payments, as applicable, shall be sent by U.S Mail, certified or registered (return receipt requested), by personal delivery (provided that a signed copy is obtained indicating that such delivery was made) or by e-mail:

<u>To Company</u>
c/o Ramo Law PC
315 S. Beverly Dr., Suite 210
Beverly Hills, CA 90212
Attn: Michelle Chang, Esq., Geoff Lee, Esq.
Email: michelle@ramolaw.com, geoff@ramolaw.com

<u>To Lender and Producer</u>
c/o 828 Production LLC
6310 San Vicente Boulevard, Suite 100
Los Angeles, CA 90048

4

DocuSign Envelope ID: FB66C64D-0C68-4D36-8675-93724D6CA134

Attn: Todd Lundbohm
Email: todd@828mediacapital.com

c/o Ramo Law PC
315 S. Beverly Dr., Suite 210
Beverly Hills, CA 90212
Attn: Zev Raben, Esq.
Email: zev@ramolaw.com

19. <u>Confidentiality</u>: Producer hereby acknowledges and agrees that Producer shall not directly issue or authorize the issuance of any publicity or disclose any confidential, non-public information concerning this Agreement, Producer's engagement and/or Producer's services under this Agreement, the results and proceeds of Producer's services under this Agreement, the Picture, Company, or Company's business or production methods, provided that Producer shall not be in breach of this provision if: (a) Producer discloses any such information to Producer's representatives; (b) Producer is compelled to do so in connection with a legal proceeding; or (c) Producer makes incidental and non-disparaging reference solely to said matters during an interview concerned primarily with Producer rather than any of said matters set forth herein. For the avoidance of doubt, Producer's confidentiality and publicity restrictions hereunder shall apply to any and all media whatsoever, including, without limitation, any social networking site, micro-blogging service, online forum, personal website or blog, or user-generated or user-uploaded content website (e.g., Facebook, Twitter, Google+, Instagram, etc.). Producer agrees that Producer, directly or indirectly through any of either party's representatives, attorneys, agents, employees, or any other party acting on Producer's behalf, shall make any intentionally disparaging, derogatory, or negative comments concerning the Picture (and/or any individuals or companies who provided services on the Picture, including, without limitation, director, writers, producers, cast and crew) and/or Company. Furthermore and consistent herewith, Producer, directly or indirectly through any of either party's representatives, attorneys, agents, employees, or any other party acting on Producer's behalf, shall not disparage, denigrate, tarnish, abuse, modify or take other action which may negatively impact the (i) Picture, (ii) Company, (iii) Company's parent, subsidiary, affiliates, successors, and assigns or (iv) Company's reputation, services, management, employees or principals.

20. <u>Double Benefits</u>:  In no event shall Lender and/or Producer be provided with expenses or other benefits pursuant to either this Agreement and/or in any other agreement between Company, Lender and Producer in connection with the Picture (each, a "Picture Agreement") so as to result in double benefits (other than compensation and credit, which shall not be considered double benefits); provided, however, that in the event that one agreement accords a benefit more favorable than the corresponding benefit accorded in the other agreements, Company shall provide Lender and/or Producer with the more favorable benefit. Any material default by Lender and/or Producer of any of the terms of any Picture Agreement shall also be a default by Lender and Producer under this Agreement, and vice versa.

21. <u>Force Majeure/Illness/Incapacity</u>: Company shall not be obligated to pay Producer any compensation in respect to any periods that Producer does not actually render services hereunder because of illness, incapacity, default, or force majeure event (collectively a "Suspension Event") and Company may extend the term of the Agreement and Producer's services required hereunder by the length of time of any such Suspension Event. A force majeure event shall be defined as any labor dispute, fire, war or governmental action, or any other unexpected or disruptive event beyond Company's control which hampers or prevents Company's ability to develop, produce, promote, distribute and/or otherwise exploit the Picture.

22. <u>Miscellaneous</u>:  All disputes shall be submitted to confidential final and binding arbitration. The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except that the prevailing party in such arbitration proceeding shall be entitled to reimbursement of its reasonable outside attorneys' fees and costs (including, without limitation, in connection with any arbitration), at the JAMS office located in Los Angeles County, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single, mutually approved, neutral arbitrator who shall be an attorney or retired judge with at least ten (10) years' experience in the motion picture industry. The arbitrator shall follow arbitration laws of the State of California in adjudicating the dispute. The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages. The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award. Any award shall be final, binding, and non-appealable. Each party hereby irrevocably submits to the jurisdiction of the state and federal courts for the County of Los Angeles in connection with any petition to confirm an arbitration award obtained pursuant to this Paragraph. The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including reasonable, outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered. The arbitration will be confidential and conducted in private, and will not be open to the public or media.  Except in connection with any petition to confirm the arbitration award, no matter relating to the arbitration (including, but not limited to, the testimony, evidence or result) may be: (i) made public in any manner or form (ii) reported to any news agency or publisher; or (iii) disclosed to any third party not involved in the arbitration.

5

DocuSign Envelope ID: FB66C64D-0C68-4D36-8675-93724D6CA134

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

"Company"                                                    "Lender"

By:   David Brown                                            By:   Todd Lundbohm

Its: Authorized Signatory                                    Its: Authorized Signatory

## INDUCEMENT BY PRODUCER

I have read the foregoing agreement and I agree to render all services, grant all rights, and observe all restrictions necessary to enable Lender to comply with its obligations under said agreement. Should I fail to do so, Company shall have the same rights against me as it shall have against Lender. I agree to indemnify Company by reason of my failure or the failure of Lender to comply fully with any of my or its obligations. I certify that my services are rendered as an employee of Lender pursuant to a valid and binding written employment agreement, and, unless I am deemed substituted for Lender as a direct party to the foregoing agreement, I agree to look solely to Lender for payment of compensation for my services and discharge of all other obligations of an employer.

Todd Lundbohm, an individual

6

Exhibit H

**CONFIDENTIAL SIDE LETTER**

December 17, 2019

**RE:  Confidential Side Letter / "Chasing Nightmares" / Clear Distribution LLC / 828 Media Capital, LLC / Todd Lundbohm**

Reference is hereby made to the certain Term Sheet dated as of November 20, 2019, (the "Agreement") between Nightmares PSC LLC ("Company"), on the one hand, and 828 Media Capital, LLC ("828 Media") on the other hand, in connection with the motion picture project presently entitled "Chasing Nightmares" (the "Picture").  Capitalized terms not defined herein shall have the same meaning and effect as set forth in the Agreement.

Notwithstanding anything to the contrary in the Agreement, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, this letter shall confirm *on a strictly confidential basis,* that Company, and 828 Media agree to the following:

- In consideration for the Investment, 828 Media shall be entitled to receive an amount equal to fifty percent (50%) of one hundred percent (100%) of the sales commissions actually received by Clear Distribution LLC in connection with its sales agency services with respect to the Picture, from the Effective Date until such time as the Investment, the EP Fee, and all premium, and default interest associated therewith have been repaid by Company to 828 Media.

The terms and conditions of this side letter are confidential; provided that parties will not be in breach for disclosure of this Side Letter in order to enforce the terms herein.  This letter may be executed in counterparts and by fax/electronic or PDF signatures shall have the same force as original.

IN WITNESS WHEREOF, the parties hereto have executed this letter agreement as of the 17th day of December, 2019.

CLEAR DISTRIBUTION LLC

By: David Brown
Authorized Signatory for Clear Distribution LLC

828 MEDIA CAPITAL, LLC

By: Todd Lundbohm
Authorized Signatory for 828 Media Capital, LLC

Exhibit I

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

**OPERATING AGREEMENT OF
NIGHTMARES PSC LLC
A CALIFORNIA LIMITED LIABILITY COMPANY**

**THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY JURISDICTION. NO MEMBERSHIP INTEREST MAY BE SOLD OR OFFERED FOR SALE (WITHIN THE MEANING OF ANY SECURITIES LAW) UNLESS A REGISTRATION STATEMENT UNDER ALL APPLICABLE SECURITIES LAWS WITH RESPECT TO THE MEMBERSHIP INTEREST IS THEN IN EFFECT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS IS THEN APPLICABLE TO THE MEMBERSHIP INTEREST. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE APPLICABLE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.**

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

This Operating Agreement (the "Agreement") is made as of December 6, 2019 ("Effective Date") by the Managers (as defined below) of the Company (as defined below), a manager-managed California Limited Liability Company, and such parties who from time to time execute this Agreement as Members (as defined and specified in Exhibit A).

The Managers (as defined below) hereby represent and agree that they filed, on behalf of the Company, Articles of Organization with the Secretary of State for the State of California, and that they desire to enter into an operating agreement in accordance with the California Revised Unified Limited Liability Company Act.

WHEREAS, the Company desires to provide for the governance of the Company and the conduct of its business, and to specify the relative rights and obligations of the Managers and Members (as defined below);

WHEREAS, the Managers (as defined below) hereunder desire to enter into this Agreement, which shall supersede and replace the Initial Operating Agreement, to express the terms and conditions of their membership in the Company and their respective rights and obligations with respect thereto; and

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged by each party to the others, the parties hereto, for themselves, their respective heirs, executors, administrators, successors and assigns, hereby agree as follows:

## ARTICLE I: DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

Section 1.1. *"Affiliate."* "Affiliate" means any Person under the control of, in common control with, or in control of a Member or a Manager, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited liability company, the ability to exercise more than fifty-one percent (51%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

Section 1.2. *"Agreement."* "Agreement" means this Agreement, in its original form and as amended from time to time.

Section 1.3. *"Articles."* "Articles" means the Articles of Organization filed with the California Secretary of State forming this limited liability company, as initially filed on February 21, 2019 and as they may be amended from time to time.

Section 1.4. *"Available Cash Flow."* "Available Cash Flow" means, with respect to any Fiscal Year or other period, the sum of all cash receipts of the Company from any and all sources, less all cash disbursements (including, without limitation, loan repayments) and a reasonable allowance for reserves, contingencies and anticipated obligations as determined by the Managers.

Section 1.5. *"Bankruptcy."* "Bankruptcy" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

Section 1.6. *"CAMA."* "CAMA" means the third party Collection Account Management Agreement, which shall be established by a collection agent (Freeway and Fintage being expressly preapproved by the Members).

Section 1.7. *"Capital Account."* "Capital Account" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as (1) increased by any additional contributions and the Member's share of the Company's Profits (as defined below), and (2) decreased by any distribution to that Member as well as that Member's share of Company Losses (as defined below).

Section 1.8. *"Capital Contribution."* "Capital Contribution" means, with respect to any Member, Cash Capital Contribution. "Cash Capital Contribution" shall mean the amount of money contributed to the Company, in consideration of a Percentage Interest held by such Member, if any. A Capital Contribution shall not be deemed a loan.

Section 1.9. *"Code."* "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding revenue law.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 1.10 *"Collection Account."* "Collection Account" means the separate account which shall be established by a third party collection agent (Freeway and Fintage being expressly approved by the Members) for the purpose of collecting all Company Gross Revenue, and paying costs and expenses as set forth in the CAMA.

Section 1.11. *"Company."* "Company" means Nightmares PSC LLC, the entity formed in accordance with this Agreement and the Articles.

Section 1.12. *"Company Minimum Gain."* "Company Minimum Gain" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations section 1.704-2(d) [26CFR § 1.704-2(d)].

Section 1.13. *"Company Gross Revenue."* "Company Gross Revenue" shall have the definition set forth in Exhibit C, which Exhibit C the Members agree shall replace and supersede Exhibit NP in each of the Investment Agreements for the Picture, and which is approved by all Members.

Section 1.14. *"Deferments."* "Deferments" means arrangements for the deferral of some or all of the costs of goods and/or services (e.g. acting, writing, directing, and producing) provided by the suppliers of such goods and/or services, and all of which shall be approved by all of the Managers in writing.

Section 1.15. *"Departing Member."* "Departing Member" means any Member whose conduct results in a Dissolution Event (defined below) or who withdraws from the Company in accordance with Section 4.7, where such withdrawal does not result in Dissolution (defined below) of the Company.

Section 1.16. *"Dissolution."* "Dissolution" means (i) when used with reference to the Company, the earlier of (a) the date upon which the Company is terminated under the California Revised Uniform Limited Liability Company Act, or any similar provision enacted in lieu thereof, or (b) the date upon which the Company ceases to be a going concern, in accordance with Article IX herein, and (ii) when used with reference to any Member, the earlier of (a) the date upon which there is a Dissolution of the Company or (b) the date upon which such Member's entire interest in the Company is terminated by means of a distribution or series of distributions by the Company to such Member.

Section 1.17. *"Dissolution Event."* "Dissolution Event" means one or more of the following: the death, resignation, retirement, expulsion, or bankruptcy of all Members.

Section 1.18. *"Distribution."* "Distribution" means the transfer of money or property by the Company to the Members without consideration in accordance with this Agreement.

Section 1.19. *"Economic Interest"* "Economic Interest" means a Person's (defined below) right to share in the Profits, Losses or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to vote or to participate in the management of the Company, or, except as provided otherwise herein, any right to information concerning the business and affairs of the Company.

Section 1.21. *"Fiscal Year."* "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

Section 1.23. *"LLC Act."* "LLC Act" means the California Revised Uniform Limited Liability Company Act, as amended from time to time, and the provisions of any succeeding law.

Section 1.24. *"Losses."* "Losses" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable loss for such year or period, determined in accordance with Code section 703(a).

Section 1.25. *"Majority Interest."* "Majority Interest" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

Section 1.26. *"Manager."* "Manager" means the Person who (i) has been admitted as a Manager in the Company; (ii) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (iii) has not engaged in conduct resulting in a Dissolution Event or terminated his, her, or its membership as a Manager for any other reason. 828 Productions LLC ("828"), Perth Road Productions LLC ("Perth Road"), and Specter Entertainment LLC ("Specter") shall individually and collectively be referred to herein as the "Manager(s)" as set forth in Exhibit B.

Section 1.27. *"Member."* "Member" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

Section 1.26. *"Member Nonrecourse Debt."* "Member Nonrecourse Debt" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations section 1.704-2(b) (4) [26 CFR § 1.704-2(b) (4)].

Section 1.28. *"Member Nonrecourse Deductions."* "Member Nonrecourse Deductions" means items of Company loss, deduction, or Code section 705(a) (2) (B) [26 USCS § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 1.29. *"Membership Interest."* "Membership Interest" means a Member's rights in the Company, collectively, including the Member's Economic Interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the LLC Act.

Section 1.30. *"Negative Capital Account."* "Negative Capital Account" means a Capital Account with a balance of less than zero.

Section 1.31. *"Nonrecourse Liability."* "Nonrecourse Liability" has the meaning provided in the Regulations section 1.752-1(a)(2). [26 CFR § 1.752-1(a)(2)].

Section 1.33. *"Officer."* "Officer" means any Person appointed by the Managers, in accordance with Section 5.1 of this Agreement, to conduct, or to assist the Managers in the conduct of the day-to-day business and affairs of the Company. Such Officers may include a Chairperson, one or more Senior Vice Presidents, one or more Vice Presidents, a Secretary, one or more Assistant Secretaries, a Chief Financial Officer, a Treasurer, one or more Assistant Treasurers, and a Comptroller.

Section 1.34. *"Percentage Interest."* "Percentage Interest" means the percentage ownership of the Company of each Member, including the Managers, as set forth in the column entitled "Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time to time pursuant to this Agreement.

Section 1.35. *"Person."* "Person" means an individual, partnership, limited partnership, corporation, limited liability company, registered limited liability partnership, trust, estate, association, or any other entity.

Section 1.36. *"Picture."* "Picture" means the motion picture project currently entitled "Chasing Nightmares."

Section 1.37. *"Positive Capital Account."* "Positive Capital Account" means a Capital Account with a balance greater than zero.

Section 1.38. *"Principal."* "Principal" means the natural Person, which is in ultimate control of a Member.

Section 1.39. *"Profits."* "Profits" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income for such year or period, determined in accordance with Code section 703(a).

Section 1.40. *"Regulations."* "Regulations," as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations, which may be promulgated.

Section 1.40. *"Secretary of State."* "Secretary of State" means the Secretary of State for the State of California.

Section 1.41. *"Tax Matters Partner."* "Tax Matters Partner" as defined in Code section 6231 [26 USCS § 6231] is that Member designated by the Company in Section 8.7 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

## ARTICLE II: FORMATION AND ORGANIZATION

Section 2.1. *Initial Date and Initial Parties.* This Agreement is first entered into as of the Effective Date by and among the Company and the Persons who are Members of the Company on that Effective Date.

Section 2.2. *Period of Duration.* The period of duration of the Company ("Period of Duration") shall commence on the date of the filing of the Articles with the California Secretary of State, and shall continue in perpetuity unless the Company is terminated or dissolved sooner in accordance with the provisions of this Agreement.

Section 2.3. *Subsequent Parties.* No Person may become a Member of the Company without agreeing to and becoming a signatory of this Agreement and any offer or assignment of a Membership Interest is contingent upon the fulfillment of this condition.

Section 2.4. *Name.* The name of this Company is Nightmares PSC LLC.

Section 2.5. *Business and Purpose of the Company.* The business of the Company shall be (i) to develop, produce and exploit the Picture; (ii) to perform and conduct any other activity necessary or incidental to the foregoing in furtherance of the objects of the business of the Company; and (iii) to engage in any lawful act or activity for which a limited liability company may be organized under the LLC Act.

Section 2.6. *Principal Place of Business.* The Company will have its principal place of business at 3940 Laurel Canyon Blvd. #1413, Studio City, CA 91604, or at any other address designated by the Managers. The Company shall maintain its principal executive offices at its principal place of business, as well as maintaining at that location all records and documents which it is required to keep by the LLC Act.

Section 2.7. *Resident Agent.* The name and address of the Company's agent for service of process in the State of California is Michelle Chang, 315 S. Beverly Drive, Suite 210, Beverly Hills, CA 90212.

4

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 2.8. *Names and Addresses of Members.*  The name, present mailing address, and Economic Interest, Membership Interest, and Percentage Interest of each Member are defined in Exhibit A.

Section 2.9. *Names and Addresses of Managers.*  The names and present mailing addresses of the Managers are defined in Exhibit B.

## ARTICLE III: CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 3.1. *Initial Capital Contributions.*  Each Member shall contribute to the Company the monies as set forth in Exhibit A as that Member's initial Capital Contribution.  Notwithstanding the foregoing, the Managers shall have the unfettered right to accept or reject, in their discretion, any proposed Capital Contribution, subject to the terms of this Agreement. All Persons whose Capital Contributions are accepted by the unanimous approval of the Managers shall be deemed Members. For purposes of clarification, a Manager's respective Capital Contributions in the form of management services to the Company, as set forth in Exhibit A, shall not be deemed a Cash Capital Contribution, and no Capital Account Amount shall be allocated to such services, provided, however, a Manager may, at the Managers' election, deem their compensation in connection with their respective services on the Picture (e.g. acting, writing, directing, and producing) as a Capital Contribution.

Section 3.2. *Additional Contributions.*  No Member shall be required to make any additional contribution to the Company.  However, upon the approval by the Managers that additional capital is desirable or necessary, any Member may, but shall not be required to, contribute additional capital to the Company on terms and conditions as determined by the Managers, subject to Section 3.1.

Section 3.3. *Company Capital.*  No Member shall have the right to withdraw, or receive any return of, his, her or its Capital Contribution, and no Capital Contribution may be returned in the form of property other than cash, except as specifically provided herein.

Section 3.4. *No Interest on Capital Contributions.*  Except as expressly provided in this Agreement, no Capital Contribution of any Member shall bear any interest or otherwise entitle the contributing Member to any compensation for use of the contributed capital.

Section 3.5. *General Rules for Adjustment of Capital Accounts.*  The Capital Account of each Member shall be:

(a) Increased by:
   (i) Such Member's Cash Capital Contributions;
   (ii) The agreed fair market value of property contributed by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code section 752);
   (iii) All items of Company income and gain (including income and gain exempt from tax) allocated to such Member pursuant to Article VI or other provisions of this Agreement; and

(b) Decreased by:
   (i) The amount of cash distributed to such Member;
   (ii) The agreed fair market value of all actual and deemed distributions of property made to such Member pursuant to this Agreement (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to Code Section 752);
   (iii) All items of Company deduction and loss allocated to such Member pursuant to Article IV or other provisions of this Agreement.

Section 3.6. *Special Rules with Respect to Capital Accounts.*  For purposes of computing the balance in a Member's Capital Account, no credit shall be given for any Capital Contribution which such Member is to make until such contribution is actually made.

Section 3.7. *Transferee's Capital Account.*  In the event a Member, or the holder of an Economic Interest, transfers an interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest.

Section 3.8. *Right to Return of Contributions.*  No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement.

Section 3.9. *Capital Accounts.*  A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations section 1.704-1(b)(2)(iv) [26 CFR § 1.704-1(b)(2)(iv)], which shall reflect all Capital Contributions to the Company.  Should any member transfer or assign all or any part of his, her, or its

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Membership Interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

Section 3.10. *Failure of Member to Make Contribution.* All Members shall make timely payment to the Company of required Capital Contributions. The failure of any Member to make their initial Capital Contribution will render him, her, or it in a default and may result in the loss of the Member's ability to participate in the Company. Further, a Member who is in default may have his, her, or its proportionate interest in the Company diluted, reduced, or even eliminated, depending on the extent and circumstances of the default.

Section 3.11. *No Priorities of Members; No Withdrawals of Capital.* Except as otherwise specified in Article IV and/or in the LLC Act and/or Exhibit C of this Agreement, no Member shall have a priority over any other Member as to any Distribution, whether by way of return of capital or by way of Profits, or as to any allocation of Profits. No Member shall have the right to withdraw or reduce his, her, or its Capital Contributions in the Company except as otherwise provided by the LLC Act.

Section 3.12. *Purpose of Capital Contribution.* Each Member (including any Person who becomes a Member after formation pursuant to Article IV or by operation of the LLC Act) hereby represents that he, she or it is acquiring his, her or its interest for investment purposes only and not with a view to the distribution thereof. Any transfer of an interest shall be made by a Member only in accordance with this Agreement, the LLC Act and applicable federal and state securities laws.

Section 3.13. *Loans/Debt Financing.* The Company may borrow funds and/or take on debt to conduct its business and may secure these loans and/or debt financing (which may include, without limitation, premium return and/or default penalty) with the assets and income of the Company and/or such loans and/or debt financing may be without recourse.

Section 3.14. [Intentionally Omitted]

## ARTICLE IV: MEMBERS

Section 4.1. *Limitation of Liability.* No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his, her, or its membership in the Company, except as expressly set forth in this Agreement or as required by law.

Section 4.2. *Additional Members.* Additional Members may be admitted to the Company only if approved by the Managers and all Members, subject to this Agreement, and the Members' Percentage Interest, Economic Interest, and Membership Interest shall be diluted in accordance with the terms hereof. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and Percentage Interest, Economic Interest and Membership Interest of any additional Members.

Section 4.3. *Transactions with Company.* A Member may lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the LLC Act. To the extent permitted by applicable laws, such Member shall be treated like any other Person with respect to transactions with the Company, and such loan shall be separate and distinct from Capital Contributions.

Section 4.4. *Company is Manager-Managed.* It is the intent of the Members of this Company that this Company is manager-managed and the Managers shall participate actively in the management of the Company and act as the agents of the Company, except as limited by the provisions contained in Article V.

Section 4.5. *Meetings.* There will be no required regular or annual meetings of the Members. However, subject to the LLC Act, any Member may call a meeting at any time, provided such is approved by the Managers. Meetings of the Members shall be held at the Company's principal executive office or at any other place within the State of California, selected by the Member calling the meeting, except as set forth in Section 4.5(a). Written notice of the meeting shall be provided to all Members entitled to vote at the meeting. Notice shall be given in accordance with the requirements of the LLC Act. Any meetings of the Members shall be conducted in accordance with all of the requirements under the LLC Act. Unless otherwise provided in this Agreement and the LLC Act, approval of any matters coming before the Members may be obtained by a vote of the Majority Interest unless otherwise set forth in the Member's Investment Agreement.

(a) *Actions without Meetings.* Unless otherwise provided in this Agreement, any action, which may be taken at any meeting of the Members, may be taken without a meeting and without prior notice if consent in writing, providing for the action so taken is signed by the Majority Interest, unless otherwise set forth in the Member's Investment Agreement. All such consents shall be filed and maintained in the Company's records.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 4.6. *Other Business.* The Members, the Managers, and any Affiliate of the Members and/or Managers, may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. The Company shall not have any rights in or to such independent ventures or the income or profits by virtue of this Agreement.

Section 4.7. *Withdrawal.* Consistent with the LLC Act and notwithstanding anything to the contrary, no Member may withdraw as a Member, by notice or otherwise, without the affirmative vote of the Majority Interest. For purposes of clarification, such vote may include the vote of the withdrawing Member.

Section 4.8. *Admission of New Members.* After the formation of the Company, any Person may become a Member of the Company upon approval of the Managers, subject to Sections 3.1, 3.2 and 4.2.

Section 4.9. *Rights of Members and Non-Members.* Upon the request of a Member or a holder of an Economic Interest who is not a Member, for purposes reasonably related to the interest of that Person, the Company shall promptly deliver to the Member or holder of an Economic Interest, at the expense of the Company, a copy of this Agreement and a copy of the information listed in this Agreement.

Section 4.10. *Limitation on Exposing Member to Personal Liability.* Neither the Company nor the Managers, nor any or all Members may take any action that will have the effect of exposing any Member to personal liability for the obligations of the Company, without first obtaining the prior written consent of such Member.

## ARTICLE V: MANAGEMENT BY THE MANAGERS

Section 5.1. *Company is Manager-managed.* The Company shall be managed by its Managers as set forth in Exhibit B, who may also be Members for the Period of Duration of the Company. The Managers shall have exclusive control and decision-making authority over all aspects of the Picture, including development, pre-production, production, post-production, business management, including signing authority on all bank accounts, and approval rights over the final cut of the Picture. As between the Managers, the decision shall be by majority vote and all references to Managers' approval in this Agreement shall abide by such rule with respect to all customary key creative matters (subject to any third party rights and/or agreements), business decisions, and management decisions in connection with the Company, provided that, in the event of a tie between the Managers, Perth Road and Specter, jointly, shall be the tie breaker for all creative decisions of Company, and 828 shall be the tie breaker for all business decisions of Company. 828 and Specter shall confer on all talent and crew deals regarding the Picture but Specter shall have the authority to make day-to-day, on-set decisions.

Section 5.2. *Duties of the Manager.* The Managers are the general managers and have general supervision, direction, and control of the business of the Company. The Managers shall preside at all meetings of the Members. The Managers shall have the general powers and duties of management typically vested in the office of president of a corporation. Without in any way derogating from the generality of the foregoing and except as set forth in this Agreement, the Managers, as between themselves and the Members, shall have full and exclusive authority with respect to all decisions required or permitted to be made affecting the Company. Unless greater or other authorization is required pursuant to this Agreement or under the California Revised Uniform Limited Liability Company Act for the Company to engage in an activity or transaction, all activities or transactions must be approved by a majority of the Managers, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Manager authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

Section 5.3. *Officers of the Company.* The Managers may, at the Managers' discretion and in accordance with Section 5.1 of this Agreement, appoint Officers of the Company at any time to conduct, or to assist the Managers in the conduct of, the day-to-day business and affairs of the Company. The Officers shall serve at the pleasure of the Managers, subject to all rights, if any, of an Officer under any contract of employment between the Company and Officer, if any, separate from this Agreement. An individual may hold a number of offices. The Officers shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation and as shall be determined from time to time by the Managers in accordance with Section 5.1 of this Agreement, but subject in all instances to the supervision and control of the Managers in accordance with Section 5.1 of this Agreement, and the terms of this Agreement.

(a) *Signing Authority of Officers.* Subject to the terms of this Agreement, the appointed Officers shall have such authority to sign documents on behalf of the Company as may be delegated to them by the Managers, if any.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

(b) *Acts of Officers as Conclusive Evidence of Authority.* Any note, mortgage, deed of trust, evidence of indebtedness, contract, certificate, statement, conveyance or other instrument or obligation in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other Person, when signed by the appropriate Officer is not invalidated as to the Company by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other Person that the signing officers had no authority to execute the same.

Section 5.4.  *Limitations on Power of the Managers.*  The Managers may not undertake the following acts on behalf of the Company without first obtaining the consent of a supermajority interest (i.e. greater than sixty six percent (66%) of the total interests held by the Members):

(a) The approval of a sale, transfer, exchange, assignment, or other disposition of all or any part of a Member's Membership Interest (excluding the right to assign the "Net Profits" (as defined in Exhibit C) based on Member's Economic Interest) in the Company and admission of the assignee as a Member of the Company, subject to Article 7;

(b) The decision to continue to operate the business of the Company after the occurrence of a Dissolution Event;

(c) The sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a single transaction or as a series of transactions over a three-month period, except if it is in a distribution or license agreement that is customary in the entertainment industry in connection with the Picture, including, but not limited to, producer representation agreements and/or agency representation agreements, or if the same is part of the orderly liquidation and winding up of the Company's affairs upon the Dissolution of the Company;

(d) The merger of the Company with any other business entity;

(e) The confession of a judgment against the Company;

(f) Any act which would prevent the Company from conducting its duly authorized business'

(g) The conversion of the Company into another business entity;

(h) Any amendment to this Agreement, except as set forth in Section 12.11;

(i) Any act outside the scope of the purpose of the Company as set forth in Section 2.5;

(j) Any deferral of fees other than those set forth in the Agreement;

(k) Company taking on any debt, equity (in excess of the Maximum deferral, etc. that would impact the waterfall).

Section 5.5.  *Limitation on Exposing Managers to Personal Liability.*  Neither the Company nor any Member may take any action that will have the effect of exposing any of the Managers of the Company to personal liability for the obligations of the Company, without first obtaining the written consent of such Manager.

Section 5.6.  *Compensation of Managers.*  The Managers may receive compensation for services rendered in connection with the Picture (e.g., producer, director, acting fees and/or "Profit Participation," as defined below, in connection therewith) and not in the capacity of a Manager of the Company, which shall be set forth in separate service agreements and/or finance agreement for any and all of the Managers.

Section 5.7.  *Fiduciary Duties.*  The fiduciary duties the Managers owe to the Company in connection to the Managers' management duties hereunder, and to the Members of the Company, are those of a partner to a partnership and to the partners of the partnership.

Section 5.8.  *Liability for Acts and Omissions.*  As long as the Managers act in accordance with Section 5.7, the Managers shall not incur liability to any other Member or to the Company for any act or omission which occurs while in the performance of services for the Company.

Section 5.9.  *Removal of a Manager.*  The Managers may be removed, but only for criminal activity (i.e. a criminal act, fraud or embezzlement, whether or not such act results in a criminal charge or conviction), and only by vote of the Majority Interest at a meeting called expressly for that purpose in accordance with Section 4.5 and the Act. For purposes of clarification, such vote shall not include the vote of the Manager to be removed. Any removal shall be without prejudice to the rights, if any, of such Manager under such Manager's respective services agreement (including, without limitation, in connection with any credit and/or compensation provisions set forth therein, in accordance with the terms of thereof) and such Manager shall retain any ownership right as a Member of the Company, if any, as set forth in Exhibit A unless otherwise agreed to by the Majority Interest.  Upon the effectiveness of such removal, the Members may, by the consent of the Majority Interest, elect a successor Manager to continue the business of the Company.

Section 5.10.  *Withdrawal of a Manager.*  A Manager may withdraw as a Manager only by vote of the Majority Interest.  For purposes of clarification, such vote may include the vote of the withdrawing Manager. Any withdrawal shall be without prejudice to the rights, if any, of such Manager under such Manager's respective services agreement

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

(including, without limitation, in connection with any credit and/or compensation provisions set forth therein, in accordance with the terms of thereof). Additionally, the withdrawing Manager shall not retain any Percentage Interest or Membership Interest as set forth in Exhibit A. Upon the effectiveness of such withdrawal, the Members may, by the consent of the Majority Interest, elect a successor Manager to continue the business of the Company.

Section 5.11. *Incapacity or Death of a Manager*. In the event of the withdrawal, incapacity/permanent disability, or death of a Manager (or principal of the Manager, as applicable), a new Manager may be named by the Majority Interest; however, the withdrawing/incapacitated/deceased Manager (or such Manager's heirs or successor) shall retain such Manager's Economic Interest, if any.

## ARTICLE VI:  DISTRIBUTION OF REVENUES

Section 6.1. *Distributions*. Distributions of Company Gross Revenue shall be governed by the CAMA in accordance with Exhibit C. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Members pursuant to this Section 6.1.

Section 6.2. *Profit Participation*. Managers shall have the right to allocate to parties furnishing rights, monies or services to the Picture (including, without limitation, to the Managers in their capacities other than as Managers of the Company) in the form of profit participation ("Profit Participation") and such Profit Participation shall be in the form of profit participation only from the "Producer's Share of Net Profits" (as defined in Exhibit C). For purposes of clarification, a Manager may be accorded Profit Participation in the Producer's Share of Net Profits pursuant to the service agreement of a respective Manager (e.g. a director agreement, producer agreement, etc.).

Section 6.3. *Special Allocations*.

(a) *Qualified Income Offset*. In the event any Member, in such capacity, unexpectedly receives any adjustments, allocations or distributions described in 1.704-1(b)(2)(ii)(d)(4) (regarding depletion deductions) of the Code and applicable Treasury Regulations, 1.704-1(b)(2)(ii)(d)(5) (regarding certain mandatory allocations under Treasury Regulations regarding family partnerships, the so-called varying interest rules, or certain in-kind distributions), or 1.704-1(b)(2)(ii)(d)(6) (regarding certain distributions, to the extent they exceed certain expected offsetting increases in a Member's Capital Account), items of Company income and gain shall be specially allocated to such Members in an amount and a manner sufficient to eliminate, as quickly as possible, the deficit balances in the Member's Capital Account created by such adjustments, allocations or distributions. Any special allocations of items of income or gain pursuant to this subsection (a) shall be taken into account in computing subsequent allocations of Profits pursuant to this Article VI, so that the net amount of any items so allocated and the Profits or other items allocated to each Member pursuant to this Article VI shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI as if such unexpected adjustments, allocations or distributions had not occurred.

(b) *Section 704(c) Allocations*. In accordance with Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial book value. In the event the book value of any Company property is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its fair market value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Majority Interest, in any manner that reasonably reflects the purpose of this Agreement. Allocations made pursuant to this subsection (b) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, other items, or Distributions pursuant to any provision of this Agreement.

(c) The Members shall make such other special allocations as are required in order to comply with any mandatory provision of the applicable Treasury Regulations or to reflect a Member's Economic Interest in the Company determined with reference to such Member's right to receive Distributions from the Company and such Member's obligation, if any, to pay any expenses or liabilities.

(d) The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their share of Company income and loss for income tax purposes.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 6.4. *Allocation of Tax Items*. Except as otherwise required by applicable law, every item of income, gain, deduction, or loss shall be allocated among the Members in proportion to their Percentage Interests.

Section 6.5. *Compliance with the Code and Regulations*. The Company intends to comply with the Code and all applicable Treasury Regulations, including, without limitation, the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

## ARTICLE VII:  TRANSFERS OF MEMBERSHIP

Section 7.1. *Restriction on Transferability of Membership Interests*. A Member may not transfer, assign, encumber, or convey all or any part of his, her, or its Economic Interest or Membership Interest in the Company, except as provided herein. In entering into this Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships between or among the Members. Notwithstanding the foregoing, transfers of Membership Interests to a trust solely for estate planning purposes shall not be subject to the restrictions set forth herein except as otherwise required by law.

Section 7.2. *Permitted Transfers*. Any Member who wishes to transfer all or any part of his, her, or its Membership Interest or Economic Interest in the Company shall only have the right to transfer such Membership Interest or Economic Interest back to the Company at a price equal to 100% of the transferor's interest (less any Distributions made to such Member).

Section 7.3. *Transfers Not in Compliance with This Agreement*. Any transfer not in compliance with the provisions of Sections 7.2 or any other provision of this Agreement shall be null and void and have no force or effect.

Section 7.4. *No Release of Liability*. Any Member or departing Member whose interest in the Company is sold pursuant to Article VII is not relieved thereby of any liability he, she, or it may owe the Company, if any.

## ARTICLE VIII:  BOOKS, RECORDS, AND REPORTING

Section 8.1. *Books and Records*. The Company shall maintain at its principal place of business the following books and records:

(a) A current list of the full name and last known business or residence address of each Member together with the Capital Contribution, Capital Account, Economic Interest, Membership Interest and Percentage Interest of each Member;

(b) A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) A copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) Copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) The books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) True and correct copies of all relevant documents and records indicating the amount, cost, and value of all of the property and assets of the Company.

Section 8.2. *Accounting Rights*. Company shall enter into a CAMA pursuant to which a Collection Account shall be established for the purpose of collecting all Company Gross Revenue, and paying costs and expenses as set forth in the CAMA including, without limitation, sales agency fees, guild residuals, fees, and third party gross participations as tentatively outlined in Exhibit C. The Members shall be parties and beneficiary thereto (with customary full accounting and audit rights). Company shall irrevocably direct all domestic distributors and the foreign sales agent (or foreign distributors, if no foreign sales agent) to pay all Company Gross Revenues directly to the Collection Account.

Section 8.3. *Accounting Methods*. The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

Section 8.4. *Reports*. The Company shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Company shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

and state tax returns, which the Company shall send to each Member within ninety (90) days of the conclusion of the taxable year.

(a) All information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns; and

(b) A copy of the Company's federal, state, and local income tax or information returns for the taxable year.

Section 8.5. *Inspection Rights*. For purposes reasonably related to their Membership Interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Company shall provide Members with copies of all records and documents to which Members are entitled under the Act.

Section 8.6. *Bank Accounts*. The Managers shall maintain all of the funds of the Company in a bank account in the name of the Company, at a depository institution, as the Managers shall determine in accordance with Section 5.1 of this Agreement. The Managers shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. Each Manager, acting alone, may endorse checks, drafts, or other evidence of indebtedness to the Company for the sole purpose of depositing them in the Company accounts. Each Manager, acting alone, may sign checks, drafts, or other evidence of indebtedness obligating the Company to pay money to a third party.

Section 8.7. *Tax Matters Partner*. The Company designates David Brown as Tax Matters Partner as defined in Code section 6231 [26 USCS § 6231], to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations, but retains the right to make such a designation by amendment to this Agreement, in the manner provided in this Agreement for amendments.

## ARTICLE IX TERMINATION AND DISSOLUTION

Section 9.1. *Dissolution*. The Company shall be dissolved upon the occurrence of any of the following events:

(a) By the written approval all of the Members to dissolve the Company;

(b) The sale or other disposition of substantially all of Company's assets;

(c) Entry of a decree of judicial dissolution under the Act;

(d) Bankruptcy of the Company; or

(e) Dissolution Event.

Section 9.2. *Certificate of Dissolution and/or Cancellation*. As soon as possible after the occurrence of any of the events specified in Section 9.1 above, the Company shall file a Certificate of Dissolution and/or Cancellation in such form as prescribed by the Secretary of State.

Section 9.3. *Conduct of Business*. Upon the filing of the Certificate of Dissolution and/or Cancellation with the Secretary of State, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business. The dissolved Company continues to exist pursuant to the LLC Act for the purpose of winding up its affairs, prosecuting and defending actions by or against it in order to collect and discharge obligations, disposing of and conveying its property, and collecting and dividing its assets.

Section 9.4. *Distribution of Company Gross Revenue*. The Members shall continue to divide Company Gross Revenue and Available Cash Flow during the winding-up period in the same manner and the same priorities as provided for in Articles III and VI hereof. The proceeds from the liquidation of property shall be applied in the following order:

(a) To the payment of creditors, in the order of priority as provided by law, except to the Members on account of their Capital Contributions;

(b) To the payment of loans or advances that may have been made by any of the Members or their Principals for working capital or other requirements of the Company, except to Members on account of their Capital Contributions;

(c) To the Members in accordance with the positive balances in their Capital Accounts after adjustments for all Distribution. Where the Distribution pursuant to this Section 9.4 consists both of cash (or cash equivalents) and non-cash assets, the cash (or cash equivalents) shall first be distributed, in a descending order, to fully satisfy each category starting with Section 9.4(a) above and in accordance with Exhibit C. In the case of non-cash assets, the distribution values are to be based on the fair market value thereof as determined in good faith by the liquidator, and the shortest maturity portion of such non-cash assets (*e.g.*, notes or other indebtedness) shall, to the extent such non-cash assets are readily divisible, be distributed, in a descending order, to fully satisfy each category above, starting with the most preferred category.

11

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

(d) After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members who are creditors of the Company, the remaining assets shall be distributed among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Article VI. Members shall not be required to restore Negative Capital Account Balances.

Section 9.5. *Winding Up and Dissolution.* If the Company is dissolved, the Managers shall wind up the Company's affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's creditors of the commencement of dissolution proceedings.

Section 9.6. *Members' Receipt of Payment.* Except as otherwise provided in this Agreement, or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Profits from any individual Members, except as provided in Article VI.

Section 9.7. *Disposition of the Picture.* Notwithstanding the terms of Section 9.4, it is understood and agreed that upon dissolution of the Company, if all the rights in the Picture and/or its underlying property (to the extent owned by the Company) have not been disposed of by the Company prior to such dissolution, then any and all copyrights and copyright rights ancillary thereto of the Company in and to the Picture and/or its underlying property (to the extent owned by the Company) shall be promptly transferred to the Managers, unless otherwise specified in this Agreement or any other agreement in connection with the Picture and the Managers shall assume all responsibility and obligations (including repayment obligations to the Members and disbursement of Profit Participations to third parties pursuant to Exhibit C) in connection with the Picture. In furtherance thereof, the Managers shall promptly execute all necessary and proper assignments and/or other documents to effectuate said transfer.

## **ARTICLE X:  INDEMNIFICATION**

Section 10.1. *Indemnification.*

(a) The Company shall indemnify and hold harmless each of the Members, and each of their respective officers, directors, shareholders, partners, members, trustees, beneficiaries, employees, agents, heirs, assigns, successors-in-interest and Affiliates, (collectively, "Indemnified Persons") from and against any and all losses, damages, liabilities and expenses, (including costs and reasonable attorneys' fees), judgments, fines, settlements and other amounts (collectively "Liabilities") reasonably incurred by any such Indemnified Person in connection with the defense or disposition of any action, suit or other proceeding, whether civil, criminal, administrative or investigative and whether threatened, pending or completed (collectively a "Proceeding"), in which any such Indemnified Person may be involved, or with which any such Indemnified Person may be threatened, with respect to or arising out of any act performed by the Indemnified Person or any omission or failure to act if (i) the performance of the act or the omission or failure was done in good faith and within the scope of the authority conferred upon the Indemnified Person by this Agreement or by the Act, except for acts by the Indemnified Party of willful misconduct, gross negligence or reckless disregard of duty, acts by the Indemnified Party which constitute a material breach of this Agreement from which such Indemnified Person derived an improper personal benefit, or (ii) a court of competent jurisdiction determines upon application that, in view of all of the circumstances, the Indemnified Person is fairly and reasonably entitled to indemnification from the Company for such liabilities as such court may deem proper. The Company's indemnification obligations hereunder shall apply not only with respect to any Proceeding brought by the Company, or a Member, but also with respect to any Proceeding brought by a third party. For purposes of clarification, the indemnification obligation shall not apply in a Proceeding brought by the Company against the Indemnified Person or the Indemnified Person against the Company.

(b) Each Member shall and does hereby agree to indemnify and save harmless the Company, the Managers, the Managers' and Company's Affiliates, counsel and consultants, officers, assigns, etc. and each other Member, their officers, assigns, etc. from any and all liabilities resulting from (i) a breach by such Member of any of the warranties and representations contained in this Agreement made by such Member; (ii) the untruth of any of the warranties and representations contained herein; and (iii) any claims arising from any third party that such Member has contracted with in connection with the Picture. If such warranties and representations either are breached or are not true, the Member who breached such warranties and/or representations, shall, at the election of the Majority Interest, be subject to a rescission of such Member's rights or interests in the Company.

Section 10.2. *Contract Right; Expenses.* The right to indemnification conferred in Section 10.1(a) shall be a contract right and shall include the right to require the Company to advance the expenses incurred by the Indemnified

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Person in defending any such Proceeding in advance of its final disposition; provided, however, that, if the LLC Act so requires, the payment of such expenses in advance of the final disposition of a Proceeding shall be made only upon receipt by the Company of an undertaking, by or on behalf of the Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under Section 10.1(a) or otherwise.

Section 10.3. *Indemnification of Officers and Employees*. The Company may, to the extent authorized from time to time by the Majority Interest, grant rights to indemnification and to advancement of expenses to any Officer, employee, or agent of the Company to the fullest extent of Sections 10.1(a) and 10.2.

Section 10.4. *Other Insurance*. The Managers agree that the Company shall maintain all customary insurance relating to the production of the Picture during production only, if necessary.

Section 10.5. *Assets of the Company*. Any indemnification under Section 10.1 shall be satisfied solely out of the assets of the Company. No Member shall be subject to personal liability or required to fund or to cause to be funded any obligation by reason of these indemnification provisions.

## ARTICLE XI: INVESTMENT REPRESENTATIONS

Section 11.1 *Representations By the Non-Managing Members*. AS A MATERIAL INDUCEMENT TO THE COMPANY TO SELL THE MEMBERSHIP INTEREST TO THE NON-MANAGING MEMBER, EACH NON-MANAGING MEMBER REPRESENTS AND WARRANTS TO THE COMPANY AND THE OTHER MEMBERS AS FOLLOWS, AND ACKNOWLEDGES THAT BY SIGNING THIS AGREEMENT, HE, SHE OR IT HAS READ AND UNDERSTANDS THE FOLLOWING:

(a) Investment Purpose. THE NON-MANAGING MEMBER IS ACQUIRING THE MEMBERSHIP INTEREST FOR HIS, HER OR ITS OWN ACCOUNT, NOT AS AN AGENT OR NOMINEE, AND NOT WITH A VIEW TO, OR FOR SALE IN CONNECTION WITH, ANY DISTRIBUTION THEREOF IN VIOLATION OF APPLICABLE SECURITIES LAWS. THE NON-MANAGING MEMBER FURTHER REPRESENTS THAT HE/SHE/IT DOES NOT HAVE ANY PRESENT CONTRACT, UNDERTAKING, UNDERSTANDING OR ARRANGEMENT WITH ANY PERSON TO SELL, TRANSFER OR GRANT PARTICIPATIONS TO SUCH PERSONS OR ANY THIRD PERSON, WITH RESPECT TO THE MEMBERSHIP INTEREST.

(b) Accredited or Sophisticated Investor Status. THE NON-MANAGING MEMBER REPRESENTS AND WARRANTS THAT SUCH NON-MANAGING MEMBER IS EITHER (I) AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR (II) A "SOPHISTICATED INVESTOR" WHO HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT HE, SHE, OR IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING THE MEMBERSHIP INTERESTS

(c) Reliance on Exemptions. THE NON-MANAGING MEMBER UNDERSTANDS THAT THE MEMBERSHIP INTERESTS ARE BEING OFFERED AND SOLD TO HIM/HER/IT IN RELIANCE ON SPECIFIC EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF FEDERAL AND STATE SECURITIES LAWS AND THAT THE COMPANY IS RELYING IN PART UPON THE TRUTH AND ACCURACY OF, AND THE NON-MANAGING MEMBER'S COMPLIANCE WITH THE REPRESENTATIONS, WARRANTIES, AGREEMENTS, ACKNOWLEDGEMENTS AND UNDERSTANDINGS OF THE NON-MANAGING MEMBER SET FORTH HEREIN IN ORDER TO DETERMINE THE AVAILABILITY OF THE EXEMPTIONS AND THE ELIGIBILITY OF THE NON-MANAGING MEMBER TO ACQUIRE THE MEMBERSHIP INTEREST.

(d) Information. THE NON-MANAGING MEMBER AND THEIR ADVISORS, IF ANY, HAVE BEEN FURNISHED WITH ALL MATERIALS RELATING TO THE BUSINESS, FINANCES AND OPERATIONS OF THE COMPANY AND MATERIALS RELATING TO THE MEMBERSHIP INTEREST WHICH HAVE BEEN REQUESTED BY THE NON-MANAGING MEMBER AND WHICH ARE REQUIRED UNDER THE 1933 ACT. THE NON-MANAGING MEMBER AND THEIR ADVISORS, IF ANY, HAVE BEEN AFFORDED THE OPPORTUNITY TO ASK QUESTIONS OF AND TO RECEIVE ANSWERS FROM THE COMPANY'S AUTHORIZED REPRESENTATIVES CONCERNING THE COMPANY, THE PICTURE, THE COMPANY'S BUSINESS AND PROSPECTS AND THE NON-MANAGING MEMBER HAS BEEN PERMITTED TO HAVE ACCESS TO ALL INFORMATION WHICH HIM/HER/IT HAS REQUESTED IN ORDER TO EVALUATE THE MERITS AND RISKS OF THE PURCHASE OF THE MEMBERSHIP INTEREST. THE NON-MANAGING MEMBER HAS SOUGHT SUCH LEGAL AND TAX ADVICE AS HIM/HER/IT HAS CONSIDERED NECESSARY TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT TO HIS, HER OR ITS PURCHASE OF

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

THE MEMBERSHIP INTEREST, AND IN DETERMINING TO PURCHASE MEMBERSHIP INTEREST HEREUNDER, THE NON-MANAGING MEMBER IS NOT RELYING ON ANY REPRESENTATIONS OF THE COMPANY OR ANY OTHER MEMBER. THE NON-MANAGING MEMBER IS AN INVESTOR IN SECURITIES OF COMPANIES IN THE DEVELOPMENT STAGE AND ACKNOWLEDGES THAT HIM/HER/IT IS ABLE TO FEND FOR ITSELF, CAN BEAR THE ECONOMIC RISK OF HIS, HER OR ITS INVESTMENT, AND HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THE PURCHASE OF THE MEMBERSHIP INTEREST.

Section 11.2. *No Governmental Review.* THE NON-MANAGING MEMBER UNDERSTANDS THAT NO ARBITRATION BOARD OR PANEL, COURT OR FEDERAL, STATE, MUNICIPAL OR OTHER GOVERNMENTAL DEPARTMENT, COMMISSION, BOARD, BUREAU, AGENCY OR INSTRUMENTALITY, DOMESTIC OR FOREIGN HAS PASSED ON OR MADE ANY RECOMMENDATION OR ENDORSEMENT OF THE MEMBERSHIP INTEREST OR THE FAIRNESS OR SUITABILITY OF THE INVESTMENT IN THE MEMBERSHIP INTEREST, NOR HAVE SUCH AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OF THE MEMBERSHIP INTEREST.

Section 11.3. *Transfer or Resale.* THE NON-MANAGING MEMBER UNDERSTANDS THAT:

(a) THE MEMBERSHIP INTEREST HAVE NOT BEEN AND ARE NOT BEING REGISTERED UNDER THE 1933 ACT OR ANY STATE SECURITIES LAWS, AND MAY NOT BE OFFERED FOR SALE, SOLD, ASSIGNED OR TRANSFERRED UNLESS SUBSEQUENTLY REGISTERED THEREUNDER, OR IN RELIANCE ON AN AVAILABLE EXEMPTION FROM REGISTRATION; AND

(b) NEITHER THE COMPANY NOR ANY OTHER PERSON IS UNDER ANY OBLIGATION TO REGISTER MEMBERSHIP INTERESTS UNDER THE 1933 ACT OR ANY STATE SECURITIES LAWS OR TO COMPLY WITH THE TERMS AND CONDITIONS OF ANY EXEMPTION THEREUNDER.

(c) THE MEMBERSHIP INTEREST MAY NEED TO BE HELD INDEFINITELY, AND THE NON-MANAGING MEMBER MUST CONTINUE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT IN THE MEMBERSHIP INTEREST UNLESS THE MEMBERSHIP INTERESTS ARE SUBSEQUENTLY REGISTERED UNDER THE 1933 ACT OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. WHEN AND IF THE MEMBERSHIP INTEREST MAY BE DISPOSED OF WITHOUT REGISTRATION IN RELIANCE ON RULE 144 PROMULGATED UNDER THE 1933 ACT, SUCH DISPOSITION CAN BE MADE ONLY IN LIMITED AMOUNTS IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH RULE, AND THE NON-MANAGING MEMBER MUST DELIVER AN OPINION OF COUNSEL TO THE COMPANY REASONABLY ACCEPTABLE TO THE COMPANY IN FORM, SUBSTANCE AND SCOPE TO THE EFFECT THAT THE MEMBERSHIP INTEREST MAY BE SOLD OR TRANSFERRED UNDER AN EXEMPTION FROM SUCH REGISTRATION, AND IF THE RULE 144 EXEMPTION IS NOT AVAILABLE, PUBLIC SALE WITHOUT REGISTRATION WILL REQUIRE COMPLIANCE WITH AN EXEMPTION UNDER THE 1933 ACT.

Section 11.4. *Risk of Investment.* THE NON-MANAGING MEMBER IS FULLY AWARE OF THE INHERENT RISK OF HIS, HER OR ITS INVESTMENT IN THE COMPANY. THE COMPANY'S SOLE PURPOSE IS TO INVEST IN THE PRODUCTION OF THE PICTURE. THIS INVESTMENT IS EXTREMELY RISKY AS ARE ALL INVESTMENTS IN MOTION PICTURES. THERE IS ABSOLUTELY NO CERTAINTY OR GUARANTY THAT:

(a) THE PICTURE CAN BE COMPLETED;

(b) THE PICTURE CAN BE COMPLETED WITHIN THE BUDGET;

(c) A DISTRIBUTION ARRANGEMENT CAN BE FINALIZED FOR THE PICTURE;

(d) A FORCE MAJEURE EVENT WILL NOT OCCUR WHICH COULD PREVENT COMPLETION OF THE PICTURE OR CAUSE THE COST OF COMPLETION OF THE PICTURE TO EXCEED THE BUDGET;

(e) ANY PROFITS WILL BE REALIZED OR ANY CASH DISTRIBUTED TO ANY MEMBER; OR

(f) THE PICTURE WILL BE SUCCESSFUL.

THE NON-MANAGING MEMBER ACKNOWLEDGES THAT SUCH MEMBER HAS READ AND UNDERSTANDS THE "RISK FACTORS" ATTACHED HERETO AS EXHIBIT "E" AND "TAX CONSIDERATIONS" ATTACHED HERETO AS EXHIBIT "F".

Section 11.5. *Knowledge and Experience.* THE NON-MANAGING MEMBER WARRANTS THAT HIM/HER/IT HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL, TAX AND BUSINESS MATTERS AS TO ENABLE HIM/HER/IT TO EVALUATE THE MERITS AND RISKS OF HIS, HER OR ITS INVESTMENT IN THE COMPANY AND TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT THERETO.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 11.6. *Finders/Brokers; Pre-Existing Relationship; No Advertisement.*    THE NON-MANAGING MEMBER HAS INCURRED NO LIABILITY FOR COMMISSIONS OR OTHER FEES TO ANY FINDER OR BROKER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE COST OF WHICH IS IN ANY PART THE LIABILITY OF OR PAYABLE BY THE COMPANY. THE NON-MANAGING MEMBER HAS A PRE-EXISTING PERSONAL OR BUSINESS RELATIONSHIP WITH THE COMPANY AND/OR ANY OF ITS OFFICERS OR CONTROLLING PERSONS, OR BY HIS, HER OR ITS BUSINESS OR FINANCIAL EXPERIENCE OR THE BUSINESS OR FINANCIAL EXPERIENCE OF ITS FINANCIAL ADVISORS WHO ARE UNAFFILIATED WITH AND WHO ARE NOT COMPENSATED BY THE COMPANY, DIRECTLY OR INDIRECTLY, COULD BE REASONABLY ASSUMED TO HAVE THE CAPACITY TO PROTECT HIS/HER OWN INTEREST IN CONNECTION WITH THE ACQUISITION OF THE MEMBERSHIP INTEREST. THE NON-MANAGING MEMBER ACKNOWLEDGES THAT THE OFFER AND SALE OF THE UNITS WAS NOT ACCOMPLISHED BY THE PUBLICATION OF ANY ADVERTISEMENT.

Section 11.7. *Binding Agreement.* THIS AGREEMENT IS AND WILL REMAIN ITS VALID AND BINDING AGREEMENT, ENFORCEABLE IN ACCORDANCE WITH ITS TERMS (SUBJECT, AS TO THE ENFORCEMENT OF REMEDIES, TO ANY APPLICABLE BANKRUPTCY, INSOLVENCY OR OTHER LAWS AFFECTING THE ENFORCEMENT OF CREDITOR'S RIGHTS).

Section 11.8. *Tax Position.*    THE NON-MANAGING MEMBER AGREES THAT, UNLESS HE, SHE OR IT PROVIDES PRIOR WRITTEN NOTICE TO THE COMPANY, HE, SHE OR IT WILL NOT TAKE A POSITION ON HIS, HER OR ITS FEDERAL INCOME TAX RETURN, ON ANY CLAIM FOR REFUND, OR IN ANY ADMINISTRATIVE OR LEGAL PROCEEDINGS, THAT IS INCONSISTENT WITH ANY INFORMATION RETURN FILED BY THE COMPANY OR WITH THE PROVISIONS OF THIS AGREEMENT.

Section 11.9. *Confidentiality.*    MEMBERS SHALL NOT, AT ANY TIME, DISCLOSE OR SUBMIT TO ANY PERSON, FIRM, CORPORATION OR OTHER ENTITY ALL OR ANY PART OF THIS AGREEMENT OR ANY CONFIDENTIAL OR PROPRIETARY INFORMATION OR TRADE SECRETS (COLLECTIVELY REFERRED TO AS "CONFIDENTIAL INFORMATION") OF THE COMPANY, ITS AFFILIATES, SUBSIDIARIES, OWNERS, OFFIC ERS, DIRECTORS, EMPLOYEES OR AGENTS OBTAINED OR LEARNED BY MEMBERS, INCLUDING, WITHOUT LIMITATION, INFORMATION ABOUT THE COMPANY, ITS INVESTORS, OTHER MEMBERS, ANY CAPITAL CONTRIBUTIONS, AND/OR ANY INFORMATION REGARDING THE PICTURE OTHER THAN TO MEMBERS' AGENTS OR REPRESENTATIVES OR AS REQUIRED BY LAW. MEMBERS RECOGNIZE AND ACKNOWLEDGE THAT THE CONFIDENTIAL INFORMATION OF THE COMPANY IS A VALUABLE, SPECIAL, AND UNIQUE ASSET OF AND BELONGS SOLELY TO THE COMPANY.

## ARTICLE XII: MISCELLANEOUS PROVISIONS

Section 12.1. *Assurances.* Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the Managers in accordance with Section 5.1 of this Agreement, the Majority Interest, and/or the Company or required by this Agreement or the LLC Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

Section 12.2. *Complete Agreement.* This Agreement, the Articles and the Exhibits attached hereto, constitute the complete and exclusive statement of the agreement among the Members and the Company with respect to the matters discussed herein and therein, and together shall supersede all prior written or oral statements among the Managers, Members and the Company, including any prior statements, warranties, or representations.

Section 12.3. *Section Headings.* The section headings, which appear throughout this Agreement, are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

Section 12.4. *Binding Effect.* Subject to the provisions of this Agreement relating to the transferability of Membership Interests or Economic Interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

Section 12.5. *Interpretation.* All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member or the Company relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member and/or by his, her, or its counsel.

15

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 12.6.  *Company Counsel.*  The Members and Managers acknowledge and agree that Company counsel may, upon separate and independent written agreement, also become counsel to any Manager, Principal, Member or Affiliate of a Member or Manager.  The Members and Managers may execute any written consents on behalf of the Company (but not on behalf of any individual Member or Manager) any written consents to such a concurrent representation as may be required by the rules governing professional conduct in the applicable jurisdiction(s).  The Members and Managers acknowledge and agree that Company counsel (i.e. Ramo Law PC) owes them no direct duties in their individual capacity and that Company counsel's duties are owed to the Company and shall be owed to any Manager, Principal, Member or Affiliate of a Member or Manager, which it may now or in the future and upon separate and independent agreement, represent individually.  The Members and Managers acknowledge that Company counsel (i.e. Ramo Law PC) does not represent the Company in connection with accounting or other taxation matters.

Section 12.7.  *Applicable Law.*  Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not by the law of conflicts, of the State of California. The Agreement shall be governed and construed in accordance with the laws of the State of California, without regard to any conflicts of laws principles of the State of California or any other jurisdiction that would call for the application of the law of any jurisdiction other than the State of California; provided, however, that matters relating to the formation of Company as an California limited liability company and the rights and obligations of members of an California limited liability company as set forth in the LLC Act shall be governed by and construed in accordance with the LLC and the related laws of the State of California.

Section 12.8.  *Arbitration.*  Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), as said rules may be amended from time to time with rights of discovery if requested by the arbitrator. Such rules and procedures are incorporated and made part of this Agreement by reference. It is agreed that the arbitration shall be before a single arbitrator familiar with entertainment law. The prevailing party in such arbitration shall be entitled to recover his, her or its attorneys' fees and costs incurred in connection with such arbitration. Any award shall be final, binding and non-appealable. The parties hereby expressly waive any and all rights to appeal, or to petition to vacate or modify, any arbitration award issued in a dispute arising out of this Agreement. Each party hereby irrevocably submits to the jurisdiction of the state and federal courts for the County of Los Angeles in connection with any petition to confirm an arbitration award obtained pursuant to this Section 12.8. The parties agree to accept service of process in accordance with JAMS Rules. The arbitration will be confidential and conducted in private, and will not be open to the public or media.  No matter relating to the arbitration (including but not limited to, the testimony, evidence or result) may be (i) made public in any manner or form (ii) reported to any news agency or publisher (iii) disclosed to any third party not involved in the arbitration.

Section 12.9.  *Remedies.*  Except as otherwise set forth herein, the remedies available at law and equity, which a Person may be lawfully entitled, are cumulative.  The parties agree and acknowledge that in the event of a breach by a party of any obligation hereunder, the damage caused any other party shall not be irreparable or otherwise so sufficient as to give rise to a right to seek or obtain injunctive or other equitable relief, and the parties hereto acknowledge that their rights and remedies in the event of any such breach shall be limited to the right, if any, to recover damages in an action at law and shall not include the right to enjoin the development, financing, production, distribution or other exploitation of the Picture hereunder.

Section 12.10.  *Notices.*  Any notice or other writing to be served upon the Company or any Members thereof in connection with this Agreement shall be in writing via U.S. mail with a copy also via electronic mail and shall be deemed completed when delivered to both the mailing address specified in Exhibit A and to said email address above, if to a Member, and to the resident agent, if to the Company.  Any Member shall have the right to change the address at which notices shall be served upon ten (10) days written notice to the Company and to the other Members.

Section 12.11.  *Amendments.*  Any amendments, modifications, or alterations to this Agreement or to the Articles must be in writing and signed by all of the Members. Notwithstanding the foregoing, Exhibits A and B may be amended to reflect current Members and their Economic Interest, Membership Interest, and Percentage Interest (who are Members in accordance with the terms of this Agreement) without the written consent of all Members.

Section 12.12.  *Severability.*  Each provision of this Agreement is severable from the other provisions.  If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of this Agreement, which shall continue in full force and effect.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

Section 12.13.  *Counterparts.*  This Agreement may be executed in counterparts, and sent via facsimile, electronic transmission and/or by PDF signature, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

*[signature page to follow]*

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

IN WITNESS WHEREOF, the Managers and Members have executed or caused to be executed this Agreement, effective as of the Effective Date.

MANAGERS

"828"

_____
By: Todd Lundbohm
Its: Authorized Agent

"Perth Road"

_____
By: Christopher McGowan

"Specter"

_____
By: David Brown
Its: Authorized Agent

MEMBERS

"828"

_____
By: Todd Lundbohm
Its: Authorized Agent

"Perth Road"

_____
By: Christopher McGowan

"Specter"

_____
By: David Brown
Its: Authorized Agent

18

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

## EXHIBIT A

## MEMBERS

MANAGING MEMBERS – PRODUCERS

| Member | Contact | Economic Interest | Membership Interest / Percentage Interest | Capital Contribution |
|--------|---------|-------------------|-------------------------------------------|----------------------|
| 828 Productions LLC | Todd Lundbohm | 50%* of 100% of Net Profits | 50% | Management services |
| Perth Road Productions LLC | Chris McGowan | 25%* of 100% of Net Profits | 25% | Management services |
| Specter Entertainment LLC | David Brown | 25%* of 100% of Net Profits | 25% | Management services |

*For purposes of clarity, pursuant to Section 6.2, any additional profit participation shares shall be allocated from Perth Road's and Specter's shares only, on a pro rata basis, leaving 828's 50% participation unchanged.

DocuSign Envelope ID: B4B5A2D9-920D-45D8-A993-E3F1AF20D4D4

**EXHIBIT B**

**MANAGERS**

| Manager | Contact | Percentage Interest |
|---|---|---|
| 828 Productions LLC | See Exhibit A | See Exhibit A |
| Perth Road Productions LLC | See Exhibit A | See Exhibit A |
| Specter Entertainment LLC | See Exhibit A | See Exhibit A |

Exhibit J

| AMOUNT | DESCRIPTION | DATE | TYPE |
|---|---|---|---|
| $ 5,000.00 | Zelle from Todd/828 (Trance 1 per Term Sheet) | 11/11/19 | Zelle |
| $ 10,000.00 | Funding, 828 Productions Wire (Trance 1 per Term Sheet) | 11/18/19 | Wire |
| $ 25,000.00 | Funding, 828 Productions Wire (Trance 2, per Term Sheet) | 11/19/19 | Wire |
| $ 200,000.00 | Funding, 828 Productions (Trance 2, per Term Sheet) | 11/25/19 | Account Transfer |
| $ 100,000.00 | Funding, 828 Deposit (Trance 3, per Term Sheet) | 11/29/19 | Deposit |
| $ 100,000.00 | Funding, 828 Productions (Trance 4, per Term Sheet) | 11/29/19 | Deposit |
| $ 200,000.00 | Funding, 828 Productions (Trance 5, per Term Sheet) | 12/13/19 | Deposit |
| $ 160,000.00 | Funding, 828 Productions (Trance 6, deposited $115,000) | 12/13/19 | Wire |
| $ (45,000.00) | 828 Producer Fee (Withheld from Trance 4) | 12/17/19 | Cash+ ATM Withdrawal |
| $ 30,500.00 | Funding, 828 Productions (Deposit Advance) | 12/23/19 | Deposit |
| $ 40,000.00 | Funding, 828 Productions (Payroll Help) | 12/26/19 | Deposit |
| $ 100.00 | Funding, 828 Productions (To cover monthly bank fees) | 12/29/19 | Account Transfer |
| $ 825,600.00 | Total of all incoming funding | | |
| $ (15.00) | Incoming Wire Fee | 11/18/19 | Bank Fee Charge |
| $ (6,000.00) | Office Space, Catalyst Post (Copy in files) | | |
| $ (757.70) | EXPEDIA 7495623660683 800-397-3342 NV 11/18 | | |
| $ (339.22) | ENTERPRISE RENT-A-CAR STUDIO CITY CA 11/18 | | |
| $ (75.64) | AROMA COFFEE & TEA STUDIO CITY CA 11/18 | | |
| $ (54.67) | RITE AID STORE - 5573 STUDIO CITY CA 11/19 | | |
| $ (6,581.00) | ABACUS INSURANCE 424-214-3700 CA 11/20 | | |
| $ (6,285.52) | AIRBNB - Chris McGowan | | |
| $ (45,000.00) | Petty Cash - ATM Withdrawal | | |
| $ (90,308.00) | SAG Deposit | | |
| $ (5,000.00) | Casting Director, Chad Darnell | | |
| $ (30,000.00) | Entertainment Partners Deposit | | |
| $ (15,500.00) | Cashier Checks ( | | |
| $ (25.00) | Online Domestic Wire Fee | | |
| $ (25.00) | Online Domestic Wire Fee | | |
| $ (35.00) | Domestic Wire Fee | | |
| $ (70.08) | CVS/PHARMACY #09 09675 Studio City CA 11/24 | | |
| $ (45,000.00) | Petty Cash - ATM Withdrawal | | |
| $ (800.00) | Petty Cash - ATM Withdrawal | | |
| $ (7,500.00) | Ramo Law, Production Legal | | |
| $ (25.00) | Online Domestic Wire Fee | | |
| $ (200.00) | MALIBU CRX SP ADMIN OF 818-8800363 CA 11/25 | | |
| $ (50.00) | LIB CONGRESS/COPYRIGH 202-707-2573 DC 11/25 | | |
| $ (2,500.00) | Payroll Accountant, JTRB Film Services | | |
| $ (2,625.00) | Egor DP Payment | | |
| $ (4,174.26) | Entertainment Partners Payroll Invoice | | |
| $ (280.34) | Entertainment Partners Payroll Invoice | | |
| $ (3,457.00) | Cashier Checks ( | | |
| $ (429.53) | ENTERPRISE RENT-A-CAR STUDIO CITY CA 11/26 | | |
| $ (977.50) | RAMO LAW PC 310-284-3494 CA 11/26 | | |
| $ (55.00) | LIB CONGRESS/COPYRIGH 202-707-2573 DC 11/26 | | |
| $ (40,000.00) | Graham McTavish Wire | | |
| $ (25,000.00) | Director Payement, Chris McGowan | | |
| $ (2,500.00) | Payroll Accountant, JTRB Film Services | | |
| $ (25.00) | Online Domestic Wire Fee | | |
| $ (19.95) | PADDLE.NET* MACPAW.COM London 11/27 | | |
| $ (5,000.00) | IN *PRODIGY PUBLIC REL 310-8572020 CA 11/27 | | |
| $ (342.46) | SET STUFF RENTALS http://www.se CA 11/27 | | |
| $ (778.87) | THE EXPENDABLES RECYCLE VAN NUYS CA 11/27 | | |
| $ (148.79) | SET STUFF RENTALS LOS ANGELES CA 11/27 | | |
| $ (7,500.00) | Ramo Law, Production Legal | | |
| $ (25.00) | Online Domestic Wire Fee | | |
| $ (2,000.00) | Petty Cash - ATM Withdrawal | | |
| $ (5,900.00) | Cashier Checks ( | | |
| $ (28,400.00) | Cashier Checks ( | | |
| $ (1,800.00) | Cashier Checks ( | | |
| $ (1,440.99) | MELROSE MAC INC 323-937-4600 CA 12/02 | | |
| $ (610.03) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 11/25 | | |
| $ (1,066.00) | ABACUS INSURANCE 424-214-3700 CA 12/04 | | |
| $ (550.00) | SQ *VANGUARD SANITATION gosq.com CA 12/03 | | |
| $ (3,850.00) | Cashier Checks ( | | |
| $ (2,625.00) | Egor DP Payment | | |
| $ (80.00) | Anthony Pagliaro, Picture Cars | | |
| $ (625.00) | Anthony Pagliaro, Picture Cars | | |
| $ (2,500.00) | Payroll Accountant, JTRB Film Services | | |
| $ (1,200.00) | Camera AC, Denis Zemtsov | | |
| $ (10,772.16) | Entertainment Partners Payroll Invoice | | |
| $ (2,113.35) | Entertainment Partners Payroll Invoice | | |
| $ (17,750.00) | Cashier Checks ( | | |
| $ (1,300.00) | Cashier Checks ( | | |
| $ 102.01 | ENTERPRISE RENT-A-CAR STUDIO CITY CA 12/05 | | |
| $ (498.38) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 11/27 | | |
| $ (500.00) | Location Fee, Base Camp Rep (Topanga) | | |
| $ (71,500.00) | Anne Heche Wire | | |
| $ (6,600.00) | Location Fee, Rancho Deluxe | | |
| $ (5,000.00) | Location Fee Deposit, Rancho Deluxe | | |
| $ (1,850.00) | Transpo Driver, John Vitale | | |
| $ (2,500.00) | Payroll Accountant, JTRB Film Services (3 weeks) | | |
| $ (25.00) | Online Domestic Wire Fee | | |
| $ (436.00) | CITY OF SANTA CLARITA 661-2554377 CA 12/05 | | |
| $ (4,085.20) | BRITISH A 1252103533 800-2479297 NY 12/06 | | |
| $ (202.50) | Petty Cash - ATM Withdrawal | | |
| $ (2,000.00) | Petty Cash - ATM Withdrawal | | |
| $ (875.00) | Zelle to Anthony Pagliario, Picture Cars | | |
| $ (25.00) | Zelle to Anthony Pagliario, Picture Cars | | |
| $ (10,300.00) | Cashier Checks ( | | |
| $ (610.03) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 11/25 | | |
| $ (8.31) | CARLS JR 1100160 CANYON CNTRY CA 12/09 | | |
| $ (89.57) | CARLS JR 1100160 CANYON CNTRY CA 12/09 | | |
| $ (8.31) | SQ *VANGUARD SANITATION gosq.com CA 12/11 | | |
| $ (17,688.58) | Entertainment Partners Payroll Invoice | | |
| $ (76.44) | HARBOR FREIGHT TOOLS 3 N HOLLYWOOD CA 470857 12/12 | | |
| $ (226.43) | NIGEL BEAUTY NORTH HOLLYWO CA 12/12 | | |
| $ (2.09) | ARCO #42505 WOODLAND HILL CA 12/12 | | |
| $ (3,652.46) | Entertainment Partners Payroll Invoice | | |
| $ (22,744.73) | Entertainment Partners Payroll Invoice | | |

| AMOUNT | DESCRIPTION | DATE | TYPE |
|---|---|---|---|
| $ (2,817.17) | Entertainment Partners Payroll Invoice | 12/13/19 | Part of GEP ACH |
| $ (4,014.00) | Cashier Checks ( | 12/13/19 | OTC Withdrawl |
| $ (45,000.00) | Todd Lunbohm Producer Fee (Withheld from funding) | 12/13/19 | Zelle |
| $ (13,875.00) | Cashier Checks ( | 12/13/19 | OTC Withdrawl |
| $ (2,500.00) | Cashier Checks ( | 12/13/19 | OTC Withdrawl |
| $ (415.31) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/11 | 12/13/19 | CLEAR HORIZON DEBIT CARD |
| $ (719.88) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/11 | 12/13/19 | CLEAR HORIZON DEBIT CARD |
| $ (6,300.00) | IN *HOLLYWOOD HONEYWAG 818-7631966 CA 12/12 | 12/13/19 | ATM (Clear Horizon Debit Card) |
| $ (500.00) | Petty Cash - ATM Withdrawal | 12/16/19 | Zelle |
| $ (510.00) | Zelle to Anthony Pagliario, Picture Cars | 12/16/19 | Zelle |
| $ (500.00) | Cashier Checks ( | 12/16/19 | Zelle |
| $ (3,400.00) | Cashier Checks ( | 12/16/19 | OTC Withdrawl |
| $ (1,650.00) | SQ *VANGUARD SANITATION gosq.com CA 12/14 | 12/16/19 | CLEAR HORIZON DEBIT CARD |
| $ (15.00) | INOFILE.COM LLC 844-830-8267 TX | 12/16/19 | CLEAR HORIZON DEBIT CARD |
| $ (328.48) | BEST BUY 0000765 SHERMAN OAKS CA 12/16 | 12/16/19 | CLEAR HORIZON DEBIT CARD |
| $ (36,593.82) | Entertainment Partners Payroll Invoice | 12/16/19 | Part of GEP ACH |
| $ (4,900.00) | Cashier Checks ( | 12/18/19 | Part of GEP ACH |
| $ (498.38) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 11/27 | 12/20/19 | Part of GEP ACH |
| $ (19,540.00) | Entertainment Partners Payroll Invoice | 12/20/19 | Part of GEP ACH |
| $ (2,789.50) | Entertainment Partners Payroll Invoice | 12/20/19 | Part of GEP ACH |
| $ (498.38) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/19 | 12/23/19 | CLEAR HORIZON DEBIT CARD |
| $ (6,300.00) | IN *HOLLYWOOD HONEYWAG 818-7631966 CA 12/19 | 12/23/19 | CLEAR HORIZON DEBIT CARD |
| $ (718.88) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/21 | 12/23/19 | CLEAR HORIZON DEBIT CARD |
| $ (415.31) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/21 | 12/23/19 | CLEAR HORIZON DEBIT CARD |
| $ (220.59) | AIRBNB HHMQY8X3RN AIRBNB.COM CA 12/22 | 12/23/19 | CLEAR HORIZON DEBIT CARD |
| $ (21,305.60) | Entertainment Partners Payroll Invoice | 12/24/19 | Part of GEP ACH |
| $ (18,711.23) | Entertainment Partners Payroll Invoice | 12/26/19 | Part of GEP ACH |
| $ (2,611.50) | Entertainment Partners Payroll Invoice | 12/26/19 | Part of GEP ACH |
| $ (491.32) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/23 | 12/27/19 | CLEAR HORIZON DEBIT CARD |
| $ (746.36) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/23 | 12/27/19 | CLEAR HORIZON DEBIT CARD |
| $ (855.00) | Zelle to Christopher McGowan | 12/27/19 | Zelle |
| $ (5,325.00) | Cashier Checks ( | 12/27/19 | OTC Withdrawl |
| $ (2,500.00) | Cashier Checks ( | 12/27/19 | Cashier Check (in folder) |
| $ (500.00) | Rocky Romines (Grip) | 12/27/19 | Cashier Check (in folder) |
| $ (1,250.00) | Sooraj Valdya (Grip) | 12/27/19 | Cashier Check (in folder) |
| $ (1,000.00) | Silver Hernandez (Grip) | 12/27/19 | Cashier Check (in folder) |
| $ (8,677.27) | Entertainment Partners Payroll Invoice | 12/30/19 | Part of GEP ACH |
| $ (1,072.51) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 11/25 | 12/31/19 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 12/31/19 | ACH Credit |
| $ 8,677.27 | EP Deposit Return (Partial) | 12/31/19 | CLEAR HORIZON DEBIT CARD |
| $ (1,674.47) | AVON RENT A CAR TRUC WEST HOLLYWOO CA 12/05 | 1/3/20 | Check |
| $ (200.00) | Vanessa Gutierrez (PA) | 1/3/20 | Bank Credit |
| $ 12.00 | Service Fee Reversal | 1/3/20 | Bank Fee Charge |
| $ (15.00) | Domestic Incoming Wire Fee | 1/23/20 | Wire |
| $ 43,598.00 | SAG Deposit Return (Partial) | 1/23/20 | Wire |
| $ (5,000.00) | Entertainment Partners Payroll Invoice | 1/24/20 | Part of GEP ACH |
| $ (1,614.94) | Entertainment Partners Payroll Invoice | 1/31/20 | Part of GEP ACH |
| $ (25.00) | Online Domestic Wire Fee | 1/31/20 | Bank Fee Charge |
| $ (8,000.00) | Development Cost, Transferred to Perth Road | 1/29/20 | Account Transfer |
| $ (20,617.68) | Transfer to Undertaker LLC account (per conversation with To... | 1/31/20 | Bank Fee Charge |
| $ (1,614.94) | Entertainment Partners Payroll Invoice | 2/3/20 | Part of GEP ACH |
| $ (478.20) | Entertainment Partners Payroll Invoice | 2/5/20 | Part of GEP ACH |
| $ (1,729.95) | Entertainment Partners Payroll Invoice | 2/20/20 | Part of GEP ACH |
| $ (1,614.93) | Entertainment Partners Payroll Invoice | 2/6/20 | Part of GEP ACH |
| $ (3,750.00) | Jake York, Lost Fls. Trailer | 2/13/20 | Wire |
| $ (25.00) | Online Domestic Wire Fee | 2/13/20 | Wire |
| $ (1,675.54) | Entertainment Partners Payroll Invoice | 2/12/20 | Part of GEP ACH |
| $ (1,675.54) | Entertainment Partners Payroll Invoice | 2/20/20 | Part of GEP ACH |
| $ (12.00) | Monthly Bank Fee | 2/27/20 | Part of GEP ACH |
| $ (3,750.00) | Composer - Erik Shroder (Zelle) | 2/20/20 | Zelle |
| $ (750.00) | Assistant Editor (Scott Andrews) | 2/28/20 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 3/12/20 | Zelle - David's Savings 2315 |
| $ (2,500.00) | Editor (Gordon) | 3/22/20 | Zelle |
| $ (1,250.00) | Editor (Gordon) | 3/31/20 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 4/8/20 | Zelle |
| $ (12.00) | Monthly Bank Fee | 4/17/20 | Zelle |
| $ (3,750.00) | Composer - Erik Shroder (Zelle) | 6/15/20 | Zelle - David's Personal 4464 |
| $ (12.00) | Monthly Bank Fee | 6/30/20 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 7/31/20 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 8/30/20 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 9/30/20 | Bank Fee Charge |
| $ (12.00) | Monthly Bank Fee | 10/30/20 | Bank Fee Charge |
| $ (100,000.00) | Market Fee per Agreement (paid in installments as we could afford) | | ACCT Transfers (in pieces as we cou... |
| $ (45,000.00) | Producer Fee (paid in installments as we could afford) | | ACCT Transfers (in pieces as we cou... |
| $ (20,000.00) | Cashier Check, Script Agreement | | COPY IN FOLDER |
| $ (5,000.00) | Colorist - EGOR P. (Copies in file) | | Zelle |
| $ 825,600.00 | TODD FUNDED VIA 828 | | |
| $ (892,982.36) | PRODUCTION EXPENSES | | |
| $ (67,382.36) | DAVID BROWN OWED | | |

# Exhibit K

828 Media Capital, LLC
Attn: Todd Lundbohm
Email: todd@828mediacapital.com

Undertaker LLC
Attn: David Brown
Email: moviedavid1@gmail.com

February 9, 2020 (the "Effective Date")

**Re:** **Senior Lender Loan Term Sheet: terms and conditions ("Term Sheet") for the loan for the motion picture currently entitled, "The Undertaker's Wife" (the "Picture").**

| | | |
|---|---|---|
| 1. | Borrower: | Undertaker LLC, a California limited liability company ("Undertaker" or "Borrower"). |
| 2. | Lender: | 828 Media Capital LLC, or its assignees ("Lender"). |
| 3. | Nature of Loan: | A secured corporate loan facility against all of Borrower's assets, tangible and intangible, including but not limited to all exploitation proceeds and rights, including Clear Distribution executed pre-sales and worldwide sales to be made on a go forward basis for the Picture, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender shall have a first priority repayment position, and in accordance with the attached waterfall, attached hereto as Exhibit A. |
| 4. | Commitment Amount: | Equals up to US$1,200,000 (the "Commitment Amount") of which US$985,000 ("Loan") (i.e. the Commitment Amount less the Set Up Fee and Legal Fee) will be deposited upon (i) execution of this Term Sheet; (ii) execution of the Security Agreement; and (iii) satisfaction of the Conditions Precedent<br><br>Upon close of financing, and subject to the terms and conditions set forth herein, the Loan shall be released to Borrower, in amounts and (approximate) dates as set forth in the Lender Funding Schedule below: |
| 5. | Legal Fee: | US$15,000 (the "Legal Fee"), to be withheld from the Commitment Amount upon the closing of the loan herein. |
| 6. | Set Up Fee: | US$200,000 (the "Set Up Fee") to be withheld from the Commitment Amount upon the closing of the loan herein. |

Lender Funding Schedule table (within row 4):

| Lender Funding Schedule | | |
|---|---|---|
| Trance | US $ Amount | Target Date (subject to confirmation) |
| 1 | $50,000 | Acknowledged as paid |
| 2 | $200,000 | January 6, 2020 |
| 3 | $100,000 | January 13, 2020 |
| 4 | $100,000 | January 20, 2020 |
| 5 | $100,000 | January 27, 2020 |
| 6 | $150,000 | February 3, 2020 |
| 7 | $150,000 | February 10, 2020 |
| 8 | $150,000 | February 17, 2020 |

1

| 7. Repayment: | Borrower shall repay the Commitment Amount plus a twenty percent (20%) premium (the "Indebtedness") to the Lender by February 9, 2021 (the "Maturity Date"). |
|---|---|
| 8. Default Interest Rate: | Two percent (2%) per month on the unpaid balance of the Commitment Amount, which shall accrue after (i) the Maturity Date, or (ii) an "Event of Default" (as further defined below). If the provisions of this Term Sheet or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount. |
| 9. Contingent Compensation: | 828 Productions, LLC ("828 Productions") shall receive fifty percent (50%) of one hundred percent (100%) of the net profits with respect to the Picture in accordance with the terms of the Undertaker, LLC Operating Agreement.<br><br>828 Productions' share of net profits shall be defined, accounted and paid on a most favored nations basis with all other participants in Net Profits.<br><br>Lender and 828 Productions shall be made a party to the Collection Account Management Agreement, when established. |
| 10. Use of Proceeds: | Borrower shall use the Loan to finance pre-production, production, post-production and delivery of the Picture. |
| 11. First Opportunity and Matching: | In the event that Borrower seeks additional debt financing with respect to the Picture, Borrower shall provide Lender with written notice that it intends to raise additional financing, and Lender shall have the first opportunity to secure additional debt financing for the Picture, for thirty (30) days thereafter. In the event Lender secures and/or provides such financing, then Lender shall receive five percent (5%) of any such amount as an executive producer fee in the budget for the Picture.<br><br>In the event that Lender does not secure such additional debt financing for the Picture, then Borrower, upon receipt of an offer to finance the Picture, shall provide the key terms of such offer to Lender in writing, in each instance. Lender shall thereafter have fourteen (14) days to determine if it will match such terms and provide the additional debt financing (or secure such additional debt financing from another third party). |
| 12. Lender's Approval Rights: | Lender shall be entitled to approve all additional financing as well as any other key agreements related to the Picture, until such time as the Indebtedness is repaid. |
| 13. Reports: | Until repayment of the Commitment Amount (and Default Interest, if any), Borrower shall provide regular status reports containing meaningful and reasonable detail on material production activities, including timeline to and budget for completion of pre-production, production, and post-production, as well as sales and distribution activities. This includes call-sheets, production reports, bank statements, discussion with third party vendors and financiers.<br><br>For the avoidance of doubt, if Borrower fails to meet the obligations set forth herein, Lender shall have the right to terminate this Term |

| | |
|---|---|
| | Sheet and, following Borrower's receipt of written notice of such termination, the Commitment Amount (and Default Interest, if any) shall immediately become due and payable. |
| 14. Security: | Pursuant to that certain Security Agreement entered into between Borrower and Lender, Lender has a first priority security interest in all of Borrower's assets, tangible and intangible, including, but not limited to accounts receivable, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender is entitled to perfect its security interest in the Collateral (as defined in the Security Agreement) by filing a UCC-1 statement and any other relevant filings, with each applicable state and government authority, as determined by Lender, in Lender's sole discretion. |
| 15. Audit Rights: | Lender shall have the right to audit the books and records of Borrower, on a semi-annual basis, subject to at least thirty (30) days prior written notice to Company, at Lender's expense, until payment of the Commitment Amount (and Default Interest, if any) is irrevocably received by Lender. In the event the audit uncovers a discrepancy unfavorable to Lender, Borrower shall pay the third party costs of any such audit. |
| 16. Financing Documents: | The following documents and all other documentation required under this Term Sheet shall constitute the "Financing Documents":<br><br>i.)    Promissory Note;<br>ii.)    Power of Attorney;<br>iii.)    Corporate documents and certificates of Borrower (and its managers and/or members, including, but not limited to, Specter Entertainment, LLC);<br>iv.)    Irrevocable Direction-to-Pay / Notice of Assignment(s) / Assignment of Proceeds Agreement(s) with Clear Distribution / rest of world distributors; and<br>v.)    Copyright Mortgage and Assignment; and<br>vi.)    Any other documents required, in Lender's sole discretion.<br><br>All Financing Documents shall be in form and substance satisfactory to Lender and, unless otherwise agreed by Lender in writing, prepared by Lender's counsel. |
| 17. Credit, Set Visits, One-Sheet; Premiere Tickets; Press: | Lender shall be entitled to the following credits in connection with the Picture:<br><br>An animated company logo in first position, other than the distributors for the Picture, prior to main title sequence of the Picture for the Lender as well as in paid ads, and tied to all others getting animated logos in all respects.<br><br>A bug logo in the end credits of the Picture, as well as in paid ads, tied to all others receiving a bug logo in all respects.<br><br>A company credit, on screen, in the main titles of the Picture, and in paid ads, in first position among company credits, in the following form: "In Association with 828 Media Capital" and tied to all others receiving company credit in all respects.<br><br>A "Produced By" credit, on screen, in the first position of the main titles and tied to all other receiving producer credit in all respects. |

| | |
|---|---|
| | Four (4) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, in the main titles of the Pictures, on two cards (shared only with each other) and in paid ads in first through fourth position among all executive producers, and tied in all respects to any other party receiving an executive producer credit. |
| | All credits are on a most favored nations basis with other companies and producers, as applicable. |
| | Lender, and its designees, shall be entitled to unlimited set visits during production of the Picture. |
| | Borrower will provide Lender with one (1) high quality "one-sheet" (or an electronic file thereof) for the Picture, which Lender may use to promote, market and advertise its business. |
| | Borrower will use commercially reasonable good faith efforts to cause the domestic distributor of the Picture to provide Lender with at least six (6) invitations to the Picture's domestic premiere and festival screening, if any, including travel/accommodations on a most favored nations basis with all other producers. |
| | Borrower shall reference "828 Media Capital" as the financier in any press releases regarding the Picture. |
| 18. Assignment: | Neither this Term Sheet nor the Commitment Amount are assignable by Borrower. |
| 19. Insurance: | Borrower shall ensure that Lender is named as an additional insured under all insurance policies for the Picture. |
| 20. Events of Default: | If at any time after Closing, any of the following "Events of Default" have occurred (as determined by Lender in its sole discretion), the Commitment Amount (and Default Interest, if any) shall immediately become due and payable: |
| | i.)     Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due; |
| | ii.)     Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements and/or obligations of Borrower contained in the Term Sheet or in any agreement relating to the Loan and/or the Picture which would materially adversely affect the value of the Loan; |
| | iii.)     Borrower's failure to perform or observe, in a due and timely manner, any of the material terms, provisions, covenants, conditions, agreements or obligations contained in the Financing Documents or in any other agreement, contract, indenture, document, or instrument executed, or to be executed, by Borrower in connection with the Financing Documents which would have a materially adverse effect on the ability of Borrower to perform its obligations pursuant to the Financing Documents; |
| | iv.)     Borrower receiving any other form of financing without Lender's express written approval; |
| | v.)     Suspension by Borrower of its business operations; |

| | |
|---|---|
| | vi.)      The failure of Borrower to effect delivery of the Picture to sales agents and distributors in accordance with the terms and conditions of the relevant sales and distribution agreements by their respective delivery dates;<br><br>vii.)     Any material change in the budget, cash flow schedule, financing structure, timing of pre-production, production, and/or post-production, Borrower's production team or other change which would be an Event of Default in the Financing Documents. |
| 21.  Conditions Precedent to Closing: | The funding of the Loan is subject to Borrower's compliance with each of the following conditions:<br><br>i.)      Cash flow schedule, budget, and production schedule for the Picture;<br><br>ii.)     Execution and/or approval of the Financing Documents;<br><br>iii.)    Borrower providing an executed copy of the sales agent agreement with Clear Distribution;<br><br>iv.)     There being, prior to the time of Closing, no material adverse change in Borrower's condition, financial or otherwise, or financial business prospects from that represented in any financial statement or other information submitted to Lender or upon which Lender has relied;<br><br>v.)      Lender shall have received, in form and substance reasonably satisfactory to Lender, copies of all agreements or documents, and all amendments thereto, relating to the formation, existence, power, authority and governance of Borrower, together with copies of all certificates which are required to be, or may be, filed in connection with the creation of Borrower;<br><br>vi.)     Receipt and approval by Lender of chain of title documentation with respect to the Picture, including, but not limited to, the current copy of the screenplay;<br><br>vii.)    Update records of Borrower to reflect more than one manager, and full execution of amended and restated operating agreement for Borrower; and<br><br>viii.)   Fully executed agreements for the key talent participating in the Picture, and the director for the Picture.<br><br>Condition subsequent:<br><br>Borrower must obtain a fully executed collection account management agreement within sixty (60) days from the end of principal photography. |
| 22.  Representations and Warranties: | The Borrower hereby represents and warrants to Lender that:<br>          (i) It is duly organized, validly existing and in good standing. It has the power and all necessary rights and title to enter into and perform this Agreement and the transactions contemplated hereby or referred to herein. It has taken all necessary action to authorize the entry into and performance of this Agreement and such transactions. |

(ii) This Term Sheet constitutes a legal, valid and binding obligation of the Borrower and is in proper form for enforcement against it.

(iii) The entry into and performance of this Term Sheet and the transactions contemplated hereby do not and will not conflict with: (a) any existing law or regulation or any official or judicial order, or (b) its articles of creation, or (c) any agreement or document to which it is a party or which is binding upon it or any of its assets. Without limiting the generality of the foregoing, the Borrower represents and warrants that there are not now any liens, claims, encumbrances, legal proceedings, restrictions, agreements or understandings which might conflict or interfere with, limit, derogate from, or be inconsistent with or otherwise affect any of the provisions of this Agreement or any of the representations or warranties of the Borrower contained herein, including without limitation, any U.C.C. filings, copyright assignments or other liens, inconsistent herewith or offsets or other costs charged against the Picture by any distributor pursuant to cross-collateralization agreements or otherwise.

(iv) All authorizations, approvals, consents, licenses, exemptions, filings, registrations, notarizations and other matters, official or otherwise, required by the Borrower or advisable in connection with the entry into, performance, validity and enforceability of this Agreement and the transactions contemplated hereby the Borrower have been obtained or effected and are in full force and effect (other than the registration of security interests to be created pursuant hereto).

(v) No litigation, arbitration or administrative proceedings are threatened or, to its knowledge, pending which call into question the validity or performance of its obligations hereunder.

(vi) All information which might be material to a person assuming the obligations and acquiring the rights assumed and acquired by the Lender pursuant to this Agreement has been disclosed in writing to the Lender and there are no facts or circumstances which might make such information misleading or inaccurate.

(vii) The Borrower's warranties, representations and agreements are of the essence of this Agreement and shall survive the early termination hereof. None of the Borrower's warranties, representations or agreements shall in any way be limited by reason of any investigation made by the Lender or on behalf of the Lender regarding said warranties, representations or agreements.

The Lender represents and warrants that they have the power and all necessary rights and title to enter into and perform this Term Sheet and the transactions contemplated hereby or referred to herein. They have taken all necessary action to authorize the entry into and performance of this Term Sheet and such transactions. And they are properly organized and in good standing.

| | |
|---|---|
| 23. Indemnification: | Each Party shall, at its own expense, indemnify, save and hold harmless the other party and its successors, licensees, assigns, agents, representatives and affiliates from and against any and all claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable outside attorneys' fees), incurred or sustained by reason of or arising out of any breach or alleged breach of any of the warranties, representations or agreements herein made by the other Party, or from any reliance upon any such warranties, representations or agreements. If any person or entity shall make any claim or institute any suit or proceeding alleging any facts, which, if true, would constitute a breach by the other Party, of any warranty, representation or agreement herein made, the Party shall give prompt |

| | |
|---|---|
| | written notice of same to the other Party and shall undertake at its own cost and expense the defense thereof and shall supply competent and experienced counsel to defend any such suit or proceeding for the non-breaching Party. |
| 24.  Confidentiality: | The terms of this Term Sheet are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender except that Borrower may disclose such terms to its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors, also governmental entities and other parties with a right to access such information, including guilds or parties required by law. |
| 25.  Conflict Waiver | The Parties acknowledge that Ramo Law PC ("Ramo") solely represents Lender in connection with the financing of the Picture. It is also agreed and acknowledged that Ramo represents Borrower on other matters, including with respect to the production legal for the Picture, and may continue to do so, and has advised Borrower to seek outside counsel with respect to the subject matter herein between Lender and Borrower. Ramo shall not provide financing advice in connection with this matter to Borrower. Notwithstanding such representation and any actual or potential conflict of interest, the Parties consent to Ramo's representation of Lender, provided that the parties acknowledges and agrees that at no time will Ramo's representation be construed, claimed or deemed to be a breach of a fiduciary relationship, a conflict of interest or a violation of any other obligation to Lender and/or Borrower.<br><br>_____ Initialed by Borrower<br><br><br>_____ Initialed by Lender |
| 26.  Notice: | <u>Lender</u><br>As set forth above<br><br>With a copy to:<br>Ramo Law PC<br>315 S. Beverly Dr., Ste. 210<br>Beverly Hills, CA 90212<br>Attn: Zev Raben, Esq. & Elsa Ramo, Esq.<br>Email: zev@ramolaw.com; eramo@ramolaw.com<br><br><u>Borrower</u><br>Undertaker LLC<br>3940 Laurel Canyon Blvd. #1413<br>Studio City, CA 91604<br>Attn: David Brown<br>Email: moviedavid1@gmail.com<br><br>With a copy to:<br>Ramo Law PC<br>315 S. Beverly Dr., Ste. 210<br>Beverly Hills, CA 90212<br>Attn: Michelle Chang<br>Email: michelle@ramolaw.com |

| | |
|---|---|
| 27. Exclusivity: | Borrower shall not solicit or entertain competing financial proposals or conduct any negotiation, or enter into any agreement, arrangement or understanding for a competing financial transaction, for a period of fourteen (14) days from the execution of this Term Sheet unless otherwise agreed to by Borrower and Lender in writing. |
| 28. Miscellaneous: | The terms and conditions of this Term Sheet shall be interpreted and governed by California law applicable to contracts entered into and to be wholly performed in California without reference to choice of law rules. The parties consent to the jurisdiction and venue of the State of California in the City and County of Los Angeles. Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS comprehensive arbitration rules and procedures. The prevailing party in such arbitration shall be entitled to recover its reasonable, outside attorneys' fees and costs incurred in connection with such arbitration. This Term Sheet shall be deemed to have been drafted jointly by the parties, notwithstanding that one party or the other may have performed the actual drafting hereof. No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of the Term Sheet shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other covenant or condition. The provisions of this Term Sheet are severable. If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision. This Term Sheet may be executed by facsimile or PDF signatures and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Unless and until modified, amended or superseded by the Financing Documents in writing, this Term Sheet sets forth the legally binding Term Sheet of the parties with respect to the subject matter hereof. |

The parties shall enter into the Financing Documents to be negotiated in good faith reflecting the terms and conditions of this Term Sheet prior to the making of this Loan.

Sincerely,

_____
By: Todd Lundbohm
Its: Authorized Signatory

AGREED AND ACCEPTED:

UNDERTAKER LLC

_____
By: David Brown
Its: Authorized Signatory

Exhibit L

| AMOUNT | DESCRIPTION | DATE | TYPE |
|---|---|---|---|
| $ 200,000.00 | B2B/Todd Funding | 3/9/20 Deposit |
| $ 150,000.00 | B2B/Todd Funding | 2/3/20 Deposit |
| $ 150,000.00 | B2B/Todd Funding | 2/13/20 Deposit |
| $ 100,000.00 | B2B/Todd Funding | 1/13/20 Deposit |
| $ 100,000.00 | B2B/Todd Funding | 1/27/20 Deposit |
| $ 85,000.00 | B2B/Todd Funding | 2/7/20 Deposit |
| $ 60,000.00 | B2B/Todd Funding | 1/7/20 Deposit |
| $ 55,000.00 | B2B/Todd Funding | 12/30/19 Deposit |
| $ 50,000.00 | B2B/Todd Funding | 2/7/20 Deposit |
| $ 50,000.00 | B2B/Todd Funding | 5/13/21 Account Transfer |
| $ 50,000.00 | B2B/Todd Funding | 6/19/11 Account Transfer |
| $ (60.00) | Catalyst Post Services - Office/Edit Bays | 6/11/20 Apple Pay - David Paid |
| $ (1,000.00) | Editor, Gordon Antell - Zelle | 4/28/20 Zelle - David Paid |
| $ (1,250.00) | Editor, Gordon Antell - Zelle | 4/17/20 Zelle - David Paid |
| $ (1,250.00) | Editor, Gordon Antell - Zelle | 4/24/20 Zelle - David Paid |
| $ (1,250.00) | Editor, Gordon Antell - Zelle | 4/28/20 Zelle - David Paid |
| $ (3,000.00) | Catalyst Post Services - Office/Edit Bays | 6/11/20 Apple Pay - David Paid |
| $ (2,500.00) | Color Correction - Egor P | 3/13/20 Zelle |
| $ (2,500.00) | Color Correction - Egor P | 3/18/20 Zelle |
| $ (2,500.00) | Color Correction - Egor P | 5/21/20 Zelle |
| $ (3,000.00) | Catalyst Post Services - Office/Edit Bays | 6/10/20 Apple Pay - David Paid |
| $ (3,000.00) | Catalyst Post Services - Office/Edit Bays | 6/10/20 Apple Pay - David Paid |
| $ (3,500.00) | Composer - Erick Shrader (paid by Specter Enterta | 4/11/20 Zelle |
| $ 20,617.68 | Transfer from NIGHTMARES PSC (9586) | 1/29/20 Account Transfer |
| $ 7,631.96 | Greenslate Wire Back (Over Credit) | 2/13/20 Wire |
| $ 5,300.00 | PEX Card Return | 2/27/20 ACH CREDIT |
| $ 2,330.94 | PEX Card Return | 3/10/20 ACH CREDIT |
| $ 1,000.00 | Debit Card Return (A-1 Medical) | 2/27/20 Debit Card |
| $ 700.00 | PEX Card Return | 3/4/20 ACH CREDIT |
| $ 550.00 | Debit Card Return (A-1 Medical) | 2/27/20 Debit Card |
| $ 339.77 | Debit Card Return (A-1 Medical) | 2/27/20 Debit Card |
| $ 329.73 | Petty Cash Deposit | 3/10/20 Deposit |
| $ 55.50 | PEX Card Return | 3/4/20 ACH CREDIT |
| $ 1.00 | Account Opening Deposit (paid by David 4464) | 12/27/19 Account Transfer |
| $ (1.00) | Transfer of Account Opening Deposit Back to Davi | 12/30/19 Account Transfer |
| $ (25.00) | Online Domestic Wire Fee | 12/30/19 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/7/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/14/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 12/31/19 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/21/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/21/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/22/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/24/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/27/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/27/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/28/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/29/20 Bank Fee |
| $ (25.00) | Online Domestic Wire Fee | 1/30/20 Bank Fee |
| $ (45.00) | April Monthly Fees | 5/1/20 Bank Fee |
| $ (30.00) | May Monthly Fees | 6/3/20 Bank Fee |
| $ (30.00) | June Monthly Fees | 7/1/20 Bank Fee |
| $ (30.00) | July Monthly Fees | 8/5/20 Bank Fee |
| $ (30.00) | August Monthly Fees | 9/2/20 Bank Fee |
| $ (30.00) | September Monthly Fees | 10/5/20 Bank Fee |
| $ (30.00) | October Monthly Fees | 11/4/20 Bank Fee |
| $ (30.00) | November Monthly Fees | 12/3/20 Bank Fee |
| $ (30.00) | January Monthly Fees | 2/3/21 Bank Fee |
| $ (30.00) | February Monthly Fees | 3/3/21 Bank Fee |
| $ (30.00) | March Monthly Fees | 4/5/21 Bank Fee |
| $ (30.00) | April Monthly Fees | 5/3/21 Bank Fee |
| $ (60.33) | The Production Truck - Expenditures | 1/21/20 Debit Card |
| $ (44.76) | Check #3004 - Receipt Reimbursement Crafty - Da | 1/3/20 Check |
| $ (60.00) | Greenslate Payroll Funding | 3/30/20 Wire |
| $ (69.73) | A-1 Medical Supplies - Art Dept | 2/20/20 Debit Card |
| $ (121.90) | A-1 Medical Supplies - Art Dept | 2/21/20 Debit Card |
| $ (96.69) | Marsh Monthly Fees | 4/3/20 Bank Fee |
| $ (152.56) | A-1 Medical Supplies - Art Dept | 2/14/20 Debit Card |
| $ (184.30) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/13/20 Clear Horizon Debit Card |
| $ (200.00) | Check #3004 - Griffin Howes | 1/23/20 Check |
| $ (200.00) | Zelle - Egor P - Picture Cars | 3/18/20 Zelle |
| $ (200.00) | Zelle - Egor P - DP Salary | 3/3/20 Zelle |
| $ (200.00) | February Monthly Fees | 3/4/20 Bank Fee |
| $ (250.00) | Check #3006 - Transcoding Editor - Frederick Brow | 1/24/20 Check |
| $ (250.00) | Check #3015 - Peter Chang | 1/24/20 Check |
| $ (250.00) | Check #3030 - Transcoding Editor - Frederick Brow | 1/24/20 Check |
| $ (250.00) | Check #3043 - Falk Mattern (Grip) | 2/27/20 Check |
| $ (250.00) | Check #3045 - Sooraj Va'dux | 3/7/20 Check |
| $ (250.60) | A-1 Medical Supplies - Art Dept | 2/21/20 Debit Card |
| $ (267.43) | Zelle - Anthony Pagliaro - Picture Cars | 3/3/20 Zelle |
| $ (300.00) | Check #3008 - Deniz Zemtsov (Camera AC) | 2/18/20 Check |
| $ (300.00) | Check #3051 - Monica Donnar | 2/11/20 Check |
| $ (300.00) | Zelle - Anthony Pagliaro - Picture Cars | 3/3/20 Zelle |
| $ (300.00) | Check #3016 - Justin Walfick - Art Help | 3/9/20 Zelle |
| $ (318.45) | Debit Card - Morisco Maxi Hard Drives | 2/18/20 Debit Card |
| $ (342.68) | Zelle - Receipt Reimbursement - Staples | 1/3/20 Zelle |
| $ (380.74) | GEP Payroll (Central Casting via EP) | 7/16/20 Check |
| $ (410.00) | Check #3012 - Chase Stockman (Making of Series) | 2/26/20 Check |
| $ (419.03) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/13/20 Clear Horizon Debit Card |
| $ (437.79) | Check #3063 Eugene Johnson - Art Director | 3/14/20 Check |
| $ (483.73) | Check #3063 Eugene Johnson - Art Director | 3/14/20 Check |
| $ (500.00) | Withdrawal - Cashier Checks | 1/3/20 OTC Withdrawal |
| $ (500.00) | Check #3008 - Gregory Boardoton | 1/30/20 Check |
| $ (500.00) | Check #3007 - Anne-Lise Jacobson (Making of Seri | 2/28/20 Wire |
| $ (500.00) | Greenslate Payroll Funding | 2/28/20 Wire |
| $ (526.00) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/18/20 Clear Horizon Debit Card |
| $ (526.06) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/18/20 Clear Horizon Debit Card |
| $ (526.06) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/24/20 Clear Horizon Debit Card |
| $ (550.00) | A-1 Medical Supplies - Art Dept | 2/20/20 Debit Card |
| $ (571.73) | Transfer back to FALLOUT LLC Account | 3/18/20 Account Transfer |
| $ (602.70) | GEP Payroll (Central Casting via EP) | 5/7/20 ACH Debit |
| $ (650.00) | Zelle - Anthony Pagliaro - Picture Cars | 2/6/20 Zelle |
| $ (650.00) | Zelle - Oasis Nguyen - Makeup FX | 3/3/20 Zelle |
| $ (664.50) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/18/20 Clear Horizon Debit Card |
| $ (664.50) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/18/20 Clear Horizon Debit Card |
| $ (664.50) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/18/20 Clear Horizon Debit Card |
| $ (698.53) | Zelle - Travel Stipend - Jose Ramos | 3/31/20 Zelle |
| $ (710.47) | GEP Payroll (Central Casting via EP) | 2/11/20 ACH Debit |
| $ (784.00) | Zelle - John LaFleur - Catering | 3/10/20 Zelle |
| $ (831.50) | Zelle - Eugene Johnson - Art Director | 3/3/20 Zelle |
| $ (875.00) | Check #3010 - Catalyst Post Services (Edit Suite) | 1/9/20 Check |
| $ (1,000.00) | Zelle - Vanessa Gutierrez | 1/3/20 Check |
| $ (1,000.00) | Petty Cash Withdrawal | 1/7/20 ATM |
| $ (1,000.00) | Zelle - Chad Durrell - Housing Allowance | 2/3/20 Zelle |
| $ (1,000.00) | Check #3036 - Heidi Noonan - Set AD | 1/30/20 Check |
| $ (1,000.00) | Zelle - David Brown - Petty Cash ATM (using perso | 2/11/20 Zelle |
| $ (1,000.00) | A-1 Medical Supplies - Art Dept | 2/13/20 Debit Card |
| $ (1,000.00) | Check #3067 - Raul Morales | 1/30/20 Check |
| $ (1,004.89) | Check #3069 - Staples Receipt Reimbursement - D | 1/3/20 Check |
| $ (1,090.89) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/13/20 Clear Horizon Debit Card |
| $ (1,090.89) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/13/20 Clear Horizon Debit Card |
| $ (1,090.89) | AVON RENT A CAR TRUC WEST HOLLYWOO CA | 2/13/20 Clear Horizon Debit Card |
| $ (1,250.00) | Check #3039 - Ara Thomas - Gaffer | 2/3/20 Check |
| $ (1,250.00) | Zelle - Falk Mattern (Grip) | 3/3/20 Zelle |
| $ (1,250.00) | Check #3044 - Sooraj Va'dux (Grip) | 2/14/20 Check |
| $ (1,250.00) | Check #3056 - Raul Morales | 2/14/20 Check |
| $ (1,250.00) | Check #3066 Falk Mattern | 2/14/20 Check |
| $ (1,250.00) | Check #3071 - Sooraj Va'dux (Grip) | 3/3/20 Zelle |
| $ (1,250.00) | Zelle - Jose Ramos - Costume Designer | 3/3/20 Zelle |
| $ (1,250.00) | Zelle - J Scott Davis - Assistant Editor | 2/6/20 Zelle |
| $ (1,350.00) | Check #3057 - Kiril Petrov (Lens Rentals) | 2/13/20 Check |
| $ (1,500.00) | Withdrawal - Cashier Checks | 1/9/20 OTC Withdrawal |
| $ (1,500.00) | Transcoding Editor - Frederick Brow | 1/30/20 Zelle |
| $ (1,500.00) | Zelle - Casting Director | 1/30/20 Zelle |
| $ (1,500.00) | Check #3062 - Denis Zemtsov - Camera AC | 2/6/20 Check |
| $ (1,500.00) | Zelle - J Scott Davis - Assistant Editor | 2/26/20 Zelle |
| $ (1,500.00) | Zelle - J Scott Davis - Assistant Editor | 3/9/20 Zelle |
| $ (1,623.00) | Check #3074 - Denis Zemtsov (Camera AC) | 2/21/20 Check |

| AMOUNT | DESCRIPTION | DATE | TYPE |
|---|---|---|---|
| $ (1,640.00) | Check #3028 - Chase Stockman (Making of Series) | 1/23/20 Check |
| $ (1,649.91) | Check #3034 - Receipt Reimbursement - David Bro | 1/13/20 Check |
| $ (1,675.00) | Transfer to NIGHTMARES PSC LLC account | 3/10/20 Account Transfer |
| $ (1,733.00) | Check #3033 - Wooden Nickel Lighting Supplies | 1/30/20 Check |
| $ (1,801.00) | Check #3031 - Heidi Noonan (Set AD) | 2/3/20 Check |
| $ (2,000.00) | Withdrawal - Cashier Checks | 1/30/20 OTC Withdrawal |
| $ (2,028.74) | Check #3053 - JTRB Film Services - Receipt Reimb | 2/11/20 Check |
| $ (2,050.00) | Check #3037 - Chase Stockman (Making of Series) | 2/24/20 Check |
| $ (2,050.00) | Check #3045 - Chase Stockman (Behind the Scene) | 2/7/20 Check |
| $ (2,050.00) | Check #3029 - Chase Stockman (Making of Series) | 2/14/20 Check |
| $ (2,050.00) | Check #3040 - Chase Stockman (Behind the Series) | 2/21/20 Check |
| $ (2,500.00) | Check #3054 - Dan Butovskiy - BRD Camera - Cam | 2/7/20 Check |
| $ (2,250.00) | Check #3055 - Dan Butovskiy (AC) | 2/21/20 Check |
| $ (2,250.00) | Check #3019 - Jose Ramos (Costumes) | 2/21/20 Check |
| $ (2,500.00) | Check #3035 - JTRB Film Services - Accountant We | 1/6/20 Check |
| $ (2,500.00) | Check #3017 - JTRB Film Services - Accountant We | 1/24/20 Check |
| $ (2,500.00) | Check #3036 - JTRB Film Services - Accountant We | 1/14/20 Check |
| $ (2,500.00) | Check #3035 - JTRB Film Services - Accountant We | 1/21/20 Check |
| $ (2,500.00) | Check #3061 - JTRB Film Services - Weekly Accoun | 2/7/20 Check |
| $ (2,500.00) | Zelle - John LaFleur - Catering | 3/3/20 Zelle |
| $ (2,500.00) | Check #3031 - JTRB Film Services - Weekly Accoun | 2/11/20 Check |
| $ (2,500.00) | Zelle - John LaFleur - Catering | 2/11/20 Zelle |
| $ (2,500.00) | Zelle - JTRB Film Services (LuJian) - Accountant Sa | 2/24/20 Zelle |
| $ (2,500.00) | Zelle - JTRB Film Services (LuJian) - Accountant Sa | 2/27/20 Zelle |
| $ (2,500.00) | Zelle - Egor P - DP Salary | 3/3/20 Zelle |
| $ (2,555.00) | Check #3035 - Anne-Lise Jacobson (Making of Seri | 1/21/20 Check |
| $ (2,555.00) | Check #3025 - Anne-Lise Jacobson (Making of Seri | 1/27/20 Check |
| $ (2,555.00) | Check #3016 - Anne-Lise Jacobson (Behind the Sce | 3/7/20 Check |
| $ (2,555.00) | Check #3065 - Anne-Lise Jacobson (Making of Seri | 2/24/20 Check |
| $ (2,555.00) | Check #3065 - Anne-Lise Jacobson (Making of Serie | 2/21/20 Check |
| $ (2,666.10) | The Production Truck Rentals | 2/3/20 Debit Card |
| $ (2,625.00) | Check #3019 - Egor P - DP Salary | 2/24/20 Check |
| $ (2,625.00) | Check #3044 - Egor P - DP Salary | 2/7/20 Check |
| $ (2,676.00) | Check #3018 - Egor P - DP Salary | 3/3/20 Check |
| $ (2,655.00) | Check #3017 - Egor P - DP Salary | 1/30/20 Check |
| $ (2,661.00) | Check #3033 - Egor P - DP Salary | 1/23/20 Check |
| $ (2,700.00) | Check #3077 - Kiril Petrov (Lens Rentals) | 2/25/20 Check |
| $ (2,934.52) | Greenslate Payroll Funding | 3/11/20 Wire |
| $ (3,000.00) | Check #3006 - Graphic Designer - Carin L | 1/8/20 Check |
| $ (3,000.00) | Check #3032 - Lu's Troto | 3/20/20 Check |
| $ (3,000.00) | Check #3032 - Lu's Troto | 3/20/20 Check |
| $ (3,025.00) | Check #3068 - Egor P - DP Salary | 2/21/20 Check |
| $ (3,130.59) | Check #3020 - JTRB Film Services - Accountant + R | 1/3/20 Check |
| $ (3,307.14) | Check #3041 - Catalyst Post Services (Office) | 2/4/20 Check |
| $ (3,412.43) | Greenslate Payroll Funding | 3/6/20 Wire |
| $ (3,500.00) | Zelle - Chad Durrell - Housing Allowance | 1/3/20 Zelle |
| $ (3,500.00) | Withdrawal - Cashier Checks | 1/30/20 OTC Withdrawal |
| $ (3,751.41) | Check #3037 - Catalyst Post Office Space | 2/10/20 Check |
| $ (4,000.00) | Check #3051 - Lu's Troto | 2/10/20 Check |
| $ (4,217.48) | GEP Payroll (Central Casting via EP) | 2/14/20 ACH Debit |
| $ (4,818.00) | Cast Salary - Marc Singer | 2/18/20 Wire |
| $ (5,000.00) | Director Salary - Chad Durrell | 12/31/19 Wire |
| $ (5,000.00) | Producer Salary - DB Film LLC - David Brown | 12/31/19 Wire |
| $ (5,000.00) | Ramo Lux Production Legal | 1/7/20 Wire |
| $ (5,000.00) | Pex Card Funding | 2/19/20 Wire |
| $ (5,450.00) | Check #3035 - Catalyst Post Services (Office) | 2/5/20 Check |
| $ (7,550.00) | Check #3049 - Ara Thomas (Grip/Camera/Lighting | 2/7/20 Check |
| $ (6,750.00) | Check #3060 - Ara Thomas (Grip/Camera/Rentals) | 2/14/20 Check |
| $ (9,156.00) | Check #3021 - Ara Thomas (Camera/Grip/Lighting | 2/24/20 Check |
| $ (10,000.00) | Pex Card Funding | 2/3/20 Wire |
| $ (10,000.00) | Check #3022 - Peter Loisios - Location Deposit (M | 1/21/20 Wire |
| $ (10,000.00) | Pex Card Funding | 1/21/20 Wire |
| $ (10,000.00) | Ramo Lux Production Legal | 2/24/20 Wire |
| $ (10,000.00) | Pex Card Funding | 2/10/20 Wire |
| $ (10,000.00) | Greenslate Payroll Funding | 2/25/20 Wire |
| $ (10,000.00) | Pex Card Funding | 3/11/20 Wire |
| $ (13,850.00) | Director Salary - Chad Durrell | 2/4/20 Check |
| $ (15,000.00) | Greenslate Payroll Funding | 2/13/20 Wire |
| $ (15,000.00) | Greenslate Payroll Funding | 3/30/20 Wire |
| $ (15,000.00) | Pex Card Funding | 2/5/20 Wire |
| $ (15,615.00) | Withdrawal - Cashier Checks | 2/27/20 OTC Withdrawal |
| $ (16,110.84) | GEP Payroll (Central Casting via EP) | 2/21/20 ACH Debit |
| $ (17,000.00) | Greenslate Payroll Funding | 2/5/20 Wire |
| $ (19,200.00) | Director Salary - Chad Durrell | 2/27/20 Wire |
| $ (19,318.66) | Greenslate Payroll Funding | 3/18/20 Wire |
| $ (36,602.18) | SAG Deposit | 2/3/20 Wire |
| $ (36,602.28) | TRANSFER TO TODD/B2B | 7/8/20 Account Transfer |
| $ (40,000.00) | Greenslate Payroll Funding | 2/6/20 Wire |
| $ (43,297.82) | Greenslate Payroll Funding | 1/6/20 Wire |
| $ (47,000.00) | Greenslate Payroll Funding | 1/16/20 Wire |
| $ (49,000.00) | Check #3020 - Peter Loisios - Location Fee (Main F | 1/16/20 Check |
| $ (50,000.00) | Producer Fee ($300k less $86k ATM fee = $64) | Various transfer/account transfer |
| $ (65,000.00) | Cast Salary - John Brotherlone | 2/3/20 Wire |
| $ (65,000.00) | Cast Salary - Shavager Sossamon | 2/3/20 Wire |
| $ (190,000.00) | Market Fee per SAA | 2/3/20 Wire |
| $ 845,200.00 | B2B 2 Todd Funded |
| $ (1,011,194.65) | Total Production Expenses |

| | | |
|---|---|---|
| $ (65,994.65) | Owed to David Brown | |

Exhibit M

**CONFIDENTIAL SIDE LETTER**

February 9, 2020

**RE:  Confidential Side Letter / "The Undertaker's Wife" / Clear Distribution LLC / 828 Media Capital LLC**

Reference is hereby made to the certain Sales Agency Agreement dated as of December 18, 2019 (the "Agreement") between Clear Distribution LLC ("Clear") and Undertaker LLC in connection with the motion picture project presently entitled "The Undertaker's Wife" (the "Picture").  With regard to the Agreement, 828 Media Capital LLC  ("828") and Clear hereby enter into this Confidential Side Letter ("Side Letter"). Capitalized terms not defined herein shall have the same meaning and effect as set forth in the Agreement.

Notwithstanding anything to the contrary in the Agreement, the Operating Agreement for the Picture, or any other agreements between any of the parties or their related entities, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, this letter shall confirm *on a strictly confidential basis,* that Clear and 828 agree to the following:

- Clear shall in perpetuity pay to 828 Fifty Percent (50%) of One Hundred Percent (100%) of any and all sales fees received from the sales of the Picture in any media throughout the world.

The terms and conditions of this side letter are confidential; provided that the parties hereto will not be in breach for disclosure of this Side Letter in order to enforce the terms herein.  This Side Letter may be executed in counterparts and by fax/electronic or PDF signatures shall have the same force as original.

IN WITNESS WHEREOF, the parties hereto have executed this letter agreement as of the 9th day of February, 2020.

CLEAR DISTRIBUTION LLC

_____
By:  David Brown
Authorized Signatory for Clear Distribution LLC

828 MEDIA CAPITAL LLC

_____
By: _____
Authorized Signatory for 828 Media Capital LLC

Exhibit N

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AL    EF3D262A6464

**OPERATING AGREEMENT OF
UNDERTAKER LLC
A CALIFORNIA LIMITED LIABILITY COMPANY**

**THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY JURISDICTION.  NO MEMBERSHIP INTEREST MAY BE SOLD OR OFFERED FOR SALE (WITHIN THE MEANING OF ANY SECURITIES LAW) UNLESS A REGISTRATION STATEMENT UNDER ALL APPLICABLE SECURITIES LAWS WITH RESPECT TO THE MEMBERSHIP INTEREST IS THEN IN EFFECT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS IS THEN APPLICABLE TO THE MEMBERSHIP INTEREST.  A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE APPLICABLE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.**

DocuSign Envelope ID: 8A3EC4B0-4393-484A-...F-EF3D262A6464

This Operating Agreement (the "Agreement") is made as of December 19, 2019 ("Effective Date") by the Managers (as defined below) of the Company (as defined below), a manager-managed California Limited Liability Company, and such parties who from time to time execute this Agreement as Members (as defined and specified in Exhibit A).

The Managers (as defined below) hereby represent and agree that they filed, on behalf of the Company, Articles of Organization with the Secretary of State for the State of California, and that they desire to enter into an operating agreement in accordance with the California Revised Unified Limited Liability Company Act.

WHEREAS, the Company desires to provide for the governance of the Company and the conduct of its business, and to specify the relative rights and obligations of the Managers and Members (as defined below);

WHEREAS, the Managers (as defined below) hereunder desire to enter into this Agreement, which shall supersede and replace the Initial Operating Agreement, to express the terms and conditions of their membership in the Company and their respective rights and obligations with respect thereto; and

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged by each party to the others, the parties hereto, for themselves, their respective heirs, executors, administrators, successors and assigns, hereby agree as follows:

## ARTICLE I: DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

Section 1.1. *"Affiliate."* "Affiliate" means any Person under the control of, in common control with, or in control of a Member or a Manager, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited liability company, the ability to exercise more than fifty-one percent (51%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

Section 1.2. *"Agreement."* "Agreement" means this Agreement, in its original form and as amended from time to time.

Section 1.3. *"Articles."* "Articles" means the Articles of Organization filed with the California Secretary of State forming this limited liability company, as initially filed on December 18, 2019 and as they may be amended from time to time.

Section 1.4. *"Available Cash Flow."* "Available Cash Flow" means, with respect to any Fiscal Year or other period, the sum of all cash receipts of the Company from any and all sources, less all cash disbursements (including, without limitation, loan repayments) and a reasonable allowance for reserves, contingencies and anticipated obligations as determined by the Managers.

Section 1.5. *"Bankruptcy."* "Bankruptcy" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

Section 1.6. *"CAMA."* "CAMA" means the third party Collection Account Management Agreement, which shall be established by a collection agent (Freeway and Fintage being expressly preapproved by the Members).

Section 1.7. *"Capital Account."* "Capital Account" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as (1) increased by any additional contributions and the Member's share of the Company's Profits (as defined below), and (2) decreased by any distribution to that Member as well as that Member's share of Company Losses (as defined below).

Section 1.8. *"Capital Contribution."* "Capital Contribution" means, with respect to any Member, Cash Capital Contribution. "Cash Capital Contribution" shall mean the amount of money contributed to the Company, in consideration of a Percentage Interest held by such Member, if any. A Capital Contribution shall not be deemed a loan.

Section 1.9. *"Code."* "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding revenue law.

Section 1.10 *"Collection Account."* "Collection Account" means the separate account which shall be established by a third party collection agent (Freeway and Fintage being expressly approved by the Members) for the purpose of collecting all Company Gross Revenue, and paying costs and expenses as set forth in the CAMA.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-A     -EF3D262A6464

Section 1.11.  *"Company."* "Company" means Undertaker LLC, the entity formed in accordance with this Agreement and the Articles.

Section 1.12.  *"Company Minimum Gain."* "Company Minimum Gain" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations section 1.704-2(d)  [26CFR § 1.704-2(d)].

Section 1.13.  *"Company Gross Revenue."* "Company Gross Revenue" shall have the definition set forth in Exhibit C, which Exhibit C the Members agree shall replace and supersede Exhibit NP in each of the Investment Agreements for the Picture, and which is approved by all Members.

Section 1.14.  *"Deferments."* "Deferments" means arrangements for the deferral of some or all of the costs of goods and/or services (e.g. acting, writing, directing, and producing) provided by the suppliers of such goods and/or services, and all of which shall be approved by all of the Managers in writing.

Section 1.15.  *"Departing Member."* "Departing Member" means any Member whose conduct results in a Dissolution Event (defined below) or who withdraws from the Company in accordance with Section 4.7, where such withdrawal does not result in Dissolution (defined below) of the Company.

Section 1.16.  *"Dissolution."* "Dissolution" means (i) when used with reference to the Company, the earlier of (a) the date upon which the Company is terminated under the California Revised Uniform Limited Liability Company Act, or any similar provision enacted in lieu thereof, or (b) the date upon which the Company ceases to be a going concern, in accordance with Article IX herein, and (ii) when used with reference to any Member, the earlier of (a) the date upon which there is a Dissolution of the Company or (b) the date upon which such Member's entire interest in the Company is terminated by means of a distribution or series of distributions by the Company to such Member.

Section 1.17.  *"Dissolution Event."* "Dissolution Event" means one or more of the following: the death, resignation, retirement, expulsion, or bankruptcy of all Members.

Section 1.18.  *"Distribution."* "Distribution" means the transfer of money or property by the Company to the Members without consideration in accordance with this Agreement.

Section 1.19.  *"Economic Interest"* "Economic Interest" means a Person's (defined below) right to share in the Profits, Losses or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to vote or to participate in the management of the Company, or, except as provided otherwise herein, any right to information concerning the business and affairs of the Company.

Section 1.20.    [intentionally omitted]

Section 1.21.  *"Fiscal Year."* "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

Section 1.23.  *"LLC Act."* *"LLC* Act" means the California Revised Uniform Limited Liability Company Act, as amended from time to time, and the provisions of any succeeding law.

Section 1.24.  *"Losses."* "Losses" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable loss for such year or period, determined in accordance with Code section 703(a).

Section 1.25.    *"Majority Interest."* "Majority Interest" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

Section 1.26.  *"Manager."* "Manager" means the Person who (i) has been admitted as a Manager in the Company; (ii) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (iii) has not engaged in conduct resulting in a Dissolution Event or terminated his, her, or its membership as a Manager for any other reason. 828 Productions LLC ("828") and Specter Entertainment LLC ("Specter") shall individually and collectively be referred to herein as the "Manager(s)" as set forth in Exhibit B.

Section 1.27.    *"Member."* "Member" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

Section 1.26.  *"Member Nonrecourse Debt."* "Member Nonrecourse Debt" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations section 1.704-2(b) (4) [26 CFR § 1.704-2(b) (4)].

Section 1.27.    [intentionally omitted]

Section 1.28.  *"Member Nonrecourse Deductions."* "Member Nonrecourse Deductions" means items of Company loss, deduction, or Code section 705(a) (2) (B) [26 USCS § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

Section 1.29.  *"Membership Interest."* "Membership Interest" means a Member's rights in the Company, collectively, including the Member's Economic Interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the LLC Act.

3

DocuSign Envelope ID: 8A3EC4B0-4393-484A-␣␣-EF3D262A6464

Section 1.30. *"Negative Capital Account."* "Negative Capital Account" means a Capital Account with a balance of less than zero.

Section 1.31. *"Nonrecourse Liability."* "Nonrecourse Liability" has the meaning provided in the Regulations section 1.752-1(a)(2). [26 CFR § 1.752-1(a)(2)].

Section 1.32. [intentionally omitted]

Section 1.33. *"Officer."* "Officer" means any Person appointed by the Managers, in accordance with Section 5.1 of this Agreement, to conduct, or to assist the Managers in the conduct of the day-to-day business and affairs of the Company. Such Officers may include a Chairperson, one or more Senior Vice Presidents, one or more Vice Presidents, a Secretary, one or more Assistant Secretaries, a Chief Financial Officer, a Treasurer, one or more Assistant Treasurers, and a Comptroller.

Section 1.34. *"Percentage Interest."* "Percentage Interest" means the percentage ownership of the Company of each Member, including the Managers, as set forth in the column entitled "Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time to time pursuant to this Agreement.

Section 1.35. *"Person."* "Person" means an individual, partnership, limited partnership, corporation, limited liability company, registered limited liability partnership, trust, estate, association, or any other entity.

Section 1.36. *"Picture."* "Picture" means the motion picture project currently entitled "The Undertaker's Wife."

Section 1.37. *"Positive Capital Account."* "Positive Capital Account" means a Capital Account with a balance greater than zero.

Section 1.38. *"Principal."* "Principal" means the natural Person, which is in ultimate control of a Member.

Section 1.39. *"Profits."* "Profits" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income for such year or period, determined in accordance with Code section 703(a).

Section 1.40. *"Regulations."* "Regulations," as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations, which may be promulgated.

Section 1.40. *"Secretary of State."* "Secretary of State" means the Secretary of State for the State of California.

Section 1.41. *"Tax Matters Partner."* "Tax Matters Partner" as defined in Code section 6231 [26 USCS § 6231] is that Member designated by the Company in Section 8.7 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

## ARTICLE II:  FORMATION AND ORGANIZATION

Section 2.1. *Initial Date and Initial Parties.* This Agreement is first entered into as of the Effective Date by and among the Company and the Persons who are Members of the Company on that Effective Date.

Section 2.2. *Period of Duration.* The period of duration of the Company ("Period of Duration") shall commence on the date of the filing of the Articles with the California Secretary of State, and shall continue in perpetuity unless the Company is terminated or dissolved sooner in accordance with the provisions of this Agreement.

Section 2.3. *Subsequent Parties.* No Person may become a Member of the Company without agreeing to and becoming a signatory of this Agreement and any offer or assignment of a Membership Interest is contingent upon the fulfillment of this condition.

Section 2.4. *Name.* The name of this Company is Undertaker LLC.

Section 2.5. *Business and Purpose of the Company.* The business of the Company shall be (i) to develop, produce and exploit the Picture; (ii) to perform and conduct any other activity necessary or incidental to the foregoing in furtherance of the objects of the business of the Company; and (iii) to engage in any lawful act or activity for which a limited liability company may be organized under the LLC Act.

Section 2.6. *Principal Place of Business.* The Company will have its principal place of business at 3940 Laurel Canyon Blvd. #1413, Studio City, CA 91604, or at any other address designated by the Managers. The Company shall maintain its principal executive offices at its principal place of business, as well as maintaining at that location all records and documents which it is required to keep by the LLC Act.

Section 2.7. *Resident Agent.* The name and address of the Company's agent for service of process in the State of California is Michelle Chang, 315 S. Beverly Drive, Suite 210, Beverly Hills, CA 90212.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-A/    -EF3D262A6464

Section 2.8. *Names and Addresses of Members.* The name, present mailing address, and Economic Interest, Membership Interest, and Percentage Interest of each Member are defined in Exhibit A.

Section 2.9. *Names and Addresses of Managers.* The names and present mailing addresses of the Managers are defined in Exhibit B.

## ARTICLE III: CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 3.1. *Initial Capital Contributions.* Each Member shall contribute to the Company the monies as set forth in Exhibit A as that Member's initial Capital Contribution. Notwithstanding the foregoing, the Managers shall have the unfettered right to accept or reject, in their discretion, any proposed Capital Contribution, subject to the terms of this Agreement. All Persons whose Capital Contributions are accepted by the unanimous approval of the Managers shall be deemed Members. For purposes of clarification, a Manager's respective Capital Contributions in the form of management services to the Company, as set forth in Exhibit A, shall not be deemed a Cash Capital Contribution, and no Capital Account Amount shall be allocated to such services, provided, however, a Manager may, at the Managers' election, deem their compensation in connection with their respective services on the Picture (e.g. acting, writing, directing, and producing) as a Capital Contribution.

Section 3.2. *Additional Contributions.* No Member shall be required to make any additional contribution to the Company. However, upon the approval by the Managers that additional capital is desirable or necessary, any Member may, but shall not be required to, contribute additional capital to the Company on terms and conditions as determined by the Managers, subject to Section 3.1.

Section 3.3. *Company Capital.* No Member shall have the right to withdraw, or receive any return of, his, her or its Capital Contribution, and no Capital Contribution may be returned in the form of property other than cash, except as specifically provided herein.

Section 3.4. *No Interest on Capital Contributions.* Except as expressly provided in this Agreement, no Capital Contribution of any Member shall bear any interest or otherwise entitle the contributing Member to any compensation for use of the contributed capital.

Section 3.5. *General Rules for Adjustment of Capital Accounts.* The Capital Account of each Member shall be:

(a) Increased by:

(i) Such Member's Cash Capital Contributions;

(ii) The agreed fair market value of property contributed by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code section 752);

(iii) All items of Company income and gain (including income and gain exempt from tax) allocated to such Member pursuant to Article VI or other provisions of this Agreement; and

(b) Decreased by:

(i) The amount of cash distributed to such Member;

(ii) The agreed fair market value of all actual and deemed distributions of property made to such Member pursuant to this Agreement (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to Code Section 752); and

(iii) All items of Company deduction and loss allocated to such Member pursuant to Article IV or other provisions of this Agreement.

Section 3.6. *Special Rules with Respect to Capital Accounts.* For purposes of computing the balance in a Member's Capital Account, no credit shall be given for any Capital Contribution which such Member is to make until such contribution is actually made.

Section 3.7. *Transferee's Capital Account.* In the event a Member, or the holder of an Economic Interest, transfers an interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest.

Section 3.8. *Right to Return of Contributions.* No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement.

Section 3.9. *Capital Accounts.* A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations section 1.704-1(b)(2)(iv) [26 CFR § 1.704-1(b)(2)(iv)], which shall reflect all Capital Contributions to the Company. Should any member transfer or assign all or any part of his, her, or its

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AE ⸱EF3D262A6464

Membership Interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

Section 3.10. *Failure of Member to Make Contribution*. All Members shall make timely payment to the Company of required Capital Contributions. The failure of any Member to make their initial Capital Contribution will render him, her, or it in a default and may result in the loss of the Member's ability to participate in the Company. Further, a Member who is in default may have his, her, or its proportionate interest in the Company diluted, reduced, or even eliminated, depending on the extent and circumstances of the default.

Section 3.11. *No Priorities of Members; No Withdrawals of Capital*. Except as otherwise specified in Article IV and/or in the LLC Act and/or Exhibit C of this Agreement, no Member shall have a priority over any other Member as to any Distribution, whether by way of return of capital or by way of Profits, or as to any allocation of Profits. No Member shall have the right to withdraw or reduce his, her, or its Capital Contributions in the Company except as otherwise provided by the LLC Act.

Section 3.12. *Purpose of Capital Contribution*. Each Member (including any Person who becomes a Member after formation pursuant to Article IV or by operation of the LLC Act) hereby represents that he, she or it is acquiring his, her or its interest for investment purposes only and not with a view to the distribution thereof. Any transfer of an interest shall be made by a Member only in accordance with this Agreement, the LLC Act and applicable federal and state securities laws.

Section 3.13. *Loans/Debt Financing*. The Company may borrow funds and/or take on debt to conduct its business and may secure these loans and/or debt financing (which may include, without limitation, premium return and/or default penalty) with the assets and income of the Company and/or such loans and/or debt financing may be without recourse.

## ARTICLE IV:  MEMBERS

Section 4.1. *Limitation of Liability*. No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his, her, or its membership in the Company, except as expressly set forth in this Agreement or as required by law.

Section 4.2. *Additional Members*. Additional Members may be admitted to the Company only if approved by the Managers and all Members, subject to this Agreement, and the Members' Percentage Interest, Economic Interest, and Membership Interest shall be diluted in accordance with the terms hereof. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and Percentage Interest, Economic Interest and Membership Interest of any additional Members.

Section 4.3. *Transactions with Company*. A Member may lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the LLC Act. To the extent permitted by applicable laws, such Member shall be treated like any other Person with respect to transactions with the Company, and such loan shall be separate and distinct from Capital Contributions.

Section 4.4. *Company is Manager-Managed*. It is the intent of the Members of this Company that this Company is manager-managed and the Managers shall participate actively in the management of the Company and act as the agents of the Company, except as limited by the provisions contained in Article V.

Section 4.5. *Meetings*. There will be no required regular or annual meetings of the Members. However, subject to the LLC Act, any Member may call a meeting at any time, provided such is approved by the Managers. Meetings of the Members shall be held at the Company's principal executive office or at any other place within the State of California, selected by the Member calling the meeting, except as set forth in Section 4.5(a). Written notice of the meeting shall be provided to all Members entitled to vote at the meeting. Notice shall be given in accordance with the requirements of the LLC Act. Any meetings of the Members shall be conducted in accordance with all of the requirements under the LLC Act. Unless otherwise provided in this Agreement and the LLC Act, approval of any matters coming before the Members may be obtained by a vote of the Majority Interest unless otherwise set forth in the Member's Investment Agreement.

(a) *Actions without Meetings*. Unless otherwise provided in this Agreement, any action, which may be taken at any meeting of the Members, may be taken without a meeting and without prior notice if consent in writing, providing for the action so taken is signed by the Majority Interest, unless otherwise set forth in the Member's Investment Agreement. All such consents shall be filed and maintained in the Company's records.

Section 4.6. *Other Business*. The Members, the Managers, and any Affiliate of the Members and/or Managers, may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and

description, independently or with others. The Company shall not have any rights in or to such independent ventures or the income or profits by virtue of this Agreement.

Section 4.7. *Withdrawal.* Consistent with the LLC Act and notwithstanding anything to the contrary, no Member may withdraw as a Member, by notice or otherwise, without the affirmative vote of the Majority Interest. For purposes of clarification, such vote may include the vote of the withdrawing Member.

Section 4.8. *Admission of New Members.* After the formation of the Company, any Person may become a Member of the Company upon approval of the Managers, subject to Sections 3.1, 3.2 and 4.2.

Section 4.9. *Rights of Members and Non-Members.* Upon the request of a Member or a holder of an Economic Interest who is not a Member, for purposes reasonably related to the interest of that Person, the Company shall promptly deliver to the Member or holder of an Economic Interest, at the expense of the Company, a copy of this Agreement and a copy of the information listed in this Agreement.

Section 4.10. *Limitation on Exposing Member to Personal Liability.* Neither the Company nor the Managers, nor any or all Members may take any action that will have the effect of exposing any Member to personal liability for the obligations of the Company, without first obtaining the prior written consent of such Member.

## ARTICLE V: MANAGEMENT BY THE MANAGERS

Section 5.1. *Company is Manager-managed.* The Company shall be managed by its Managers as set forth in Exhibit B, who may also be Members for the Period of Duration of the Company. The Managers shall have exclusive control and decision-making authority over all aspects of the Picture, including development, pre-production, production, post-production, business management, including signing authority on all bank accounts, and approval rights over the final cut of the Picture. As between the Managers, the decision shall be by majority vote and all references to Managers' approval in this Agreement shall abide by such rule with respect to all customary key creative matters (subject to any third party rights and/or agreements), business decisions, and management decisions in connection with the Company, provided that, in the event of a tie between the Managers, Specter shall be the tie breaker for all creative decisions of Company, and 828 shall be the tie breaker for all business decisions of Company. 828 and Specter shall confer on all talent and crew deals regarding the Picture but Specter shall have the authority to make day-to-day, on-set decisions.

Section 5.2. *Duties of the Manager.* The Managers are the general managers and have general supervision, direction, and control of the business of the Company. The Managers shall preside at all meetings of the Members. The Managers shall have the general powers and duties of management typically vested in the office of president of a corporation. Without in any way derogating from the generality of the foregoing and except as set forth in this Agreement, the Managers, as between themselves and the Members, shall have full and exclusive authority with respect to all decisions required or permitted to be made affecting the Company. Unless greater or other authorization is required pursuant to this Agreement or under the California Revised Uniform Limited Liability Company Act for the Company to engage in an activity or transaction, all activities or transactions must be approved by a majority of the Managers, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Manager authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

Section 5.3. *Officers of the Company.* The Managers may, at the Managers' discretion and in accordance with Section 5.1 of this Agreement, appoint Officers of the Company at any time to conduct, or to assist the Managers in the conduct of, the day-to-day business and affairs of the Company. The Officers shall serve at the pleasure of the Managers, subject to all rights, if any, of an Officer under any contract of employment between the Company and Officer, if any, separate from this Agreement. An individual may hold a number of offices. The Officers shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation and as shall be determined from time to time by the Managers in accordance with Section 5.1 of this Agreement, but subject in all instances to the supervision and control of the Managers in accordance with Section 5.1 of this Agreement, and the terms of this Agreement.

(a) *Signing Authority of Officers.* Subject to the terms of this Agreement, the appointed Officers shall have such authority to sign documents on behalf of the Company as may be delegated to them by the Managers, if any.

(b) *Acts of Officers as Conclusive Evidence of Authority.* Any note, mortgage, deed of trust, evidence of indebtedness, contract, certificate, statement, conveyance or other instrument or obligation in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other Person, when signed

DocuSign Envelope ID: 8A3EC4B0-4393-484A-/    F-EF3D262A6464

by the appropriate Officer is not invalidated as to the Company by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other Person that the signing officers had no authority to execute the same.

Section 5.4. *Limitations on Power of the Managers*. The Managers may not undertake the following acts on behalf of the Company without first obtaining unanimous consent of the Members):

(a) The approval of a sale, transfer, exchange, assignment, or other disposition of all or any part of a Member's Membership Interest (excluding the right to assign the "Net Profits" (as defined in Exhibit C) based on Member's Economic Interest) in the Company and admission of the assignee as a Member of the Company, subject to Article 7;

(b) The decision to continue to operate the business of the Company after the occurrence of a Dissolution Event;

(c) The sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a single transaction or as a series of transactions over a three-month period, except if it is in a distribution or license agreement that is customary in the entertainment industry in connection with the Picture, including, but not limited to, producer representation agreements and/or agency representation agreements, or if the same is part of the orderly liquidation and winding up of the Company's affairs upon the Dissolution of the Company;

(d) The merger of the Company with any other business entity;

(e) The confession of a judgment against the Company;

(f) Any act which would prevent the Company from conducting its duly authorized business'

(g) The conversion of the Company into another business entity;

(h) Any amendment to this Agreement, except as set forth in Section 12.11;

(i) Any act outside the scope of the purpose of the Company as set forth in Section 2.5;

(j) Any deferral of fees other than those set forth in the Agreement;

(k) Company taking on any debt, equity (in excess of the Maximum deferral, etc. that would impact the waterfall).

Section 5.5. *Limitation on Exposing Managers to Personal Liability*. Neither the Company nor any Member may take any action that will have the effect of exposing any of the Managers of the Company to personal liability for the obligations of the Company, without first obtaining the written consent of such Manager.

Section 5.6. *Compensation of Managers*. The Managers may receive compensation for services rendered in connection with the Picture (e.g., producer, director, acting fees and/or "Profit Participation," as defined below, in connection therewith) and not in the capacity of a Manager of the Company, which shall be set forth in separate service agreements and/or finance agreement for any and all of the Managers.

Section 5.7. *Fiduciary Duties*. The fiduciary duties the Managers owe to the Company in connection to the Managers' management duties hereunder, and to the Members of the Company, are those of a partner to a partnership and to the partners of the partnership.

Section 5.8. *Liability for Acts and Omissions*. As long as the Managers act in accordance with Section 5.7, the Managers shall not incur liability to any other Member or to the Company for any act or omission which occurs while in the performance of services for the Company.

Section 5.9. *Removal of a Manager*. The Managers may be removed, but only for criminal activity (i.e. a criminal act, fraud or embezzlement, whether or not such act results in a criminal charge or conviction), and only by vote of the Majority Interest at a meeting called expressly for that purpose in accordance with Section 4.5 and the Act. For purposes of clarification, such vote shall not include the vote of the Manager to be removed. Any removal shall be without prejudice to the rights, if any, of such Manager under such Manager's respective services agreement (including, without limitation, in connection with any credit and/or compensation provisions set forth therein, in accordance with the terms of thereof) and such Manager shall retain any ownership right as a Member of the Company, if any, as set forth in Exhibit A unless otherwise agreed to by the Majority Interest. Upon the effectiveness of such removal, the Members may, by the consent of the Majority Interest, elect a successor Manager to continue the business of the Company.

Section 5.10. *Withdrawal of a Manager*. A Manager may withdraw as a Manager only by vote of the Majority Interest. For purposes of clarification, such vote may include the vote of the withdrawing Manager. Any withdrawal shall be without prejudice to the rights, if any, of such Manager under such Manager's respective services agreement (including, without limitation, in connection with any credit and/or compensation provisions set forth therein, in accordance with the terms of thereof). Additionally, the withdrawing Manager shall not retain any Percentage Interest or Membership Interest as set forth in Exhibit A. Upon the effectiveness of such withdrawal, the Members may, by the consent of the Majority Interest, elect a successor Manager to continue the business of the Company.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AL    EF3D262A6464

Section 5.11. *Incapacity or Death of a Manager*. In the event of the withdrawal, incapacity/permanent disability, or death of a Manager (or principal of the Manager, as applicable), a new Manager may be named by the Majority Interest; however, the withdrawing/incapacitated/deceased Manager (or such Manager's heirs or successor) shall retain such Manager's Economic Interest, if any.

## ARTICLE VI:  DISTRIBUTION OF REVENUES

Section 6.1. *Distributions*. Distributions of Company Gross Revenue shall be governed by the CAMA in accordance with Exhibit C. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Members pursuant to this Section 6.1.

Section 6.2. *Profit Participation*. Managers shall have the right to allocate to parties furnishing rights, monies or services to the Picture (including, without limitation, to the Managers in their capacities other than as Managers of the Company) in the form of profit participation ("Profit Participation") and such Profit Participation shall be in the form of profit participation only from the "Producer's Share of Net Profits" (as defined in Exhibit C). For purposes of clarification, a Manager may be accorded Profit Participation in the Producer's Share of Net Profits pursuant to the service agreement of a respective Manager (e.g. a director agreement, producer agreement, etc.).

Section 6.3. *Special Allocations*.

(a) *Qualified Income Offset*. In the event any Member, in such capacity, unexpectedly receives any adjustments, allocations or distributions described in 1.704-1(b)(2)(ii)(d)(4) (regarding depletion deductions) of the Code and applicable Treasury Regulations, 1.704-1(b)(2)(ii)(d)(5) (regarding certain mandatory allocations under Treasury Regulations regarding family partnerships, the so-called varying interest rules, or certain in-kind distributions), or 1.704-1(b)(2)(ii)(d)(6) (regarding certain distributions, to the extent they exceed certain expected offsetting increases in a Member's Capital Account), items of Company income and gain shall be specially allocated to such Members in an amount and a manner sufficient to eliminate, as quickly as possible, the deficit balances in the Member's Capital Account created by such adjustments, allocations or distributions. Any special allocations of items of income or gain pursuant to this subsection (a) shall be taken into account in computing subsequent allocations of Profits pursuant to this Article VI, so that the net amount of any items so allocated and the Profits or other items allocated to each Member pursuant to this Article VI shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI as if such unexpected adjustments, allocations or distributions had not occurred.

(b) *Section 704(c) Allocations*. In accordance with Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial book value. In the event the book value of any Company property is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its fair market value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Majority Interest, in any manner that reasonably reflects the purpose of this Agreement. Allocations made pursuant to this subsection (b) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, other items, or Distributions pursuant to any provision of this Agreement.

(c) The Members shall make such other special allocations as are required in order to comply with any mandatory provision of the applicable Treasury Regulations or to reflect a Member's Economic Interest in the Company determined with reference to such Member's right to receive Distributions from the Company and such Member's obligation, if any, to pay any expenses or liabilities.

(d) The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their share of Company income and loss for income tax purposes.

Section 6.4. *Allocation of Tax Items*. Except as otherwise required by applicable law, every item of income, gain, deduction, or loss shall be allocated among the Members in proportion to their Percentage Interests.

Section 6.5. *Compliance with the Code and Regulations*. The Company intends to comply with the Code and all applicable Treasury Regulations, including, without limitation, the minimum gain chargeback requirements, and

intends that the provisions of this Article be interpreted consistently with that intent.

## ARTICLE VII:  TRANSFERS OF MEMBERSHIP

Section 7.1.  *Restriction on Transferability of Membership Interests.*  A Member may not transfer, assign, encumber, or convey all or any part of his, her, or its Economic Interest or Membership Interest in the Company, except as provided herein.  In entering into this Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships between or among the Members. Notwithstanding the foregoing, transfers of Membership Interests to a trust solely for estate planning purposes shall not be subject to the restrictions set forth herein except as otherwise required by law.

Section 7.2.  *Permitted Transfers.*  Any Member who wishes to transfer all or any part of his, her, or its Membership Interest or Economic Interest in the Company shall only have the right to transfer such Membership Interest or Economic Interest back to the Company at a price equal to 100% of the transferor's interest (less any Distributions made to such Member).

Section 7.3.  *Transfers Not in Compliance with This Agreement.*  Any transfer not in compliance with the provisions of Sections 7.2 or any other provision of this Agreement shall be null and void and have no force or effect.

Section 7.4.  *No Release of Liability.*  Any Member or departing Member whose interest in the Company is sold pursuant to Article VII is not relieved thereby of any liability he, she, or it may owe the Company, if any.

## ARTICLE VIII:  BOOKS, RECORDS, AND REPORTING

Section 8.1.  *Books and Records.*  The Company shall maintain at its principal place of business the following books and records:

(a) A current list of the full name and last known business or residence address of each Member together with the Capital Contribution, Capital Account, Economic Interest, Membership Interest and Percentage Interest of each Member;

(b) A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c)  Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) A copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) Copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) The books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) True and correct copies of all relevant documents and records indicating the amount, cost, and value of all of the property and assets of the Company.

Section 8.2.  *Accounting Rights.*  Company shall enter into a CAMA pursuant to which a Collection Account shall be established for the purpose of collecting all Company Gross Revenue, and paying costs and expenses as set forth in the CAMA including, without limitation, sales agency fees, guild residuals, fees, and third party gross participations as tentatively outlined in Exhibit C. The Members shall be parties and beneficiary thereto (with customary full accounting and audit rights). Company shall irrevocably direct all domestic distributors and the foreign sales agent (or foreign distributors, if no foreign sales agent) to pay all Company Gross Revenues directly to the Collection Account.

Section 8.3.  *Accounting Methods.*  The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

Section 8.4.  *Reports.*  The Company shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency.  The Company shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns, which the Company shall send to each Member within ninety (90) days of the conclusion of the taxable year.

(a) All information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns; and

(b) A copy of the Company's federal, state, and local income tax or information returns for the taxable year.

Section 8.5. *Inspection Rights*. For purposes reasonably related to their Membership Interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Company shall provide Members with copies of all records and documents to which Members are entitled under the Act.

Section 8.6. *Bank Accounts*. The Managers shall maintain all of the funds of the Company in a bank account in the name of the Company, at a depository institution, as the Managers shall determine in accordance with Section 5.1 of this Agreement. The Managers shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. Each Manager, acting alone, may endorse checks, drafts, or other evidence of indebtedness to the Company for the sole purpose of depositing them in the Company accounts. Each Manager, acting alone, may sign checks, drafts, or other evidence of indebtedness obligating the Company to pay money to a third party.

Section 8.7. *Tax Matters Partner*. The Company designates Specter as Tax Matters Partner as defined in Code section 6231 [26 USCS § 6231], to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations, but retains the right to make such a designation by amendment to this Agreement, in the manner provided in this Agreement for amendments.

## ARTICLE IX TERMINATION AND DISSOLUTION

Section 9.1. *Dissolution*. The Company shall be dissolved upon the occurrence of any of the following events:
(a) By the written approval all of the Members to dissolve the Company;
(b) The sale or other disposition of substantially all of Company's assets;
(c) Entry of a decree of judicial dissolution under the Act;
(d) Bankruptcy of the Company; or
(e) Dissolution Event.

Section 9.2. *Certificate of Dissolution and/or Cancellation*. As soon as possible after the occurrence of any of the events specified in Section 9.1 above, the Company shall file a Certificate of Dissolution and/or Cancellation in such form as prescribed by the Secretary of State.

Section 9.3. *Conduct of Business*. Upon the filing of the Certificate of Dissolution and/or Cancellation with the Secretary of State, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business. The dissolved Company continues to exist pursuant to the LLC Act for the purpose of winding up its affairs, prosecuting and defending actions by or against it in order to collect and discharge obligations, disposing of and conveying its property, and collecting and dividing its assets.

Section 9.4. *Distribution of Company Gross Revenue*. The Members shall continue to divide Company Gross Revenue and Available Cash Flow during the winding-up period in the same manner and the same priorities as provided for in Articles III and VI hereof. The proceeds from the liquidation of property shall be applied in the following order:
(a) To the payment of creditors, in the order of priority as provided by law, except to the Members on account of their Capital Contributions;
(b) To the payment of loans or advances that may have been made by any of the Members or their Principals for working capital or other requirements of the Company, except to Members on account of their Capital Contributions;
(c) To the Members in accordance with the positive balances in their Capital Accounts after adjustments for all Distribution. Where the Distribution pursuant to this Section 9.4 consists both of cash (or cash equivalents) and non-cash assets, the cash (or cash equivalents) shall first be distributed, in a descending order, to fully satisfy each category starting with Section 9.4(a) above and in accordance with Exhibit C. In the case of non-cash assets, the distribution values are to be based on the fair market value thereof as determined in good faith by the liquidator, and the shortest maturity portion of such non-cash assets (*e.g.,* notes or other indebtedness) shall, to the extent such non-cash assets are readily divisible, be distributed, in a descending order, to fully satisfy each category above, starting with the most preferred category.
(d) After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members who are creditors of the Company, the remaining assets shall be distributed among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Article VI. Members shall not be required to restore Negative Capital Account Balances.

Section 9.5. *Winding Up and Dissolution.* If the Company is dissolved, the Managers shall wind up the Company's affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's creditors of the commencement of dissolution proceedings.

Section 9.6. *Members' Receipt of Payment.* Except as otherwise provided in this Agreement, or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Profits from any individual Members, except as provided in Article VI.

Section 9.7. *Disposition of the Picture.* Notwithstanding the terms of Section 9.4, it is understood and agreed that upon dissolution of the Company, if all the rights in the Picture and/or its underlying property (to the extent owned by the Company) have not been disposed of by the Company prior to such dissolution, then any and all copyrights and copyright rights ancillary thereto of the Company in and to the Picture and/or its underlying property (to the extent owned by the Company) shall be promptly transferred to the Managers, unless otherwise specified in this Agreement or any other agreement in connection with the Picture and the Managers shall assume all responsibility and obligations (including repayment obligations to the Members and disbursement of Profit Participations to third parties pursuant to Exhibit C) in connection with the Picture. In furtherance thereof, the Managers shall promptly execute all necessary and proper assignments and/or other documents to effectuate said transfer.

## ARTICLE X:  INDEMNIFICATION

Section 10.1. *Indemnification.*

(a) The Company shall indemnify and hold harmless each of the Members, and each of their respective officers, directors, shareholders, partners, members, trustees, beneficiaries, employees, agents, heirs, assigns, successors-in-interest and Affiliates, (collectively, "Indemnified Persons") from and against any and all losses, damages, liabilities and expenses, (including costs and reasonable attorneys' fees), judgments, fines, settlements and other amounts (collectively "Liabilities") reasonably incurred by any such Indemnified Person in connection with the defense or disposition of any action, suit or other proceeding, whether civil, criminal, administrative or investigative and whether threatened, pending or completed (collectively a "Proceeding"), in which any such Indemnified Person may be involved, or with which any such Indemnified Person may be threatened, with respect to or arising out of any act performed by the Indemnified Person or any omission or failure to act if (i) the performance of the act or the omission or failure was done in good faith and within the scope of the authority conferred upon the Indemnified Person by this Agreement or by the Act, except for acts by the Indemnified Party of willful misconduct, gross negligence or reckless disregard of duty, acts by the Indemnified Party which constitute a material breach of this Agreement from which such Indemnified Person derived an improper personal benefit, or (ii) a court of competent jurisdiction determines upon application that, in view of all of the circumstances, the Indemnified Person is fairly and reasonably entitled to indemnification from the Company for such liabilities as such court may deem proper. The Company's indemnification obligations hereunder shall apply not only with respect to any Proceeding brought by the Company, or a Member, but also with respect to any Proceeding brought by a third party. For purposes of clarification, the indemnification obligation shall not apply in a Proceeding brought by the Company against the Indemnified Person or the Indemnified Person against the Company.

(b) Each Member shall and does hereby agree to indemnify and save harmless the Company, the Managers, the Managers' and Company's Affiliates, counsel and consultants, officers, assigns, etc. and each other Member, their officers, assigns, etc. from any and all liabilities resulting from (i) a breach by such Member of any of the warranties and representations contained in this Agreement made by such Member; (ii) the untruth of any of the warranties and representations contained herein; and (iii) any claims arising from any third party that such Member has contracted with in connection with the Picture. If such warranties and representations either are breached or are not true, the Member who breached such warranties and/or representations, shall, at the election of the Majority Interest, be subject to a rescission of such Member's rights or interests in the Company.

Section 10.2. *Contract Right; Expenses.* The right to indemnification conferred in Section 10.1(a) shall be a contract right and shall include the right to require the Company to advance the expenses incurred by the Indemnified Person in defending any such Proceeding in advance of its final disposition; provided, however, that, if the LLC Act so requires, the payment of such expenses in advance of the final disposition of a Proceeding shall be made only upon receipt by the Company of an undertaking, by or on behalf of the Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under Section 10.1(a) or otherwise.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-A   -EF3D262A6464

Section 10.3. *Indemnification of Officers and Employees*. The Company may, to the extent authorized from time to time by the Majority Interest, grant rights to indemnification and to advancement of expenses to any Officer, employee, or agent of the Company to the fullest extent of Sections 10.1(a) and 10.2.

Section 10.4. *Other Insurance*. The Managers agree that the Company shall maintain all customary insurance relating to the production of the Picture during production only, if necessary.

Section 10.5. *Assets of the Company*. Any indemnification under Section 10.1 shall be satisfied solely out of the assets of the Company. No Member shall be subject to personal liability or required to fund or to cause to be funded any obligation by reason of these indemnification provisions.

## ARTICLE XI: INVESTMENT REPRESENTATIONS

Section 11.1 *Representations By the Non-Managing Members*. AS A MATERIAL INDUCEMENT TO THE COMPANY TO SELL THE MEMBERSHIP INTEREST TO THE NON-MANAGING MEMBER, EACH NON-MANAGING MEMBER REPRESENTS AND WARRANTS TO THE COMPANY AND THE OTHER MEMBERS AS FOLLOWS, AND ACKNOWLEDGES THAT BY SIGNING THIS AGREEMENT, HE, SHE OR IT HAS READ AND UNDERSTANDS THE FOLLOWING:

(a) Investment Purpose. THE NON-MANAGING MEMBER IS ACQUIRING THE MEMBERSHIP INTEREST FOR HIS, HER OR ITS OWN ACCOUNT, NOT AS AN AGENT OR NOMINEE, AND NOT WITH A VIEW TO, OR FOR SALE IN CONNECTION WITH, ANY DISTRIBUTION THEREOF IN VIOLATION OF APPLICABLE SECURITIES LAWS. THE NON-MANAGING MEMBER FURTHER REPRESENTS THAT HE/SHE/IT DOES NOT HAVE ANY PRESENT CONTRACT, UNDERTAKING, UNDERSTANDING OR ARRANGEMENT WITH ANY PERSON TO SELL, TRANSFER OR GRANT PARTICIPATIONS TO SUCH PERSONS OR ANY THIRD PERSON, WITH RESPECT TO THE MEMBERSHIP INTEREST.

(b) Accredited or Sophisticated Investor Status. THE NON-MANAGING MEMBER REPRESENTS AND WARRANTS THAT SUCH NON-MANAGING MEMBER IS EITHER (I) AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR (II) A "SOPHISTICATED INVESTOR" WHO HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT HE, SHE, OR IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING THE MEMBERSHIP INTERESTS

(c) Reliance on Exemptions. THE NON-MANAGING MEMBER UNDERSTANDS THAT THE MEMBERSHIP INTERESTS ARE BEING OFFERED AND SOLD TO HIM/HER/IT IN RELIANCE ON SPECIFIC EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF FEDERAL AND STATE SECURITIES LAWS AND THAT THE COMPANY IS RELYING IN PART UPON THE TRUTH AND ACCURACY OF, AND THE NON-MANAGING MEMBER'S COMPLIANCE WITH THE REPRESENTATIONS, WARRANTIES, AGREEMENTS, ACKNOWLEDGEMENTS AND UNDERSTANDINGS OF THE NON-MANAGING MEMBER SET FORTH HEREIN IN ORDER TO DETERMINE THE AVAILABILITY OF THE EXEMPTIONS AND THE ELIGIBILITY OF THE NON-MANAGING MEMBER TO ACQUIRE THE MEMBERSHIP INTEREST.

(d) Information. THE NON-MANAGING MEMBER AND THEIR ADVISORS, IF ANY, HAVE BEEN FURNISHED WITH ALL MATERIALS RELATING TO THE BUSINESS, FINANCES AND OPERATIONS OF THE COMPANY AND MATERIALS RELATING TO THE MEMBERSHIP INTEREST WHICH HAVE BEEN REQUESTED BY THE NON-MANAGING MEMBER AND WHICH ARE REQUIRED UNDER THE 1933 ACT. THE NON-MANAGING MEMBER AND THEIR ADVISORS, IF ANY, HAVE BEEN AFFORDED THE OPPORTUNITY TO ASK QUESTIONS OF AND TO RECEIVE ANSWERS FROM THE COMPANY'S AUTHORIZED REPRESENTATIVES CONCERNING THE COMPANY, THE PICTURE, THE COMPANY'S BUSINESS AND PROSPECTS AND THE NON-MANAGING MEMBER HAS BEEN PERMITTED TO HAVE ACCESS TO ALL INFORMATION WHICH HIM/HER/IT HAS REQUESTED IN ORDER TO EVALUATE THE MERITS AND RISKS OF THE PURCHASE OF THE MEMBERSHIP INTEREST. THE NON-MANAGING MEMBER HAS SOUGHT SUCH LEGAL AND TAX ADVICE AS HIM/HER/IT HAS CONSIDERED NECESSARY TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT TO HIS, HER OR ITS PURCHASE OF THE MEMBERSHIP INTEREST, AND IN DETERMINING TO PURCHASE MEMBERSHIP INTEREST HEREUNDER, THE NON-MANAGING MEMBER IS NOT RELYING ON ANY REPRESENTATIONS OF THE COMPANY OR ANY OTHER MEMBER. THE NON-MANAGING MEMBER IS AN INVESTOR IN SECURITIES OF COMPANIES IN THE DEVELOPMENT STAGE AND ACKNOWLEDGES THAT HIM/HER/IT IS ABLE TO FEND FOR ITSELF, CAN BEAR THE ECONOMIC RISK OF HIS, HER OR ITS INVESTMENT, AND HAS SUCH

KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THE PURCHASE OF THE MEMBERSHIP INTEREST.

Section 11.2. *No Governmental Review.* THE NON-MANAGING MEMBER UNDERSTANDS THAT NO ARBITRATION BOARD OR PANEL, COURT OR FEDERAL, STATE, MUNICIPAL OR OTHER GOVERNMENTAL DEPARTMENT, COMMISSION, BOARD, BUREAU, AGENCY OR INSTRUMENTALITY, DOMESTIC OR FOREIGN HAS PASSED ON OR MADE ANY RECOMMENDATION OR ENDORSEMENT OF THE MEMBERSHIP INTEREST OR THE FAIRNESS OR SUITABILITY OF THE INVESTMENT IN THE MEMBERSHIP INTEREST, NOR HAVE SUCH AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OF THE MEMBERSHIP INTEREST.

Section 11.3. *Transfer or Resale.* THE NON-MANAGING MEMBER UNDERSTANDS THAT:

(a) THE MEMBERSHIP INTEREST HAVE NOT BEEN AND ARE NOT BEING REGISTERED UNDER THE 1933 ACT OR ANY STATE SECURITIES LAWS, AND MAY NOT BE OFFERED FOR SALE, SOLD, ASSIGNED OR TRANSFERRED UNLESS SUBSEQUENTLY REGISTERED THEREUNDER, OR IN RELIANCE ON AN AVAILABLE EXEMPTION FROM REGISTRATION; AND

(b) NEITHER THE COMPANY NOR ANY OTHER PERSON IS UNDER ANY OBLIGATION TO REGISTER MEMBERSHIP INTERESTS UNDER THE 1933 ACT OR ANY STATE SECURITIES LAWS OR TO COMPLY WITH THE TERMS AND CONDITIONS OF ANY EXEMPTION THEREUNDER.

(c) THE MEMBERSHIP INTEREST MAY NEED TO BE HELD INDEFINITELY, AND THE NON-MANAGING MEMBER MUST CONTINUE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT IN THE MEMBERSHIP INTEREST UNLESS THE MEMBERSHIP INTERESTS ARE SUBSEQUENTLY REGISTERED UNDER THE 1933 ACT OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. WHEN AND IF THE MEMBERSHIP INTEREST MAY BE DISPOSED OF WITHOUT REGISTRATION IN RELIANCE ON RULE 144 PROMULGATED UNDER THE 1933 ACT, SUCH DISPOSITION CAN BE MADE ONLY IN LIMITED AMOUNTS IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH RULE, AND THE NON-MANAGING MEMBER MUST DELIVER AN OPINION OF COUNSEL TO THE COMPANY REASONABLY ACCEPTABLE TO THE COMPANY IN FORM, SUBSTANCE AND SCOPE TO THE EFFECT THAT THE MEMBERSHIP INTEREST MAY BE SOLD OR TRANSFERRED UNDER AN EXEMPTION FROM SUCH REGISTRATION, AND IF THE RULE 144 EXEMPTION IS NOT AVAILABLE, PUBLIC SALE WITHOUT REGISTRATION WILL REQUIRE COMPLIANCE WITH AN EXEMPTION UNDER THE 1933 ACT.

Section 11.4. *Risk of Investment.* THE NON-MANAGING MEMBER IS FULLY AWARE OF THE INHERENT RISK OF HIS, HER OR ITS INVESTMENT IN THE COMPANY. THE COMPANY'S SOLE PURPOSE IS TO INVEST IN THE PRODUCTION OF THE PICTURE. THIS INVESTMENT IS EXTREMELY RISKY AS ARE ALL INVESTMENTS IN MOTION PICTURES. THERE IS ABSOLUTELY NO CERTAINTY OR GUARANTY THAT:

(a) THE PICTURE CAN BE COMPLETED;

(b) THE PICTURE CAN BE COMPLETED WITHIN THE BUDGET;

(c) A DISTRIBUTION ARRANGEMENT CAN BE FINALIZED FOR THE PICTURE;

(d) A FORCE MAJEURE EVENT WILL NOT OCCUR WHICH COULD PREVENT COMPLETION OF THE PICTURE OR CAUSE THE COST OF COMPLETION OF THE PICTURE TO EXCEED THE BUDGET;

(e) ANY PROFITS WILL BE REALIZED OR ANY CASH DISTRIBUTED TO ANY MEMBER; OR

(f) THE PICTURE WILL BE SUCCESSFUL.

THE NON-MANAGING MEMBER ACKNOWLEDGES THAT SUCH MEMBER HAS READ AND UNDERSTANDS THE "RISK FACTORS" ATTACHED HERETO AS EXHIBIT "E" AND "TAX CONSIDERATIONS" ATTACHED HERETO AS EXHIBIT "F".

Section 11.5. *Knowledge and Experience.* THE NON-MANAGING MEMBER WARRANTS THAT HIM/HER/IT HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL, TAX AND BUSINESS MATTERS AS TO ENABLE HIM/HER/IT TO EVALUATE THE MERITS AND RISKS OF HIS, HER OR ITS INVESTMENT IN THE COMPANY AND TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT THERETO.

Section 11.6. *Finders/Brokers; Pre-Existing Relationship; No Advertisement.* THE NON-MANAGING MEMBER HAS INCURRED NO LIABILITY FOR COMMISSIONS OR OTHER FEES TO ANY FINDER OR BROKER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE COST OF WHICH IS IN ANY PART THE LIABILITY OF OR PAYABLE BY THE COMPANY. THE NON-MANAGING MEMBER HAS A PRE-EXISTING PERSONAL OR BUSINESS RELATIONSHIP WITH THE COMPANY AND/OR ANY OF ITS OFFICERS OR CONTROLLING PERSONS, OR BY HIS, HER OR ITS

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AL    EF3D262A6464

BUSINESS OR FINANCIAL EXPERIENCE OR THE BUSINESS OR FINANCIAL EXPERIENCE OF ITS FINANCIAL ADVISORS WHO ARE UNAFFILIATED WITH AND WHO ARE NOT COMPENSATED BY THE COMPANY, DIRECTLY OR INDIRECTLY, COULD BE REASONABLY ASSUMED TO HAVE THE CAPACITY TO PROTECT HIS/HER OWN INTEREST IN CONNECTION WITH THE ACQUISITION OF THE MEMBERSHIP INTEREST. THE NON-MANAGING MEMBER ACKNOWLEDGES THAT THE OFFER AND SALE OF THE UNITS WAS NOT ACCOMPLISHED BY THE PUBLICATION OF ANY ADVERTISEMENT.

Section 11.7. *Binding Agreement.* THIS AGREEMENT IS AND WILL REMAIN ITS VALID AND BINDING AGREEMENT, ENFORCEABLE IN ACCORDANCE WITH ITS TERMS (SUBJECT, AS TO THE ENFORCEMENT OF REMEDIES, TO ANY APPLICABLE BANKRUPTCY, INSOLVENCY OR OTHER LAWS AFFECTING THE ENFORCEMENT OF CREDITOR'S RIGHTS).

Section 11.8. *Tax Position.* THE NON-MANAGING MEMBER AGREES THAT, UNLESS HE, SHE OR IT PROVIDES PRIOR WRITTEN NOTICE TO THE COMPANY, HE, SHE OR IT WILL NOT TAKE A POSITION ON HIS, HER OR ITS FEDERAL INCOME TAX RETURN, ON ANY CLAIM FOR REFUND, OR IN ANY ADMINISTRATIVE OR LEGAL PROCEEDINGS, THAT IS INCONSISTENT WITH ANY INFORMATION RETURN FILED BY THE COMPANY OR WITH THE PROVISIONS OF THIS AGREEMENT.

Section 11.9. *Confidentiality.* MEMBERS SHALL NOT, AT ANY TIME, DISCLOSE OR SUBMIT TO ANY PERSON, FIRM, CORPORATION OR OTHER ENTITY ALL OR ANY PART OF THIS AGREEMENT OR ANY CONFIDENTIAL OR PROPRIETARY INFORMATION OR TRADE SECRETS (COLLECTIVELY REFERRED TO AS "CONFIDENTIAL INFORMATION") OF THE COMPANY, ITS AFFILIATES, SUBSIDIARIES, OWNERS, OFFIC ERS, DIRECTORS, EMPLOYEES OR AGENTS OBTAINED OR LEARNED BY MEMBERS, INCLUDING, WITHOUT LIMITATION, INFORMATION ABOUT THE COMPANY, ITS INVESTORS, OTHER MEMBERS, ANY CAPITAL CONTRIBUTIONS, AND/OR ANY INFORMATION REGARDING THE PICTURE OTHER THAN TO MEMBERS' AGENTS OR REPRESENTATIVES OR AS REQUIRED BY LAW. MEMBERS RECOGNIZE AND ACKNOWLEDGE THAT THE CONFIDENTIAL INFORMATION OF THE COMPANY IS A VALUABLE, SPECIAL, AND UNIQUE ASSET OF AND BELONGS SOLELY TO THE COMPANY.

## ARTICLE XII: MISCELLANEOUS PROVISIONS

Section 12.1. *Assurances.* Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the Managers in accordance with Section 5.1 of this Agreement, the Majority Interest, and/or the Company or required by this Agreement or the LLC Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

Section 12.2. *Complete Agreement.* This Agreement, the Articles and the Exhibits attached hereto, constitute the complete and exclusive statement of the agreement among the Members and the Company with respect to the matters discussed herein and therein, and together shall supersede all prior written or oral statements among the Managers, Members and the Company, including any prior statements, warranties, or representations.

Section 12.3. *Section Headings.* The section headings, which appear throughout this Agreement, are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

Section 12.4. *Binding Effect.* Subject to the provisions of this Agreement relating to the transferability of Membership Interests or Economic Interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

Section 12.5. *Interpretation.* All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member or the Company relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member and/or by his, her, or its counsel.

Section 12.6. *Company Counsel.* The Members and Managers acknowledge and agree that Company counsel may, upon separate and independent written agreement, also become counsel to any Manager, Principal, Member or Affiliate of a Member or Manager. The Members and Managers may execute on behalf of the Company (but not on behalf of any individual Member or Manager) any written consents to such a concurrent representation as may be required by the rules governing professional conduct in the applicable jurisdiction(s). The Members and Managers acknowledge and agree that Company counsel (i.e. Ramo Law PC) owes them no direct duties in their individual

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AL    EF3D262A6464

capacity and that Company counsel's duties are owed to the Company and shall be owed to any Manager, Principal, Member or Affiliate of a Member or Manager, which it may now or in the future and upon separate and independent agreement, represent individually. The Members and Managers acknowledge that Company counsel (i.e. Ramo Law PC) does not represent the Company in connection with accounting or other taxation matters.

Section 12.7. *Applicable Law.* Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not by the law of conflicts, of the State of California. The Agreement shall be governed and construed in accordance with the laws of the State of California, without regard to any conflicts of laws principles of the State of California or any other jurisdiction that would call for the application of the law of any jurisdiction other than the State of California; provided, however, that matters relating to the formation of Company as an California limited liability company and the rights and obligations of members of an California limited liability company as set forth in the LLC Act shall be governed by and construed in accordance with the LLC and the related laws of the State of California.

Section 12.8. *Arbitration.* Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), as said rules may be amended from time to time with rights of discovery if requested by the arbitrator. Such rules and procedures are incorporated and made part of this Agreement by reference. It is agreed that the arbitration shall be before a single arbitrator familiar with entertainment law. The prevailing party in such arbitration shall be entitled to recover his, her or its attorneys' fees and costs incurred in connection with such arbitration. Any award shall be final, binding and non-appealable. The parties hereby expressly waive any and all rights to appeal, or to petition to vacate or modify, any arbitration award issued in a dispute arising out of this Agreement. Each party hereby irrevocably submits to the jurisdiction of the state and federal courts for the County of Los Angeles in connection with any petition to confirm an arbitration award obtained pursuant to this Section 12.8. The parties agree to accept service of process in accordance with JAMS Rules. The arbitration will be confidential and conducted in private, and will not be open to the public or media. No matter relating to the arbitration (including but not limited to, the testimony, evidence or result) may be (i) made public in any manner or form (ii) reported to any news agency or publisher (iii) disclosed to any third party not involved in the arbitration.

Section 12.9. *Remedies.* Except as otherwise set forth herein, the remedies available at law and equity, which a Person may be lawfully entitled, are cumulative. The parties agree and acknowledge that in the event of a breach by a party of any obligation hereunder, the damage caused any other party shall not be irreparable or otherwise so sufficient as to give rise to a right to seek or obtain injunctive or other equitable relief, and the parties hereto acknowledge that their rights and remedies in the event of any such breach shall be limited to the right, if any, to recover damages in an action at law and shall not include the right to enjoin the development, financing, production, distribution or other exploitation of the Picture hereunder.

Section 12.10. *Notices.* Any notice or other writing to be served upon the Company or any Members thereof in connection with this Agreement shall be in writing via U.S. mail with a copy also via electronic mail and shall be deemed completed when delivered to both the mailing address specified in Exhibit A and to said email address above, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days written notice to the Company and to the other Members.

Section 12.11. *Amendments.* Any amendments, modifications, or alterations to this Agreement or to the Articles must be in writing and signed by all of the Members. Notwithstanding the foregoing, Exhibits A and B may be amended to reflect current Members and their Economic Interest, Membership Interest, and Percentage Interest (who are Members in accordance with the terms of this Agreement) without the written consent of all Members.

Section 12.12. *Severability.* Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of this Agreement, which shall continue in full force and effect.

Section 12.13. *Counterparts.* This Agreement may be executed in counterparts, and sent via facsimile, electronic transmission and/or by PDF signature, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

*[signature page to follow]*

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AL    EF3D262A6464

IN WITNESS WHEREOF, the Managers and Members have executed or caused to be executed this Agreement, effective as of the Effective Date.

MANAGERS

"828"

_____
By: Todd Lundbohm
Its: Authorized Agent

"Specter"

_____
By: David Brown
Its: Authorized Agent

MEMBERS

"828"

_____
By: Todd Lundbohm
Its: Authorized Agent

"Specter"

_____
By: David Brown
Its: Authorized Agent

DocuSign Envelope ID: 8A3EC4B0-4393-484A-A...  :EF3D262A6464

**EXHIBIT A**

**MEMBERS**

MANAGING MEMBERS – PRODUCERS

| Member | Contact | Economic Interest | Membership Interest / Percentage Interest | Capital Contribution |
|---|---|---|---|---|
| 828 Productions LLC | Todd Lundbohm | 50%* of 100% of Net Profits | 50% | Management services |
| Specter Entertainment LLC | David Brown | 50%* of 100% of Net Profits | 50% | Management services |

*For purposes of clarity, pursuant to Section 6.2, any additional profit participation shares shall be allocated from 828's and Specter's shares equally.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-...F-EF3D262A6464

**EXHIBIT B**

**MANAGERS**

| Manager | Contact | Percentage Interest |
|---|---|---|
| 828 Productions LLC | See Exhibit A | See Exhibit A |
| Specter Entertainment LLC | See Exhibit A | See Exhibit A |

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AL    -EF3D262A6464

## EXHIBIT C

### Net Profits Definition

"Company Gross Revenue" (defined below) shall have the following deductions paid by or charged against Company (or its affiliated or related entities) and deducted on a continuing and cumulative basis:

(i)  First,

    a. Actual, direct, out-of-pocket, verifiable collection account management costs and fees;

    b. Residuals and applicable payments owed to or on behalf of unions and guilds, including without limitation SAG-AFTRA;

    c. To the extent applicable, any bonus payments to third parties (to the extent paid by Company or not otherwise assumed by a distributor) (e.g. box office bonuses);

    d. To the extent not deducted off the top prior to receipt of Company Gross Revenue, and to the extent applicable, all actual, direct, out-of-pocket, verifiable distribution fees and distribution costs (including, without limitation, ad overhead, if charged), all actual, direct, out-of-pocket, verifiable sales fees if applicable, and any actual, direct, out-of-pocket fees and/or costs to third parties who represent the Picture (e.g. producer representatives, sales advisors, etc.);

    e. All actual, direct, out-of-pocket marketing and distribution costs paid by Company (including, without limitation, residuals, union obligations, delivery items, reasonable and customary costs for producers, director, cast and others related to the Picture to attend premieres, film festivals and film markets);

    f. All actual, direct, out-of-pocket payments to agents, accountants, attorneys and other parties who represent the Picture;

    g. Actual interest on the direct costs of production of the Picture;

    h. Any payments paid as advances, royalties or otherwise in connection with the exploitation of ancillary and subsidiary rights; and,

    i. All actual, direct, out-of-pocket costs of auditing any distributor of the Picture of any ancillary or subsidiary rights (including without limitation, reasonable outside legal and auditor fees and costs).

(ii)  Second, repayment of the 828 Media Capital loan to the extent not yet paid;

(iii)  Third, Sales Agent shall recoup One Hundred Thousand Dollar ($100,000) of its Market Fee (as defined in the Sales Agency Agreement with respect to the Picture ["SAA"]);

(iv)  Fourth, 828 Media Capital shall recoup its premium plus default interest, if any, on its loan;

(v) Fifth, Sales Agent shall receive its Twenty Percent (20%) Sales Fee (as defined in the SAA) which shall be calculated on a first dollar (i.e. retroactive) basis, without double counting;

(vi)  Sixth, a return to the investors in the amount of one hundred and twenty percent (120%) of the capital contributions made by each investor, on a pro rata pari passu basis, if any;

(vii) Seventh, payment of deferments, if any;

(viii) Eighth, the balance shall be considered "Net Proceeds", and shall be calculated on a "rolling" basis that is readjusted as additional receipts and expenses may come in. There will be no double deductions--the same cost or expense will not be deducted twice. Company may take reasonable and customary reserves to cover anticipated expenses not yet charged to the Picture, and Company shall liquidate such reserves no less than every twelve (12) months. Net Proceeds shall be payable, on a pro rata pari passu basis to (1) fifty percent (50%) collectively to the managers of Company, and to profit participants providing services on the Picture in accordance with their respective service agreements, on a pro rata pari passu basis (the "Producer's Share of Net Proceeds"); and, (2) fifty percent (50%) to the investors who provided a capital contributions to the Company, on a pro rata pari passu basis (the "Investor's Share of Net Proceeds"). For purposes of clarification, the aggregate total of the Producer's Share of Net Proceeds and the Investor's Share of Net Proceeds shall not exceed 100%.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-A...    -EF3D262A6464

"Company Gross Revenue" will be all monies received by or credited to the Company (and its affiliated and related entities) from the distribution and exploitation of the Picture and all ancillary and subsidiary rights therein (including from merchandising, but not including any income from the exploitation of sequel, remake or other subsequent production rights). Revenue will not be considered "Company Gross Revenue" unless it is non-refundable and received or credited in U.S. Dollars in the United States (or in the Company's foreign bank account and available to be remitted to the United States). "Company Gross Revenue" is determined after all bona fide refunds, credits, allowances, discounts and adjustments. So-called "soft monies" shall be deemed "Company Gross Revenues" to the extent not used to offset the Budget or lent against.

Creditor-Debtor:  The relationship between the Company and Artist is one of "creditor-debtor" and nothing in the Agreement between the Company and Artist or this definition shall make Company a fiduciary or trustee of Artist.  Nothing contained in the Agreement between Company and Artist or this definition shall be deemed directly or indirectly to give Artist a security interest in the Picture or the revenue stream derived from the exploitation of the Picture.  Company makes no representation that the Picture will be released or that the Picture will be successful enough that it will generate any amount of Net Proceeds and/or Company Gross Revenue.  Artist shall not have any security interest, lien or other interest in the receipts of Company and Company has no obligation to segregate any funds.  Company shall have the broadest possible latitude in the distribution of the Picture, and the exercise of Company's judgment in good faith in all matters pertaining thereto shall be final.  In no event shall Company incur any liability based upon a claim that Company has failed to realize receipts or revenue that could have been realized.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-A    -EF3D262A6464

## EXHIBIT D

## RISK FACTORS

MAKING A SUBSCRIPTION TO THE COMPANY INVOLVES VARIOUS RISKS RELATING BOTH TO THE NATURE OF THE MANAGEMENT OF COMPANY AND THE MOVIE INDUSTRY ITSELF AND SUCH SUBSCRIPTION IS THEREFORE SUITABLE ONLY FOR PERSONS OR ENTITIES WITH THE FINANCIAL CAPABILITY OF MAKING AND HOLDING LONG-TERM INVESTMENTS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. THEREFORE, IN ADDITION TO THE MATTERS SET FORTH ELSEWHERE IN THE AGREEMENT, PROSPECTIVE INVESTORS SHOULD CONSIDER THE FOLLOWING FACTORS:

A.    COMPANY-RELATED RISKS

1.    RELIANCE ON MANAGEMENT – EXCEPT AS SET FORTH IN THIS AGREEMENT, DECISIONS WITH RESPECT TO THE MANAGEMENT OF COMPANY WILL BE MADE BY THE MANAGERS IN THE MANAGERS' SOLE DISCRETION. THE SUCCESS OF THE PICTURE WILL LARGELY DEPEND ON THE QUALITY OF THE MANAGEMENT OF THE COMPANY. THE MANAGERS, WITH THE ADVICE AND ASSISTANCE OF OTHER PROFESSIONALS, WILL ADMINISTER ALL BUSINESS ASPECTS OF THE MANAGERS, THE COMPANY AND THE PICTURE. ALTHOUGH THE MANAGERS BELIEVE THAT THE MANAGERS HAVE THE NECESSARY BUSINESS AND MOTION PICTURE EXPERIENCE TO SUPERVISE THE MANAGEMENT OF THE COMPANY, THERE CAN BE NO ASSURANCE THAT THE MANAGERS WILL PERFORM ADEQUATELY OR THAT THE COMPANY'S OPERATIONS WILL BE SUCCESSFUL. PURCHASERS OF INTERESTS WILL RECEIVE AN ECONOMIC INTEREST IN THE COMPANY, BUT SHALL NOT BE PARTICIPANTS IN THE MANAGEMENT OR THE OPERATIONS OF THE MANAGERS, THE COMPANY OR THE PICTURE. ACCORDINGLY, EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, AN INVESTOR WILL HAVE NO RIGHT TO VOTE ON, OR TO VETO ACTIONS OF THE MANAGERS, WILL HAVE NO CREATIVE CONTROL, AND MANAGER-APPROVED ACTIONS MAY BE APPROVED DESPITE THE INVESTOR'S DISSENT FROM SUCH ACTIONS. NEITHER THE COMPANY, THE MANAGERS NOR ANY OF THE MANAGERS' ADVISORS HAVE MANAGED OR PRODUCED A FEATURE FILM PREVIOUSLY, AND NO ASSURANCE CAN BE HAD THAT THEIR EFFORTS WILL BE SUCCESSFUL FOR THE PICTURE.

2.    LIMITED OPERATING HISTORY – THE COMPANY HAS BEEN IN EXISTENCE FOR A VERY SHORT PERIOD OF TIME, AND IS SUBJECT TO ALL THE RISKS INCIDENT TO THE CREATION AND DEVELOPMENT OF A NEW BUSINESS, INCLUDING THE ABSENCE OF A HISTORY OF OPERATIONS AND MINIMAL NET WORTH. FURTHERMORE, THE COMPANY HAS NOT PRODUCED OR DISTRIBUTED A FULL-LENGTH MOTION PICTURE. THE COMPANY AND THE MANAGERS HAVE, AND WILL CONTINUE TO, ENDEAVOR TO EMPLOY OR OTHERWISE RETAIN THE SERVICES OF THOSE PERSONS WITH THE SKILLS NECESSARY TO SUCCESSFULLY PRODUCE AND DISTRIBUTE A FULL-LENGTH FEATURE FILM, BUT NO ASSURANCES CAN BE GIVEN THAT THEY WILL BE SUCCESSFUL IN THESE EFFORTS.

3.    MANAGERS' CONFLICTS OF INTEREST – THE MANAGERS ARE NOT REQUIRED TO RENDER EXCLUSIVE SERVICES IN CONNECTION WITH THE PICTURE OR THE COMPANY. THE MANAGERS, THE PRODUCTION TEAM AND THE TALENT HAVE INTERESTS IN A VARIETY OF ACTIVITIES OTHER THAN ACTING AS MANAGERS TO THE COMPANY, INCLUDING INVOLVEMENT WITH THE PRODUCTION OF OTHER FILMS. IN ADDITION, THE MANAGERS, THE PRODUCTION TEAM AND THE TALENT MAY ORGANIZE COMPANIES THAT ARE SIMILAR TO THE COMPANY IN THE FUTURE. THE MANAGERS MAY BE PRINCIPALS IN, OR HAVE PROFIT INTEREST IN, THE COMPANY. ACCORDINGLY, CONFLICTS OF INTEREST MAY ARISE IN THE ALLOCATION OF THE MANAGERS', THE PRODUCTION TEAM'S AND/OR THE TALENT'S TIME BETWEEN THE COMPANY AND ONE OR MORE OF THESE OTHER ACTIVITIES. ADDITIONALLY, THE MANAGERS

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AD⎯⎯EF3D262A6464

MAY ENTER INTO SERVICES AGREEMENTS WITH THE COMPANY. THE TERMS OF SUCH AGREEMENT MAY NOT BE THE RESULT OF AN ARMS-LENGTH TRANSACTION, BUT BE CONSIDERED TO BE EQUAL TO, OR LESS THAN, INDUSTRY STANDARDS FOR THE ASSOCIATED SERVICES RENDERED TO THE COMPANY.

4.    INDEMNIFICATION – UNDER CERTAIN CIRCUMSTANCES, THE MANAGERS WILL BE INDEMNIFIED BY THE COMPANY FOR ANY LIABILITIES OR LOSSES ARISING OUT OF THE MANAGERS' ACTIVITIES IN CONNECTION WITH THE COMPANY.  INDEMNIFICATION UNDER SUCH PROVISION COULD REDUCE OR DEPLETE THE ASSETS OF THE COMPANY.

5.    WORKING CAPITAL REQUIREMENTS AND THE POTENTIAL NEED FOR ADDITIONAL FINANCING – THERE IS NO ASSURANCE THAT UNFORESEEN EVENTS WILL NOT OCCUR, RESULTING IN THE NEED TO RAISE ADDITIONAL FUNDS BEYOND WHAT THE COMPANY AND THE MANAGERS PROJECT. FURTHERMORE, COMPANIES WITH LIMITED OPERATING HISTORIES, SUCH AS THE COMPANY AND THE MANAGERS, DO NOT ALWAYS USE CAPITAL IN THE MOST EFFICIENT MANNER. THUS, THE COMPANY AND THE MANAGERS MAY NEED TO RAISE ADDITIONAL CAPITAL TO FUND FUTURE OPERATIONS AND TO SATISFY FUTURE CAPITAL REQUIREMENTS OF THE COMPANY. THE FAILURE TO RAISE ANY ADDITIONAL NEEDED FUNDS COULD HAVE A MATERIAL ADVERSE EFFECT ON THE COMPANY AND THE MANAGERS. IN ADDITION, IT IS ANTICIPATED THAT RAISING ADDITIONAL FUNDS WILL RESULT IN ADDITIONAL DILUTION OF EACH OFFEREE'S INVESTMENT.  SUBJECT TO THE TERMS OF THE AGREEMENT, THOUGH THE COMPANY AND THE MANAGERS DO NOT ANTICIPATE THAT ADDITIONAL FINANCING WILL NEED TO BE OBTAINED, THERE CAN BE NO ASSURANCE THAT ADDITIONAL CAPITAL WILL NOT BE NEEDED.

6.    LIABILITY OF MEMBERS – MEMBERS MIGHT, UNDER APPLICABLE LAW, BE LIABLE TO THE COMPANY IN AN AMOUNT EQUAL TO ANY DISTRIBUTION MADE FROM THE COMPANY TO MEMBERS, IF, AFTER DISTRIBUTION IS MADE, THE REMAINING ASSETS OF THE COMPANY ARE NOT SUFFICIENT TO PAY ITS THEN OUTSTANDING LIABILITIES, EXCLUSIVE OF LIABILITIES TO THE MEMBERS ARISING ON ACCOUNT OF THEIR RESPECTIVE INTERESTS IN THE COMPANY.

7.    LOSS ON DISSOLUTION OR TERMINATION – IN THE EVENT OF A DISSOLUTION OR TERMINATION OF THE COMPANY, THE PROCEEDS REALIZED IN THE LIQUIDATION OF ASSETS, IF ANY, WILL BE DISTRIBUTED TO THE MEMBERS ONLY AFTER THE SATISFACTION OF CLAIMS OF CREDITORS. ACCORDINGLY, THE ABILITY OF A MEMBER TO RECOVER ALL OR ANY PORTION OF HIS OR HER OR ITS INVESTMENT UNDER SUCH CIRCUMSTANCES WILL DEPEND ON THE AMOUNT OF FUNDS SO REALIZED AND THE AMOUNT OF CLAIMS TO BE SATISFIED THEREFROM.

8.    INCOME TAX CONSEQUENCES – THERE ARE VARIOUS RISKS ASSOCIATED WITH THE FEDERAL INCOME TAX ASPECTS OF AN INVESTMENT IN THE COMPANY WHICH SHOULD BE CAREFULLY CONSIDERED BY EACH PROSPECTIVE INVESTOR TO DETERMINE WHETHER AN INVESTMENT IN THE COMPANY IS SUITABLE FOR SUCH PROSPECTIVE INVESTOR. EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OR HER OR ITS OWN TAX ADVISOR WITH RESPECT TO THE FEDERAL (AS WELL AS STATE AND LOCAL) INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE COMPANY.

B.    MOVIE INDUSTRY RISKS

1.    COMPETITIVE INDUSTRY – SOME SEGMENTS OF THE MOTION PICTURE INDUSTRY ARE HIGHLY COMPETITIVE.  THE COMPANY WILL BE COMPETING WITH THE PRODUCERS OF OTHER FILMS IN ARRANGING FOR DISTRIBUTION IN ALL AVAILABLE MARKETS AND MEDIA. IN THE DISTRIBUTION PHASE, COMPETITION WILL LIMIT THE AVAILABILITY OF SUCH MARKETS AND MEDIA REQUIRED FOR THE SUCCESSFUL DISTRIBUTION OF THE PICTURE. THE PICTURE WILL BE COMPETING DIRECTLY WITH OTHER MOTION PICTURES AND INDIRECTLY WITH

DocuSign Envelope ID: 8A3EC4B0-4393-484A-⌐F-EF3D262A6464

OTHER FORMS OF PUBLIC ENTERTAINMENT. THE COMPANY WILL COMPETE WITH NUMEROUS LARGER MOTION PICTURE PRODUCTION COMPANIES AND DISTRIBUTION COMPANIES, WHICH HAVE SUBSTANTIALLY GREATER RESOURCES, LARGER AND MORE EXPERIENCED PRODUCTION AND DISTRIBUTION STAFFS, AND ESTABLISHED HISTORIES OF SUCCESSFUL PRODUCTION AND DISTRIBUTION OF MOTION PICTURES.

2.      COMMERCIAL SUCCESS – THE PICTURE'S SUCCESS IS PRIMARILY DEPENDENT ON AUDIENCE ACCEPTANCE OF THE PICTURE, WHICH IS EXTREMELY DIFFICULT TO PREDICT AND, THEREFORE, INHERENTLY RISKY. MANY FILMS ARE PRODUCED EACH YEAR AND NEVER RELEASED.  MANY FILMS ARE RELEASED EACH YEAR, WHICH ARE NOT COMMERCIALLY SUCCESSFUL AND FAIL TO RECOUP THEIR PRODUCTION COSTS FROM UNITED STATES THEATRICAL DISTRIBUTION.   FOREIGN AND ANCILLARY MARKETS HAVE THEREFORE BECOME INCREASINGLY IMPORTANT.  LICENSING OF A MOTION PICTURE IN THE ANCILLARY MARKETS IS PARTICULARLY DEPENDENT UPON PERFORMANCE IN DOMESTIC THEATRICAL DISTRIBUTION.

NEITHER THE MANAGERS NOR THE COMPANY CAN PREDICT THE ECONOMIC SUCCESS OF THE PICTURE BECAUSE THE REVENUE DERIVED FROM THE DISTRIBUTION OF A MOTION PICTURE (WHICH DOES NOT NECESSARILY BEAR ANY CORRELATION TO THE PRODUCTION OR DISTRIBUTION COSTS INCURRED) DEPENDS PRIMARILY UPON ITS ACCEPTANCE BY THE PUBLIC, WHICH CANNOT BE ACCURATELY PREDICTED. THE ECONOMIC SUCCESS OF A MOTION PICTURE ALSO DEPENDS UPON THE PUBLIC'S ACCEPTANCE OF COMPETING FILMS, THE AVAILABILITY OF ALTERNATIVE FORMS OF ENTERTAINMENT AND LEISURE-TIME ACTIVITIES, GENERAL ECONOMIC CONDITIONS AND OTHER TANGIBLE AND INTANGIBLE FACTORS, ALL OF WHICH CAN CHANGE AND CANNOT BE PREDICTED WITH CERTAINTY. NEITHER THE MANAGERS NOR THE COMPANY CAN ASSURE MEMBERS THAT THE PICTURE WILL GENERATE ENOUGH REVENUE TO OFFSET ITS DISTRIBUTION AND MARKETING COSTS, IN WHICH CASE THE COMPANY WOULD NOT RECEIVE ANY NET REVENUES FOR THE PICTURE.

3.      PRODUCTION – PARTICULARLY AS PRODUCED BY INDEPENDENT FILMMAKERS, EACH MOTION PICTURE IS A SEPARATE BUSINESS VENTURE WITH ITS OWN MANAGEMENT, EMPLOYEES AND EQUIPMENT AND ITS OWN BUDGETARY REQUIREMENTS.   THERE ARE SUBSTANTIAL RISKS ASSOCIATED WITH FILM PRODUCTION, INCLUDING DEATH OR DISABILITY OF KEY PERSONNEL, OTHER FACTORS CAUSING DELAYS, DESTRUCTION OR MALFUNCTION OF SETS OR EQUIPMENT, THE INABILITY OF PRODUCTION PERSONNEL TO COMPLY WITH BUDGETARY OR SCHEDULING REQUIREMENTS AND PHYSICAL DESTRUCTION OR DAMAGE TO THE PICTURE ITSELF.  ALTHOUGH SOME OF THESE PROBLEMS MAY BE COVERED BY COMPANY'S INSURANCE FOR THE PICTURE, SIGNIFICANT DIFFICULTIES SUCH AS THESE MAY MATERIALLY INCREASE THE COST OF PRODUCTION OR MAY CAUSE THE ENTIRE PROJECT TO BE ABANDONED.

4.      DEPENDENCE ON KEY PERSONNEL – THE COMPANY'S FUTURE SUCCESS DEPENDS, IN SIGNIFICANT PART, UPON THE CONTINUED SERVICE OF THE INDIVIDUALS THAT CONSTITUTE THE PRODUCTION TEAM AND THE MANAGERS' ADVISORS. NEITHER THE COMPANY NOR THE MANAGERS MAINTAINS KEY PERSON LIFE INSURANCE FOR ANY TEAM MEMBER OR EMPLOYEE. FURTHERMORE, THE COMPANY'S AND THE MANAGERS' SUCCESS IS DEPENDENT ON THE ABILITY OF THE COMPANY AND THE MANAGERS TO ATTRACT TOP TALENT, BOTH WITHIN THE PRODUCTION TEAM AND THE CAST OF THE PICTURE. THE COMPANY'S AND THE MANAGERS' INABILITY TO ATTRACT SUCH TALENT OR THE LOSS OF THE SERVICES OF ONE OR MORE MEMBERS OF THE PRODUCTION TEAM COULD HAVE A MATERIAL ADVERSE EFFECT ON THE COMPANY'S AND THE MANAGERS' ABILITY TO SUCCESSFULLY PRODUCE AND DISTRIBUTE THE PICTURE. ADDITIONALLY, THE COMPANY MAY ELECT TO FOREGO THE PURCHASE OF A COMPLETION BOND OR OTHER TYPES OF PRODUCTION RELATED INSURANCE FOR THE PICTURE, RESULTING IN CERTAIN LOSSES RELATING TO ANY OF THE PICTURE'S KEY

DocuSign Envelope ID: 8A3EC4B0-4393-484A-...F-EF3D262A6464

PERSONNEL, EQUIPMENT, LOCATIONS AND/OR FILM FOOTAGE BEING UNINSURED WHICH COULD HAVE A MATERIAL ADVERSE EFFECT ON THE COMPANY'S AND THE MANAGERS' ABILITY TO SUCCESSFULLY PRODUCE AND DISTRIBUTE THE PICTURE.

5.     LABOR DISPUTES – THERE IS NO ASSURANCE THAT LABOR DIFFICULTIES AFFECTING PRODUCTION WILL NOT ARISE, INCLUDING BUT NOT LIMITED TO UNION STRIKES.  IF SUCH LABOR DIFFICULTIES ARISE, FILM PRODUCTION AND, HENCE, RETURN TO INVESTING MEMBERS COULD BE DELAYED OR DIMINISHED.

6.     AUDIENCE APPEAL – THE ULTIMATE PROFITABILITY OF ANY MOTION PICTURE DEPENDS UPON ITS AUDIENCE APPEAL IN RELATION TO THE COST OF ITS PRODUCTION AND DISTRIBUTION.  THE AUDIENCE APPEAL OF A GIVEN MOTION PICTURE DEPENDS, AMONG OTHER THINGS, ON UNPREDICTABLE CRITICAL REVIEWS AND CHANGING PUBLIC TASTES AND SUCH APPEAL CANNOT BE ANTICIPATED WITH CERTAINTY.

7.     COST OVERRUNS – THE COSTS OF PRODUCING MOTION PICTURES ARE OFTEN UNDERESTIMATED AND MAY BE INCREASED BY REASON OF FACTORS BEYOND THE CONTROL OF THE PRODUCERS.  SUCH FACTORS MAY INCLUDE WEATHER CONDITIONS, ILLNESS OF TECHNICAL AND ARTISTIC PERSONNEL, ARTISTIC REQUIREMENTS, LABOR DISPUTES, GOVERNMENTAL REGULATIONS, EQUIPMENT BREAKDOWNS, AND OTHER PRODUCTION DISRUPTIONS.  WHILE THE COMPANY INTENDS TO ENGAGE PRODUCTION PERSONNEL WHO HAVE DEMONSTRATED AN ABILITY TO COMPLETE FILMS WITHIN THE ASSIGNED BUDGET, THE RISK OF A FILM RUNNING OVER BUDGET OR OF NOT BEING COMPLETED IS ALWAYS SIGNIFICANT AND MAY HAVE A SUBSTANTIAL ADVERSE IMPACT ON THE PROFITABILITY OF THE PICTURE.

8.     DISTRIBUTION – THE PROFITABLE DISTRIBUTION OF A MOTION PICTURE DEPENDS IN LARGE PART ON THE AVAILABILITY OF ONE OR MORE CAPABLE AND EFFICIENT DISTRIBUTORS WHO ARE ABLE TO ARRANGE FOR APPROPRIATE ADVERTISING AND PROMOTION, PROPER RELEASE DATES AND BOOKINGS IN FIRST-RUN AND OTHER THEATERS.  THERE CAN BE NO ASSURANCE THAT PROFITABLE DISTRIBUTION ARRANGEMENTS WILL BE OBTAINED FOR THE PICTURE OR THAT THE PICTURE CAN OR WILL BE DISTRIBUTED PROFITABLY OR THAT THE PICTURE WILL BE DISTRIBUTED AT ALL.

9.     LONG-TERM PROJECT – THE PRODUCTION AND DISTRIBUTION OF A MOTION PICTURE INVOLVES THE PASSAGE OF A SIGNIFICANT AMOUNT OF TIME.   PRE-PRODUCTION ON A PICTURE MAY EXTEND FOR TWO TO THREE MONTHS OR MORE.  PRINCIPAL PHOTOGRAPHY MAY EXTEND FOR SEVERAL WEEKS OR MORE.  POST-PRODUCTION MAY EXTEND FOR THREE TO FOUR MONTHS OR MORE.   DISTRIBUTION AND EXHIBITION OF MOTION PICTURES GENERALLY AND OF THE PICTURE MAY CONTINUE FOR YEARS BEFORE GROSS REVENUE OR NET PROFITS (AS DEFINED HEREIN) MAY BE GENERATED, IF AT ALL.

10.     FOREIGN DISTRIBUTION – FOREIGN DISTRIBUTION OF A MOTION PICTURE (I.E., OUTSIDE THE UNITED STATES AND CANADA) MAY REQUIRE THE USE OF VARIOUS FOREIGN DISTRIBUTORS.  SOME FOREIGN COUNTRIES MAY IMPOSE GOVERNMENT REGULATIONS ON THE DISTRIBUTION OF FILMS. IN ADDITION, REVENUES DERIVED FROM THE DISTRIBUTION OF THE PICTURE IN FOREIGN COUNTRIES, IF ANY, MAY BE SUBJECT TO CURRENCY CONTROLS AND OTHER RESTRICTIONS, WHICH MAY TEMPORARILY OR PERMANENTLY PREVENT THE INCLUSION OF SUCH REVENUE IN GROSS REVENUE.

11.     INVESTING MEMBERS LAST IN LINE – A MOTION PICTURE TYPICALLY GOES FROM THE PRODUCER TO THE DISTRIBUTOR WHO IN TURN MAY SEND IT TO TERRITORIAL SUB-DISTRIBUTORS, WHO SEND IT TO THEATRICAL EXHIBITORS.  THE BOX OFFICE RECEIPTS GENERATED BY A MOTION PICTURE TRAVEL THIS SAME ROUTE IN REVERSE.  THE EXHIBITOR

TAKES A CUT AND SENDS THE BALANCE TO THE SUB-DISTRIBUTOR, WHO TAKES A CUT AND SENDS THE BALANCE TO THE DISTRIBUTOR, WHO TAKES A CUT AND SENDS THE BALANCE TO THE PRODUCER. THE PROBLEM FOR THE INVESTING MEMBERS WITH THIS SYSTEM IS THAT SUCH INVESTING MEMBERS, WHO HAVE HAD THEIR MONEY AT RISK FOR THE LONGEST TIME, ARE AT THE TAIL END OF THE BOX OFFICE RECEIPTS CHAIN. THUS, IF THE COMPANY, IN NEGOTIATING A DISTRIBUTION DEAL, HAS TO RELY HEAVILY ON A PARTICIPATION AT SOME DEFINED LEVEL OF THE PICTURE'S REVENUE STREAM, REVENUES TO THE COMPANY, AND THUS TO INVESTING MEMBERS, ARE LIKELY TO BE THE LAST IN LINE TO BENEFIT FROM SUCH A REVENUE STREAM, IF ANY.

12.    INDUSTRY CHANGES – NEITHER THE MANAGERS NOR THE COMPANY CAN PREDICT THE EFFECT THAT RAPID TECHNOLOGICAL CHANGE, EMERGING DISTRIBUTION CHANNELS OR ALTERNATIVE FORMS OF ENTERTAINMENT MAY HAVE ON THE COMPANY, THE MANAGERS OR THE MOTION PICTURE INDUSTRY. THE ENTERTAINMENT INDUSTRY IN GENERAL, AND THE MOTION PICTURE INDUSTRY IN PARTICULAR, CONTINUE TO UNDERGO SIGNIFICANT CHANGES, PRIMARILY DUE TO TECHNOLOGICAL DEVELOPMENTS. DUE TO RAPID GROWTH OF TECHNOLOGY AND SHIFTING CONSUMER TASTES, NEITHER THE MANAGERS NOR THE COMPANY CAN ACCURATELY PREDICT THE OVERALL EFFECT THAT TECHNOLOGICAL GROWTH OR THE AVAILABILITY OF ALTERNATIVE FORMS OF ENTERTAINMENT MAY HAVE ON THE POTENTIAL REVENUE FROM AND PROFITABILITY OF THE PICTURE. IN ADDITION, CERTAIN OUTLETS FOR THE DISTRIBUTION OF MOTION PICTURES MAY NOT OBTAIN THE PUBLIC ACCEPTANCE THAT IS OR WAS PREVIOUSLY PREDICTED. IF CERTAIN DISTRIBUTION CHANNELS ARE ACCEPTED BY THE PUBLIC, NEITHER THE MANAGERS NOR THE COMPANY CAN ASSURE OFFEREES THAT THE COMPANY WILL BE SUCCESSFUL IN EXPLOITING SUCH CHANNELS. MOREOVER, TO THE EXTENT THAT OTHER DISTRIBUTION CHANNELS GAIN POPULAR ACCEPTANCE, IT IS POSSIBLE THAT DEMAND FOR EXISTING DISTRIBUTION CHANNELS, SUCH AS DVDS, WILL DECREASE. IF THE COMPANY IS UNABLE TO EXPLOIT NEW DISTRIBUTION CHANNELS TO THE SAME EXTENT EXPECTED AS EXISTING CHANNELS. COMPANY'S BUSINESS, OPERATIONS OR FINANCIAL CONDITION COULD BE MATERIALLY ADVERSELY AFFECTED.

13.    PICTURE'S LIABILITIES – THE COMPANY WILL ACTIVELY PARTICIPATE IN THE PRODUCTION AND DISTRIBUTION OF THE PICTURE. BECAUSE INSURANCE COVERING SUCH LIABILITY MAY NOT BE AVAILABLE AT A REASONABLE COST, OR MAY SIMPLY NOT BE OBTAINED, THE ASSETS OF THE COMPANY MAY BE EXPOSED TO OPERATING RISKS THAT MAY ARISE FROM THE CREATION, EXPLOITATION AND DISPOSITION OF THE PICTURE.

C.    MANAGERS' DISCRETION REGARDING PRODUCTION AND DISTRIBUTION MATTERS

1.    SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, THE MANAGERS HAVE RESERVED THE SPECIFIC AUTHORITY TO ENTER INTO AGREEMENTS ON BEHALF OF THE COMPANY WITH MOTION PICTURE OR TELEVISION STUDIOS, DISTRIBUTORS AND/OR OTHER THIRD PARTIES PURSUANT TO WHICH THE COMPANY, IN EXCHANGE FOR SUCH STUDIOS', DISTRIBUTORS AND/OR OTHER THIRD PARTIES' ASSISTANCE IN PRODUCING, DISTRIBUTING AND/OR OTHERWISE EXPLOITING THE PICTURE, MAY COMMIT TO PAY SUCH PARTIES OUT OF REVENUES GENERATED BY THE PICTURE AT A POINT IN THE PICTURE'S REVENUE STREAM PRIOR TO COMPANY'S RECEIPT OF ITS GROSS REVENUE. SUCH AGREEMENTS MAY INCLUDE, BUT ARE NOT LIMITED TO, FLAT FEE ARRANGEMENTS, NEGATIVE PICKUP DEALS OR AN OUTRIGHT SALE OF THE PICTURE, IF IN THE JUDGMENT OF THE MANAGERS; SUCH A SALE WOULD BE IN THE BEST INTEREST OF THE COMPANY. IN ADDITION, SUBJECT TO THE TERMS AND CONDITIONS OF THE LLC AGREEMENT, THE MANAGERS HAVE RESERVED THE RIGHT (1) TO PRODUCE THE PICTURE AND SEEK THE MOST ADVANTAGEOUS DISTRIBUTION AGREEMENT FOR THE PICTURE, AND (2) TO ENTER INTO AGREEMENTS ON BEHALF OF THE COMPANY WHICH PROVIDE THAT PERSONS RENDERING SERVICES OR OTHER MATERIALS OR FACILITIES IN CONNECTION WITH THE DEVELOPMENT, PRODUCTION, DISTRIBUTION OR OTHER

DocuSign Envelope ID: 8A3EC4B0-4393-484A-ADD.    3D262A6464

EXPLOITATION OF THE PICTURE SHALL RECEIVE, AS SALARY OR OTHER COMPENSATION, DEFERRED AMOUNTS OR A PERCENTAGE PARTICIPATION IN COMPANY REVENUE. SUCH RELIANCE ON THE JUDGMENT AND DISCRETION OF THE MANAGERS PLACE A GREATER EMPHASIS ON THE SKILLS AND JUDGMENT OF THE MANAGERS, AND THE MANAGERS' ADVISORS AND THEREFORE MAKES IT IMPERATIVE THAT PROSPECTIVE NON-MANAGING MEMBERS CAREFULLY EXAMINE THE ABILITIES OF SUCH MANAGERS AND THE MANAGERS' ASSOCIATES BEFORE CHOOSING TO PROVIDE ANY SUBSCRIPTION HEREUNDER.

2.    DISTRIBUTIONS AND LIQUIDITY - DISTRIBUTION OF THE COMPANY'S PROCEEDS TO THE MEMBERS WILL PROVIDE A PRIMARY SOURCE OF DISTRIBUTABLE CASH OR SECURITIES TO THE MEMBERS. THE MANAGERS WILL HAVE ABSOLUTE DISCRETION IN THE TIMING OF SUCH DISTRIBUTIONS, IF ANY, SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT. THERE CAN BE NO ASSURANCE THAT THERE WILL BE ANY DISTRIBUTIONS OR THAT AGGREGATE DISTRIBUTIONS, IF ANY, WILL EQUAL OR EXCEED THE MEMBERS' INVESTMENT IN THE COMPANY.

D.    INVESTMENT-RELATED RISK

1.    AN INVESTOR WHO PURCHASES INTERESTS IN THE COMPANY SHOULD BE AWARE THAT THE INVESTMENT IN THE COMPANY IS HIGHLY SPECULATIVE AND THAT SUCH INVESTOR RISKS LOSING HIS, HER OR ITS ENTIRE INVESTMENT.

2.    ILLIQUIDITY OF INVESTMENT – THERE IS NO PUBLIC MARKET FOR THE INTERESTS AND ONE IS NOT EXPECTED TO DEVELOP. EACH INVESTOR SHOULD BE AWARE THAT HE/SHE/OR IT MUST BEAR THE RISKS OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE ANY TRANSFER, SALE OR ASSIGNMENT OF THE INTERESTS IS SUBJECT TO THE CONSENT OF THE MANAGERS IN ITS DISCRETION. FURTHERMORE, THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE LAW, AND THEREFORE, CANNOT BE SOLD AND MUST BE HELD INDEFINITELY UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE ACT, AND ANY OTHER APPLICABLE LAW, OR, IN THE OPINION OF THE MANAGERS, EXEMPTIONS FROM SUCH REGISTRATION ARE AVAILABLE. ANY SUCH REGISTRATION IS UNLIKELY TO OCCUR IN THE FUTURE. IN ADDITION, NO SALE, TRANSFER OR ASSIGNMENT OF AN INTEREST WILL BE PERMITTED IF, IN THE OPINION OF COUNSEL FOR THE COMPANY, SUCH SALE, TRANSFER OR ASSIGNMENT WOULD VIOLATE THE STATUS OF THE ORIGINAL SALE OF THE INTERESTS WHICH FORMED THE BASIS FOR THE EXEMPTION FROM REGISTRATION UNDER THE ACT, OR ANY APPLICABLE STATE SECURITIES LAWS, PURSUANT TO WHICH SUCH INTERESTS WERE OFFERED, OR CAUSE A TERMINATION OF THE ENTITY'S TREATMENT AS A COMPANY FOR FEDERAL INCOME TAX PURPOSES. AS A RESULT OF THESE RESTRICTIONS, MEMBERS MAY NOT BE ABLE TO LIQUIDATE THEIR INVESTMENT IN THE EVENT OF AN EMERGENCY, AND THE INTERESTS MAY NOT BE READILY ACCEPTED AS COLLATERAL FOR A LOAN.

3.    INHERENT UNCERTAINTY OF PROJECTIONS – THE INDICATIVE CASHFLOWS AND CERTAIN FORWARD LOOKING STATEMENTS ARE BASED ON CERTAIN ASSUMPTIONS AND OTHER INFORMATION AVAILABLE TO THE MANAGERS. HOWEVER, THE UNDERLYING ESTIMATES, ASSUMPTIONS AND FUTURE EVENTS ARE INHERENTLY UNCERTAIN, AND UNANTICIPATED EVENTS MAY OCCUR WHICH WOULD CAUSE ACTUAL RESULTS TO VARY, PERHAPS MATERIALLY FROM ANY FORECASTED RESULTS. EACH INVESTOR SHOULD BE AWARE THAT MANY FILMS DO NOT GET RELEASED OR IF RELEASED ARE NOT COMMERCIALLY SUCCESSFUL, AND LOSE MONEY. AS A CONSEQUENCE, EACH INVESTOR SHOULD BE AWARE THAT NEITHER THE COMPANY NOR THE MANAGERS GUARANTEE OR WARRANT ANY SPECIFIC PROJECTED RESULT OF AN INVESTMENT IN THE COMPANY. ACCORDINGLY, INVESTORS SHOULD RETAIN AND RELY UPON THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS WITH

DocuSign Envelope ID: 8A3EC4B0-4393-484A-AD...EF3D262A6464

RESPECT TO THEIR INDIVIDUAL SUITABILITY FOR AN INVESTMENT IN THE COMPANY AND THE TAX CONSEQUENCES RESULTING THEREFROM.

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THE COMPANY.

DocuSign Envelope ID: 8A3EC4B0-4393-484A-ADD.   3D262A6464

## EXHIBIT E

### TAX CONSIDERATIONS

BECAUSE OF THE COMPLEXITIES OF THE TAX CONSEQUENCES OF AN INVESTMENT IN THE COMPANY, PARTICIPATION IN THE COMPANY SHOULD BE CONSIDERED BY A PROSPECTIVE INVESTOR ONLY AFTER OBTAINING ADEQUATE TAX COUNSELING FROM THE PROSPECTIVE INVESTOR'S OWN TAX ADVISOR, AND THIS OFFERING IS MADE ON THAT BASIS. IN PARTICULAR, NO PROSPECTIVE INVESTOR SHOULD INVEST IN THE INTERESTS FOR THE PURPOSE OF OBTAINING A TAX BENEFIT WITHOUT CONSULTING HIS, HER OR ITS OWN TAX ADVISOR.

PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE ("IRS") MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY THE COMPANY AND THAT CHANGES IN THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR THE REGULATIONS OR RULINGS OR OTHER DECISIONS AFTER THE DATE OF THIS MEMORANDUM MAY ADVERSELY AFFECT THE TAX ASPECTS OF AN INVESTMENT IN THE COMPANY.

THE FOLLOWING IS MERELY A SUMMARY OF SOME IMPORTANT FEDERAL INCOME TAX RISKS AND CONSIDERATIONS AFFECTING THE COMPANY AND PROSPECTIVE INVESTORS. IT DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OF ALL THE PROVISIONS DISCUSSED NOR A COMPLETE LISTING OF ALL POTENTIAL TAX RISKS. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS TO DETERMINE THE EXTENT TO WHICH THESE RULES WILL AFFECT THEM.

1.     SCOPE OF THE DISCUSSION; CHANGES IN TAX LAWS – THE FOLLOWING GENERAL DISCUSSION OF CERTAIN OF THE FEDERAL INCOME TAX ASPECTS OF AN INVESTMENT IN THE COMPANY IS BASED UPON THE CURRENT PROVISIONS OF THE CODE, THE EXISTING AND PROPOSED REGULATIONS THEREUNDER ("REGULATIONS"), PUBLISHED RULINGS AND PROCEDURES OF THE IRS, AND COURT DECISIONS. NO ASSURANCE CAN BE GIVEN THAT LEGISLATIVE OR ADMINISTRATIVE CHANGES OR COURT DECISIONS WILL NOT OCCUR THAT WOULD REQUIRE SIGNIFICANT MODIFICATION OF THE STATEMENTS EXPRESSED IN THIS SECTION, NOR CAN ASSURANCE BE GIVEN THAT SUCH CHANGES MAY NOT BE RETROACTIVE WITH RESPECT TO TRANSACTIONS ENTERED INTO PRIOR TO THE OCCURRENCE OF SUCH CHANGES. THE COMPANY HAS NOT REQUESTED, AND DOES NOT INTEND TO REQUEST, ANY TAX RULINGS FROM THE IRS OR AN OPINION OF LEGAL COUNSEL WITH RESPECT TO ANY TAX ASPECTS OF AN INVESTMENT IN THE COMPANY.

2.     COMPANY CLASSIFICATION – THE COMPANY WILL LIKELY BE TREATED AS A PARTNERSHIP FOR US FEDERAL INCOME TAX PURPOSES UNLESS AN ELECTION IS MADE TO TREAT THE COMPANY AS A CORPORATION. THE MANAGERS MAY MAKE AN ELECTION TO TREAT THE COMPANY AS A CORPORATION. A PARTNERSHIP IS NOT SUBJECT, AS AN ENTITY, TO FEDERAL INCOME TAX. INSTEAD, EACH MEMBER IS REQUIRED TO TAKE INTO ACCOUNT, IN DETERMINING HIS OR HER OR ITS FEDERAL INCOME TAX, HIS OR HER OR ITS DISTRIBUTIVE SHARE OF THE COMPANY'S INCOME, GAINS, LOSSES, DEDUCTIONS AND CREDITS, WHETHER OR NOT ANY ACTUAL CASH DISTRIBUTIONS ARE MADE TO SUCH MEMBER. A MEMBER OF A PARTNERSHIP MAY OFFSET HIS OR HER OR ITS SHARE OF COMPANY LOSSES IN A TAXABLE YEAR AGAINST HIS OR HER OR ITS INCOME FROM OTHER SOURCES IN SUCH YEAR, SUBJECT TO CERTAIN LIMITATIONS, INCLUDING THE BASIS, AT-RISK, AND PASSIVE ACTIVITY LOSS LIMITATIONS.

3.     INSUFFICIENT CASH DISTRIBUTIONS – EACH MEMBER IS REQUIRED TO TAKE INTO ACCOUNT IN DETERMINING HIS OR HER OR ITS FEDERAL INCOME TAX LIABILITY HIS OR HER OR ITS DISTRIBUTIVE SHARE OF INCOME, GAINS, LOSSES, DEDUCTIONS AND CREDITS OF THE COMPANY IRRESPECTIVE OF ANY CASH DISTRIBUTIONS MADE TO SUCH MEMBER DURING THE

DocuSign Envelope ID: 8A3EC4B0-4393-484A-ADD. F3D262A6464

TAXABLE YEAR. NO GUARANTEED MINIMUM ANNUAL DISTRIBUTION IS INTENDED WITH RESPECT TO THE INTERESTS. IF AND WHEN A CASH DISTRIBUTION IS MADE TO THE MEMBERS, THERE CAN BE NO ASSURANCE THAT IT WILL BE SUFFICIENT TO SATISFY THE INCOME TAX LIABILITY RESULTING FROM THE OWNERSHIP OF INTERESTS.

4.      OVERVIEW OF THE TREATMENT OF CERTAIN DEDUCTIONS – THE COMPANY WILL ATTEMPT TO DEDUCT ALL OF THE ITEMS DESCRIBED BELOW IN THE TIME AND MANNER SET FORTH BELOW AT AS EARLY A TIME AS THE MANAGERS BELIEVE THE LAW PERMITS. HOWEVER, THERE ARE MANY FACTUAL AND LEGAL QUESTIONS INVOLVED WITH RESPECT TO THE AVAILABILITY AND TIMING OF DEDUCTIONS, ONLY SOME OF WHICH ARE DISCUSSED BELOW, AND THERE CAN BE NO ASSURANCE THAT DEDUCTIONS CLAIMED BY THE COMPANY WILL BE ACCEPTED BY THE IRS OR BY A COURT IN ALL INSTANCES.

5.      ALLOCATIONS – EACH MEMBER'S ALLOCABLE SHARE OF OVERALL NET INCOME OR LOSS, AS WELL AS ANY ITEM OF INCOME, GAIN, LOSS, DEDUCTION OR CREDIT RECOGNIZED BY THE COMPANY, WILL BE BASED UPON THE VARIOUS ALLOCATIONS OF SUCH ITEMS SET FORTH HEREIN, UNLESS THE ALLOCATION IS FOUND NOT TO HAVE "SUBSTANTIAL ECONOMIC EFFECT". THE MANAGERS BELIEVE THAT THE ALLOCATIONS SHOULD HAVE SUBSTANTIAL ECONOMIC EFFECT BECAUSE THE MANAGERS INTEND TO MAINTAIN CAPITAL ACCOUNTS IN ACCORDANCE WITH THE REGULATIONS, DISTRIBUTE LIQUIDATION PROCEEDS IN ACCORDANCE WITH THE MEMBERS' CAPITAL ACCOUNT BALANCES, AND INCLUDE IN THE OPERATING AGREEMENT QUALIFIED INCOME OFFSET AND MINIMUM GAIN CHARGE-BACK PROVISIONS. IN ADDITION, ALLOCATIONS ATTRIBUTABLE TO NON-RECOURSE DEBT, IF ANY, WILL BE DETERMINED NO DIFFERENTLY THAN ANY OTHER ALLOCATIONS.

SHOULD THE IRS, ON AUDIT, MAKE A DETERMINATION WITH RESPECT TO ANY TAX ASPECTS OF THE COMPANY, WHICH THE MANAGERS DEEM IS DETRIMENTAL TO THE COMPANY OR THE MEMBERS, THE MANAGERS MAY EMPLOY ANY LEGAL MEANS NECESSARY TO CHALLENGE AND/OR DEFEND AGAINST THE IRS' DETERMINATION. THIS COULD INVOLVE THE INCURRENCE OF SIGNIFICANT LEGAL AND ACCOUNTING FEES.

6.      LIMITATIONS OF DEDUCTION OF LOSSES – A MEMBER WILL BE SUBJECT TO CERTAIN LIMITATIONS RELATED TO THE ABILITY TO DEDUCT LOSSES ALLOCATED FROM THE COMPANY TO HIM OR HER OR IT DURING ANY YEAR. DUE TO THE PASSIVE ACTIVITY LOSS LIMITATION AND OTHER LIMITATIONS DESCRIBED HEREIN, NO MEMBER SHOULD ASSUME, AND NO REPRESENTATION IS MADE HEREIN, THAT A TAX DEDUCTION OR CREDIT WILL BE AVAILABLE TO HIM OR HER OR IT FROM THE COMPANY TO REDUCE SUCH MEMBER'S FEDERAL INCOME TAX OR FEDERAL TAXABLE INCOME.

7.      BASIS LIMITATION – A MEMBER IS ALLOWED TO DEDUCT HIS OR HER OR ITS DISTRIBUTIVE SHARE OF THE COMPANY'S LOSSES OR DEDUCTIONS FOR ANY TAXABLE YEAR ONLY TO THE EXTENT OF THE MEMBER'S ADJUSTED BASIS OF HIS OR HER OR ITS INTERESTS AT THE END OF SUCH YEAR. LOSSES THAT EXCEED SUCH ADJUSTED BASIS MAY BE CARRIED FORWARD INDEFINITELY AND, SUBJECT TO OTHER APPLICABLE LIMITATIONS, DEDUCTED IN SUCCEEDING YEARS TO THE EXTENT SUCH ADJUSTED BASIS AT THE END OF EACH SUCH SUCCEEDING YEAR EXCEEDS ZERO BEFORE REDUCTION BY ANY LOSS FOR SUCH YEAR. IN ADDITION, ANY MONEY DISTRIBUTED (OR DEEMED DISTRIBUTED) TO A MEMBER IN EXCESS OF HIS OR HER OR ITS ADJUSTED BASIS IN HIS OR HER OR ITS INTERESTS WILL BE TAXED AS GAIN FROM THE SALE OR EXCHANGE OF HIS OR HER OR ITS INTERESTS.

8.      PASSIVE ACTIVITY LOSS LIMITATION – THE INTERESTS SHOULD BE TREATED AS AN INVESTMENT IN A PASSIVE ACTIVITY, AND THE MEMBERS WILL NOT BE ACTIVELY OR MATERIALLY PARTICIPATING IN THE MANAGEMENT OF THE COMPANY. THUS, LOSSES GENERATED BY THE COMPANY AND ALLOCATED TO A MEMBER MAY DEDUCT IN ANY TAXABLE

DocuSign Envelope ID: 8A3EC4B0-4393-484A-ADD⸱⸱F3D262A6464

YEAR SOLELY TO THE EXTENT OF SUCH MEMBER'S PASSIVE ACTIVITY INCOME AND CREDITS GENERALLY WILL BE LIMITED TO THE TAX ALLOCABLE TO THE PASSIVE ACTIVITIES. ANY DISALLOWED LOSS OR CREDIT FROM A PASSIVE ACTIVITY WILL BE TREATED AS A DEDUCTION OR CREDIT ALLOCABLE TO SUCH ACTIVITY IN THE NEXT TAXABLE YEAR. THE PASSIVE LOSS RULES PROVIDE THAT UPON A FULLY TAXABLE DISPOSITION OF THE TAXPAYER'S ENTIRE INTEREST IN A PASSIVE ACTIVITY, ANY SUSPENDED LOSSES WILL BE DEDUCTIBLE WITHOUT REGARD TO THE AMOUNT OF PASSIVE INCOME. HOWEVER, CREDITS THAT ARE NOT RELATED TO THE MEASUREMENT OF REAL ECONOMIC LOSSES OF THE TAXPAYER WILL NOT BECOME ALLOWABLE MERELY BY REASON OF A DISPOSITION, BUT ONLY WHEN SUFFICIENT TAX ON PASSIVE INCOME IS REALIZED. THE PASSIVE LOSS RULES APPLY TO INDIVIDUALS, ESTATES, TRUSTS, CLOSELY-HELD CORPORATIONS AND ANY PERSONAL SERVICE CORPORATION. INCOME ALLOCABLE TO A MEMBER WILL GENERALLY BE FILM INCOME, AND MEMBERS SUBJECT TO THE PASSIVE ACTIVITY LOSS RULES WILL NOT BE ABLE TO DEDUCT PASSIVE LOSSES AGAINST SUCH INCOME.

9.    AT-RISK LIMITATION – EACH MEMBER'S DEDUCTION OF HIS OR HER OR ITS SHARE OF ALLOCABLE LOSSES FROM THE COMPANY WILL BE LIMITED TO SUCH MEMBER'S CASH CONTRIBUTIONS PLUS THE MEMBER'S SHARE OF ANY QUALIFIED NON-RECOURSE FINANCING.

10.    CAPITAL LOSS LIMITATION – NON-CORPORATE MEMBERS ARE ABLE TO DEDUCT CAPITAL LOSSES SOLELY TO THE EXTENT OF CAPITAL GAINS PLUS $3,000. CORPORATE MEMBERS ARE ABLE TO DEDUCT CAPITAL LOSSES SOLELY TO THE EXTENT OF CAPITAL GAINS. UNUSED CAPITAL LOSSES MAY BE CARRIED FORWARD TO FUTURE TAX YEARS.

11.    MISCELLANEOUS ITEMIZED EXPENSES – A NON-CORPORATE MEMBER'S DEDUCTION OF MISCELLANEOUS ITEMIZED EXPENSES IS LIMITED TO THE EXCESS OF THOSE AMOUNTS OVER 2% OF THE INDIVIDUAL'S ADJUSTED GROSS INCOME. THIS LIMITATION MAY APPLY TO NON-CORPORATE MEMBER'S SHARE OF THE COMPANY'S EXPENSES. ALSO, SUCH EXPENSES WILL NOT BE ALLOWED IN CALCULATING ALTERNATIVE MINIMUM TAXABLE INCOME.

12.    CASH DISTRIBUTIONS – CASH DISTRIBUTIONS GENERALLY WILL NOT BE TAXABLE AS INCOME TO A MEMBER TO THE EXTENT OF HIS OR HER OR ITS BASIS IN HIS OR HER OR ITS INTERESTS IMMEDIATELY BEFORE THE DISTRIBUTION, BUT THE AMOUNT RECEIVED WILL REDUCE THE BASIS OF SUCH INTERESTS (BUT NOT BELOW ZERO). CASH DISTRIBUTIONS IN EXCESS OF SUCH BASIS GENERALLY WILL BE CONSIDERED TO BE GAIN FROM THE SALE OR EXCHANGE OF THE MEMBER'S INTERESTS, TAXABLE IN ACCORDANCE WITH THE RULES DESCRIBED BELOW WITH RESPECT TO A SALE OR OTHER DISPOSITION OF INTERESTS. A REDUCTION IN A MEMBER'S SHARE OF COMPANY LIABILITIES MAY BE TREATED AS A DISTRIBUTION OF CASH TO SUCH MEMBER.

13.    SALE OR OTHER DISPOSITION OF INTERESTS – GAIN OR LOSS REALIZED ON THE SALE OR EXCHANGE OF ALL OR PART OF A MEMBER'S INTERESTS WILL GENERALLY BE TREATED AS CAPITAL GAIN OR LOSS. A CAPITAL LOSS UPON A SALE OR EXCHANGE MAY BE SUBJECT TO SEVERE LIMITATIONS ON DEDUCTIBILITY ON THE MEMBERS' TAX RETURNS.

14.    STEP-UP IN BASIS ELECTION – IN THE CASE OF A TRANSFER OF A COMPANY INTEREST BY SALE OR AS A RESULT OF THE DEATH OF A MEMBER, THE TRANSFEREE OF SUCH COMPANY INTEREST IS TREATED AS THOUGH HE OR SHE HAD ACQUIRED AN INTEREST DIRECTLY IN HIS, HER OR ITS SHARE OF THE ASSETS OF THE COMPANY, WITH A NEW TAX BASIS FOR SUCH ASSETS EQUAL IN THE AGGREGATE TO THE TRANSFEREE'S BASIS IN HIS OR HER OR ITS COMPANY INTEREST AT THE DATE OF ACQUISITION. THE MANAGERS HAVE THE RIGHT, IN THEIR SOLE AND ABSOLUTE DISCRETION, TO MAKE OR DECLINE TO MAKE AN ELECTION WHICH WOULD RESULT IN SUCH TRANSFEREE OBTAINING THE BENEFIT OF A "STEPPED-UP" BASIS FOR PURPOSES OF DETERMINING GAIN OR LOSS ON THE SALE OF THE COMPANY'S ASSETS, IF SUCH

DocuSign Envelope ID: 8A3EC4B0-4393-484A-ADL    F3D262A6464

TRANSFEREE'S BASIS IS GREATER THAN HIS OR HER OR ITS SHARE OF THE COMPANY'S BASIS FOR ITS ASSETS. THE FAILURE TO MAKE SUCH AN ELECTION DOES NOT AFFECT THE RIGHT OF THE MANAGERS TO MAKE OR DECLINE TO MAKE SUBSEQUENT ELECTIONS. THE MANAGERS' DECISION REGARDING THE MAKING OF SUCH AN ELECTION SHALL BE MADE IN THE BEST INTEREST OF THE COMPANY BASED ON THE ADVICE OF COUNSEL AND THE COMPANY'S ACCOUNTANTS.

15.    LIQUIDATION OF THE COMPANY – A MEMBER WILL NOT ORDINARILY RECOGNIZE GAIN OR LOSS UPON TERMINATION OF THE COMPANY AND DISTRIBUTION OF THE COMPANY'S ASSETS TO THE MEMBERS. HOWEVER, GAIN WOULD BE RECOGNIZED TO THE EXTENT OF ANY CASH DISTRIBUTION IN EXCESS OF THE ADJUSTED BASIS OF THE MEMBER'S INTEREST IN THE COMPANY IMMEDIATELY BEFORE DISTRIBUTION. GENERALLY, A LOSS WOULD NOT BE RECOGNIZED UNLESS A MEMBER RECEIVES ONLY CASH AND THEN ONLY TO THE EXTENT THAT THE MEMBER'S ADJUSTED TAX BASIS IN HIS OR HER OR ITS COMPANY INTEREST EXCEEDS THE SUM OF ANY CASH RECEIVED.

16.    TAX ACCOUNTING – THE COMPANY WILL BE REQUIRED TO FILE AN INFORMATION TAX RETURN. THE MANAGERS INTEND TO PROVIDE INFORMATION ON ITS OPERATIONS TO ALL MEMBERS (AND ANY ASSIGNEES OF INTERESTS NOT YET ADMITTED AS SUBSTITUTED MEMBERS) WITHIN 90 DAYS AFTER THE CLOSE OF EACH FISCAL YEAR OF THE COMPANY FOR THE MEMBERS' USE IN PREPARATION OF THEIR INCOME TAX RETURNS

Exhibit O

Clear Horizon (...1097) - chase.com

5/17/2021

# CHASE *for* BUSINESS

Printed from Chase for Business

## Clear Horizon (...1097)
CLEAR HORIZON ENTERTAINMENT LLC

**$1.00**
Available balance

$0.00
Available credit

$1.00
Available plus credit

$1.00
Present balance

---

Uncollected funds                                                      Total  $0.00

---

## Account activity

SHOWING          Search

Filtered by:     Feb 1, 2020 to Mar 1, 2020          Card

| Date | Description | Type | Amount |
|------|-------------|------|--------|
| Feb 26, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/30 (...6404) | Card | –$419.03 |
| Feb 24, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/31 (...6404) | Card | –$664.50 |
| Feb 24, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/31 (...6404) | Card | –$194.90 |
| Feb 24, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 02/20 (...6404) | Card | –$526.06 |
| Feb 24, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 02/20 (...6404) | Card | –$1,090.89 |
| Feb 18, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/30 (...6404) | Card | –$526.06 |
| Feb 18, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/31 (...6404) | Card | –$664.50 |
| Feb 18, 2020 | IBM CORPORATION PITTSBURGH PA 02/18 (...6404) | Card | –$59.70 |
| Feb 13, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 02/11 (...6404) | Card | –$1,090.89 |
| Feb 10, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/30 (...6404) | Card | –$526.06 |
| Feb 10, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/31 (...6404) | Card | –$664.50 |
| Feb 6, 2020 | AVON RENT A CAR TRUC WEST HOLLYWOO CA 01/28 (...6404) | Card | –$1,090.89 |

JPMorgan Chase Bank, N.A. Member FDIC          ©2021 JPMorgan Chase & Co.          Equal Opportunity Lender ⌂

Exhibit P

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

828 Media Capital, LLC
Attn: Todd Lundbohm
Email: todd@828mediacapital.com

Fallout LLC
Attn: David Brown
Email: moviedavid1@gmail.com

February11, 2020 (the "Effective Date")

Re:   **Senior Lender Loan Term Sheet: terms and conditions ("Term Sheet") for the loan for the motion picture currently entitled, "Fallout" (the "Picture").**

| | |
|---|---|
| 1.  Borrower: | Fallout LLC, a California limited liability company ("Fallout" or "Borrower"). |
| 2.  Lender: | 828 Media Capital LLC, or its assignees ("Lender"). |
| 3.  Nature of Loan: | A secured corporate loan facility against all of Borrower's assets, tangible and intangible, including but not limited to all exploitation proceeds and rights, including Clear Distribution executed pre-sales and worldwide sales to be made on a go forward basis for the Picture, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender shall have a first priority repayment position, in accordance with the attached waterfall, attached hereto as Exhibit A. |
| 4.  Commitment Amount: | Equals up to US$1,500,000 (the "Commitment Amount") of which US$1,250,000 ("Loan") (i.e. the Commitment Amount less the Set Up Fee and Legal Fee and Producer Fee) will be deposited upon (i) execution of this Term Sheet; (ii) execution of the Security Agreement; and (iii) satisfaction of the Conditions Precedent<br><br>Upon close of financing, and subject to the terms and conditions set forth herein, the Loan shall be released to Borrower, in amounts and (approximate) dates as set forth in the Lender Funding Schedule below: |

| Lender Funding Schedule | | |
|---|---|---|
| Trance | US $ Amount | Target Date* (subject to confirmation) |
| 1 | $35,000 | Acknowledged as paid |
| 2 | $75,000 | March    4,    2020 (acknowledged as paid) |
| 3 | $175,000 | March 9, 2020 |
| 4 | $125,000 | March 16, 2020 |
| 5 | $165,000 | March 23, 2020 |
| 6 | $125,000 | March 30, 2020 |
| 7 | $125,000 | April 6, 2020 |
| 8 | $125,000 | April 13, 2020 |
| 9 | $100,000 | April 20, 2020 |
| 10 | $100,000 | April 27, 2020 |
| 11 | $100,000 | May 10, 2020 |

*Lender will agree to accelerate the Lender Funding Schedule in order to meet the financial demands necessary to finalize the deals with Billie Eilish ("Eilish") and Finneas O'Connell (O'Connell") by making such payments directly to their agent's escrow account(s).

1

828 MEDIA_0000001

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

| | |
|---|---|
| 5. Legal Fee: | US$25,000 (the "Legal Fee"), to be withheld from the Commitment Amount upon the closing of the loan herein. |
| 6. Set Up Fee: | US$200,000 (the "Set Up Fee") to be withheld from the Commitment Amount upon the closing of the loan herein. |
| 7. Repayment: | Borrower shall repay the Commitment Amount plus a twenty percent (20%) premium (the "Indebtedness") to the Lender by March 2, 2021 (the "Maturity Date") in accordance with the waterfall attached hereto as Schedule A. |
| 8. Default Interest Rate: | Two percent (2%) per month on the unpaid balance of the Commitment Amount, which shall accrue after (i) the Maturity Date, or (ii) an "Event of Default" (as further defined below). If the provisions of this Term Sheet or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount. |
| 9. Producer and Market Fees | 828 Productions, LLC ("828 Productions") shall be entitled to a producer fee of no less than Twenty-Five Thousand Dollars ($25,000), which amount shall be withheld by Lender and paid directly to 828 Productions.<br><br>David Brown, or his designee, shall be entitled to a Fifty Thousand Dollar producer fee for his services in connection with the Picture, which amount shall be paid by Borrower from the budget for the Picture.<br><br>Clear Distribution LLC ("Clear Horizon") shall be entitled to a market fee of no more than Two Hundred Thousand Dollars ($200,000), which shall be paid by Borrower from the budget for the Picture in 8 equal installment over the course of pre-production, production and post production. |
| 10. Contingent Compensation: | 828 Productions shall become a member of Borrower and own a fifty percent (50%) share of Borrower, which shall not be subject to dilution.<br><br>828 Productions shall receive fifty percent (50%) of one hundred percent (100%) of the net profits with respect to the Picture.<br><br>828 Production's share of net profits shall be defined, accounted and paid on a most favored nations basis with all other participants in Net Profits.<br><br>Lender and 828 Productions shall be made a party to the Collection Account Management Agreement, when established. |
| 11. Use of Proceeds: | Borrower shall use the Loan to finance pre-production, production, post-production and delivery of the Picture. |
| 12. Lender's Approval Regarding Any Additional Debt: | In the event that Borrower seeks additional debt financing with respect to the Picture, Borrower shall provide Lender with written notice that it intends to raise additional financing, and Lender shall have the sole approval right with respect to whether Borrower can |

828 MEDIA_0000002

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

| | |
|---|---|
| | accept any additional debt financing. Lender must consent in writing to the specific terms of any additional debt, including the review of the underlying debt agreement(s), prior to Borrower accepting any additional debt financing with respect to the Picture. |
| 13.  Lender's Approval Rights: | Lender shall be entitled to approve all additional financing as well as any other key agreements related to the Picture, until such time as the Indebtedness is repaid. This shall include, but not be limited to, the agreements for the services of Eilish and O'Connell, the SAA and/or any other distribution agreements for the Picture, the main title credited actors for the Picture, the Director for the Picture, all department head agreements for the Picture. For the avoidance of doubt, any music created by Eilish or O'Connell in connection to or related to the Picture shall be owned or licensed by Company to be exploited by Company and not any other entity.<br><br>Further, Shailene Woodley, Jenna Ortega and Maddie Ziegler are all considered essential elements, and any changes to these three roles must be approved in writing by Lender, and may be subject to a reduction in the Loan. |
| 14.  Reports: | Until repayment of the Indebtedness (and Default Interest, if any), Borrower shall provide regular status reports containing meaningful and reasonable detail on material production activities, including timeline to and budget for completion of pre-production, production, and post-production, as well as sales and distribution activities. This includes call-sheets, production reports, bank statements, discussion with third party vendors and financiers. Borrower must also provide Lender with all weekly cost reports within two (2) days of the end of the corresponding week for such report during pre-production, production and bi-weekly cost reports during post production.<br><br>For the avoidance of doubt, if Borrower fails to meet the material obligations set forth herein, after being provided with written notice of its failure and three (3) days to cure such default, Lender shall have the right to terminate this Term Sheet and, following Borrower's receipt of written notice of such termination, the Indebtedness (and Default Interest, if any) shall immediately become due and payable. |
| 15.  Security: | Lender has a first priority security interest, subject to guilds and labs, in all of Borrower's assets, tangible and intangible, including, but not limited to accounts receivable, cash accounts, equipment, intellectual property, proceeds, future proceeds, and virtually any other asset currently in Borrower's possession or in the future.<br><br>Lender is entitled to perfect its security interest in the Collateral (as defined in the Security Agreement) by filing a UCC-1 statement and any other relevant filings, with each applicable state and government authority, as determined by Lender, in Lender's sole discretion.<br><br>Upon repayment, note shall be marked "cancelled" and returned to borrower. Lender shall promptly release and reassign to Borrower or its designee) all rights and security interest to Lender in the collateral.<br><br>Additionally, Lender shall file UCC-3 financing statements terminating any UCC-1 statements with each application state and govern authority which a UCC-1 was filed. |
| 16.  Audit Rights: | Lender shall have the right to have a CPA audit the books and records of Borrower, on a semi-annual basis, subject to at least thirty (30) days |

3

828 MEDIA_0000003

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

| | prior written notice to Company, at Lender's expense, until payment of the Indebtedness (and Default Interest, if any) is irrevocably received by Lender. In the event the audit uncovers a discrepancy unfavorable to Lender in excess of 5%, Borrower shall pay the third party costs of any such audit. |
|---|---|
| 17.  Financing Documents: | The following documents and all other documentation required under this Term Sheet shall constitute the "Financing Documents":<br><br>i.)     Promissory Note;<br>ii.)    Power of Attorney;<br>iii.)   Corporate documents and certificates of Borrower (and its managers and/or members, including, but not limited to, Specter Entertainment, LLC);<br>iv.)   Irrevocable Direction-to-Pay / Notice of Assignment(s) / Assignment of Proceeds Agreement(s) with Clear Distribution / rest of world distributors; and<br>v.)    Copyright Mortgage and Assignment; and<br>vi.)   Any other documents required, in Lender's sole discretion.<br><br>All Financing Documents shall be in form and substance satisfactory to Lender and, unless otherwise agreed by Lender in writing, prepared by Lender's counsel subject to good faith negotiations. |
| 18.  Credit, Set Visits, One-Sheet; Premiere Tickets; Press: | Lender shall be entitled to the following credits in connection with the Picture:<br><br>An animated company logo in first position, other than the distributors for the Picture, prior to main title sequence of the Picture for the Lender as well as in paid ads, and tied to all others getting animated logos in all respects.<br><br>A bug logo in the end credits of the Picture, as well as in paid ads, tied to all others receiving a bug logo in all respects.<br><br>A company credit, on screen, in the main titles of the Picture, and in paid ads, in first position among company credits, in the following form: "In Association with 828 Media Capital" and tied to all others receiving company credit in all respects.<br><br>A "Produced By" credit, on screen, in the first position of the main titles and tied to all other receiving producer credit in all respects.<br><br>Four (4) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, in the main titles of the Pictures, on two cards (shared only with each other) and in paid ads in first through fourth position among all executive producers, and tied in all respects to any other party receiving an executive producer credit.<br><br>All credits are on a most favored nations basis with other companies and producers, as applicable.<br><br>Lender, and its designees, shall be entitled to unlimited set visits during production of the Picture.<br><br>Borrower will provide Lender with one (1) high quality "one-sheet" (or an electronic file thereof) for the Picture, which Lender may use to promote, market and advertise its business. |

4

828 MEDIA_0000004

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

| | |
|---|---|
| | Borrower will use commercially reasonable good faith efforts to cause the domestic distributor of the Picture to provide Lender with at least six (6) invitations to the Picture's domestic premiere and festival screening, if any, including travel/accommodations on a most favored nations basis with all other producers.<br><br>Borrower shall reference "828 Media Capital" as the financier in any press releases regarding the Picture. |
| 19. Assignment: | Neither this Term Sheet nor the Commitment Amount are assignable by Borrower. |
| 20. Insurance: | Borrower shall ensure that Lender is named as an additional insured under all insurance policies for the Picture to the extent obtained and subject to said policies terms and exclusions. |
| 21. Events of Default: | If at any time after Closing, any of the following "Events of Default" have occurred (as determined by Lender in its sole discretion), the Commitment Amount (and Default Interest, if any) shall immediately become due and payable unless such event of default is cured in the time permitted herein:<br><br>i.)    Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due;<br><br>ii.)    Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements and/or obligations of Borrower contained in the Term Sheet or in any agreement relating to the Loan and/or the Picture which would materially adversely affect the value of the Loan;<br><br>iii.)    Borrower's failure to perform or observe, in a due and timely manner, any of the material terms, provisions, covenants, conditions, agreements or obligations contained in the Financing Documents or in any other agreement, contract, indenture, document, or instrument executed, or to be executed, by Borrower in connection with the Financing Documents which would have a materially adverse effect on the ability of Borrower to perform its obligations pursuant to the Financing Documents;<br><br>iv.)    Borrower receiving any other form of financing without Lender's express written approval;<br><br>v.)    Suspension by Borrower of its business operations;<br><br>vi.)    The failure of Borrower to effect delivery of the Picture to sales agents and distributors in accordance with the terms and conditions of the relevant sales and distribution agreements by their respective delivery dates;<br><br>vii.)    Any material change in the budget, cash flow schedule, financing structure, timing of pre-production, production, and/or post-production, Borrower's production team or other change which is not approved by Lender would be an Event of Default in the Financing Documents. |
| 22. Conditions Precedent to Closing: | The funding of the Loan is subject to Borrower's compliance with each of the following conditions: |

828 MEDIA_0000005

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

|  | i.)    Cash flow schedule, budget, and production schedule for the Picture;<br><br>ii.)    Execution and/or approval of the Financing Documents;<br><br>ii.)    Borrower providing an executed copy of the sales agent agreement with Clear Distribution, including sales estimates;<br><br>iii.)    There being, prior to the time of Closing, no material adverse change in Borrower's condition, financial or otherwise, or financial business prospects from that represented in any financial statement or other information submitted to Lender or upon which Lender has relied;<br><br>iv.)    Lender shall have received, in form and substance reasonably satisfactory to Lender, copies of all agreements or documents, and all amendments thereto, relating to the formation, existence, power, authority and governance of Borrower, together with copies of all certificates which are required to be, or may be, filed in connection with the creation of Borrower;<br><br>v.)    Receipt and approval by Lender of chain of title documentation with respect to the Picture, including, but not limited to, the current copy of the screenplay;<br><br>vi.)    Update records of Borrower to reflect more than one manager, and full execution of amended and restated operating agreement for Borrower; and<br><br>viii.)    Fully executed agreements for the key talent participating in the Picture, and the director for the Picture.<br><br>Condition subsequent:<br><br>Borrower must circulate a draft collection account management agreement within sixty (60) days from the end of principal photography and use good faith efforts to have fully executed within 90 days from end of principal photography. |
| 23.  Representations and Warranties: | The Borrower hereby represents and warrants to Lender that:<br>        (i) It is duly organized, validly existing and in good standing. It has the power and all necessary rights and title to enter into and perform this Agreement and the transactions contemplated hereby or referred to herein. It has taken all necessary action to authorize the entry into and performance of this Agreement and such transactions.<br>        (ii) This Term Sheet constitutes a legal, valid and binding obligation of the Borrower and is in proper form for enforcement against it.<br>        (iii) The entry into and performance of this Term Sheet and the transactions contemplated hereby do not and will not conflict with: (a) any existing law or regulation or any official or judicial order, or (b) its articles of creation, or (c) any agreement or document to which it is a party or which is binding upon it or any of its assets. Without limiting the generality of the foregoing, the Borrower represents and warrants that there are not now any liens, claims, encumbrances, legal proceedings, restrictions, agreements or understandings which might conflict or interfere with, limit, derogate from, or be inconsistent with or otherwise affect any of the provisions of this Agreement or any of the representations or warranties of the Borrower contained herein, including without limitation, any U.C.C. filings, copyright |

828 MEDIA_0000006

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

|  | assignments or other liens, inconsistent herewith or offsets or other costs charged against the Picture by any distributor pursuant to cross-collateralization agreements or otherwise.<br><br>(iv)   All authorizations, approvals, consents, licenses, exemptions, filings, registrations, notarizations and other matters, official or otherwise, required by the Borrower or advisable in connection with the entry into, performance, validity and enforceability of this Agreement and the transactions contemplated hereby the Borrower have been obtained or effected and are in full force and effect (other than the registration of security interests to be created pursuant hereto).<br><br>(v) No litigation, arbitration or administrative proceedings are threatened or, to its knowledge, pending which call into question the validity or performance of its obligations hereunder.<br><br>(vi)   All information which might be material to a person assuming the obligations and acquiring the rights assumed and acquired by the Lender pursuant to this Agreement has been disclosed in writing to the Lender and to Borrower's best knowledge, using reasonable prudence, there are no facts or circumstances which might make such information misleading or inaccurate.<br><br>(vii)   The Borrower's warranties, representations and agreements are of the essence of this Agreement and shall survive the early termination hereof. None of the Borrower's warranties, representations or agreements shall in any way be limited by reason of any investigation made by the Lender or on behalf of the Lender regarding said warranties, representations or agreements.<br>The Lender represents and warrants that they have the power and all necessary rights and title to enter into and perform this Term Sheet and the transactions contemplated hereby or referred to herein. They have taken all necessary action to authorize the entry into and performance of this Term Sheet and such transactions. And they are properly organized and in good standing. |
|---|---|
| 24.  Indemnification: | Each Party shall, at its own expense, indemnify, save and hold harmless the other party and its successors, licensees, assigns, agents, representatives and affiliates from and against any and all third party claims, demands, causes of action, obligations, liability, loss, damage, cost and expenses (including reasonable outside attorneys' fees), incurred or sustained by reason of or arising out of any breach or alleged breach of any of the warranties, representations or agreements herein made by the other Party, or from any reliance upon any such warranties, representations or agreements. If any person or third party entity shall make any claim or institute any suit or proceeding alleging any facts, which, if true, would constitute a breach by the other Party, of any warranty, representation or agreement herein made, the Party shall give prompt written notice of same to the other Party and shall undertake at its own cost and expense the defense thereof and shall supply competent and experienced counsel to defend any such suit or proceeding for the non-breaching Party. |
| 25.  Confidentiality: | The terms of this Term Sheet are strictly confidential and the Parties agree not to disclose the terms contained herein to any third party without the prior written consent of the other party except that each Party may disclose such terms to its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors, also governmental entities and other parties with a right to access such information, including guilds or parties required by law. |
| 26.  Conflict Waiver | The Parties acknowledge that Ramo Law PC ("Ramo") solely represents Lender in connection with the financing of the Picture. It is |

828 MEDIA_0000007

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

|  |  |
|---|---|
|  | also agreed and acknowledged that Ramo represents Borrower on other matters, including with respect to the production legal for the Picture, and may continue to do so, and has advised Borrower to seek outside counsel with respect to the subject matter herein between Lender and Borrower. Ramo shall not provide financing advice in connection with this matter to Borrower. Notwithstanding such representation and any actual or potential conflict of interest, the Parties consent to Ramo's representation of Lender, provided that the parties acknowledges and agrees that at no time will Ramo's representation be construed, claimed or deemed to be a breach of a fiduciary relationship, a conflict of interest or a violation of any other obligation to Lender and/or Borrower.<br><br>⌐DB⌐ _____ Initialed by Borrower<br><br>⌐TL⌐ _____ Initialed by Lender |
| 27.  Notice: | Lender<br>As set forth above<br><br>With a copy to:<br>Ramo Law PC<br>315 S. Beverly Dr., Ste. 210<br>Beverly Hills, CA 90212<br>Attn: Zev Raben, Esq. & Elsa Ramo, Esq.<br>Email: zev@ramolaw.com; eramo@ramolaw.com<br><br>Borrower<br>Fallout LLC<br>3940 Laurel Canyon Blvd. #1413<br>Studio City, CA 91604<br>Attn: David Brown<br>Email: moviedavid1@gmail.com<br><br>With a copy to:<br>Surpin, Mayersohn & Coghill LLP<br>1880 Century Park East<br>Suite 618<br>Los Angeles, CA 90067<br>Attn: Jamie Coghill<br>Email: JCoghill@SurpMayLaw.com |
| 28.  Exclusivity: | Borrower shall not solicit or entertain competing financial proposals or conduct any negotiation, or enter into any agreement, arrangement or understanding for a competing financial transaction, for a period of thirty (30) days from the execution of this Term Sheet unless otherwise agreed to by Borrower and Lender in writing. |
| 29.  Miscellaneous: | The terms and conditions of this Term Sheet shall be interpreted and governed by California law applicable to contracts entered into and to be wholly performed in California without reference to choice of law rules.  The parties consent to the jurisdiction and venue of the State of California in the City and County of Los Angeles.  Any dispute arising hereunder shall be resolved solely through binding arbitration conducted in Los Angeles, California under and pursuant to the JAMS comprehensive arbitration rules and procedures.  The prevailing party in such arbitration shall be entitled to recover its reasonable, outside attorneys' fees and costs incurred in connection with such arbitration.  This Term Sheet shall be deemed to have been drafted jointly by the |

828 MEDIA_0000008

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

|  | parties, notwithstanding that one party or the other may have performed the actual drafting hereof. No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of the Term Sheet shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other covenant or condition. The provisions of this Term Sheet are severable. If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision. This Term Sheet may be executed by facsimile or PDF signatures and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Unless and until modified, amended or superseded by the Financing Documents in writing, this Term Sheet sets forth the legally binding Term Sheet of the parties with respect to the subject matter hereof. |
|--|--|

The parties shall enter into the Financing Documents to be negotiated in good faith reflecting the terms and conditions of this Term Sheet prior to the making of this Loan.

Sincerely,

By: Todd Lundbohm
Its: Authorized Signatory

AGREED AND ACCEPTED:
FALLOUT LLC

By: David Brown
Its: Authorized Signatory

## Schedule A

"Company Gross Revenue" (defined below) shall have the following deductions paid by or charged against Company (or its affiliated or related entities) and deducted on a continuing and cumulative basis:

(i) First,
   a. Actual, direct, out-of-pocket, verifiable collection account management costs and fees;
   b. Residuals and applicable payments owed to or on behalf of unions and guilds, including without limitation SAG-AFTRA;
   c. To the extent applicable, any bonus payments to third parties (to the extent paid by Company or not otherwise assumed by a distributor) (e.g. box office bonuses);
   d. To the extent not deducted off the top prior to receipt of Company Gross Revenue, and to the extent applicable, all actual, direct, out-of-pocket, verifiable distribution fees and distribution costs (including, without limitation, ad overhead, if charged), all actual, direct, out-of-pocket, verifiable sales fees if applicable, and any actual, direct, out-of-pocket fees and/or costs to third parties who represent the Picture (e.g. producer representatives, sales advisors, etc.);
   e. All actual, direct, out-of-pocket marketing and distribution costs paid by Company (including, without limitation, residuals, union obligations, delivery items, reasonable and customary costs for producers, director, cast and others related to the Picture to attend premieres, film festivals and film markets);
   f. All actual, direct, out-of-pocket payments to agents, accountants, attorneys and other parties who represent the Picture;

9

DocuSign Envelope ID: 4AE46A1F-CE5F-48DD-BAA2-F2B3CBE3B9C2

   g. Actual interest on the direct costs of production of the Picture;

   h. Any payments paid as advances, royalties or otherwise in connection with the exploitation of ancillary and subsidiary rights; and,

   i. All actual, direct, out-of-pocket costs of auditing any distributor of the Picture of any ancillary or subsidiary rights (including without limitation, reasonable outside legal and auditor fees and costs).

(ii)  Second, repayment of the 828 Media Capital loan plus its premium and default interest, if any, to the extent not yet paid;

(iii)  Third, Sales Agent shall receive its Twenty Percent (20%) Sales Fee (as defined in the SAA) which shall be calculated on a first dollar (i.e. retroactive) basis, without double counting;

(iv)  Fourth, a return to the investors in the amount of one hundred and twenty percent (120%) of the capital contributions made by each investor, on a pro rata pari passu basis, if any;

(v)  Fifth, payment of deferments, if any;

(vi)  Sixth, the balance shall be considered "Net Proceeds", and shall be calculated on a "rolling" basis that is readjusted as additional receipts and expenses may come in. There will be no double deductions--the same cost or expense will not be deducted twice.  Company may take reasonable and customary reserves to cover anticipated expenses not yet charged to the Picture, and Company shall liquidate such reserves no less than every twelve (12) months.  Net Proceeds shall be payable, on a pro rata pari passu basis to (1) fifty percent (50%) collectively to the managers of Company, and to profit participants providing services on the Picture in accordance with their respective service agreements, on a pro rata pari passu basis (the "Producer's Share of Net Proceeds"); and, (2) fifty percent (50%) to the investors who provided a capital contributions to the Company, on a pro rata pari passu basis (the "Investor's Share of Net Proceeds"). For purposes of clarification, the aggregate total of the Producer's Share of Net Proceeds and the Investor's Share of Net Proceeds shall not exceed 100%.

"Company Gross Revenue" will be all monies received by or credited to the Company (and its affiliated and related entities) from the distribution and exploitation of the Picture and all ancillary and subsidiary rights therein (including from merchandising, but not including any income from the exploitation of sequel, remake or other subsequent production rights).  Revenue will not be considered "Company Gross Revenue" unless it is non-refundable and received or credited in U.S. Dollars in the United States (or in the Company's foreign bank account and available to be remitted to the United States).  "Company Gross Revenue" is determined after all bona fide refunds, credits, allowances, discounts and adjustments. So-called "soft monies" shall be deemed "Company Gross Revenues" to the extent not used to offset the Budget or lent against.

Creditor-Debtor:  The relationship between the Company and Artist is one of "creditor-debtor" and nothing in the Agreement between the Company and Artist or this definition shall make Company a fiduciary or trustee of Artist.  Nothing contained in the Agreement between Company and Artist or this definition shall be deemed directly or indirectly to give Artist a security interest in the Picture or the revenue stream derived from the exploitation of the Picture.  Company makes no representation that the Picture will be released or that the Picture will be successful enough that it will generate any amount of Net Proceeds and/or Company Gross Revenue.  Artist shall not have any security interest, lien or other interest in the receipts of Company and Company has no obligation to segregate any funds.  Company shall have the broadest possible latitude in the distribution of the Picture, and the exercise of Company's judgment in good faith in all matters pertaining thereto shall be final.  In no event shall Company incur any liability based upon a claim that Company has failed to realize receipts or revenue that could have been realized.

828 MEDIA_0000010

Exhibit Q

Fallout LLC
3940 Laurel Canyon Blvd. #1413
Studio City, CA 91604

September 3, 2021

828 Media Capital LLC
C/O – Todd Lundbohm
8383 Wilshire Blvd. Suite 1038
Beverly Hills, CA 90211

Dear Mr. Lundbohm,

In regards to the Senior Lender Loan Term Sheet dated February 11, 2020 between 828 Media Capital, LLC and Fallout LLC in respect of the motion picture "Fallout", please find attached a certified cashier check for $437,060.00 for full repayment of the loan.

This figure represents the repayment of the initial $285,000 funded + $40,000 paid to Buffalo8 + 20% premium + 2% per month default interest from March 2, 2021 to September 3, 2021.

This loan repayment is made without prejudice to all of Fallout LLC's rights and remedies in respect of 828 Media Capital, LLC's breach of the Term Sheet.

Respectfully,

*David Brown* (signature)

David Brown

---

282111107 NEW 01/21 8810004306

**CHASE** ◯   **CASHIER'S CHECK**   Date 09/03/2021   1157361421   91-2/1225   Void after 7 years

Remitter: FALLOUT LLC

Pay To The
Order Of: 828 MEDIA CAPITAL LLC

Pay: FOUR HUNDRED THIRTY SEVEN THOUSAND
SIXTY DOLLARS AND 00 CENTS                                    $** 437,060.00 **

Do not write outside this box

Drawn JPMORGAN CHASE BANK, N.A.

*Rebecca Griffin* (signature)

Memo:
Note: For information only. Comment has no effect on bank's payment.

Rebecca Griffin, Chief Administrative Officer
JPMorgan Chase Bank, N.A.
Phoenix, AZ

⑈1157361421⑈ ⑆122100024⑆ 80500333⑈

Exhibit R

**Celina Kirchner**



**From:** Zev Raben <Zev@ramolaw.com>
**Subject: The Fallout Amendment**
**Date:** March 26, 2020 at 1:19:17 PM EDT
**To:** 'David Brown' <moviedavid1@gmail.com>, Jamie Coghill - Attorney <JCoghill@SurpMayLaw.com>
**Cc:** 'todd lundbohm' <todd@828mediacapital.com>

David,

I hope this message finds you well. Given the COVID-19 situation, we need to amend the existing Loan Term Sheet.

Please see the attached First Amendment to the Loan Term Sheet and an Amended and Restated Promissory Note.

1

Exhibit B page 1

Let me know if you have any questions.

Rights reserved.

Zev

**RAMO LAW PC**

**Zev Raben, Esq.**
315 South Beverly Drive, Suite 210
Beverly Hills, California 90212
Assistant: 424.282.4534
Main Office: 310.284.3494 x 119
Fax: 310.861.5246

CONFIDENTIAL COMMUNICATION: E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof.
TAX ADVICE DISCLOSURE: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

David Brown
CEO, Clear Horizon
david@clearhorizonent.com
www.clearhorizonent.com

Exhibit B page 2

Exhibit S

## FIRST AMENDMENT TO LOAN SENIOR LENDER LOAN TERM SHEET

This First Amendment to the Senior Lender Loan Term Sheet (the "Amendment"), is entered into as of March ____, 2020 (the "Effective Date"), by and Fallout LLC, a limited liability company organized and existing under the laws of the State of California ("Borrower"), and 828 Media Capital LLC, a limited liability company organized and existing under the laws of the State of Delaware ("Lender"), with respect to the Senior Lender Loan Term Sheet, dated as of February 11, 2020 (the "Loan Agreement"), between Borrower and Lender. Borrower and Lender are sometimes individually referred to in this Amendment as a "Party" and are collectively referred to as the "Parties." Capitalized terms used in this Amendment without definition have the same meanings that are given to those terms in the Loan Agreement. The Parties' agreement is as follows:

1.   **FACTUAL BACKGROUND.**

   1.1   Borrower and Lender previously entered into the Loan Agreement in which Lender agreed to make a loan to Borrower to be used to fund a portion of the cost of production of the motion picture entitled *The Fallout* (the "Picture"), for use in the payment of pre-production, production and post-production costs of the Picture, all as described more fully in the Loan Agreement.

   1.2   The Picture has halted production in response to the COVID-19 pandemic and the SAG-AFTRA rule pulling performers on productions consisting of ten or more people in response thereto.

   1.3   Borrower acknowledges that Lender has released funds for the Picture to Borrower in the amount of Two Hundred Eighty-Five Thousand United States Dollars ($285,000.00).

2.   **AMENDMENTS TO THE LOAN AGREEMENT.**

   2.1   Notwithstanding anything to the contrary in the Loan Agreement, the following shall apply:

      2.1.1   As of the Effective Date, Borrower shall not spend any more of the Loan without Lender's prior written approval, at Lender's sole discretion.

      2.1.2   Lender shall not release to Borrower any further funds for the Picture unless Lender approves at Lender's sole discretion.

      2.1.3   Borrower shall add Lender as a party and authorized signor to the production bank account ("Production Account") for the Picture no later than Friday, March 27, 2020. The parties acknowledge and agree that if Borrower is not a party to the Production Account by end of business Friday, March 27, 2020, all funds therein shall be refunded to Borrower on Monday, March 30, 2020. Borrower agrees that no further funds shall be withdrawn from the Production Account without Lender's prior written approval in each instance.

   2.2   Paragraph 4 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

      4.   Commitment Amount:   Equals up to US$365,000 (the "Commitment

- 1 -

Exhibit B page 3

Amount") of which US$285,000 ("Loan") (i.e. the Commitment Amount less the Set Up Fee, Legal Fee and Producer Fee) has been deposited in the Production Account.

2.3    Paragraph 5 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

5.    Legal Fee:    US$15,000 (the "Legal Fee"), to be withheld from the Commitment Amount upon the closing of the loan herein.

2.4    Paragraph 6 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

6.    Set Up Fee:    US$50,000 (the "Set Up Fee") to be withheld from the Commitment Amount upon the closing of the loan herein.  The Set Up Fee shall be increased to US$200,000 in the event that production and funding of the Picture resumes.

2.5    Paragraph 9 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

9.    Producer/Market Fees:

828 Productions, LLC ("828 Productions") shall be entitled to a producer fee of no less than US$15,000 ("Producer Fee"), which amount shall be withheld by Lender and paid directly to 828 Productions.

David Brown, or his designee, shall be entitled to a US$15,000 producer fee (to be increased to US$35,000 in the event that production of the Picture resumes) for his services in connection with the Picture, which amount shall be paid by Borrower from the budget for the Picture, only upon the commencement of principal photography for the Picture.

Clear Distribution LLC ("Clear Horizon") shall be entitled to a market fee of no more than US$200,000, which shall be paid by Borrower from the budget for the Picture in 8 equal installments from the remaining tranches, if Lender determines to fund any additional amounts to Borrower. For the avoidance of doubt, Clear Horizon shall not be entitled to any portion of it Market Fee from the amounts previously funded by Lender.

3.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce Lender to enter into this Amendment, Borrower represents and warrants to Lender that:

3.1    No event has occurred or is continuing which constitutes an Event of Default or potential Event of Default under the Loan Agreement.

3.2    Borrower's representations and warranties contained in the Loan Agreement are true, correct and complete on and as of the date of this Amendment, to the same extent as though the representations and warranties were made on and as of the date of this Amendment.

3.3    Borrower's execution, delivery and performance of this Amendment is within its

- 2 -

corporate power and has been duly authorized by all necessary corporate action, and this Amendment constitutes Borrower's valid and binding agreement, enforceable against Borrower in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights generally.

4.    **COUNTERPARTS.**

This Amendment may be executed in any number of counterparts, and by different Parties, in separate counterparts, each of which when executed and delivered will be deemed an original, but all of which counterparts together will constitute one and the same instrument. A signed and delivered facsimile copy of this Agreement, or a signed copy transmitted electronically in either a tagged image format file (TIFF) or a portable document format (PDF), will be binding on the Party signing the facsimile or electronically transmitted copy, and that copy will have the same effect as a signed original. A Party who delivers a facsimile or electronically transmitted signature page agrees to later deliver a signed original to any Party who requests it.

5.    **EFFECTIVE AMENDMENT.**

The Parties agree that, except as specifically provided in this Amendment, this Amendment does not in any way affect or impair the terms and conditions of the Loan Agreement, and all of the terms and conditions of the Loan Agreement are to remain in full force and effect unless otherwise specifically amended, waived or changed pursuant to the terms and conditions of this Amendment.

6.    **APPLICABLE LAW.**

This Amendment and the Parties' rights and obligations and all other aspects of this Amendment are deemed to be made under, are governed by and must be construed and enforced in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the Effective Date.

AGREED AND ACCEPTED:

FALLOUT LLC                                   828 MEDIA CAPITAL LLC


_____                       _____
By: David Brown                               By: Todd Lundbohm
Its: Authorized Signatory                     Its: Authorized Signatory

Exhibit B page 5

Exhibit T

---------- Forwarded message ---------
From: **Zev Raben** <Zev@ramolaw.com>
Date: Mon, Jul 27, 2020 at 10:24 AM
Subject: Follow up on our call
To: Harry Finkel <harry@creativlaw.com>

Harry,

Per your request, I am sending you the list of items my client would like provided within 48 hours. Based on what happened last week, it appears that when I am the messenger, David is particularly unreceptive to the message. I am not sure why that happens, but I would appreciate your assistance in trying to communicate that Todd is simply trying to get documents that he has been requesting for some time, and that this is not some sort of retaliation for whatever happened with the Occelot deal on Collected. Based on David's communications to Todd on Friday, I am hopeful that it looks like he would like to deescalate and appreciate your assistance in this regard.

**Chasing Nightmares:**

- Please provide the long-form agreement (draft) with Shudder. If no long-form exists, then provide the closed terms email(s);

- Please provide emails, short-forms, and/or long-forms for the $500k in foreign sales you have told Todd about;

- Please provide email(s) with Grindstone since you referenced that they also made an offer for this project.

- Please provide an update on the $30K outstanding from SAG.

- Copy of the PPP denial letter.

**Undertaker's Wife:**

2

Exhibit H page 1

- Please provide emails, short-forms, and/or long-forms for the foreign sales you have told Todd about;

- Please provide all emails with Netflix and explain what happened to that offer;

- Please provide information and all emails with Media 4 Group that allegedly made a $300k offer in connection with these projects.

- Please provide the original sales estimates Giulia prepared when Stephen Moyer and Julie Benz were still attached.

- Please provide an update on the $14K outstanding from DGA.

- Original footage that was shot for the BTS that includes Todd and his wife.

- Copy of the PPP denial letter.

**Fallout**:

- Please be advised that if you do not sign the attached amendment (which has been outstanding since March and Harry said he would handle at the end of May), 828 intends to invoke its Power of Attorney to sign the amendment on the Borrower's behalf;

- More importantly, 828 Media Capital deposited $175,000 in the production account a few days before 828 hit pause on the production, and yet that money is no longer in the production bank account;

- In particular, my client needs an explanation for why a $30,000 check was written for Clear Horizon's "Rent Deposit" on March 4 (Clear Horizon's sales/market fee was not to be taken until the 4th tranche of this loan

**The Collected:**

- Current bank statements (and historical bank statements showing money in and out)

- Current Budget (which shall include a breakout for previously spent monies on phase 1 and proposed budget for phase 2, reflecting costs to address COVID)

- Foreign sales update

3

Exhibit H page 2

**Please provide the above requested information within forty-eight (48) hours of receipt of this email.** This list is not a comprehensive list of the outstanding demands for information from 828.

All rights remain reserved.

Zev

**RAMO** LAW PC

**Zev Raben, Esq.**

315 South Beverly Drive, Suite 210
Beverly Hills, California 90212
Assistant: 424.282.4534

Main Office: 310.284.3494 x 119

Fax: 310.861.5246

CONFIDENTIAL COMMUNICATION: E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof.

TAX ADVICE DISCLOSURE: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

David Brown
CEO, Clear Horizon
david@clearhorizonent.com
www.clearhorizonent.com

Exhibit H page 3

Exhibit U

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Submission Number 17089-837-505-115 was submitted on Monday, February 26, 2024 at 12:26:19 PM EST**

**This PDF was generated on Monday, February 26, 2024 at 12:26:30 PM EST**

Thank you for contacting the United States Securities and Exchange Commission.  This automated response confirms that your submission has been received successfully.  We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws.  Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process.  Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts.  Therefore, this may be the only response that you receive.  If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

**Q: Please select the option that best describes your complaint.**

**A:** Fraudulent investment scheme, such as a Ponzi scheme or the promise of high-yield returns

**Q: Please select the specific category that best describes your complaint.**

**A:** Ponzi / pyramid scheme

**Q: If a return on investment of any amount was guaranteed, what percentage was guaranteed?**

**A:** Unknown

**Q: If you are alleging offering fraud, how was the offer made?**

**A:** Personal message (email, voicemail, phone call)

**Q: Is this supplemental information to a previous complaint?**

**A:** No

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: In your own words, describe the conduct or situation you are complaining about.**

**A:** 828 Media Capital and Todd Lundbohm have been performing a Ponzi scheme since 2019. I have heard from MULTIPLE investors about their losses and his deflection. His go to is to sue them into submissions or to be quiet. I've been sued by Todd now 4 times on 4 different deals with him. He personally told me when asked what happens when you lose an investors money, he told me in person, that he takes money from Investor B to pay off Investor A. This is the very definition of a Ponzi scheme. He's also living on their funds. He takes their funds under the promise of some tax shelter/credit scheme. He then takes that money to lend out. He is not a SEC fund and not a licensed lender. But, he lends it out at 20% rates and high fees. Then sues the borrowers when they can't return the predatory fees. He buys $3 million dollar homes, flies private jets, etc. I know of four other lawsuits he's filed against parties to shut them up. I also know of 3 other investors who all lost money at his hands. He goes to accountants and CPAs and ask them to send him their high networth clients. He then gives them a kick back for each referral. His emails are: todd@828mediacapital.com toddlundbohm@yahoo.com todd@828productions.com His cell phone # is: (208) 912-4075 I also know he banks with Chase Bank and Wells Fargo. I have the account #'s if you need them. You have to stop this guy.

**Q: Are you having or have you had difficulty getting access to your funds or securities?**

**A:** Yes

**Q: Did you suffer a loss?**

**A:** Yes

**Q: Enter amount of loss to nearest dollar without characters (e.g., 15000, not $15,000.00).**

**A:** 200000

**Q: When did you become aware of the conduct? (m/d/yyyy)**

**A:** 02/05/2020

**Q: When did the conduct begin? (m/d/yyyy)**

**A:** 11/01/2019

**Q: Is the conduct ongoing?**

**A:** Yes

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Has the individual or firm acknowledged the conduct?**

**A:** Yes

**Q: How did you learn about the conduct? You may select more than one answer.**

**A:** Conversations

**Q: Have you taken any action regarding your complaint? You may select more than one answer.**

**A:** Legal action; Mediation; Arbitration

**Q: Provide details.**

**A:** 828 Media Capital and Todd Lundbohm have been performing a Ponzi scheme since 2019. I have heard from MULTIPLE investors about their losses and his deflection. His go to is to sue them into submissions or to be quiet. I've been sued by Todd now 4 times on 4 different deals with him. He personally told me when asked what happens when you lose an investors money, he told me in person, that he takes money from Investor B to pay off Investor A. This is the very definition of a Ponzi scheme. He's also living on their funds. He takes their funds under the promise of some tax shelter/credit scheme. He then takes that money to lend out. He is not a SEC fund and not a licensed lender. But, he lends it out at 20% rates and high fees. Then sues the borrowers when they can't return the predatory fees. He buys $3 million dollar homes, flies private jets, etc. I know of four other lawsuits he's filed against parties to shut them up. I also know of 3 other investors who all lost money at his hands. He goes to accountants and CPAs and ask them to send him their high networth clients. He then gives them a kick back for each referral. His emails are: todd@828mediacapital.com toddlundbohm@yahoo.com todd@828productions.com His cell phone # is: (208) 912-4075 I also know he banks with Chase Bank and Wells Fargo. I have the account #'s if you need them. You have to stop this guy.

## Who are you complaining about?

**Subject # 1**

**Q: Are you complaining about a person or a firm?**

**A:** Person

**Q: Where is the person that you are complaining about employed?**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** 828 Media Capital LLC

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**
**A:** Unknown

**Q: Person's Title**
**A:** Mr

**Q: First Name**
**A:** Todd

**Q: Last Name**
**A:** Lundbohm

**Q: Email Address**
**A:** toddlundbohm@yahoo.com

**Q: Website**
**A:** 828mediacapital.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
**A:** Yes

## Which investment products are involved?

**Q: Select the type of product involved in your complaint.**
**A:** Funds (e.g., ETFs, mutual funds, private equity funds, hedge funds)

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

## About you

**Submitter # 1**

**Q: Are you filing this tip under the SEC's whistleblower program?**

**A:** Yes

**Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**

**A:** No

**Q: First Name**

**A:** David

**Q: Last Name**

**A:** Brown

**Q: Email Address**

**A:** moviedavid1@gmail.com

**Q: What is the best way to reach you?**

**A:** Email

**Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**

**A:** No

**Q: Select the profession that best represents you.**

**A:** Other

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: For Other, please specify.**

**A:** Film Producer

**Q: Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?**

**A:** No

**Q: Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?**

**A:** No

**Q: Has anyone taken steps to prevent you from reporting this violation to the SEC?**

**A:** No

**Q: Are documents or other information being submitted that could potentially identify the whistleblower?**

**A:** No

**Q: Does the whistleblower want to be eligible to apply for a whistleblower award?**

**A:** Yes

**Q: 1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**

**A:** No

**Q: 2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or**

Page 6 of 8

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(52))?

**A:** No

**Q: 3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**

**A:** No

**Q: 4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**

**A:** No

**Q: 5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**

**A:** No

**Q: 6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**

**A:** No

**Q: 7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**

**A:** No

**Q: 8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**

**A:** No

**Q: I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand**



**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission
of information, my other dealings with the SEC, or my dealings with another authority in connection
with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or
representations, or use any false writing or document knowing that the writing or document contains any
false, fictitious, or fraudulent statement or entry.

**A:** Agree

Exhibit V

11:05

←        1 message        ☆

# RE: 8th Wonder / David Brown

**A**  **andrew@ocelotcapit...**  🛡 ✉ 10:28 AM

🔒 andrew@ocelotcapital.com

To: David Brown ▾

**\*For Private Discussion Purposes Only\***

As Manager of Ocelot Capital and 8th Wonder Pictures, I can affirm that David Bown has settled his personal liabilities with my companies and we are in good standing—we mutually wish to close this chapter and for success of all parties going forward. As it relates to prior claims made around improper uses of funds related to the Collected, it appears that an independent audit validates that Brown did not personally embezzle $3,000,000.

Regards,

Andrew Townsend

 Reply       Forward

                •••

Exhibit W

**Chad Darnell**



**Chad Darnell**

Facebook

You're not friends on Facebook

4 mutual friends including

Hi        . Apologies for the weird message but I need to talk to you about David Brown.

That is, if you are the        who hosted his podcast.

He is a con artist.

He's about to be taken down in the LA Times Anna Delvey style.

I only say this because I trusted him implicitly for years. And then I realized he was as a con artist.

He has stolen thousands and millions of dollars from every production he has touched

He stole $3M on The Collected.

She stole a half million on my film.



**Chad Darnell**

I only say this because I trusted him implicitly for years. And then I realized he was as a con artist.

He has stolen thousands and millions of dollars from every production he has touched

He stole $3M on The Collected.

She stole a half million on  my film.



He used me.

The LA Times is doing a massive expose on David. Separate yourself while you still can. This will not end well for him.

And he's starting the "David Brown Foundation" where the PayPal goes straight TO HIM?

This man is a con artist



Run.

Exhibit X

COMPANY TOWN

# A Hollywood producer says he makes 'dreams come true.' But fraud allegations dog him



David Brown Levy, at the center of the photo. (Jim Cooke / Los Angeles Times; photo courtesy of Isabel Mandujano)



BY NOAH GOLDBERG

STAFF WRITER  |  🐦 FOLLOW

MAY 16, 2023 **UPDATED** 4:08 PM PT

**FOR SUBSCRIBERS**

Bennett LeBarre was in a rush.

He had been brought on to a <u>David Duchovny project</u> as the line producer and needed a production accountant quickly.

In August 2022, he hired David Brown, who had reached out to him on previous projects. Brown, charming and confident, understood budgets, cash flow and union protocols, according to LeBarre.

LeBarre thought everything had gone smoothly after shooting wrapped for the film, "Bucky F*cking Dent," about a son who fakes a Boston Red Sox winning streak for his ill father. Soon after, however, he began receiving complaints about crew and background actors not being paid.

The production, it turned out, was over budget, and hundreds of thousands of dollars had been "stolen" by Brown, according to a lawsuit filmmakers filed against Brown in Los Angeles last month.

"He truly sets the house on fire and walks away," LeBarre said.



Over the last 14 years, Brown has faced repeated accusations of fraud and deceit that allegedly occurred in many of the productions he has worked on as accountant and producer, according to a review of court records and more than 30 interviews.

In a series of at least 10 lawsuits, two bankruptcy proceedings and two criminal cases in the last decade and a half, Brown and the companies he controls have been accused of forging Kevin Spacey's signature, skimming hundreds of thousands of dollars off the top of at least two productions, failing to pay crews and background actors and failing to pay back million-dollar loans he took out for projects.

In three of nine lawsuits alleging fraud by Brown, judges in Los Angeles and Tennessee have ordered the producer and his businesses to pay about $5 million.

In two of those cases, Brown and his companies have not paid back most of the money they owe, totaling nearly $4.75 million, said attorneys who sued him.

Brown said he had settled one of the cases amicably, though an attorney representing investors said he and his companies still owe his clients more than $3 million.

In the second case, Ed McPherson, a lawyer for the company Red Card LLC, says Brown owes the company more than $1.5 million.

"We are absolutely astonished that this man has promised to pay our client a very specific amount, at a very specific time, in a very specific manner, and has, once again, reneged completely," McPherson said.

A Los Angeles County Superior Court judge ordered Brown's companies to pay $1.36 million on Aug. 31, but McPherson said that amount is now more than $1.5 million including interest.

Other cases have been settled confidentially for undisclosed amounts or were taken to arbitration, and some remain open. None of the 10 cases has been dismissed by a judge in Brown's favor.

Brown is a small player in the niche world of independent filmmaking. He's produced and helped finance several low-budget movies — those that cost less than $10 million

to make — while working as a production accountant, handling payroll and overseeing cash flow on projects.

His best-known movie is film festival darling "The Fallout," which he helped produce, starring Jenna Ortega as a teenager who survives a school shooting. The film won the narrative feature competition at South by Southwest, burnishing Brown's resume.

While he admits making mistakes, Brown denies all the claims that have been made against him, chalking some up to misunderstandings. He blames most of his legal issues on an ex-boyfriend who died last year, though others dispute that.

"I had to work really hard to get where I am today," he wrote in an email. "I had to overcome a lot. I had to fight for my place. ... I'm not some bad guy."

Hollywood has long been a magnet for claims of fabrication such as those made by Brown's accusers. His story is emblematic of the hurried, run-and-gun world of low-budget films and aspiring filmmakers, in which a man who says he can fund a film is often taken at face value by doe-eyed Hollywood aspirants. Even among ambitious producers, though, it is unusual for someone with a history of allegations of financial misconduct to be associated with multiple projects.



Subscribers get exclusive access to this story

We're offering L.A. Times subscribers special access to our best journalism. Thank you for your support.

**Explore more Subscriber Exclusive content.**





David Brown on a location scout.  (Handout)

Brown, 37, has a deep knowledge of the film industry and loves to discuss movies but can be flighty and hard to reach when problems arise, LeBarre said.

"His favorite line is: 'Tomorrow,'" he said.

Brown lives in a one-story house in Sherman Oaks with his husband, who has posted photos of the two flying in private jets with their twin babies. They drive Teslas and Mercedes-Benzes, colleagues said.

"They enjoy a lavish lifestyle that includes travel on private jets, luxury homes in New York and California," said attorneys for 8th Wonder Pictures LLC in a lawsuit. 8th Wonder Pictures sued Brown in 2021 after lending him $3 million for a film and never getting it back, according to the suit. A judge ordered Brown's company to pay 8th Wonder Pictures $3.25 million in February.

Brown said that "we didn't see the revenues we had hoped" for because of theater closures caused by the COVID-19 pandemic.

His production company, Clear Horizon Entertainment, focuses on "first-time writer/director projects that would otherwise never be made," according to the company's now-defunct website.

But people who have worked with Brown tell a different story.

"He's a con artist and knows he can take advantage of [first-time filmmakers]," said Chris McGowan, a director who made Anne Heche's final movie, "Chasing Nightmares," with Brown. "Chasing Nightmares" was in postproduction in 2020 but has since become tied up in litigation between Brown and investors over claims of

fraud and stolen money. So has a second film Brown produced of McGowan's called "Flesh."

Brown said he was "sorry" to hear McGowan called him a "con artist."

"I've made not one, but two movies for Chris to write and direct," he said. "I gave Chris the chance to make his dreams come true. It's up to him to use these opportunities to further his career."

Brown said McGowan owes him thousands of dollars on the films, which McGowan says is untrue.

Brown was born in Tennessee to teen parents in 1986. He was named David Addison Brown, after the Bruce Willis character David Addison from the TV show "Moonlighting," according to a draft of a memoir he shared with The Times. A gay child who suffered physical and sexual abuse from an early age, Brown found solace in movies and hoped to escape to Los Angeles to try his hand in the industry, he wrote.

He moved to Los Angeles in 2007 to live with a man he met on Facebook while he was in college at Middle Tennessee State University, his memoir states. The man helped him get his start as a production assistant, but the relationship soured and Brown was arrested in 2010 in Massachusetts when the partner accused Brown of stealing his credit card, the memoir says.

Joshua Chelmo, who was with Brown in Boston as a production assistant, said Brown was trying to produce a film called "Dorchester Avenue," which Brown said Mark Wahlberg was attached to. They were staying with other crew at the Liberty Hotel while scouting locations. Chelmo and others were not being paid their salaries, and Brown even asked him to spot the crew for dinner, Chelmo said.



**The man who played Hollywood: Inside Randall Emmett's crumbling empire**

June 30, 2022

When the crew confronted Brown about the money issues, he locked himself in his hotel room and refused to speak with the crew, Chelmo and associate producer Dan DeSantis said. Brown denied the claim and said he did not recall being confronted.

DeSantis and two other crew members confirmed that the production had money issues and salaries were not paid. Brown said he reached out to crew members this year "asking them what they were owed so I could make it right."

The film's director and screenwriter, Ramon Hamilton, said Brown told him at the time a casting director had been able to attach Wahlberg to the film. DeSantis confirmed that Brown repeatedly told them Wahlberg was connected. But when Hamilton called the casting director about it, she said it was not true, according to Hamilton.

"She said, 'I have no idea what you're talking about,'" Hamilton said.

Brown told The Times that Wahlberg was never connected, though they did send an offer.

"It was pie-in-the-sky dreams," Brown said.

Brown declined to say whether he told the crew that Wahlberg had signed on to the movie.

Soon after, Brown was arrested by the Boston Police Department for allegedly skipping out on a $17,000 bill at the Liberty Hotel.

Brown claims that the hotel debt was discharged during his 2015 bankruptcy case and that the hotel never fought it. He spent two months in jail in Boston on charges he

claims were bogus, according to his memoir, which he titled "And Still, I Persevered ..."

The criminal case remains open and a pretrial hearing has been set for May 30, the district attorney's office said.



RJ Mitte was looking forward to acting alongside Kevin Spacey.

The two had signed on to star in 2015 in the low-budget indie film "Triumph," about a high school student with cerebral palsy who joins his school's wrestling team. For Mitte — who made his name playing Walter White Jr. on the iconic TV series "Breaking Bad" — the screenplay's focus on a disabled character was important because he has cerebral palsy in real life.

Mitte had met Brown on the set of his last film, "Who's Driving Doug," at which Brown was the unit production manager, said Mitte's manager at the time, Melinda Esquibel.

Brown told potential investors that he had booked a screening for the film, which hadn't been made yet, at the Sundance Film Festival in Utah, according to emails attached as exhibits in bankruptcy proceedings.

Spacey, who had not yet been accused of sexual misconduct and was at the height of his celebrity from "House of Cards," had agreed to act as the wrestling coach for just $100,000, according to producers on the film. He had a niece with cerebral palsy, so he would do the small-budget film for less than he usually made, Brown told investors, their lawsuit said.

But Spacey never signed on and was unaware of the production, said Joanne Horowitz, Spacey's former manager.

Brown had forged Spacey's signature onto a fake contract to induce Mitte and
investors to buy into the film, according to a civil lawsuit filed by investors against
Brown, bankruptcy court rulings and a Tennessee judge's ruling.

Brown denied forging Spacey's signature on the contract. He said someone else did,
without providing evidence, and blamed his ex for misleading him about Spacey's
interest in the project.

"We got [Spacey] through him," Brown said.

EXHIBIT "A"

CERTIFICATE OF ENGAGEMENT

Kevin Spacey

This Certificate of Engagement is hereby made a part of that certain agreement dated as of July 7, 2015 (the "Agreement") between Triumph Productions, LLC ("Company"), on the one hand, and Kevin Spacey ("Artist"), on the other hand, regarding the acting services of Artist in connection with the theatrical motion picture presently entitled "Triumph" ("Picture"). Should any terms in this Certificate of Engagement materially conflict with any terms described in the Agreement, the Agreement's terms shall prevail.

Executed as of July 7, 2015

ACKNOWLEDGED AND AGREED:

TRIUMPH PRODUCTIONS, LLC

By: _____

Its: Producer

Kevin Spacey

Screenshots of a certificate of engagement signed with a forged signature of Kevin Spacey. Investors alleged in a lawsuit that Brown had forged Spacey's signature onto a fake contract. Brown denied the claim.  (Los Angeles Times photo illustration; source: PACER)

But Horowitz said she was contacted solely by Brown and passed on the project. And the forged contract has Spacey's and Brown's names signed.

"The only guy that contacted me was a guy named David," she said, adding that she was "100% certain" it was Brown who asked to connect Spacey to the project.

You see paperwork, you see him and you're told things and you believe them because you have no reason to doubt them," Mitte said in an interview. "It was just one thing after another that continued to spiral out of control."

On the day Spacey was supposed to show up on set in Tennessee, another man was used to block off Spacey's scenes, Mitte said. Still, Mitte claimed that producers told him Spacey was coming.



RJ Mitte attends the premiere of Netflix's "El Camino: A Breaking Bad Movie" at Regency Village Theatre in 2019 in Westwood.  (Axelle / Bauer-Griffin / Getty Images)

After they were deep into filming, Esquibel said she learned that Spacey was not involved.

She called Horowitz, who informed her that Spacey had never taken the role, Esquibel said. Horowitz confirmed that Spacey's signature was forged onto the "Triumph" contract. She had declined to attach Spacey when Brown initially reached out about the film, she said.

Horowitz said she and Spacey's lawyer sent a cease-and-desist notice to the producers of "Triumph," requiring them to stop saying that Spacey would be in the film.

"I had a heart attack," Esquibel said. "I gagged. I didn't know what to say."

Brown finally did tell the crew that Spacey would not be involved.

## "It was just one thing after another that continued to spiral out of control."

**— RJ Mitte**

"Sometimes in this industry, talent availabilities change," he wrote in an email reviewed by The Times. "I know we all took on this job in hopes of working with our 'A list' talent, but, now that his availability has changed and he can't shoot till the first week of November, as a producer, I have a fiduciary responsibility to my investors to finish the movie."

Brown added that he would increase the day rate of all crew by $25. But many did not see the increased pay — or what they were previously owed, several crew members said.



David Brown in 2018. (Handout)

Dozens of people were never paid for some of their work, and production coordinator Ashley Amezcua calculated the missed pay exceeded $150,000, based on a spreadsheet she compiled that was reviewed by The Times.

Brown disputed the figure but didn't elaborate.

Investors in the film sued Brown in 2015, saying that they were duped into giving their money and that they were told Spacey's connection to the low-budget film would bring in big profits. Brown filed a Chapter 7 bankruptcy.

A Tennessee judge found in 2018 he committed fraud and ordered him to pay more than $1.7 million in damages.

"Defendant [Brown] engaged in actual fraud which has significantly damaged plaintiffs," wrote Judge Ellen Hobbs Lyle in an April 2018 decision.

A bankruptcy judge also found that Brown had committed fraud, but later lowered the amount he owed to $384,000. Brown says he paid off the debt: "I have honored the terms of the settlement."



Two years after "Triumph" was shot, Chad Darnell met Brown in Georgia on the set of "Killerman," a movie starring Liam Hemsworth. Darnell was the location casting director and found Brown, the production supervisor, friendly and responsive.

Brown offered to finance Darnell's debut, "The Undertaker's Wife."



Chad Darnell stands outside his home in Atlanta.  (David Walter Banks / For The Times)

Darnell shot the film in early 2020, but it was never sold or released because of disputes Brown had with investors, Darnell said. Brown has been sued by Todd Lundbohm, the investor behind "The Undertaker's Wife" and another Brown film. Lundbohm claims Brown transferred more than $500,000 in film funds to personal, unrelated bank accounts. He alleged in the suit that Brown owes more than $1.2 million in damages.

Brown has denied the claims. "Every penny of the $1.1m he financed in Undertaker was accounted for," Brown said in an email.

The case is pending.

Darnell had no idea that there had been any financial issues on "The Undertaker's Wife" until he was informed by The Times.

In April 2020, Brown decided to shoot Darnell's next film, "Intelligent." Darnell, who lives in Atlanta, came to Los Angeles in July 2020 to begin preparations for the film.

But Darnell said Brown continually delayed the shooting for almost three years while stringing the director and cast members along.



Feature film casting director Chad Darnell.  (David Walter Banks / For The Times)

Brown said a medical issue caused the delays and denied that he strung anyone along. "I'm disappointed to hear Chad slander and misrepresent facts," he said.

In January, 10 days before the start of filming for "Intelligent," agents and managers for lead actors Matthew Daddario and Katherine McNamara were asking for escrow, a common holding fee that actors receive before production. But Brown never sent it to the actors, Darnell said.

Because of this, the managers and agents pulled their talent from the film, Darnell said.

Brown claimed that it was a timing issue.

"We never escrowed talent because talent schedules never worked out," he said.

Texts and emails from the agents show them asking for the escrow money repeatedly. A person close to both actors, who was not authorized to speak publicly, denied Brown's claims and said the lack of escrow was the reason talent was pulled.



Meanwhile, Brown was struggling with other money issues. He was sued in November and then again in April over his role as production accountant on Duchovny's "Bucky F*cking Dent," with lawyers for the production accusing him of theft, wire fraud and more.

"You can tell he has experience," said LeBarre. "The irony is I think he could be a damn good accountant if he wanted to be."

But instead, the filmmakers allege in the suit that their production accountant had left them with massive money issues.

Actors, contractors and crew have gone unpaid ... because of you," wrote a lawyer for the film in a demand letter to Brown in November that was attached as an exhibit to his lawsuit.

The letter came weeks after LeBarre had been desperately texting Brown about payment problems.

"Not a single cast member has been paid, buddy," LeBarre wrote Brown in an Oct. 27 message viewed by The Times.

Brown did not respond to a series of messages from LeBarre about payments, according to the messages. Brown told The Times he believed everyone got paid.



David Brown, center, during a meeting in 2022.  (Handout)

The filmmakers accused Brown in the lawsuit of skimming more than $710,000 in production funds for himself by transferring them into accounts that were unrelated to the film. Brown did eventually return more than $500,000, attorneys for the film said. Brown also "unilaterally" hired his husband and sister to serve as accountants on the film, paying them salaries without letting the filmmakers know, the lawsuit says. He also paid himself a salary of $3,700 per week, according to the suit.

"Without authorization, he made the hires and paid his household even more money than the production funds he was simultaneously stealing," wrote Bucky Dent the Film LLC attorney Michael Mancini in the lawsuit filed in federal court in Los Angeles on April 3.

The case was initially filed in November, and in February, Brown agreed to return $197,500 he still owed. He sent a check to the filmmakers, which bounced because it was drawn against insufficient funds in Brown's bank account, according to the refiled lawsuit, which is pending.

Brown said he did not steal money from the film, which he said was over budget.

He said the check he sent that bounced was meant to be held, though he did not offer any proof, and he cited emails showing he worked with a card processor to promptly approve payments when he became aware of the problem.



Around the time producers with "Bucky F*cking Dent" said they discovered hundreds of thousands of dollars missing, Darnell had just started as a producer and casting director on "Untitled SLA," his third project with Brown.

The movie, about the abduction of Patricia Hearst, would be Brown's directorial debut, with a $7-million plus budget, according to documents viewed by The Times.

Meredith Petran took a job as a production coordinator on "Untitled SLA" after working with Brown on "Bucky F*cking Dent."

"He's very nice, charming, can be funny. He's definitely quick to respond to any slights. He gets really, really, really defensive and he has a volatile temper," she recalled.

"I've never been accused of having a tempter or being volatile. I actually pride myself [on my] kindness," Brown said in an email, misspelling "tempter." "I'm actually a really sensitive guy."

Petran was able to hire a crew for "Untitled SLA," which was supposed to film in early November. Much of the cast was hired. Travel was arranged and some of the talent was put up at hotels in Los Angeles, Petran said. But the date for shooting kept getting pushed — and the crew stopped getting paid, according to seven crew members and emails from the time reviewed by The Times.

Brown admitted that crew members weren't paid for the "last week or two weeks" on the project after financing fell through, but insists he paid out $160,000 of his own money to make crew members whole.

Corey Stram, a set decorator on the film, said he is still owed $8,500 for two weeks of work.

"He has delusions of grandeur," Stram said.

In their lawsuit, producers of "Bucky F*cking Dent" also accused Brown of using money from that film to fund "Untitled SLA."

A production services company also sued Brown in February in Georgia for fraud over "Untitled SLA," alleging the crew was not paid and it was left on the hook for hundreds of thousands in wages it says Brown owed.

Still, Brown said he was trying to make the movie.

"The film is trying to come back in July. Financing is being worked out as we speak," he said.



Feature film casting director Chad Darnell at his home in Atlanta.  (David Walter Banks / For The Times)

Darnell said that his experience on "Untitled SLA" was excruciating and that he also wasn't paid what he was owed for casting and working as a producer before the project fell apart.

After "Untitled SLA" fell through, he said, he finally realized he couldn't work with Brown.

He was broke and buried in credit card debt. He started driving for Uber and Lyft in
Atlanta.

"I believed him," Darnell said. "I absolutely believed him. And he betrayed that trust."



Most who worked on the 2015 production "Triumph" and the brief 2010 "Dorchester
Avenue" project with Brown had not heard from him for years, even more than a
decade for some, and had long since given up on receiving the hundreds or thousands
of dollars in compensation they say they were still owed.

But last month Brown sent messages to crew members on "Triumph" and
"Dorchester Avenue" saying he could send them the money they were owed any way
they like it — Venmo, Cash App, whatever — according to emails reviewed by The
Times.

There was just one catch. They had to sign a non-disclosure, non-disparagement
agreement.

---

**MORE TO READ**

FOR SUBSCRIBERS

### He sought justice for George Floyd. His next target? Record labels

Feb. 9, 2024



---

### Businessman Alki David ordered to pay $8.4 million in sexual assault case

Dec. 15, 2023



---

### Terrence Howard sues CAA for allegedly cheating him out of higher pay on 'Empire'

Dec. 8, 2023



 Noah Goldberg

Noah Goldberg covers breaking news for the Los Angeles Times. He worked previously in New York City as the Brooklyn courts reporter for the New York Daily News, covering major criminal trials as well as working on enterprise stories. Before that, he was the criminal justice reporter for the Brooklyn Eagle.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

Exhibit Y

1    RUSSELL LAW, PC
     L. David Russell (SBN 260043)
2    david@russelllawpc.com
     1500 Rosecrans Ave., Suite 500
3    Manhattan Beach, CA 90266
     Telephone:   (323) 638-7551
4

5    Attorneys for Respondents
     DAVID RAYMOND BROWN, LOCK THE DOOR, LLC,
6    CLEAR HORIZON ENTERTAINMENT, LLC, CLEAR
     ENTERTAINMENT, INC, CLEAR DISTRIBUTION
7    LLC, and SPECTER ENTERTAINMENT LLC

8

9                     **JAMS ARBITRATION**

10

11

| | |
|---|---|
| 12   828 MEDIA CAPITAL, LLC; 828 PRODUCTIONS, LLC; and TODD LUNDBOHM, | JAMS Ref No.: 1210038085 |
| 13 | |
| 14                  Claimants, | **NOTICE OF MOTION AND MOTION TO RECUSE AND DISQUALIFY CLAIMANTS' COUNSEL LOWE & ASSOCIATES FROM FURTHER PARTICIPATION IN JAMS ARBITRATION REF NOS. 1210038085 AND 1210037658; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 15      v. | |
| 16   DAVID RAYMOND BROWN; LOCK THE DOOR, LLC; NIGHTMARES PSC, LLC; | |
| 17   UNDERTAKER LLC; CLEAR HORIZON ENTERTAINMENT, LLC; CLEAR | |
| 18   ENTERTAINMENT, INC; CLEAR DISTRIBUTION LLC; SPECTER | |
| 19   ENTERTAINMENT LLC; and DOES 1 through | |
| 20   20, inclusive, | |
| 21 | |
| 22               Respondents. | |

23

24

25

26

27

28

1       NOTICE IS HEREBY GIVEN THAT on March 10, 2022 at 12:00 p.m., or as soon thereafter as

2  the matter may be heard, before Hon. Ann Kough, Respondents David Raymond Brown, Lock The Door,

3  LLC, Clear Horizon Entertainment, LLC, Clear Entertainment, Inc, Clear Distribution LLC, and Specter

4  Entertainment LLC (collectively, "Respondents") will, and hereby do move, for an order recusing and

5  disqualifying Claimants 828 Media, Capital, LLC, 828 Productions, LLC, and Todd Lundbohm's

6  (collectively, "Claimants'") counsel Lowe & Associates (the "Lowe Firm") from further participation in

7  this matter.  This motion is based on the grounds that— prior to and contemporaneously with the Lowe

8  Firm's representation of the Claimants in this arbitration (and the Respondent and Counter-Claimants in

9  JAMS Arbitration Ref No. 1210037658)—attorney Kris LeFan, who until January 2022 was "Of

10  Counsel" to the Lowe Firm, represented Respondent Mr. Brown and many of the other Respondents (and

11  Claimant and Counter-Respondents in the Ref No. 1210037658 arbitration).

12      At the February 4, 2022, conference call regarding this hearing, in response to the parties'

13  inquiry, Hon. Ann Kough stated that she was willing to make a ruling that would apply to both

14  arbitrations (Ref Nos. 1210038085 and 1210037658) if both parties agreed to that approach.  The parties

15  have since met and conferred and agreed that Hon. Ann Kough's ruling will be binding on both

16  arbitrations (Ref Nos. 1210038085 and 1210037658).

17      This motion is based upon the memorandum of points and authorities, the Declaration of David

18  Brown, the Declaration of L. David Russell, on the records and file herein, and on such evidence and

19  argument as may be presented at the hearing of the motion.

20      The motion will be heard telephonically and the following information can be used to access it:

21  LINK: https://meet.loopup.com/DRfa3uL / DIAL-IN: 1-855-633-2040 / ACCESS CODE: 2872262#.

22  DATED:  February 11, 2022        RUSSELL LAW, PC

23

24                    By: _____

25                      L. David Russell
                         Attorneys for Respondents

26

27

28

MOTION TO DISQUALIFY LOWE & ASSOCIATES

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ......................................................................................................6

II.   RELEVANT FACTUAL BACKGROUND.............................................................7

      A.    The Brown Parties Retain Kris LeFan As Counsel. ..................................7

      B.    Kris LeFan Is An Attorney At The Lowe Firm For Ten Years. .................8

      C.    The Lowe Firm Represents The 828 Entities In The Lock The Door And Fallout Arbitrations. ......................................................................................9

      D.    Mr. Brown Discovers On His Own That Mr. LeFan Is A Member Of The Lowe Firm........................................................................................................9

      E.    The Lowe Firm Terminates Its Of Counsel Relationship With Mr. LeFan.......................9

III.  LEGAL STANDARD...........................................................................................10

      A.    The Duty Of Loyalty Bars The Simultaneous Representation Of Clients With Adverse Interests And Subjects Attorneys Violating This Rule To Automatic Disqualification...............................................................................10

      B.    An "Of Counsel" Lawyer's Conflicts Are Imputed To The Law Firm. ...........................11

IV.   ARGUMENT..........................................................................................................12

      A.    The Lowe Firm Is Automatically Disqualified Because Of Kris LeFan's Concurrent Representation Of The Brown Parties. ..................................12

            1.    Both The Lowe Firm And Mr. LeFan Have Admitted The "Of Counsel" Relationship's Existence.............................................13

            2.    Mr. LeFan's Conflicts Are Imputed To The Lowe Firm. ....................15

            3.    Disqualification Of The Lowe Firm Is Automatic..................................16

V.    CONCLUSION......................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Antelope Valley Groundwater Cases*, 30 Cal. App. 5th 602 (2018)................................15

*Blue Water Sunset, LLC v. Markowitz*, 192 Cal. App. 4th 488 (2011).........................15

*Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796 (N.D. Cal. 2004)..........................16

*Erikson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996) .........................................16

*Eyster v. Lowenberg*, No. B149146, 2002 WL 31235427 (Cal. Ct. App. Oct. 4, 2002). ..............13, 15

*Flatt v. Sup. Ct.*, 9 Cal. 4th 275 (1994)..............................................9, 15

*Jeffry v. Pounds*, 67 Cal. App. 3d 11 (1977)...............................................9

*M'Guinness v. Johnson*, 243 Cal. App. 4th 602 (2015)..................................15

*Netlist, Inc. v. SK hynix Inc.*, No. 816CV01605JLSJCGX, 2016 WL 8905079 (C.D. Cal. Dec. 5, 2016).........................................................................14

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135 (1999)............. passim

*State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1431 (1999) ..........................9, 10, 14

*Yorn v. Sup. Ct,.* 90 Cal. App. 3d 669, 675 (1979) ......................................9


**<u>Other Authorities</u>**

CA Eth. Op. 1993-129 (1993)................................................................. passim


**<u>Rules</u>**

Cal. Evid. Code § 623 .........................................................................14

Cal. R. Prof. Conduct 1.5.1 ...................................................................14

Cal. R. Prof. Conduct 1.7 ......................................................................9

Cal. R. Prof. Conduct 1.7 Cmt. 1 ..............................................................9

Cal. R. Prof. Conduct 1.10 ...................................................................10

MOTION TO DISQUALIFY LOWE & ASSOCIATES

**Treatises**

Rutter Cal. Prac. Guide Prof. Resp. Ch. 3-E..................................................................9

Rutter Cal. Prac. Guide Prof. Resp. Ch. 4-B...........................................................11, 16

Rutter Cal. Prac. Guide Prof. Resp. Ch. 4-G ..............................................................9

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Lowe & Associates' (the "Lowe Firm's") "Of Counsel" attorney, Kris LeFan, represented Respondent David Brown and his companies in a number of matters over 2+ years.  In the middle of this representation, the Lowe Firm *simultaneously represented* parties *directly adverse* to Mr. Brown in this Arbitration and the related Fallout Arbitration.  The California Supreme Court and California Rules of Professional Conduct are clear that—because they *simultaneously represented directly adverse* parties—the Lowe Firm is automatically disqualified from participating in this Arbitration or the Fallout Arbitration.

*    *    *

In *November 2019*, David Brown retained attorney Kris LeFan and the law firm LeFan Law to represent Mr. Brown in "dispute resolution(s)."  Over the next 2+ years—*until January 2022*, Mr. LeFan represented Mr. Brown and his affiliated entities—including Clear Horizon Entertainment, LLC and Clear Distribution LLC (collectively, the "Brown Parties")—in connection with multiple disputes.  This included litigating and negotiating a settlement for one dispute that lasted *from November 2019 through December 2020*.  Throughout this entire time period, Mr. Brown viewed Mr. LeFan as "his lawyer," and contacted him on at least a monthly basis to seek legal advice and counsel.

Unbeknownst to Mr. Brown, *in March 2018*, Lowe & Associates (the "Lowe Firm") had designated Mr. LeFan as "Of Counsel" to their law firm.  By law, under the California Rules of Professional Conduct and California Supreme Court precedent, Mr. LeFan's conflicts were imputed to the Lowe Firm and Mr. LeFan was considered to be a fully-fledged member of that firm—like Mr. Lowe himself.  Thus, in *August 2020*, when the Lowe Firm began representing 828 Media Capital, LLC, 828 Productions, LLC, and Todd Lundbohm (collectively, the "828 Parties") who are adverse to the Brown Parties in the "Fallout" Arbitration, it constituted an improper representation of directly adverse parties, making the Lowe Firm subject to automatic disqualification.

Mr. Brown only learned of Mr. LeFan's affiliation with the Lowe Firm in *December 2021,* and his counsel promptly raised the issue to the Lowe Firm and requested that the firm recuse itself.  In meet-

MOTION TO DISQUALIFY LOWE & ASSOCIATES

1  and-confer discussions between the parties, the Lowe Firm's primary argument was that its designation

2  of Mr. LeFan as "Of Counsel" was mistaken—and that Mr. LeFan only had an "intermittent" and

3  "occasional" relationship with the firm.  This argument is rebutted, factually, by Mr. LeFan himself, who

4  recently confirmed that he served as "Of Counsel" to the Lowe Firm during the time period in question.

5  Moreover, the Supreme Court and Court of Appeal have rejected this same argument, explaining that

6  when a firm publicly designates a lawyer as "of counsel," that essentially represents to the public a close

7  and continuous relationship between the lawyer and the firm.  "*As a result, the need to preserve*

8  *confidentiality and public confidence in the integrity of the legal profession and judicial process*

9  *require that of counsel attorneys be regarded as the same as partners, associates, and members of law*

10  *firms for conflict of interest issues*."  *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20

11  Cal. 4th 1135, 1155 (1999) (emphasis added).

12        Accordingly, Respondents respectfully request that the Lowe Firm be disqualified from further

13  participation in the Fallout and Lock the Door Arbitrations.

14                      **II.       RELEVANT FACTUAL BACKGROUND**

15  **A.     The Brown Parties Retain Kris LeFan As Counsel.**

16        In October or November of 2019, Mr. Brown asked his production counsel for a referral to an

17  entertainment litigator, and was referred to Kris. LeFan.  Brown Decl. ¶ 3.  On or around November 13,

18  2019, Mr. LeFan signed a Retainer Agreement engaging Kris LeFan and the law firm LeFan Law to

19  represent him in "dispute resolution(s)[.]"  Brown Decl. ¶ 4, Ex. 1.  Pursuant to this Retainer Agreement,

20  Mr. LeFan represented the Brown Parties in multiple disputes, including:

21        (1)  In November 2019, Mr. LeFan began representing Clear Horizon Entertainment, LLC (a

22              Respondent in the Lock the Door Arbitration) in a confidential arbitration (JAMS Ref No.

23              1210037065) regarding Lock the Door, LLC's (another Respondent in the Lock the Door

24              Arbitration) ownership of the rights to make the Lock the Door film.  Brown Decl. ¶ 5, Ex. 2.

25              After the parties agreed to "pause" the arbitration, settlement discussions Mr. LeFan

26              conducted extended through December 2020.  Brown Decl. ¶ 5, Ex. 3.

27

28

(2) In February and March 2020, Mr. LeFan represented Mr. Brown with respect to a dispute with the financiers of Clear Distribution LLC (a Respondent in the Lock the Door Arbitration and a Counter-Respondent in the Fallout Arbitration) regarding that entities financing and the appointment of a receiver. Brown Decl. ¶ 6.[1]

(3) In December 2021, Mr. LeFan represented Mr. Brown individually in negotiations with a lender.

Besides representing the Brown Parties with respect to these specific disputes, Mr. LeFan routinely provided the Brown Parties with legal advice during this entire time period. Brown Decl. ¶ 8. Mr. Brown considered Mr. LeFan to be "his lawyer," and sought his advice on matters at least once a month and often more frequently. *Id.* During this time period, Mr. Brown provided Mr. LeFan confidential information regarding Mr. Brown, Clear Horizon Entertainment, Clear Distribution, and Lock the Door. *Id.*

**B.    Kris LeFan Is An Attorney At The Lowe Firm For Ten Years.**

Mr. LeFan was embedded as a member of the Lowe Firm for almost ten years. Mr. LeFan began working at the Lowe Firm as an associate in November 2012. Russell Decl., Exs. 4, 8. In October 2015, Mr. LeFan was promoted to the firm's partnership. Russell Decl., Ex. 9 at 2-3.[2] In August 2017, the Lowe Firm changed its name from "Lowe & Associates" to "Lowe | LeFan." Russell Decl., Ex. 3, 5. In March 2018, the Lowe Firm's name was changed back to "Lowe & Associates." Russell Decl., Ex. 3. At that point, and until January 2022, Mr. LeFan was listed on the Lowe Firm's website as being "Of Counsel" to the firm.[3] Russell Decl., Exs. 2, 6.

Mr. LeFan's personal LinkedIn profile confirms that he was "Of Counsel" to the Lowe Firm. On December 9, 2021, Mr. LeFan's profile stated that he worked as "Of Counsel" for the Lowe Firm from November 2012 through the present. Russell Decl., Ex. 7. As of February 8, 2022, Mr. LeFan updated

---

[1] The Lowe Firm misleadingly raised this dispute in Counter-Claimants Motion for Preliminary Injunction filed in the Fallout Arbitration. *See* Brown Decl. ¶ 6, Ex. 5. Judge Friedman denied the Motion, determining that these arguments were legally irrelevant. *See* Russell Decl., Ex. 11.

[2] According to Mr. Lowe, Mr. LeFan was only an income partner. Russell Decl., Ex. 3 at 1.

[3] At this point, Mr. LeFan also began working as a solo practitioner at his own law firm, LeFan Law. Russell Decl., Ex. 8.

his profile to be more specific: he worked at the Lowe Firm as an Associate from November 2012-October 2015; as a Partner from October 2015-March 2018; *and as Of Counsel from March 2018 through December 2021*. Russell Decl., Ex. 8.

**C.     The Lowe Firm Represents The 828 Entities In The Lock The Door And Fallout Arbitrations.**

The Lowe Firm began representing the directly-adverse 828 Parties in August 2020. Russell Decl., Ex. 2 at 2. The Demand for Arbitration in the Fallout Arbitration was submitted to JAMS and served on the Lowe Firm, as counsel for 828 Media Capital, LLC, on September 8, 2020. Russell Decl., Ex. 9. The Lowe Firm then filed a Counterclaim on February 25, 2021. Russell Decl., Ex. 10. The Lowe Firm filed the Arbitration Demand for the Lock the Door Arbitration on June 9, 2021.

**D.     Mr. Brown Discovers On His Own That Mr. LeFan Is A Member Of The Lowe Firm.**

In the first half of December 2021, Mr. Brown visited the Lowe Firm's website for the first time. Brown Decl. ¶ 10. He was surprised to see Mr. LeFan, his own attorney, listed as a member of the Lowe Firm as "Of Counsel." *Id.* This also upset Mr. Brown, who did not understand how his attorney could also be a member of a firm that was directly adverse to him in two arbitrations. *Id.* Mr. Brown was understandably concerned about whether any information relating to Mr. LeFan's representation of the Brown Parties—confidential or otherwise—was shared with the Lowe Firm. *Id.*

Because of these conflicts, Mr. Brown immediately contacted Mr. LeFan and asked him about the Lowe Firm. Brown Decl. ¶ 11. Mr. LeFan confirmed that, besides having his solo firm, he was "Of Counsel" to the Lowe firm. *Id.* Mr. LeFan also stated that he still did work for the Lowe firm, that they did work for his firm, and that he and the Lowe firm had a close and ongoing relationship. *Id.*

**E.     The Lowe Firm Terminates Its Of Counsel Relationship With Mr. LeFan.**

On December 17, 2021, counsel for the Respondents contacted the Lowe Firm to alert them of the conflict of interest. Russell Decl., Ex. 1. Subsequently, the Lowe Firm contacted Mr. LeFan and instructed him to terminate his representation of Mr. Brown. Brown Decl. ¶ 12; *see also* Russell Decl., Ex. 2. The Lowe Firm also terminated its "Of Counsel" relationship with Mr. LeFan and deleted Mr. LeFan's attorney profile from the Lowe Firm's webpage. *Id.*

MOTION TO DISQUALIFY LOWE & ASSOCIATES

## III. LEGAL STANDARD

**A.    The Duty Of Loyalty Bars The Simultaneous Representation Of Clients With Adverse Interests And Subjects Attorneys Violating This Rule To Automatic Disqualification.**

"The most fundamental quality of the attorney-client relationship is the absolute and complete fidelity owed by the attorney to his or her client." Rutter Cal. Prac. Guide Prof. Resp. Ch. 3-E (citing *Flatt v. Sup. Ct.*, 9 Cal. 4th 275, 289 (1994); *Yorn v. Sup. Ct,.* 90 Cal. App. 3d 669, 675 (1979)). "The primary purpose of the duty of loyalty is to encourage public confidence in the integrity of the legal profession." Rutter Cal. Prac. Guide Prof. Resp. Ch. 3-E. In conflict of interest situations, "[t]he duty of loyalty is the primary value at stake." *Id.* As the Court of Appeal has explained:

> A lay client is likely to doubt the loyalty of a lawyer who undertakes to oppose him in an unrelated matter. Hence the decisions condemn acceptance of employment adverse to a client even though the employment in unrelated to the existing representation. Basis of the condemnation is the client's loss of confidence, not the attorney's inner conflicts.

*Jeffry v. Pounds*, 67 Cal. App. 3d 6, 11 (1977); *see also State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1431 (1999) ("A client who learns that his or her lawyer is also representing a litigation adversary, even in a wholly unrelated matter, cannot be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship.")

Accordingly, Professional Conduct Rule 1.7(a) requires that, unless they have obtained informed written consent from each client, a lawyer "shall not . . . represent a client if the representation is directly adverse to another client in the same or a separate matter." *See also* Cal. RPC 1.7 Cmt. 1 ("The duty of undivided loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed written consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated.").

Thus, a lawyer's simultaneous representation of clients with adverse interests "in all but a few instances" necessitates disqualification. *Flatt,* 9 Cal. 4th at 285; *see also* Rutter Cal. Prac. Guide Prof. Resp. Ch. 4-G ("Automatic or 'per se' disqualification for simultaneous representation of current clients with adverse interests (and no informed written consent) is the rule "in all but a few instances."). An

1  attorney cannot "evade" this rule by withdrawing from the relationship with one of its clients. *State*

2  *Farm*, 72 Cal. App. 4th at 1431.  As long as an attorney represented clients with adverse interests

3  "simultaneously," the representation is considered concurrent. *Id.*

4  **B.    An "Of Counsel" Lawyer's Conflicts Are Imputed To The Law Firm.**

5          The rule forbiting the simultaneous representation of clients extends to every lawyer in a law

6  firm.  "While lawyers are associated in a firm, none of them shall knowingly represent a client when any

7  one of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9[.]"  CA ST RPC Rule

8  1.10.  This rule applies to lawyers a firm has designated "of counsel."  As the Supreme Court has held,

9  for purposes of conflicts of interest and disqualification, an "of counsel" attorney and the principal firm

10 must be considered "a single, de facto firm," so that if one of them is precluded from a representation

11 because of a conflict of interest, the other is presumptively precluded from the representation as well.

12 *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1154 (1999)

13 (emphasis added).

14         Indeed, identifying a lawyer as "of counsel" has a specific meaning and carries with it ethical

15 obligations.  First, the California Supreme Court has explained that an of counsel relationship is a "close,

16 personal, continuous, and regular relationship" between the law firm and the of counsel lawyer.

17 *SpeeDee*, 20 Cal. 4th 1135, 1154.  Thus, attorneys may only identify lawyers as "of counsel" when they

18 actually have a close enough relationship to justify that characterization.  As the California State Bar has

19 explained: "In order to avoid false, deceptive or confusing communications, a principal member or law

20 firm ('principal') may hold out another member or law firm as 'of counsel' *only where the relationship*

21 *between them is 'close, personal, continuous, and regular.'*"  CA Eth. Op. 1993-129 (1993) (endorsed

22 by the California Supreme Court in *SpeeDee*, 20 Cal. 4th at 1154) (emphasis added).  The Supreme Court

23 echoed the sentiment that holding someone out as "of counsel" affirmatively represents their availability

24 to work on matters for clients of the firm: ""[A] firm which lists an attorney as 'of counsel' on its

25 letterhead, shingle or listing is making an affirmative representation to its clients that the services of that

26 attorney are available to clients of the firm."  *SpeeDee*, 20 Cal. 4th at 1153.

27

28

And second, as explained above, "*one consequence of the maintenance of an 'of counsel' relationship is to make the principal and 'of counsel' constituents of the same de facto law firm for conflicts purposes.*" CA Eth. Op. 1993-129 (1993) (emphasis added). "Accordingly, *if the 'of counsel' is precluded from a representation by reason of rule 3-310[4] of the California Rules of Professional Conduct, the principal is presumptively precluded as well, and vice-versa.*" *Id.* (emphasis added). As the Supreme Court explained: "The close, personal, continuous, and regular relationship between a law firm and the attorneys affiliated with it as of counsel contains many of the same elements that justify the rule of vicarious disqualification applied to partners, associates, and members." *SpeeDee*, 20 Cal. 4th at 1135.

Thus, law firms are advised to "be cognizant of the ethical considerations" when "bring[ing] on an of counsel lawyer[.]" Building Your Law Firm Through Of Counsel Relationships, *available at https://www.lexisnexis.com/community/insights/legal/b/thought-leadership/posts/building-your-law-firm-through-of-counsel-relationships* (last accessed Feb. 8, 2022); *see also* To Be—Or Not To Be—"Of Counsel," *available at https://montagelegal.com/to-be-or-not-to-be-of-counsel/* ("Any attorney or law firm contemplating an 'of counsel' relationship must understand the ethical implications that the "of counsel" designation creates – most especially the conflicts of interest rules.") (last accessed Feb. 8, 2022).

## IV.    ARGUMENT

### A.    The Lowe Firm Is Automatically Disqualified Because Of Kris LeFan's Concurrent Representation Of The Brown Parties.

Here, it is undisputed that the 828 Parties are *directly adverse* to the Brown Parties in the Fallout and Locked the Door Arbitrations.[5] Indeed, in both Arbitrations the 828 Parties have asserted claims against the Brown Parties, all whom Mr. LeFan represented.

---

[4] Rule 3-310 was Rule 1.7's predecessor. Rule 1.7 replaced Rule 3-310 effective November 1, 2018.

[5] A "directly adverse" conflict arises a number of ways applicable here, including when the interests of the clients actually conflict or when a lawyer "[a]ccepts representation of a person in a matter in which an opposing party is a client of the lawyer or the lawyer's law firm." Rutter Cal. Prac. Guide Prof. Resp. Ch. 4-B (citing CRPC 1.7).

Moreover, it cannot seriously be contested that Mr. LeFan's representation of the Brown Parties was not concurrent with the Lowe Firm's representation of the 828 Parties. Mr. Brown retained Mr. LeFan on November 13, 2019 for representation with respect to "dispute resolution(s)[.]" Russell Decl., Ex. 1. Mr. LeFan represented the Brown Parties continuously from November 2019 until January 3, 2022, when Mr. LeFan invoked the termination provision in paragraph 3 of the Retainer Agreement. Brown Decl. ¶ 12, Ex. 1. During this entire time period, Mr. Brown considered Mr. LeFan "his lawyer," and reached out to him on at least a monthly basis to seek advice. Mr. LeFan also handled specific matters concurrent with the Lowe Firm's representation of the 828 Parties, *which began in August 2020*:

(1) A JAMS confidential arbitration where Mr. LeFan represented Clear Horizon Entertainment, which was initiated in November 2019 and where Mr. LeFan conducted settlement negotiations *through December 2020* (Brown Decl. ¶20, Exs. 2-3);

(2) A dispute involving Clear Distribution's financiers *in February and March 2021* (Brown Decl. ¶ 6); and

(3) A negotiation with a lender, where Mr. LeFan represented Mr. Brown individually in *December 2021* (Brown Decl. ¶ 7).

Thus, the only issues remaining that the Lowe Firm contests are (a) whether Mr. LeFan was an "Of Counsel" attorney at the Lowe Firm while the Lowe Firm simultaneously represented the 828 Parties, (b) whether Mr. LeFan's conflicts are imputed to the Lowe Firm, and (c) whether that conflict requires disqualification here. As explained below, the answer to all three questions is "yes."

**1.      Both The Lowe Firm And Mr. LeFan Have Admitted The "Of Counsel" Relationship's Existence.**

The best evidence of the Lowe Firm's and Mr. LeFan's relationship are the representations they made to the public. From March 2018 until early January 2022, the Lowe Firm affirmatively represented to the public that Mr. LeFan served as "Of Counsel" to the firm. Russell Decl., Exs. 2, 6. By doing so, the Lowe Firm was representing to the public that Mr. LeFan had a "close, personal, continuous, and regular" relationship with the firm (CA Eth. Op. 1993-129 (1993)) and that his services were "available"

to the Lowe Firm's clients (*SpeeDee*, 20 Cal. 4th at 1153).[6]  Mr. LeFan has confirmed that he served as

an "Of Counsel" attorney to the Lowe Firm during this time period.  Brown Decl. ¶ 11.  Mr. LeFan's

LinkedIn profile—which he revised just this past month after this dispute arose—affirms that he served

as Of Counsel to the Lowe Firm from March 2018 through December 2021.  Russell Decl. ¶¶ 9-10, Ex.

8.

The Lowe Firm's only response is that, despite its ongoing representations to the public, its

relationship with Mr. LeFan was not an actual "of counsel" relationship, but rather was "intermittent,

occasional, non-continuous and otherwise terminated."  Russell Decl., Ex. 2 at 3.  This self-serving

statement should not be credited.  Not surprisingly, in a similar case the Court of Appeal rejected similar

"disclaimers" as "an opportunistic change of heart in response to [a] motion to disqualify."  *Eyster v.*

*Lowenberg*, No. B149146, 2002 WL 31235427, at *3 (Cal. Ct. App. Oct. 4, 2002).

Most obviously, Mr. LeFan himself disagrees with this self-serving statement; he recently

updated his LinkedIn profile to reaffirm that he served as Of Counsel with the Lowe Firm until last

month.  *See* Russell Decl. ¶¶ 9-10, Ex. 8.  Additionally, the Supreme Court has imputed "a close,

personal, regular and continuous relationship between the firm and the of counsel attorney, "regardless of

the frequency with which [the attorney] and the [ ] firm formally associated for cases, or the

independence of the business aspects of their practices" because closeness is "inherent in designating an

attorney as of counsel to a firm[.]"  *SpeeDee*, 20 Cal. 4th at 1155; *Eyster*, 20002 WL 3123527 at *4.

Simply put, the "conflict of interest must be imputed to the [Lowe] firm *because of the public*

*designation of their relationship*."  *SpeeDee*, 20 Cal. 4th at 1156 (emphasis added).

Moreover, the Lowe Firm was able to profit from its representations to the public that the Lowe

Firm had another partner-level lawyer associated with the firm.  It also was able to take advantage of the

---

[6] It is unclear what representations the Lowe Firm made to the State Bar about Mr. LeFan's association with the firm.  The Lowe Firm has advised that it did not report Mr. LeFan to the State Bar as "Of Counsel" with the firm.  Russell Decl., Ex. 4 at 1.  However, when asked for more detail about how "the Lowe Firm's relationship with Mr. Lefan/LeFan's firm [was] reported to the bar from 2018 to the present in the Law Corporation Annual Report/Renewal Form" (including whether Mr. LeFan was counted as one of the attorneys covered by the Law Corporation Guarantee for security), the Lowe Firm declined to provide any information.  Russell Decl. ¶ 12, Ex. 4 at 1-2, Ex. 12.

MOTION TO DISQUALIFY LOWE & ASSOCIATES

looser fee-splitting rules that of counsel attorneys enjoy with their firms.[7] After benefiting from these representations for years, the Lowe Firm should not be allowed to suddenly disavow the "Of Counsel" relationship's existence. *See* Cal. Evid. Code § 623.

Finally, the Lowe Firm seems to argue that—because Mr. LeFan was terminated from his Of Counsel position in January 2022—any ethical lapse on their part is excused because the relationship was terminated. *See* Russell Decl., Ex. 1 at 3. The California courts have been clear, however, that an attorney cannot evade disqualification by withdrawing from the relationship with one of its clients. "Thus, the attorney cannot avoid the automatic disqualification rule applicable to concurrent representation by unilaterally converting a present client into a former client prior to the hearing on the motion for disqualification." *State Farm*, 72 Cal. App. 4th at 1431. Accordingly, when determining whether the automatic disqualification rule applies, "a court should evaluate the conflict of interest at the time it arose, not at the time a disqualification motion is adjudicated in court." *Netlist, Inc. v. SK hynix Inc.*, No. 816CV01605JLSJCGX, 2016 WL 8905079, at *4 (C.D. Cal. Dec. 5, 2016).

### 2. Mr. LeFan's Conflicts Are Imputed To The Lowe Firm.

As Justice Mosk explained: "An attorney who is designated of counsel to a law firm should be subject to the same rules as a partner or associate of the firm for conflicts purposes. ***This is a bright-line rule.*** We need not inquire into the particulars of the of counsel relationship in question." *SpeeDee Oil*, 20 Cal. 4th at 1156 (J. Mosk, concurring) (emphasis added). Thus, for purposes of conflicts of interest and disqualification, an "of counsel" attorney and the principal firm are considered "a single, de facto firm." *SpeeDee Oil*, 20 Cal. 4th at 1154. "Accordingly, if the 'of counsel' is precluded from a representation by reason of rule 3–310 of the California Rules of Professional Conduct, the principal is presumptively precluded as well, and vice-versa." *Id.* (quoting CA Eth. Op. 1993-129 (1993)).

The application of this bright-line rule here is clear and simple—the Lowe Firm and their designated "Of Counsel" attorney, Mr. LeFan, are considered to be one firm for conflict purposes. The Lowe Firm's arguments that Mr. LeFan has his own firm and does not share expenses or office space

---

[7] The Lowe Firm admitted that it pays Mr. LeFan fees for referring cases. Russell Decl., Ex. 2 at 2. Lawyers who are in the same firm, like Mr. LeFan and the Lowe firm, are able to split fees without written agreement and client consent. *See* CRPC 1.5.1.

with the Lowe Firm misses the point entirely. The "public designation" of the "of counsel" lawyer—not the barriers physically separating those lawyers' practices—is what matters. *SpeeDee*, 20 Cal. 4th at 1142; *Eyster*, 20002 WL 3123527 at *4. Indeed, the "of counsel" attorney in the *SpeeDee* case presented evidence that he had a completely separate law practice from the principal firm. *SpeeDee*, 20 Cal. 4th at 1142. Following *SpeeDee*, the Court of Appeal rejected a similar argument, where a law firm denied "a close, personal, regular and continuous relationship with" their designated of counsel lawyer "because they no longer share office space, have not had common clients in several years, and have no common employees." *Eyster*, 2002 WL 31235427, at *4. The Court of Appeal explained that the closeness of the relationship "is inherent in designating an attorney as of counsel to a firm[.]"[8] *Id.*

### 3. Disqualification Of The Lowe Firm Is Automatic.

A law firm's simultaneous representation of clients with adverse interests "in all but a few instances" necessitates disqualification, which should be "*per se*" or "automatic." *Flatt*, 9 Cal. 4th at 285 (1994). This is true even if "the simultaneous representations may have nothing in common, and there is no risk that confidences to which counsel is a party in the one case have any relation to the other matter[.]" *Id.* And it is true where "an attorney of counsel to the firm creates the conflict." *SpeeDee*, 20 Cal. 4th at 1139. "Regardless whether any attorneys in the [principal] firm apart from [the of counsel lawyer] were actually exposed to client's confidences or instituted any formal "ethical screen" to preserve confidentiality*, disqualification in these circumstances was automatic*, as a breach of the twin duties of loyalty and confidentiality owed by an attorney to his client. *SpeeDee*, 20 Cal. 4th at 1156 (J. Mosk, concurring) (emphasis added). Accordingly, California courts have time and time again held that automatic disqualification must be applied in concurrent representation cases. *See, e.g., Antelope Valley Groundwater Cases*, 30 Cal. App. 5th 602, 617 (2018); *M'Guinness v. Johnson*, 243 Cal. App. 4th 602, 614-15 (2015); *Blue Water Sunset, LLC v. Markowitz*, 192 Cal. App. 4th 477, 488 (2011).

---

[8] The State Bar has taken this principle even further and stated that that two totally separate firms that share the same "of counsel" lawyer "will all be viewed effectively as constituents of one de facto firm." CA Eth. Op. 1993-129.

1    The automatic disqualification remedy is driven by the duty of loyalty and "the need to preserve

2    confidentiality and public confidence in the integrity of the legal profession and judicial process[.]"[9]

3    *SpeeDee*, 20 Cal. 4th at 1155.  The per se disqualification rule is also required "not only for acting

4    improperly, but also for failing to avoid the appearance of impropriety."  *Erikson v. Newmar Corp.*, 87

5    F.3d 298, 303 (9th Cir. 1996) (quotations omitted).

6    All these factors are implicated here.  After he learned of Mr. LeFan's affiliation with the Lowe

7    Firm, Mr. Brown felt blindsided that his attorney of two years, whom he shared confidential information

8    with, was a member of a firm which subsequently represented parties directly adverse to him in the

9    Fallout and Lock the Door Arbitrations.  Brown Decl. ¶ 10.  Accordingly, Mr. Brown was—and is—

10   concerned about his counsel's loyalty to him and whether (even inadvertently) any information or

11   confidences disclosed to the Lowe Firm.  *Id.*  These concerns have increased because: (a) the

12   discrepancies in how Mr. LeFan and the Lowe Firm have described their relationship; (b) Mr. Brown has

13   no way to verify independently the information the Lowe Firm provided; and (c) the Lowe Firm has

14   refused to provide relevant information regarding its relationship with Mr. LeFan.  Brown Decl. ¶ 14.

15   Accordingly, even if the Lowe Firm's disqualification was not automatic here—which under Supreme

16   Court precedent it is—the disqualification remedy is warranted here.

## V.    CONCLUSION

17

18   For the foregoing reasons, Respondents respectfully request that the Lowe Firm be disqualified

19   from further participation in the Fallout and Lock the Door Arbitrations.

20

21

22

23

24

---

25   [9] "The ban on concurrent representation of clients with conflicting interests (absent informed written
26   consent) is directed at preserving the attorney's duty of loyalty (rather than the duty of confidentiality) to
     the client.  Thus, the fact that the law firm has instituted screening procedures or an 'ethical wall' to
27   prevent a breach of confidentiality is irrelevant in concurrent representation cases."  Rutter Cal. Prac.
     Guide Prof. Resp. Ch. 4-B (citing *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 821-822 (N.D. Cal.
28   2004)).

1

DATED:  February 11, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSSELL LAW, PC

By: _____

L. David Russell
Attorneys for Respondents

MOTION TO DISQUALIFY LOWE & ASSOCIATES

## PROOF OF SERVICE

I declare as follows:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1500 Rosecrans Avenue, Suite 500, Manhattan Beach, California 90266. On February, 11, 2022, I served the documents described as **NOTICE OF MOTION AND MOTION TO RECUSE AND DISQUALIFY CLAIMANTS' COUNSEL LOWE & ASSOCIATES FROM FURTHER PARTICIPATION IN JAMS ARBITRATION REF NOS. 1210038085 AND 1210037658; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties in this action as follows:

☐  **(BY U.S. MAIL)** I am personally and readily familiar with the business practice of Russell Law, PC for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐  **(BY OVERNIGHT DELIVERY)** I am personally and readily familiar with the business practice of Russell Law, PC for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☐  **(BY PERSONAL DELIVERY)** By causing true copies of the document(s) listed above to be personally served at the address(es) set forth below on this date by First Legal Support Services.

☒  **(BY ELECTRONIC SERVICE)** By electronically mailing a true and correct copy through Russell Law, PC's electronic mail system to the email addresses set forth below.

Lowe & Associates, P.C.
Steven T. Lowe, Esq.
Vikram Amritraj, Esq.
Tim Everton
8383 Wilshire Blvd., Suite 1038
Beverly Hills, CA 90211
T: (310) 477-5811
F: (310) 477-7672
steven@lowelaw.com
vikram@lowelaw.com
tim@lowelaw.com
*Attorneys for Counter-Claimants*

Executed on February 11, 2022. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
L. David Russell

19

MOTION TO DISQUALIFY LOWE & ASSOCIATES

Exhibit Z



**Steven T. Lowe
Attorney**
Steven@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California

310-477-5811

January 6, 2022

***Via First Class US Mail and Email***

L. David Russell
Russell Law PC
1500 Rosecrans Ave., Suite 500
Manhattan Beach, CA 90266
David@RussellLawPC.com

Re:     ***Response to Request for Disqualification of Lowe & Associates in the (1) Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and (2) 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085) Matters***

Dear Mr. Russell:

As promised, the following shall respond to your letter of December 17, 2021:

**1.    This Appears to Be a "Set Up"**

Conspicuously absent from your letter of December 17, 2021, is any mention of when the services *concluded* that were initiated via the retainer agreement of November 19, 2019, with LeFan Law. Upon information and belief, those services concluded long before our firm started representing 828. Please advise on the specifics of the representation including the precise length.

According to your letter, in February 2021, approximately six (6) months after our firm began representing 828 (and also six months after Mr. Brown had constructive and actual knowledge that our firm was representing 828), Mr. Brown intentionally engaged Mr. LeFan a second time, knowing that Mr. LeFan was identified as "of counsel" on our firm's website. This retention was a pretext accomplished for the sole purpose of creating a potential conflict. Mr. Lefan's firm does not disclose to me or my firm what clients he

January 6, 2022
Page 2 of 6

is bringing in, nor do we, as *we have completely separate firms* (as more fully set forth hereinbelow).

Thus, the engagement of LeFan Law in February 2021 was just a ruse, where Brown already knew that we were representing 828, for Brown to use later as he saw fit. The disqualification request *ten (10) months later*, is an obvious "set up" with no actual merit or substance whatsoever. In that regard, as "of counsel", please advise how long that second engagement allegedly lasted and the amount allegedly paid to LeFan Law therefor.

2.    **LeFan Law ("LeFan") and Lowe & Associates ("Lowe") are Completely Separate Firms that Occasionally Do Business Together**

The following is undisputed:

a)    LeFan and Lowe do not share offices. The Firms are completely separate with separate identities, separate addresses of record with the State Bar, separate clients, expenses and liabilities. That has been the case since LeFan terminated his association with Lowe in March 2018.

b)    Neither Lowe nor LeFan make court appearances for the other.

c)    Lowe and LeFan are not currently working on any cases together and have not been co-counsel of record on any cases since June 2020. (Other than a case which had Lowe's name and LeFan's name as counsel but neither Lowe or LeFan ever worked on the case.)

d)    Since August 2020 (i.e., the date that Lowe started representing 828), Lowe has:

   i.    Provided minimal consultation on two cases that LeFan is handling of which LeFan is the sole counsel of record;

   ii.   Provided minimal consultation on two transactional matters (i.e., the total value of those services was minimal, i.e., $5,000.00 or less);

e)    LeFan occasionally refers cases to Lowe for which LeFan is paid referral fees but is not co-counsel of record and has zero involvement whatsoever in the handling of the cases.

That is the extent of the relationship between the Lowe and LeFan Firms during the entire approximately 1.5 years that Lowe has been representing 828. At no time has LeFan ever discussed Brown (or his matters) with Lowe and no confidential information has ever been transmitted. In fact, Lowe was not aware that LeFan was representing

Brown. LeFan conducts his own affairs, completely separate from Lowe. There is no
intention for Lowe and LeFan to work together in the future, and LeFan will be removed
from the Lowe website as "of counsel", **effective January 7, 2022**. This was previously
discussed with LeFan but inadvertently not accomplished along time ago.

Under California Rules of Professional Responsibility regarding the definition of
"Firm" or "Law Firm":

> "[w]hether a lawyer who is denominated as 'of counsel' or by a similar
> term should be deemed a member of a law firm for purposes of these rules
> will also depend on the specific facts. Compare *People ex rel. Department
> of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th
> 1135 with *Chambers v. Kay* (2002) 29 Cal.4th 142.)
> California Rules of Professional Responsibility, Rule 1.0.1, Comment 2.

Thus, the designation of a lawyer by a law firm as 'of counsel' is not a *per
se* determination that conflicts of interest may be imputed between the of counsel
lawyer and the firm; the specific facts matter. As set forth in *Chambers, supra* 29
Cal.4th, at 150, even though two lawyers "shared certain office space and
facilities," because "the two maintained independent law practices with separate
identities, separate addresses of record with the State Bar, and separate clients,
expenses, and liabilities…even though [they] worked together . . . [on] a few []
cases, they were not members of the same law firm as defined by the Rules of
Professional Conduct." *Id.*, at 150; *See* California Rules of Professional
Responsibility, Rule 1.0.1, Comment 2.

Your letter cites to *Speedee Oil Change Systems, supra* 20 Cal. 4th 1135 in
support of your argument for disqualification. However, the relationship in *Speedee Oil*
of the of counsel attorney (Disner) and firm (Shapiro Firm) is readily distinguishable
from the present case.

First, in *Speedee Oil*, Disner and the Shapiro Firm represented adverse parties in
the same litigation. Here, you've listed two (2) matters in which LeFan allegedly
represented David Brown and one of his entities, Clear Horizon Entertainment, LLC.
Both of these matters are entirely separate and unrelated to the matters in which the Lowe
Firm represents the 828 Parties.

Second, the *Speedee Oil* Court found that the Disner and the Shapiro Firm were, in
fact, engaged in an of counsel relationship such that they had a ***close, personal,
continuous and regular relationship***. *Speedee Oil Change Systems, Inc.*, *supra* 20
Cal.4th 1135 (emphasis added). As set forth above, the relationship between the Lowe
and LeFan Firms is intermittent, occasional, non-continuous and otherwise terminated.

Third, the *Speedee Oil* Court found that Disner and the Shapiro firm had obtained "confidential information from parties on opposite sides of the same litigation during overlapping periods of time." *Id.*, at 1135. Such is not the case here. See *Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 680 (material confidential information is that which is 'directly at issue in' or has 'some critical importance to, the second representation'). See also *Canatella v. Krieg, Keller, Sloan, Reilley & Roman LLP* (N.D.Cal. Mar. 13, 2012, No. C 11-05535 WHA) 2012 U.S.Dist.LEXIS 33606, at *6-7 (plaintiff provided no evidence that attorney shared any confidential information, only alleging that he assumed there was an exchange of information providing no supporting facts. Court found it unlikely due to "unrelated nature of the two different representations.")

Here, LeFan's representation of Clear Horizon in 2019 in relation to ownership rights of a film covers separate and distinct issues from Lowe's representation of 828 (which did not begin until August 2020, well after Lowe and LeFan stopped working as co-counsel on any cases, and also, upon information and belief, after LeFan's representation concluded). See *Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453 (disqualification of a law firm was not warranted on the basis that two of its attorneys might have seen financial information of the opposing party while making loans years earlier; there was no likelihood that the opposing party's outdated financial information could be used to the opposing party's disadvantage). According to your letter, LeFan's representation of Brown personally in 2021 "with respect to a dispute involving financiers of Clear Distribution LLC . . . [and] individually in negotiation with a lender" also does not suggest that there was any imaginable substantial relationship to Lowe's representation of 828 in the arbitrations. Therefore, under the foregoing authority, Lowe's minimal contacts with LeFan, the separateness of the two firms, combined with the lack of any substantial relationship between the matters, there is no requirement of disqualification.

3. **The Burden Upon 828 to Obtain New Counsel After Lowe's Representation of 828 in Two Highly Complex Ongoing Arbitration Matters Over Approximately 1.5 Years is Unduly Burdensome, Oppressive and Prejudicial**

As a practical matter, what will be obtained by disqualification? Lowe already has obtained a plethora of information about Brown (none of which came from LeFan). All of that information will be passed along to new counsel, which will probably be a larger and more aggressive firm than Lowe. However, the expense of doing so will be tremendous. *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 300 ("It must be kept in mind that disqualification usually imposes a substantial hardship on the

January 6, 2022
Page 5 of 6

disqualified attorney's innocent client, who must bear the monetary and other costs of finding a replacement.")

"Although courts must preserve the high standards of the legal profession, courts should also consider the client's right to choose his counsel and the harm to the client caused by an order of disqualification." *In re Airport Car Rental Antitrust Litigation* (1979) 470 F. Supp. 495, 502-03. "A client whose attorney is disqualified incurs a loss of time and money in being compelled to retain new counsel who in turn have to become familiar with the prior comprehensive investigation which is the core of modern complex litigation. The client moreover may lose the benefit of its longtime counsel's specialized knowledge of its operations." *Id.* (citing *Government of India v. Cook Industries, Inc.* (2d. Cir. 1978), 569 F.2d 737, 739). Furthermore, motions for disqualification are often used for strategic purposes. *In re Airport Car Rental Antitrust Litigation*, *supra* 470 F.Supp., at 503 (citing *Allegaert v. Perot* (2d. Cir. 1977) 565 F.2d 246, 251.

Here, the Lowe Firm has represented 828 for roughly 1.5 years and is currently counsel of record in two (2) arbitration proceedings with respect to 828's loans and investments in no less than four (4) films. The Lowe Firm, primarily via Mr. Amritraj, has undertaken extensive investigation into the complexities of the facts, documents, communications and data with respect to the issues in these matters. Disqualification of the firm would be overly burdensome and oppressive to 828 and there is no material confidential information that has been disclosed by LeFan that would affect Lowe's representation of 828.

Furthermore, there is zero benefit to either side. Upon information and belief, LeFan is no longer representing Brown, LeFan will no longer even be "of counsel", and Lowe and LeFan are not currently working on any cases or matters together. There is no current intent to work on any cases of matters in the future. It is Brown who has apparently kept this information in his hip pocket for over a years (as to the alleged November 2019 representation) and ten months (as to the alleged February 2021 representation). He should be estopped from raising it now. It is purely a tactical move asserted for "strategic purposes".

Finally, as you know, Vikram Amritraj primarily handles all 828 matters. In fact, you and I were first introduced in response to your letter of December 17, 2021, after you had been representing Brown, et al. for at least one month. That is because I am not on the front lines with these cases. Moreover, Mr. Amritraj has had extremely limited and sparse contact with LeFan since June 2020, *before* Lowe started representing 828. See *Adams v. Aerojet-General Corp.* (2001) 86 Cal. App. 4th 1324 (court improperly disqualified lawyer based on presumption of imputed knowledge).

January 6, 2022
Page 6 of 6

Do not hesitate to contact me regarding the foregoing.

All rights *reserved.*

LOWE & ASSOCIATES

Steven T. Lowe, Esq.

**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media
Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

**Date:** Monday, January 24, 2022 at 4:05:17 PM Pacific Standard Time

**From:** Vikram Amritraj

**To:** David Russell

**CC:** steven@lowelaw.com, tim@lowelaw.com

David:

To answer your questions from your January 10, 2022 email:

1. Since the formation of his firm, Steven Lowe has been the sole 100% owner. The name change to Lowe LeFan
occurred in August 2017, and was just that - a name change. The Lowe LeFan dba was utilized for a total of 7 months
until March 2018. At that point, Lowe Law APC resumed utilizing the Lowe & Associates name. At no time was LeFan
ever a shareholder nor did Lowe and LeFan ever form a 'partnership' under the law. LeFan never participated in the
costs/profits of the firm as a shareholder or partner at any time. Since I've been with the firm, the firm has always
utilized the name Lowe & Associates.

2. We decline to provide any of our communications with the State Bar other than what is publicly available
information.

3. Mr. Lowe's recollection is that he and LeFan had a conversation about removing LeFan from the Lowe & Associates
website in about mid 2020; however, as it didn't appear to be a pressing issue at the time, it was not actually
accomplished until recently in January 2022.

4. I can confirm that at no time have Mr. LeFan and I ever discussed any David Brown matters.

Additionally, in response to your January 19, 2022 email and based upon your representations therein, and in your
previous communications:

A. It appears LeFan provided an extremely minimal amount of services throughout the course of representation of
Brown and Clear Horizon, which boils down to sending a handful of emails to a few third parties on behalf of David
Brown and Clear Horizon Ent. LLC. You also state that LeFan "provided advice throughout the 2+ years he represented
Mr. Brown," but provide no context for what matters he allegedly provided such advice. Please provide copies of all
the LeFan billing statements showing the amount of work/nature of services LeFan allegedly provided to Clear
Horizon and Brown.

B. In your letter dated December 17, 2021, you allege that LeFan represented only Clear Horizon Ent. LLC in late 2019,
and then later represented only Brown in 2021 with regards to several narrow matters unrelated to the 828 dispute.
However in your January 19, 2022 email, you conflictingly allege that LeFan "entered into a Retainer Agreement with
**Mr. Brown** in November 2019 to represent **Mr. Brown** in 'dispute resolutions.' Despite the foregoing, in the same
email you allege that LeFan represented "**Mr. Brown/Clear Horizon Entertainment LLC**" in a dispute that lead to a
JAMS arbitration initiated **in November 2019**." Due to your conflicting representations, it is unclear who/what
entities you are alleging LeFan represented at what times. Please provide a copy of the November 2019 Retainer
Agreement referenced in your January 19, 2022 email.

C. Re the "set up": A simple google search of Kris LeFan turns up his prior association with Lowe & Associates **on the
very first page of results**. Even if Brown somehow (unbelievably) waited approx. 1.5 years to look at the Lowe &
Associates website, it's quite another thing to allege that your client never once looked up his own attorney online.
Brown clearly knew of LeFan and Lowe's prior relationship and stayed silent until now. He should be estopped from
moving to disqualify the Lowe firm.

**Page 1 of 6**

We will await your responses; however, we hope that you choose to refocus your efforts in this case towards the actual issues instead of causing our respective clients to expend unnecessary time and resources on what can only be described as a sideshow.

CONFIDENTIALITY NOTICE: This electronic message transmission contains information from Lowe & Associates, P.C. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

On Wed, Jan 19, 2022 at 8:08 PM David Russell <david@russelllawpc.com> wrote:

> Steve,
>
> Thank you for your patience. (My kids' preschools shutting down last week complicated my schedule greatly.) But the information you requested is below:
>
> 1.    Mr. LeFan entered into the Retainer Agreement with Mr. Brown in November 2019 to represent Mr. Brown in "dispute resolution(s)." Under the Retainer Agreement, Mr. LeFan represented Mr. Brown beginning on November 13, 2019 and ending on January 3, 2022. This included:
>
>> • (a) representing Mr. Mr. Brown/Clear Horizon Entertainment LLC in a dispute that lead to a JAMs arbitration that was initiated in November 2019. The arbitration was stayed while the parties pursued settlement, and *as late as December 19, 2020,* Mr. LeFan sent emails to opposing counsel on Mr. Brown's behalf regarding settlement.
>>
>> • (b) representing Mr. Brown with respect to a dispute with the financiers of Clear Distribution February and March 2021; and
>>
>> • (c) representing Mr. Brown last month in negotiations with a lender.
>
> In addition, Mr. LeFan also provided advice throughout the 2+ years he represented Mr. Brown. Mr. LeFan's representation of Mr. Brown under the Retainer Agreement lasted until January 3, 2022, when Mr. LeFan contacted Mr. Brown to terminate his firm's services.
>
> 2.    There was no "set up." Mr. Brown was unaware of Mr. LeFan's affiliation with the Lowe firm until December 2021, when Mr. Brown went onto the Lowe firm's website out of curiosity.

**Page 2 of 6**

I hope that these additional facts demonstrate why Mr. LeFan continuously represented Mr. Brown, and why under the Rules of Professional Conduct your firm must recuse itself here.  We await your response and the additional facts we requested, but in the meantime I will email JAMS to begin the process of reserving hearing dates, should they be needed.

Also, I hope that you are in good health and recovering from your bout with COVID.

Best,

David

---

**From:** David Russell <david@russelllawpc.com>
**Date:** Wednesday, January 12, 2022 at 2:55 PM
**To:** Steven Lowe <steven@lowelaw.com>
**Cc:** Tim Everson <tim@lowelllawpc.com>, Vikram Amritraj <vikram@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

Hi Steve,

I understand and am hoping you have a mild case and recover quickly.

Best,

David

---

**From:** Steven Lowe <steven@lowelaw.com>
**Date:** Wednesday, January 12, 2022 at 11:50 AM
**To:** David Russell <david@russelllawpc.com>
**Cc:** Tim Everson <tim@lowelaw.com>, Vikram Amritraj <vikram@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

David:

I was just tested positive for COVID this morning so things may be a tad delayed.

Steven T. Lowe

**Page 3 of 6**

Lowe & Associates, P.C.
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
(310) 477-5811

On Tue, Jan 11, 2022, 8:04 PM David Russell <david@russellawpc.com> wrote:

Steve,

Thanks for your email.  I'm not trying to play games or hide the ball here; I'm gathering the information you requested (which is being somewhat delayed by childcare issues arising from this new wave of the pandemic). And I trust that you are gathering the information I requested.

If you want me to give you answers to your questions first, so be it—I am just trying to get all the information out so we can try to see if there is a way to resolve this issue short of motion practice.

I hope to get back to you in the next couple of days.

Best,

David

**From:** Steven Lowe <steven@lowelaw.com>
**Date:** Monday, January 10, 2022 at 2:44 PM
**To:** David Russell <david@russelllawpc.com>
**Cc:** tim@lowelaw.com <tim@lowelaw.com>, Vikram Amritraj <vikram@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

David:

Thank you for email. Cooperation is a two way street. I had several requests for information contained in my January 6th letter. Any chance that I could get a response to those questions first?

Page 4 of 6

Kind regards,



(Bio Here)

**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

On Mon, Jan 10, 2022 at 10:38 AM David Russell <david@russelllawpc.com> wrote:

Steve,

I am in receipt of your January 6, 2022 letter, which I am still reviewing.  Thank you for meeting and conferring with me meaningfully on this issue.  I would like clarification of a few points:

- You wrote that "LeFan terminated his association with Lowe in March 2018."  From my research, it appears that--before this date--Mr. LeFan was a named partner with your firm, which was then named "Lowe LeFan."  Can you please provide more information regarding Mr. LeFan's role(s) with your firm from 2017 to the present, including when he ceased serving the firm as "Of Counsel"?  I understand that you must have reported Mr. LeFan's role(s) with your firm to the State Bar.  Could you please provide your firm's Law Corporation Annual Reports and Renewal Forms for 2019 through the present, to the extent Mr. LeFan's role was reported to the state bar?  I'm not interested in any information other than Mr. LeFan's role, so the rest of the forms could be redacted.

- You wrote that removing LeFan from the Lowe website "was previously discussed with LeFan but inadvertently not accomplished a long time ago."  Could you please advise (a) when this discussion took place and (b) when the decision was made to remove Mr. LeFan from the website?

- I assume you have discussed the disqualification issue with Mr. Amritraj, and he has confirmed that he has had no discussions and shared no information with Mr. LeFan regarding these matters or my clients.  Can you please confirm?

Best,

David

From: tim@lowelaw.com <tim@lowelaw.com>

Page 5 of 6

**Date:** Thursday, January 6, 2022 at 5:44 PM
**To:** David Russell <david@russelllawpc.com>
**Cc:** 'Steven Lowe' <steven@lowelaw.com>, 'Vikram Amritraj' <vikram@lowelaw.com>
**Subject:** Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828
Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

Good Afternoon Mr. Russell,


In connection with the above referenced matters, please see the attached.


Thank you.

(www.lowelaw.com)

**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates. which may be
confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be
aware that any disclosure, copying, distribution or use of the content of this information is prohibited.  If you have received this
communication in error, please notify us immediately by e-mail and delete the original message and any attachments without
reading or saving in any manner. Thank you in advance for your cooperation.

**Page 6 of 6**

**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media
Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)
**Date:** Monday, February 7, 2022 at 9:34:43 PM Pacific Standard Time
**From:** David Russell
**To:** Vikram Amritraj
**CC:** steven@lowelaw.com, tim@lowelaw.com

Hi Vikram,

As Mr. Lowe said, cooperation is a two-way street.  We will provide all the evidence we are relying on no later
than Friday, when we file our motion.

Kris LeFan was not a member of my law firm, so I don't understand your third point.  But if you are serious
about filing a disqualification motion against my firm, I'm happy to meet and confer in more detail.

Regards,
David

---

**From:** Vikram Amritraj <vikram@lowelaw.com>
**Date:** Monday, February 7, 2022 at 4:25 PM
**To:** David Russell <david@russelllawpc.com>
**Cc:** steven@lowelaw.com <steven@lowelaw.com>, tim@lowelaw.com <tim@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828
Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

David:

First, in my email of January 24, 2022, I requested the retainer agreement between LeFan Law and Mr.
Brown, as well as all billing statements. Are you planning to produce those to us and, if so, by when?

Second, as I mentioned in the same email, we decline to provide any of our communications to the State Bar
other than what is publicly available. However, as I already told you, at no time has Mr. LeFan (or his firm)
been reported to the State Bar as of counsel with our firm.

Third, it occurs to me that if you proceed with your intended motion, your firm would also be subject to
disqualification.

Hypothetically, and purely based on your reasoning for your intended motion, just like LeFan could have (but
didn't) convey any confidential information about Brown to us (because based on your communications, he
couldn't have obtained any such info relevant to the 828 disputes), LeFan, theoretically, could have conveyed
confidential information about 828 (were he privy to any, which he wasn't) to your client, or to you. While
purely hypothetical, even if your claims had a shred of merit (which they don't), a conflict would also exist
with Mr. Brown and your firm.

Best,

**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates, P.C. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

On Fri, Feb 4, 2022 at 3:05 PM David Russell <david@russelllawpc.com> wrote:

Thank you Vikram—two follow up questions seeking clarification:

- How was the Lowe firm's relationship with Mr. Lefan/LeFan's firm reported to the bar from 2018 to the present in the Law Corporation Annual Report/Renewal Form?

- Was Mr. LeFan counted as one of the attorneys covered by the Law Corporation Guarantee for security in the Law Corporation Annual Report/Renewal Form in the years 2018, 2019, 2020, and 2021?  For example—for 2021 were three lawyers listed for the Lowe firm (Mr. Lowe, you, Ms. Hilvert) or four?

Best,
David

**From:** Vikram Amritraj <vikram@lowelaw.com>
**Date:** Friday, February 4, 2022 at 1:15 PM
**To:** David Russell <david@russelllawpc.com>
**Cc:** steven@lowelaw.com <steven@lowelaw.com>, tim@lowelaw.com <tim@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

David,

Per our phone call earlier, and to answer some of your questions in your January 10, 2022 email: Please be advised that at no time has Mr. LeFan ever been reported to the State Bar as 'Of Counsel' with our firm. Mr. LeFan has also not been included on our malpractice insurance since he left Lowe & Associates in March 2018.

Best,

**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates, P.C. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

On Mon, Jan 24, 2022 at 4:05 PM Vikram Amritraj <vikram@lowelaw.com> wrote:

David:

To answer your questions from your January 10, 2022 email:

1. Since the formation of his firm, Steven Lowe has been the sole 100% owner. The name change to Lowe LeFan occurred in August 2017, and was just that - a name change. The Lowe LeFan dba was utilized for a total of 7 months until March 2018. At that point, Lowe Law APC resumed utilizing the Lowe & Associates name. At no time was LeFan ever a shareholder nor did Lowe and LeFan ever form a 'partnership' under the law. LeFan never participated in the costs/profits of the firm as a shareholder or partner at any time. Since I've been with the firm, the firm has always utilized the name Lowe & Associates.

2. We decline to provide any of our communications with the State Bar other than what is publicly available information.

3. Mr. Lowe's recollection is that he and LeFan had a conversation about removing LeFan from the Lowe & Associates website in about mid 2020; however, as it didn't appear to be a pressing issue at the time, it was not actually accomplished until recently in January 2022.

4. I can confirm that at no time have Mr. LeFan and I ever discussed any David Brown matters.

Additionally, in response to your January 19, 2022 email and based upon your representations therein, and in your previous communications:

A. It appears LeFan provided an extremely minimal amount of services throughout the course of representation of Brown and Clear Horizon, which boils down to sending a handful of emails to a few third parties on behalf of David Brown and Clear Horizon Ent. LLC. You also state that LeFan "provided advice throughout the 2+ years he represented Mr. Brown," but provide no context for what matters he allegedly provided such advice. Please provide copies of all the LeFan billing statements showing the amount of work/nature of services LeFan allegedly provided to Clear Horizon and Brown.

B. In your letter dated December 17, 2021, you allege that LeFan represented only Clear Horizon Ent. LLC in late 2019, and then later represented only Brown in 2021 with regards to several narrow matters unrelated to the 828 dispute. However in your January 19, 2022 email, you conflictingly allege that

**Page 3 of 7**

LeFan "entered into a Retainer Agreement **with Mr. Brown** in November 2019 to represent **Mr. Brown** in 'dispute resolutions.' Despite the foregoing, in the same email you allege that LeFan represented "**Mr. Brown/Clear Horizon Entertainment LLC**" in a dispute that lead to a JAMS arbitration initiated **in November 2019**." Due to your conflicting representations, it is unclear who/what entities you are alleging LeFan represented at what times. Please provide a copy of the November 2019 Retainer Agreement referenced in your January 19, 2022 email.

C. Re the "set up": A simple google search of Kris LeFan turns up his prior association with Lowe & Associates **on the very first page of results.** Even if Brown somehow (unbelievably) waited approx. 1.5 years to look at the Lowe & Associates website, it's quite another thing to allege that your client never once looked up his own attorney online. Brown clearly knew of LeFan and Lowe's prior relationship and stayed silent until now. He should be estopped from moving to disqualify the Lowe firm.

We will await your responses; however, we hope that you choose to refocus your efforts in this case towards the actual issues instead of causing our respective clients to expend unnecessary time and resources on what can only be described as a sideshow.



**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates, P.C. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

On Wed, Jan 19, 2022 at 8:08 PM David Russell <david@russelllawpc.com> wrote:

Steve,

Thank you for your patience. (My kids' preschools shutting down last week complicated my schedule greatly.) But the information you requested is below:

1.      Mr. LeFan entered into the Retainer Agreement with Mr. Brown in November 2019 to represent Mr. Brown in "dispute resolution(s)." Under the Retainer Agreement, Mr. LeFan represented Mr. Brown beginning on November 13, 2019 and ending on January 3, 2022. This included:

·  (a) representing Mr. Mr. Brown/Clear Horizon Entertainment LLC in a dispute that lead to a JAMs arbitration that was initiated in November 2019. The arbitration was stayed while the parties pursued settlement, and *as late as December 19, 2020*, Mr. LeFan sent emails to opposing counsel on Mr. Brown's behalf regarding settlement.

·  (b) representing Mr. Brown with respect to a dispute with the financiers of Clear Distribution February and March 2021; and

**Page 4 of 7**

(c) representing Mr. Brown last month in negotiations with a lender.

In addition, Mr. LeFan also provided advice throughout the 2+ years he represented Mr. Brown. Mr. LeFan's representation of Mr. Brown under the Retainer Agreement lasted until January 3, 2022, when Mr. LeFan contacted Mr. Brown to terminate his firm's services.

2.      There was no "set up." Mr. Brown was unaware of Mr. LeFan's affiliation with the Lowe firm until December 2021, when Mr. Brown went onto the Lowe firm's website out of curiosity.

I hope that these additional facts demonstrate why Mr. LeFan continuously represented Mr. Brown, and why under the Rules of Professional Conduct your firm must recuse itself here. We await your response and the additional facts we requested, but in the meantime I will email JAMS to begin the process of reserving hearing dates, should they be needed.

Also, I hope that you are in good health and recovering from your bout with COVID.

Best,
David

**From:** David Russell <david@russelllawpc.com>
**Date:** Wednesday, January 12, 2022 at 2:55 PM
**To:** Steven Lowe <steven@lowelaw.com>
**Cc:** Tim Everson <tim@lowelaw.com>, Vikram Amritraj <vikram@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

Hi Steve,

I understand and am hoping you have a mild case and recover quickly.

Best,
David

**From:** Steven Lowe <steven@lowelaw.com>
**Date:** Wednesday, January 12, 2022 at 11:50 AM
**To:** David Russell <david@russelllawpc.com>
**Cc:** Tim Everson <tim@lowelaw.com>, Vikram Amritraj <vikram@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

David:

I was just tested positive for COVID this morning so things may be a tad delayed.

Steven T. Lowe
Lowe & Associates, P.C.
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
(310) 477-5811

On Tue, Jan 11, 2022, 8:04 PM David Russell <david@russelllawpc.com> wrote:

Steve,

Thanks for your email. I'm not trying to play games or hide the ball here; I'm gathering the information you requested (which is being somewhat delayed by childcare issues arising from this new wave of the pandemic). And I trust that you are gathering the information I requested.

If you want me to give you answers to your questions first, so be it—I am just trying to get all the information out so we can try to see if there is a way to resolve this issue short of motion practice.

I hope to get back to you in the next couple of days.

Best,
David

---

**From:** Steven Lowe <steven@lowelaw.com>
**Date:** Monday, January 10, 2022 at 2:44 PM
**To:** David Russell <david@russelllawpc.com>
**Cc:** tim@lowelaw.com <tim@lowelaw.com>, Vikram Amritraj <vikram@lowelaw.com>
**Subject:** Re: Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

David:

Thank you for email. Cooperation is a two way street. I had several requests for information contained in my January 6th letter. Any chance that I could get a response to those questions first?

Kind regards,

🖼
(Bio Here)
**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

On Mon, Jan 10, 2022 at 10:38 AM David Russell <david@russelllawpc.com> wrote:

Steve,

I am in receipt of your January 6, 2022 letter, which I am still reviewing.  Thank you for meeting and conferring with me meaningfully on this issue.  I would like clarification of a few points:

- You wrote that "LeFan terminated his association with Lowe in March 2018."  From my research, it appears that--before this date--Mr. LeFan was a named partner with your firm, which was then named "Lowe LeFan."  Can you please provide more information regarding Mr. LeFan's role(s) with your firm from 2017 to the present, including when he ceased serving the firm as "Of Counsel"?  I understand that you must have reported Mr. LeFan's role(s) with your firm to the State Bar.  Could you please provide your firm's Law Corporation Annual Reports and Renewal Forms for 2019 through the present, to the extent Mr. LeFan's role was reported to the state bar?  I'm not interested in any information other than Mr. LeFan's role, so the rest of the forms could be redacted.

- You wrote that removing LeFan from the Lowe website "was previously discussed with LeFan but inadvertently not accomplished along time ago."  Could you please advise (a) when this discussion took place and (b) when the decision was made to remove Mr. LeFan from the website?

- I assume you have discussed the disqualification issue with Mr. Amritraj, and he has confirmed that he has had no discussions and shared no information with Mr. LeFan regarding these matters or my clients.  Can you please confirm?

Best,
David

**From:** tim@lowelaw.com <tim@lowelaw.com>
**Date:** Thursday, January 6, 2022 at 5:44 PM
**To:** David Russell <david@russelllawpc.com>
**Cc:** 'Steven Lowe' <steven@lowelaw.com>, 'Vikram Amritraj' <vikram@lowelaw.com>
**Subject:** Fallout, LLC et al. vs. 828 Media Capital, LLC et al. (JAMS Ref. # 1210037658) and 828 Media Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No. 1210038085)

Good Afternoon Mr. Russell,

In connection with the above referenced matters, please see the attached.

Thank you.

**Error! Filename not specified.**
(www.lowelaw.com)
**CONFIDENTIALITY NOTICE:** This electronic message transmission contains information from Lowe & Associates. which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

Exhibit AA

# LeFan Law

A Professional Corporation
1925 Century Park East
Suite #2140
Los Angeles, California 90067
(213) 290-1091
kris@lefanlaw.com

## RETAINER AGREEMENT

The undersigned ("CLIENT") wishes to retain LeFan Law, PC (also referred to here as "ATTORNEYS" or "LeFan Law") for dispute resolution(s) (the "Matter"). The filing of any lawsuit and/or appearance in any administrative matter (i.e., arbitration) will require a separate retainer agreement.

1.    EFFECTIVE DATE
This agreement will not take effect, and LeFan Law, PC will have no obligation to provide legal services, unless and until CLIENT returns a signed copy of this agreement by email to kris@lefanlaw.com and provides the initial retainer called for in par. 2 to LeFan Law, PC (the "Effective Date").

2.    INITIAL RETAINER
█████████████████████████████████

3.    DISCHARGE AND WITHDRAWAL
CLIENT may discharge LeFan Law at any time and LeFan Law may terminate LeFan Law's services at any time but only in accordance with our professional obligations. ███████████████████████



4.    HOURLY RATES
████████████████████████████████████

5.    BILLING
███████████████████████████



6.    **DISCLAIMER OF GUARANTEE**



7.    **JURISDICTION AND VENUE**

8.    **INSURANCE DISCLOSURE**





Agreed and accepted by:

Date:   November 13, 2019

David Brown

2 of 2

Exhibit BB

(tel:3104775811)

 (https://lowelaw.com)



# Kris S. LeFan

## Of Counsel

Kris S. LeFan, an attorney skilled in advanced and creative dispute resolution (including crisis management) with an emphasis on entertainment and business law, has been with the firm since 2012.



Mr. LeFan was raised in San Francisco's Mission District. He received his bachelor's degree from the Goodman School of Drama at DePaul University in Chicago, where he went on to perform at the Tony Award-winning Steppenwolf and Chicago Shakespeare theaters, among others.

Mr. LeFan earned his Juris Doctorate at the accelerated SCALE® Program at Southwestern Law School, where he founded the Student Mediation Association and lead the Trial Advocacy Honors Program team to 1st place in an ABA mock trial competition. After graduating, Mr. LeFan received his mediation certification from the Straus Institute for Dispute Resolution at Pepperdine School of Law.

Since graduation, Mr. LeFan was a Certified Law Clerk for the Hardcore Gang Division, the Preliminary Hearing Unit and Major Crimes division of the Los Angeles District Attorney's Office, winning over a dozen preliminary hearings for the office. As a Reserve Deputy City Attorney for the Los Angeles City Attorney's Office Criminal Division, Mr. LeFan negotiated plea deals and conducted domestic violence jury trials.

Mr. LeFan's cases at Lowe & Associates include:


(https://lowelaw.com)

- White v Dr. Dre, Suge Knight, Snoop Dog, Warren G
- Hessnice v Freemantle Media
- From the Heart v Playboy International Enterprises
- Justin Pope v Fetty Wap and the Remy Boyz
- Pitchdark v Starz, Addition and Joey Graceffa
- Hitbound Music v BBC
- Hedda Muskat v CAA
- Carmen Trutanich v. John Shallman
- Parallel Entertainment, Inc. v. John Caparulo
- Michael Williams v Broad Daylight, LLC
- Tamara Johnson v. Vernon Lynch
- Stephen Hendricks v. BBC America
- Abrams Artists v. Zak Bagans
- Bernard Hiller v. Informant Media
- Laura Lake v. Los Angeles City Attorney Mike Feuer
- Jane Doe v. Sony Pictures Entertainment
- Tyler Chapman v. City of LA; LA DWP

Mr. LeFan's other notable clients include a state Supreme Court Judge, blockbuster movie star James Marsden, multi-platinum selling West Coast rap icon, Warren G, preeminent talent agency Rebel Entertainment Partners, hip hop originators Kurtis Blow, Gizmo (later "You-Can-Ask-Giz") and Positive K, historic recording studio Hollywood Sound Recorders, street artist Louis Carreon, and living legend tattoo artist, Mark Mahoney.

Along with judging local law school moot court and mock trial competitions, Mr. LeFan is a professor of entertainment law at Relativity Film School and has been a legal commentator on NBC Sports Radio. Mr. LeFan's pro bono work includes parole board hearings for a "lifer" in Corcoran State Prison and defending evictions of vulnerable tenants.

Mr. LeFan is also a member of the prestigious California Society of Entertainment Attorneys (CSEL), whose work includes United States Supreme Court amicus briefs, statewide legislative activities, and the strategic leveling of the playing field between artists and multinational conglomerates.

Prior to becoming an attorney, Mr. LeFan was a Special Program Director for the United Nations High Commissioner for Refugees (UNHCR), where he directed a program with Sudanese refugees ("the Lost Boys") at Sherkole Refugee Camp in Ethiopia's Blue Nile region on how to avoid landmines and other unexploded ordinances during their repatriation. He has been cultural attache to the late Professor Donald N. Levine of the University of Chicago on peacebuilding missions in the Middle East, Africa and South America. Mr. LeFan also co-founded the Awassa Youth Campus and Peace Dojo, a community center in Southern Ethiopia, dedicated to grassroots HIV/AIDS education, gender equality and peace studies through the practice of aikido.

# Recommendations (tel:3104775811)

**Donald N. Levine, PhD, Peter B. Ritzma Professor Emeritus of Sociology and former dean of the College, University of Chicago**

As an acknowledged expert on conditions in an important region of the world, over the past 20 years I have been involved in numerous cases involving Americans who come from that region. In my work, I have had occasion to collaborate with some two-dozen lawyers from all over the U.S. Mr. LeFan ranks with the very best of these, including several who are his senior by decades. Given a choice, I would pick LeFan over any of them. He is sharp, quick, alert, knowledgeable, and congenial. At present, Mr. Le Fan has taken on a criminal case that has perplexed a number of attorneys over the course of several years. Not long ago he joined me on a visit to the client in prison. Although I have previously visited the client a number of times, LeFan found ways to expedite the admissions process, of which I had not previously known. Once there, I found it comforting to see how quickly and competently he moved to take charge of the case. During a two-hour visit at the prison, he gained the confidence of the inmate, and assembled a good deal of pertinent information, which led him to develop a scenario for securing the client's parole beyond which I had realized was possible. I heartily recommend this energetic, smart, and promising young attorney.

– Donald N. Levine, PhD, Peter B. Ritzma Professor Emeritus of Sociology and former dean of the College, University of Chicago

**Nicholas Rosenberg Criminal Defense Attorney**

Kris Le Fan is a dynamic and knowledgeable lawyer who fights for his clients and forges relationships that benefit his clients. I recommend him as a criminal defense attorney who also practices Entertainment Law, a field in which he is a vigorous advocate and polished negotiator.

– Nicholas Rosenberg Criminal Defense Attorney

Home (https://lowelaw.com/)

The Firm (https://lowelaw.com/the-firm/)

Blogs (https://lowelaw.com/blogs/)

Privacy Policy (https://lowelaw.com/privacy-policy/)

Contact Us (https://lowelaw.com/contact-us/)

© 2020 Lowe & Associates. All Rights Reserved.

12/9/21, 11:20 AM

Kris S. LeFan - Lowe & Associates - Attorneys at Business Law

8383 Wilshire Boulevard, Suite 1038
(tel:3104775811)Beverly Hills, CA 90211

(310) 477-5811 (tel:3104775811)

 (https://www.facebook.com/LoweLaw90211/)
(https://lowelaw.com/)

 (https://twitter.com/LoweLaw)

(https://www.instagram.com/loweassociates/)

(https://www.linkedin.com/company/lowe-
associates/)

Exhibit CC

  

Home    My Network    Jobs



**Kris S. LeFan** (He/Him)
Business and Entertainment Attorney

More    Message    Follow



## Kris S. LeFan (He/Him) · 2nd
Business and Entertainment Attorney

- LeFan Law, PC
-  Southwestern University School of Law

Los Angeles, California, United States · Contact info

**11,016** followers · **500+** connections

8 mutual connections: Jerren Wright, Claudia Trevisan (she/her), and 6 others

Follow    Message    More

## Activity
11,016 followers

    Kris S. shared this

    **Surgeon general warns of emerging youth mental health crisis in rare public advisory**
Kris S. shared this

    **What's Really Behind Global Vaccine Hesitancy**
Kris S. shared this

(74) Kris S. LeFan | LinkedIn

 

1

Home    My Network    Jobs

 **Kris S. LeFan** (He/Him)
Business and Entertainment Attorney

More    Message    Follow

 US billionaire surrenders $70m of stolen art

Kris S. shared this

 **Unofficial Trump Propagandist Devin Nunes Makes It Official**

Kris S. shared this

See all activity

## About

Legal Strategies for Creative People

## Experience

### Principal
LeFan Law, PC
Mar 2017 – Present · 4 yrs 10 mos

 **Dr. Dre's Three Alleged Mistresses Want No...**

 **Songwriter claims that The Weeknd's 'Starbo...**

### Of Counsel
Lowe & Associates, PC
Nov 2012 – Present · 9 yrs 2 mos
8383 Wilshire Boulevard Suite 1038 Beverly Hills, California 90211

Business and Entertainment Litigation

 **'Orphan Black' Production Company...**

 **City Attorney Carmen**

 



Home    My Network    Jobs

 **Kris S. LeFan** (He/Him)
Business and Entertainment Attorney

More    Message    Follow

Jun 2012 – Nov 2012 · 6 mos
City Hall East 200 Main Street Los Angeles, CA 90012

Criminal Prosecution

 **Certified Law Clerk**
Los Angeles County District Attorney's Office
Mar 2011 – Jan 2012 · 11 mos

 **Prosecutor: South LA serial killer Hughes...**

 **8 inmates charged with directing deadly jail riot**

 **Assistant to Professor Emeritus**
University of Chicago
2005 – 2007 · 2 yrs
University of Chicago

Assistant to Professor Donald N. Levine PhD

 **Why I've Spent a Fifth of My Life in Prison in...**

 **Donald N. Levine PhD**

**Show 5 more experiences** ⌄

## Education

 **Southwestern University School of Law**
Doctor of Law (JD), Law
2009 – 2011
Activities and Societies: Trial Advocacy Honors Program;
Student Mediation Association Founder

Exhibit DD

# RUSSELL LAW PC

1500 Rosecrans Ave., Suite 500
Manhattan Beach, CA 90266
https://www.RussellLawPC.com

**L. David Russell**
David@RussellLawPC.com

December 17, 2021

**VIA EMAIL**

Vikram Amritraj
Lowe & Associates
8383 Wilshire Blvd, Suite 1038
Beverly Hills, CA 90211
vikram@lowelaw.com

Re:    Disqualification of Lowe & Associates in the (1) Fallout, LLC et al. vs. 828
Media Capital, LLC et al. (JAMS Ref. # 1210037658) and (2) 828 Media
Capital, LLC et al. v. David Raymond Brown et al. (JAMS Ref No.
1210038085) Matters

Dear Vikram:

We just learned that Kris S. LeFan is associated with Lowe & Associates and is listed on the firm's website as "Of Counsel" to the firm. Mr. LeFan's association with the Lowe firm has created conflicts of interest with his current clients, which include Mr. Brown and other parties the Lowe firm is pursuing claims against. As explained below, these conflicts of interest disqualify Lowe & Associates from serving as counsel in the two JAMS matters listed above.

\*       \*       \*

On November 13, 2019, Mr. Brown—in his personal capacity—entered into a retainer agreement with Mr. LeFan to provide legal services. Since then, Mr. LeFan has continuously represented Mr. Brown and several of the companies Mr. Brown is associated with in various matters. This includes disputes involving the companies and subject matter involved in this litigation. For example:

- Starting in late 2019, Mr. LeFan represented Clear Horizon Entertainment LLC (a respondent in the No. 1210038085 Arbitration) in a JAMS arbitration regarding Lock the Door, LLC's (another respondent in the No. 1210038085 Arbitration) ownership of the rights to make the Lock the Door film.

- In February 2021 (when the No. 1210037658 Arbitration had been underway for nearly half a year), Mr. LeFan represented Mr. Brown with respect to a dispute involving the financiers of Clear Distribution LLC (which is a respondent in both JAMS arbitrations)

Vikram Amritraj
December 17, 2021
Page 2

involving issues regarding its financing and the appointment of a receiver that your
clients have injected into the arbitration proceeding. *See* 05/18/2021 for Preliminary
Injunction at 1, 11, 16.

Mr. LeFan's representation of Mr. Brown is ongoing. Indeed, just last week, Mr. LeFan
represented Mr. Brown individually in a negotiation with a lender. Mr. LeFan obtained
confidential information relating to all these matters.

As you are surely aware, under California's conflict of interest rules, when Mr. LeFan
individually is forbidden from representing a client, that prohibition extends to the Lowe firm as
well. Cal. RPC 1.10(a). Indeed, as the Supreme Court has held, for purposes of conflicts of
interest and disqualification, an "of counsel" attorney and the principal firm must be considered
"a single, de facto firm" so that if one of them is precluded from a representation because of a
conflict of interest, the other is presumptively precluded from the representation as well. *People
ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1154 (1999).

Here, the Lowe firm's representation of 828 Media Capital and the other parties in the
two arbitrations are clearly "directly adverse" to Mr. LeFan's current clients, including Mr.
Brown, Lock the Door LLC, and Clear Distribution LLC. As explained above, these conflicts
are imputed to the Lowe firm. Thus, the Lowe Firm's representation—without Mr. Brown's or
the other Respondents' and Counter-Respondents' informed written consent—violates Rule of
Professional Conduct 1.7. *See, e.g.,* Cal. Prac. Guide Prof. Resp. Ch. 4-G ("Automatic or 'per
se' disqualification for simultaneous representation of current clients with adverse interests (and
no informed written consent) is the rule "in all but a few instances."); Cal. RPC 1.7 Cmt. 1 ("The
duty of undivided loyalty to a current client prohibits undertaking representation directly adverse
to that client without that client's informed written consent. Thus, absent consent, a lawyer may
not act as an advocate in one matter against a person the lawyer represents in some other matter,
even when the matters are wholly unrelated.").

Additionally, to the extent that Clear Horizon Entertainment LLC or Clear Distribution
LLC can be considered former clients, the Lowe firm's involvement prosecuting claims against
those entities violates Rule of Professional Conduct 1.9(a) because—as explained above—the
matters Mr. LeFan handled are substantially related to the matters being litigated in the
arbitrations.

Please confirm that Lowe & Associates will recuse itself from the two JAMS arbitrations
by December 24, 2021. If the firm refuses to do so, my clients reserve all rights, and will
promptly file motions with the arbitrators to disqualify Lowe & Associates from serving as
counsel.

Sincerely,

L. David Russell

1500 Rosecrans Ave., Suite 500 Manhattan Beach, CA 90266

# Exhibit EE

| Case # | State | Defendants | Plaintiffs | State | Court |
|---|---|---|---|---|---|
| 23STCV19501 | California | Gunar Overbeck | 828 Media Capital LLC | California | Stanley Mosk |
| 24STCP00122 | California | RedBox Entertainment LLC / Screen Media Ventures LLC | 828 Media Capital LLC | California | Los Angeles County |
| 24STCV07568 | California | K. Asher Levin | 828 Media Capital LLC | California | Los Angeles County |
| 23STCV30711 | California | Ellen Wander / Motus Studios Internatonal Srl / Film Bridge International Inc / AC Film Holdings LLC | 828 Media Capital LLC | California | Stanley Mosk |
| 21STCV25399 | California | Shaun Sanghani / SSS Entertainment LLC / SSS Film Capital LLC | 828 Media Capital LLC / 828 Productions LLC / Todd Lundbohm | California | Stanley Mosk |
| 24STCV06105 | California | Shark Bite Productions LLC / Ellen Wander / Film Bridge International Inc | 828 Media Capital LLC | California | Los Angeles County |
| 21STCV42780 | California | Blood Pageant LLC / Robert Burton / Chris Gilmore / Anthony J Sands / Todd W Stevenson / Stevenson Law Office | 828 Media Capital LLC | California | Stanley Mosk |
| 20STCV38935 | California | David Brown / Clear Distribution LLC / Clear Entertainment Inc / Fallout LLC | 828 Media Capital LLC | California | Stanley Mosk |
| 22STCV27225 | California | 8th Wonder Pictures LLC / David Brown / Clear Distribution LLC / Lock the Door LLC | 828 Media Capital LLC / 828 Productions LLC / Todd Lundbohm | California | Stanley Mosk |
| 37-2023-00043911-CU-BC-CTL | California | Scott Lampe / Steven J Hilton / Big Bay Yachts Inc | Todd Lundbohm | California | San Diego County |

Exhibit FF



**The State Bar**
**of California**

**OFFICE OF CHIEF TRIAL COUNSEL**

845 S. Figueroa Street, Los Angeles, CA 90017

July 07, 2025

David Brown

████████████████

RE:      Case Number:      25-O-21434 Kris Le Fan

Dear David Brown:

We have received your complaint against one or more California attorney(s). We have assigned the number shown above to this matter; please reference this number in your communications with us.

Your complaint will first be reviewed by an attorney in the Intake Unit. If we need further information, we will contact you. We will also advise you of any determination in this matter. If you want to know the status of your complaint, you may contact us by calling the State Bar's toll-free complaint line at 800-843-9053.

Thank you for your patience.

Sincerely,

OFFICE OF CHIEF TRIAL COUNSEL/INTAKE

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017



**The State Bar**
*of California*

**OFFICE OF CHIEF TRIAL COUNSEL**

845 S. Figueroa Street, Los Angeles, CA 90017

July 07, 2025

David Brown

████████████████████

RE:    Case Number:    25-O-21436 Steven Todd Lowe

Dear David Brown:

We have received your complaint against one or more California attorney(s).  We have assigned the number shown above to this matter; please reference this number in your communications with us.

Your complaint will first be reviewed by an attorney in the Intake Unit.  If we need further information, we will contact you.  We will also advise you of any determination in this matter.  If you want to know the status of your complaint, you may contact us by calling the State Bar's toll-free complaint line at 800-843-9053.

Thank you for your patience.

Sincerely,

OFFICE OF CHIEF TRIAL COUNSEL/INTAKE

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017



**The State Bar**
***of California***

**OFFICE OF CHIEF TRIAL COUNSEL**

845 S. Figueroa Street, Los Angeles, CA 90017

July 07, 2025

David Brown

██████████████████

RE:    Case Number:    25-O-21435 Vikram Amritraj

Dear David Brown:

We have received your complaint against one or more California attorney(s). We have assigned the number shown above to this matter; please reference this number in your communications with us.

Your complaint will first be reviewed by an attorney in the Intake Unit. If we need further information, we will contact you. We will also advise you of any determination in this matter. If you want to know the status of your complaint, you may contact us by calling the State Bar's toll-free complaint line at 800-843-9053.

Thank you for your patience.

Sincerely,


OFFICE OF CHIEF TRIAL COUNSEL/INTAKE

## **Bar Complaint**

**Attorney:**
Kris Lefan
Bar # 278611

**Complainant:**
David Brown



### **Summary of Complaint**

I am submitting this complaint against attorney Kris LeFan for serious violations of the California Rules of Professional Conduct, including conflict of interest, breach of loyalty, and retaliatory withdrawal.

Mr. LeFan previously represented me in connection with film financing and production matters related to several film projects, including *The Fallout*, *Chasing Nightmares*, and *The Undertaker's Wife*. During this time, he also provided advice concerning legal threats and negotiations involving 828 Media Capital LLC and Todd Lundbohm. His representation included confidential strategy discussions and document review on matters directly adverse to these parties.

Unbeknownst to me at the time, Mr. LeFan was also Of Counsel to Lowe & Associates, P.C., the firm representing 828 Media Capital LLC and Mr. Lundbohm — the very parties adverse to me. This conflict was not disclosed to me during our representation. In December 2021, my counsel notified Lowe & Associates of the clear and disqualifying conflict, citing Kris LeFan's prior representation of me and access to confidential information.

Shortly after that notice, Mr. LeFan called me directly and admitted that Steven Lowe, Managing Partner of the firm, was "pissed" about the disqualification request. Within days, Mr. LeFan terminated his representation of me without proper notice or substitution of counsel. His withdrawal followed his firm's refusal to recuse itself and appeared designed to protect his own standing with Lowe & Associates, rather than to fulfill his duties to me as a client.

Mr. LeFan never obtained informed written consent to represent me while also working in affiliation with a firm that was actively adverse to me on matters he previously advised me on. This violates Rule 1.9 (Duties to Former Clients) and Rule 1.10 (Imputed Conflicts) of the California Rules of Professional Conduct.

Additionally, his abrupt termination following my conflict notice to his affiliated firm appears retaliatory and in bad faith, further violating his duty of loyalty under Rule 1.7.

**<u>Requested Action</u>**

I respectfully request that the State Bar investigate Mr. LeFan's conduct. His failure to disclose a clear conflict of interest, combined with his retaliatory withdrawal, caused me harm during active litigation and undermined the integrity of my legal representation.

I am prepared to provide all supporting documentation, including:

- My retainer history with Mr. LeFan
- Conflict notice letters sent to Lowe & Associates in December 2021
- The disqualification motion filed in January 2022
- My sworn declaration outlining the breach
- Mr. LeFan's statements to me after being confronted with the conflict

Thank you for your time and attention to this matter.

David Brown



# Bar Complaint

**Attorney:**
Steven Lowe
Bar #122208

**Complainant:**
David Brown



## Summary of Complaint

I am filing this complaint against Steven Lowe, managing attorney at Lowe & Associates, P.C., for knowingly violating professional conflict of interest rules, refusing to withdraw from conflicted representation, and participating in unethical litigation tactics designed to harm a former client.

Between 2019 and 2021, I was represented by attorney Kris LeFan, who at the time was Of Counsel to Mr. Lowe's firm. Mr. LeFan advised me on multiple legal matters directly related to 828 Media Capital LLC and its principal, Todd Lundbohm — including financing negotiations and project-related disputes on *The Fallout*, *Chasing Nightmares*, and *The Undertaker's Wife*.

In late 2021, I became aware that Mr. Lowe and his firm were now representing 828 Media Capital in active litigation and arbitration directly adverse to me, in matters involving the same projects on which Mr. LeFan had previously advised me.

On December 17, 2021, my attorney sent a formal conflict notice and request for disqualification to Lowe & Associates, citing prior attorney-client privilege and confidential information shared. Rather than withdraw, Mr. Lowe personally directed the firm to oppose disqualification, despite clear notice of the conflict.

Mr. Lowe then oversaw filings authored by his associate Vikram Amritraj defending their ongoing representation, despite the firm's prior access to confidential material and the fact that I was never asked to sign a conflict waiver or informed consent.

To be clear:
- Mr. Lowe was aware that my former counsel was part of his firm.
- Mr. Lowe knowingly refused to withdraw when faced with a conflict.
- Mr. Lowe enabled and directed further litigation against me, a former client.

This violates the California Rules of Professional Conduct, including:
- Rule 1.9(a): Conflict with former client in substantially related matter
- Rule 1.10(a): Imputed conflicts apply firm-wide
- Rule 5.1(a) & (b): Failure to supervise firm attorneys' compliance with ethical rules

- Rule 8.4(a): Knowingly assisting violations of ethical duties

As a result, I was subjected to litigating against my former attorney's firm, a firm that had helped draft contracts, reviewed budgets, and advised me regarding disputes with 828 Media. This caused serious harm, including loss of counsel, disruption of strategy, reputational damage, and legal expense in opposing their improper representation.

**<u>Requested Action</u>**

I request that the State Bar investigate Mr. Lowe for violating conflict-of-interest rules and using his position as a managing partner to shield his firm from disqualification, despite clear ethical breaches.

Supporting documents available upon request include:
- Conflict notice letters (Dec 17, 2021)
- The Disqualification Motion (January 2022)
- Declarations of David Brown and former counsel (submitted with motion)
- Lowe & Associates' opposition filings
- Evidence of prior representation and confidential disclosures to Mr. LeFan

Thank you for your time and attention to this matter.

David Brown



<u>**Bar Complaint**</u>

**Attorney:**
Vikram Amritaj
Bar # 321584

<b>Complainant:</b><br>David Brown



<u>**Summary of Complaint**</u>

I am filing this complaint against Vikram Amritraj, an attorney at Lowe & Associates, P.C., for
violating conflict of interest rules, participating in active litigation against a former client of the
firm, and engaging in bad-faith and retaliatory legal tactics after being formally notified of an
ethical conflict.

Starting in 2019, I was previously represented by Kris LeFan, who was Of Counsel to Lowe &
Associates during the time he advised me on multiple film-related matters, including disputes
involving 828 Media Capital LLC and its principal Todd Lundbohm. These matters included the
films *The Fallout*, *Chasing Nightmares*, and *The Undertaker's Wife*.

In December 2021, my legal counsel served a formal conflict notice and disqualification demand
on Lowe & Associates. The firm had begun representing 828 Media Capital in proceedings
directly adverse to me — despite having previously advised me on those same projects through
Mr. LeFan.

Instead of withdrawing, Mr. Amritraj personally signed and filed an opposition to the motion to
disqualify, actively arguing that the conflict was irrelevant and that disqualification was
unnecessary. He did this despite:

- The firm's prior access to confidential information;
- No informed written waiver ever being signed by me;
- California Rule of Professional Conduct 1.9 clearly applying.

Worse, Mr. Amritraj attempted to deflect attention from his own ethical breach by falsely
alleging a conflict on the part of my attorney, David Russell — without factual or legal basis.
This was plainly retaliatory and had no relevance to the actual disqualification issue at hand. His
filing amounted to the legal equivalent of "I know you are, but what am I," and reflects a pattern
of unprofessional conduct and bad faith.

Mr. Amritraj's continued participation in litigation adverse to a former client of his firm —
despite being formally notified and provided declarations proving the conflict — violates:

- Rule 1.9(a) (conflict with former client in related matter),
- Rule 1.10(a) (imputed firm-wide disqualification),
- Rule 3.3 (duty of candor to tribunal),
- Rule 8.4(a), (c) (misconduct and assisting unethical conduct).

As a result of Mr. Amritraj's actions, I was forced to litigate against a conflicted firm, defend
against improper filings, and endure significant strategic and reputational harm. His conduct was
not only unethical, it was combative and retaliatory in nature, intended to punish me for asserting
my rights.

**Requested Action**

I respectfully request the State Bar investigate Mr. Amritraj for personally participating in a
conflict of interest violation and for engaging in abusive litigation tactics in defense of an
undisputed ethical breach.

Supporting materials include:
- Conflict notice (December 17, 2021)
- My sworn declaration and that of my attorney David Russell
- The January 2022 Motion to Disqualify
- Opposition filings signed by Mr. Amritraj
- Evidence of prior representation and confidential disclosures to Lowe & Associates via
  Kris LeFan

Thank you for your attention to this matter.

David Brown



Exhibit GG







**New Feature:** We have added the ability to view prerequisite information based on the applicable professions and license types. Examples of types of prerequisites are a Broker of Record, Supervisor, Professional In Charge, Pharmacist In Charge, etc. Click on the license number, then click the VIEW AFFILIATIONS button.

Facility Name

828 Media Capital LLC

Doing Business As

City

State

---Select---

Profession

--None--

Type

--None--

License/Application/Approval Number

SEARCH

Current EST Time is **Jul 07, 2025 13:34 EST**

| Facility Name | Profession | License/Approval Number | Type | Application Type | Status | Discipline | Street Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Your search return 0 records | | | | | | | | | | |

Last Name

Lunbohmn

First Name

Todd

City

State

---Select---

Profession

--None--

Type

--None--

License/Application/Approval Number

SEARCH

Current EST Time is **Jul 07, 2025 13:34 EST**

| Name ▲ | Profession | License/Approval Number | Type | Application Type | Status | Discipline | Street Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Your search return 0 records | | | | | | | | | | |